## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ROY L. PEARSON, JR.**                                          :
3012 Pineview Court, N.E.                                        :
Washington, D.C. 20018                                          :
(202) 269-1191                                                  :
                                                                :
                              Plaintiff,                        :
                                                                :
              v.                                                :      Civil Action No. _____
                                                                :
**DISTRICT OF COLUMBIA**                                        :
  **Serve:**    Office of the Attorney General           :
              One Judiciary Square                      :
              441-4th Street, N.W.                      :
              Suite 600 South                          :
              Washington, D.C. 20001                   :
                                                                :
     and                                                     :
                                                                :
**TYRONE T. BUTLER**                                            :
D.C. Office of Administrative Hearings                          :
825 N. Capitol Street, N.E.                                     :
Suite 4150                                                      :
Washington, D.C. 20002                                          :
                                                                :
     and                                                     :
                                                                :
**PETER M. WILLNER**                                            :
Council For Court Excellence                                    :
1111 14th Street, N.W.                                          :
Suite 510                                                       :
Washington, D.C. 20036                                          :
                                                                :
     and                                                     :
                                                                :
**ROBERT R. RIGSBY**                                            :
500 Indiana Avenue, N.W.                                        :
Chambers 1620                                                   :
Washington, D.C. 20001                                          :
                                                                :
     and                                                     :
                                                                :
**ANITA JOSEY-HERRING**                                         :
500 Indiana Avenue, N.W.                                        :
Chambers 2640                                                   :
Washington, D.C. 20001                                          :
                                                                :
     and                                                     :

**GEORGE C. VALENTINE**                    :
441 4th Street, N.W.                       :
Suite 600 South                            :
Washington, D.C.  20001                    :
                                           :
                        Defendants.        :
_____   :

## COMPLAINT FOR EQUITABLE AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL

**Introduction**

1.      This is a Civil Action for damages, injunctive and declaratory relief, and other appropriate legal and equitable relief, brought by plaintiff Roy L. Pearson, Jr. ("plaintiff"), a former Administrative Law Judge ("ALJ") with the District of Columbia Office of Administrative Hearings ("OAH") until his unlawful demotion and subsequent termination.

2.      Plaintiff brings this action against the District of Columbia ("D.C."), OAH Chief Judge Tyrone T. Butler ("CJ Butler"), Commissioner Peter M. Willner ("Willner"), Commissioner Robert R. Rigsby ("Rigsby"), Commissioner Anita Josey-Herring ("Josey-Herring") and Commissioner George C. Valentine ("Valentine").   The named commissioners, and CJ Butler, are members of the Commission on the Selection and Tenure of Administrative Law Judges ("Commission").   The Commission is responsible, under the Office of Hearings Establishment Act of 2001 (OAH Act), D.C. Code § 2-1831.01 et. seq. and 6 DCMR 3700 et. seq., for deciding whether to reappoint ALJs at the OAH, and it is required to do so by, among other things, giving "significant weight" to CJ Butler's recommendation.

3.      The Commission, and CJ Butler, are prohibited from considering - as a negative factor in CJ Butler's reappointment recommendation, or the Commission's decision on whether to reappoint - an ALJ's expressions of opinion about any public issue, particularly those relating to his duties; an ALJ's criticisms of management at OAH; an ALJ's criticism of the alleged abuse by OAH supervisors of their positions, or an ALJ's criticism of an OAH supervisor's alleged failure to comply with ethical rules.  An ALJ's statements in these regards are absolutely privileged, however they are phrased, if they are statements of opinion about a public issue or the ALJ reasonably believes his factual statement evidences gross mismanagement, abuse of authority in connection with the administration of a public program, or the violation of a law or regulation.   Indeed, under the D.C. Whistleblower Act an ALJ is *required* to disclose these matters.

4.      From the outset of his initial appointment plaintiff was repeatedly required, as a

matter of law, to express opinions and make factual statements about the lack of ethics and the gross mismanagement he discovered at the two year old OAH, including the ways in which the decisional independence of ALJs  was sharply restricted.  In response, plaintiff was targeted by supervisors and CJ Butler for verbal assaults, involuntary reassignment, threatened with termination, demoted and finally terminated by the Commission.

5.      These retaliatory events occurred despite plaintiff's outstanding judicial record; indeed because of it.  Both the Commission's notice of possible denial of reappointment, and its decision to not reappoint plaintiff, squarely rest on plaintiff's exercise of his statutory and ethical obligation to express his opinion and to disclose unlawful or unethical conditions and actions at OAH.

6.      Additionally, the members of the Commission failed to observe the mandatory statutory and regulatory requirements and deadlines for determining whether to reappoint plaintiff, and allowed CJ Butler to similarly disregard mandatory statutory and regulatory requirements and deadlines.

7.      The single non-retaliatory "concern" mentioned in the Commission's written decision not to reappoint plaintiff is conclusively rebutted by digital recordings of plaintiff's hearings and by the results of the Commission's own investigation into the conduct of plaintiff's hearings.

8.      The defendants were emboldened to ratify CJ Butler's pattern and practice of retaliating against plaintiff, and to extend it into the reappointment process, by the coincidence that plaintiff was being vilified in the media for exercising his constitutional right to file and prosecute a consumer lawsuit.

9.      Confident that this media storm would provide cover for a retaliatory demotion and refusal to reappoint, the defendants made little effort to mask their retaliatory motive.

10.     The fact that the individual defendants are either lawyers and/or judges, or in one case  a  member  of  a  organization  ostensibly  dedicated  to  the  improvement  of  judicial

administration, makes their conduct especially painful for a lawyer-plaintiff, incredibly chilling for OAH ALJs, and an appropriate subject for judicial condemnation and an award of punitive damages.

## JURISDICTION AND VENUE

11.     This court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1331 because there is a federal question that arises under the First Amendment to the Constitution, the Fifth Amendment to the Constitution, and the laws of the United States, specifically 42 U.S.C. § 1983.

12.     Venue in this district is appropriate pursuant to 28 U.S.C. § 1391, because Defendants' unlawful actions were taken within the District of Columbia in this judicial district.

13.     Pursuant to D.C. Code §§ 1-615.54(a) and 12-309, plaintiff provided Notice to the Mayor of his claims on October 29, 2007 and on April 24, 2008.

## PARTIES

14.     Plaintiff is a resident of the District of Columbia and was employed by the OAH as an ALJ from May 2, 2005 until May 2, 2007, and as an Attorney-Advisor from May 3, 2007 until November 10, 2007.

15.     Defendant D.C., although designated pursuant to Article I, Section 8 of the constitution as the capital of the United States, is a municipal corporation which governs D.C. pursuant to The District of Columbia Self-Government and Governmental Reorganization Act, P.L. No. 93-108, 87 Stat. 774, D.C. Code § 1-211.  OAH, plaintiff's former employer, is an independent agency of D.C. Its functions, under the Office of Administrative Hearings Act of 2001, include adjudicating contested cases brought pursuant to the D.C. Administrative Procedures Act and other substantive statutes and regulations.

16.     Tyrone T. Butler ("CJ Butler") was appointed and confirmed as the Chief Administrative Law Judge for the D.C. Office of Administrative Hearings effective in mid-2003. His term expires in mid-2009.  CJ Butler is sued here in his official and his individual capacities.

17.     The Commission on the Selection and Tenure of Administrative Law Judges ("Commission") is comprised of five persons, three of whom are voting members.  CJ Butler, as OAH's Chief Judge, is a non-voting member.  The District of Columbia's attorney general, or his or her designee, is also a non-voting member.  At all times relevant to this complaint the attorney general's designee was George C. Valentine, who acted as counsel to the Commission. The three voting members of the Commission are appointed by the Chief Judge of the Superior Court of the District of Columbia, the Chairman of the D.C. Council and the Mayor of the District of Columbia.  At all times relevant to this complaint Robert R. Rigsby ("Rigsby") was the Chief Judge's appointee to the Commission and Peter M. Willner ("Willner") was the D.C. Council Chairman's appointee to the Commission.  Henry W. Lavine was the Mayor's appointee until April 30, 2007. On June 27, 2007 his vacant position was filled by the Mayor's appointment of Anita Josey-Herring ("Josey-Herring").  Defendants Valentine, Rigsby, Willner and Josey-Herring are sued here in their official and their individual capacities.

## FACTUAL ALLEGATIONS

A.     **History and Scope of the D.C. Whistleblower Act**

18.     In 1979, as one of its first steps after obtaining legislative authority from the United States Congress, the District of Columbia Council adopted the District of Columbia Comprehensive Merit Personnel Act ("Personnel Act").  The Act included a title, known as "Whistleblower Protection", that sought to protect employees of the District Government from reprisal when they report waste, fraud or abuse in the workplace, or when they refuse a supervisors' instruction to violate state or federal laws.

19.     However, in the eight years that followed its enactment "few District government employees c[a]me forward as whistleblowers." Report of the Committee on Government Operations, Council of the District of Columbia, on Bill 12-191, April 28, 1998, at 3. As a consequence, on April 1, 1997, a member of the D.C. Council introduced the substantially stronger and far more comprehensive D.C. Whistleblower Reinforcement Act of 1997 ("Whistleblower Reinforcement Act").

20.     The Whistleblower Reinforcement Act was referred to the Council's Committee on Government Operations for consideration.  After conducting extensive hearings and research the Committee concluded that the far more comprehensive rights, obligations and protections in the proposed Act were necessary. The resulting legislation was called the District of Columbia Whistleblower Amendment Act of 1998 ("Whistleblower Act").   That legislation was unanimously adopted by the D.C. Council and took effect on October 7, 1998.

21.     The Whistleblower Act begins with a statement of what "the Council declares as its policy . . ."  The listed policy objectives include; (a) enhancing the right of District employees to challenge the actions and failures of their agencies and to ***express their views*** without fear of retaliation through appropriate channels within the agency and complete and frank responses to Council inquiries;. (b) ensuring that rights of employees to expose ***dishonesty, incompetence, or administrative failure*** are protected; (c) guaranteeing the rights of employees to contact and

communicate with the Council; (d) protecting employees from reprisal or retaliation for the performance of their duties and (e) motivating employees to do their duties *justly* and efficiently.

22.     In furtherance of these policy objectives the Whistleblower Act lists specific rights, as well as obligations, of District of Columbia Government employees.

23.     The rights include: (a) the right to freely express their opinions on all public issues, including those related to the duties they are assigned to perform . . ." and (b) the right to assemble in public places for the free discussion of matters of interest to themselves and to the public and the right to notify, on their own time, fellow employees of these meetings.

24.     The Whistleblower Act also includes obligations that District employees have, including the requirement that "each employee of the District government **shall** make all protected disclosures concerning any violation of law, rule, or regulation or other disclosures enumerated in D.C. Code § 1-615.52(a)(6)."

25.     D.C. Code § 1-615.52(a)(6), which lists the disclosures a D.C. government employee is obligated to make, defines a "protected disclosure" as "any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee *reasonably believes* evidences: (A) Gross mismanagement . . . (C) Abuse of authority in connection with the administration of a public program; [or] (D) A violation of a federal, state, or local law, rule or regulation . . ."

26.     To safeguard the discharge of those obligations, the central prohibition contained in the Whistleblower Act is stated very simply:  "A supervisor shall not threaten to take or take a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order."  D.C. Code § 1-615.53.

27.     In a civil action brought pursuant to the Whistleblower Act, when a plaintiff demonstrates by a preponderance of the evidence that an activity proscribed by § 1-615.53 was a contributing factor in an alleged prohibited personnel action against the plaintiff, the burden of

proof shifts to the employing District agency to prove by clear and convincing evidence that the alleged action would have occurred for legitimate *independent* reasons even if the employee had not engaged in the activities protected by § 1-615.53.

28.    An "independent reason" for taking adverse action obviously cannot be shown if the reason for the adverse action relates in any way to an employee's conduct in exercising his rights under the Whistleblower Act.

29.    Moreover, the Whistleblower Act makes clear that "[n]otwithstanding any other provision of law, a violation of   § 1-615.53 constitutes a *complete* affirmative defense for a whistleblower to a prohibited personnel action in a . .. challenge, or adjudication of that action." D.C. Code § 1-615.54(c).  Thus, the Whistleblower Act takes precedence over any other District of Columbia law, regulation or rule – including ethical rules.

**B.    The D.C. Office of Administrative Hearings**

30.    The right, and indeed the obligation, of each D.C. Government employee to express opinions about public issues and to make critical factual statements about administrative ineptitude and dishonesty that the employee discovers, applies with special force to ALJs in the D.C. Office of Administrative Hearings ("OAH"), who have that and related obligations under ethical rules that apply only to them.

31.    The OAG came into existence with the unanimous adoption, effective March 6, 2002, of the Office of Hearings Establishment Act of 2001 ("OAH Act").

32.    The purpose of the OAH Act was to professionalize the adjudication of administrative cases in the District of Columbia.  It sought to accomplish that goal by, over time, consolidating into one agency responsibility for the adjudication of most District of Columbia administrative cases.  The key way the legislation hoped to professionalize the adjudication of cases was by attracting, selecting, training and retaining a professional cadre of experienced attorneys to act as administrative law judges ("ALJs") and to require those judges to act independently in deciding cases.

33. The OAH Act sought to assure the quality of an OAH ALJs' decisions by:

a) explicitly requiring that a Commission on the Selection And Retention of Administrative Law Judge "competitive*y* recruit and retain highly qualified, effective, and efficient Administrative Law Judges from the public and private sectors,"  D.C. Official Code § 2-1831.11(c);

b) encouraging the Chief ALJ of the OAH to make case assignments based on "expertise, case complexity, and other appropriate criteria," D.C. Official Code § 2-1831.05(a) (3);

c) requiring the Chief ALJ to establish "standard and special training programs for Administrative Law Judges," D.C. Official Code § 2-1831.051(4);

d) requiring that the Chief ALJ provide "continuing education programs for Administrative Law Judges . . .," D.C. Official Code § 2-1831.051(4); and

e) permitting ALJs to "supervise, direct and evaluate the work of employees assigned to him or her," D.C. Official Code § 2-1831.09(a) (6).

34. The OAH Act sought to assure the independence of ALJs by:

a) requiring the adoption, and *implementation*, of  a code of judicial ethics, D.C. Official Code § 2-1831.05(a)(9);

b) barring the Chief ALJ from implementing any program for quality assurance that "shall require that an outcome in any case be altered," D.C. Official Code § 2-1831.05(b) (12);

c) giving ALJs responsibility for their case load from the time a case is filed until the case is disposed of, D.C. Official Code § 2-1831.05(a) (12);

d) making ALJs exclusively ". . . accountable and responsible for the fair, impartial, effective and efficient disposition of cases . . .," D.C. Official Code § 2-1831.09(a);

e) requiring that "[a]ll components of the District of Columbia . . . cooperate with the . . . Administrative Law Judges in the discharge of their duties," D.C. Official Code § 2-1831.13(a);

f) authorizing ALJs to "[f]ully participate in office management committees and management activities to set and steer policies relating to Office operations . . .," D.C. Official Code § 2-1831.09(a)(5);

g) placing the exclusive power to appoint, select and discipline ALJs in a Commission, and not the Chief ALJ, D.C. Official Code § 2-1831.06; and

h) granting ALJs the same immunity from suit, liability, discovery and subpoena in a civil action relating to actions taken in the performance of their duties, as judges of the D.C. Superior Court, D.C. Official Code § 2-1831.09(g); and

i) prohibiting the Chief Judge from promoting one Administrative Law Judge to a position over another Administrative Law Judge. D.C. Code § 2-1831.05(a)(5). .

35.     Finally, the OAH Act sought to assure the integrity of OAH ALJs by:

a) requiring that ALJs engage in *no* conduct inconsistent with the duties, responsibilities, and *ethical* obligations of an Administrative Law Judge . . .," D.C. Official Code § 2-1831.09(a)(3;.

b) requiring that ALJs "[c]onform to all legally applicable standards of conduct . . .," D.C. Official Code § 2-1831.09(a)(7);

c) requiring that ALJs "decide all cases in an impartial manner," D.C. Official Code § 2-1831.09(a)(8);

d) prohibiting an ALJ from engaging in the practice of law, D.C. Official Code § 2-1831.09(a)(7), except when representing him or her self; and

e) requiring that ALJs take an oath of office prior to the commencement of

   duties, D.C. Official Code § 2-1831.09(a)(11).

36. In the above ways the D.C. Council hoped to remove the perception that had developed, up to that point, that District of Columbia administrative law judges "lack[ed] *independence* and . . . ha[d] a bias in favor of th[e] agency" for whom they heard cases. Finding No. 3, Office of Administrative Hearings Establishment Act of 2001.

37. The Council also hoped to "*expedite* the fair and just conclusion of contested cases." Finding No. 4, Office of Administrative Hearings Establishment Act of 2001.

38. As mandated by the OAH Act, in August 2004 the Chief Judge of OAH adopted the *OAH Administrative Law Judges Code of Ethics* ("OAH Code of Ethics").  The OAH Code of Ethics is binding on CJ Butler, to the same extent it is on every other ALJ at OAH.

39. The OAH Code of Ethics, in its opening paragraph, requires that "An Administrative Law Judge shall participate in establishing, maintaining and enforcing high standards of conduct and shall personally observe those standards of conduct . . ." Chpt. I(B).  To that end, it requires that all of its provisions be construed and applied to further the "integrity and independence of this administrative court."

40. Indeed, the OAH Code of Ethics goes so far as to *require* that administrative law judges "take appropriate action or initiate appropriate disciplinary measures against an[other] Administrative Law Judge . . . for unprofessional conduct of which he may become aware." Chp. III(M), Code of Ethics.

## C.  Plaintiff's Selection From Dozens Of Applicants Nationwide

41. Presumably to realize these statutory goals of independence, integrity and scrupulous ethics, in September of 2004 the D.C. Office of Administrative Hearings solicited applicants to fill new positions as administrative law judges.  The nation-wide advertisement stated in relevant part:

The Office of Administrative Hearings ("OAH"), a newly **independent tribunal** of the District of Columbia, seeks applications from qualified attorneys interested in becoming an Administrative Law Judge ("ALJ"). . . .

\*          \*          \*          \*

. . .ALJs will hold hearings, decide motions, write orders and opinions, and manage a litigation docket. . . .ALJs report to the Chief Administrative Law Judge or his designee on administrative matters, **but decide cases independently under applicable law**. . . .

Requirements include: 1) A minimum of 5 years' practice experience, including litigation; 2) a record of strong legal and organizational skills; 3) judicial temperament; 4) the ability to write and speak clearly and concisely; 5) a strong interest in public service and in working as part of a team in a start-up organization; and 6) D.C. Bar membership or eligibility for admission without examination.  Finalists will be required to undergo a background check and take an analytical writing exam. . . .

42.     By September of 2004 plaintiff had enjoyed an almost 30-year career of public service as a law school clinical instructor and administrator, legal services attorney, legal services administrator, hearing examiner and *pro bono* (without fee) community volunteer.

43.     As a Georgetown University Law School clinical instructor, and Assistant Director of the D.C. Project clinic, plaintiff supervised Georgetown University School of Law students who assisted the D.C. Council and District of Columbia administrative agencies in drafting legislation and enacting laws.

44.     As a legal services attorney for twelve years, and Assistant Director of the city-wide D.C. Neighborhood Legal Services Program for thirteen years, plaintiff directly provided or supervised the delivery of a wide range of civil and administrative legal services to indigent District of Columbia residents in federal and D.C. courts and federal and D.C. administrative agencies.  After leaving NLSP in 2002 plaintiff contracted with NLSP for eight months as Special Counsel.

45.     Thereafter, as a hearing examiner with the D.C. Office of Police Complaints, plaintiff for a number of years served on a select panel of veteran attorneys who heard and adjudicated administrative claims of police misconduct in the District of Columbia.

46.     Throughout his legal career plaintiff also volunteered his services, and served on the boards, of legal and community organizations such as the Columbia Heights Youth Club, the Washington Council of Lawyers, the National Conference of Black Lawyers and the Ft. Lincoln Civic Association, Inc.

47.     In response to OAH's nation-wide advertisement in September 2004, plaintiff initially submitted a rèsumè and a letter explaining his interest, as part of the first stage of the application process.

48.     In December of 2004, in the second stage of the application process, plaintiff completed and submitted responses to a 21 page questionnaire and application form to facilitate a thorough investigation into his background.  Plaintiff completely and honestly answered all questions on the questionnaire about his personal and professional history and swore to the veracity of his responses before a notary public.

49.     In February of 2005, in the third stage of the application process, plaintiff was one of approximately 37 attorneys from around the United States who were selected from the pool of initial applicants to sit for a three hour writing examination.

50.     In March of 2005 plaintiff was notified that he was one of only three attorneys, of the thirty-seven selected to take the examination from the nation-wide pool of applicants, who passed the rigorous writing examination.

51.     Because only three attorneys passed the ALJ Writing Examination, the Commission on the Selection and Tenure of Administrative Law Judges subsequently rescinded its regulations requiring that OAH ALJs pass a writing examination, so that it could interview and hire additional attorneys as ALJs in August of  2005.

52.     In the fourth, and final stage in the application process plaintiff was interviewed by the 5-person Commission on the Selection and Tenure of Administrative Law Judges ("Commission") on March 29, 2005.

53.     On April 4, 2005 plaintiff was offered a position as an Administrative Law Judge with the D.C. Office of Administrative Hearings ("OAH"), at a salary of $92,484, with a start date of April 18, 2005.  Shortly thereafter plaintiff was notified that his start date had been postponed to May 2, 2005.

54.     Plaintiff commenced work as an ALJ with OAH on May 2, 2005.

**D.     Discovery That "Court" Was Actually A Law Firm**

55.     Shortly after beginning work plaintiff discovered that CJ Butler was widely viewed, within and outside OAH, as grossly inept as an administrator.  CJ Butler, a former career police officer in New York, had never practiced law or lived in the District of Columbia before being selected as Chief Judge of the OAH in 2003.

56.     Despite his ignorance of District of Columbia law, and of the District of Columbia, and despite the newness of the agency he had been selected to start up, CJ Butler spent large amounts of time traveling around the United States in 2005 as the president-elect of the National Association of Administrative Law Judges.  He also sought to burnish his credentials by volunteering to serve on various boards outside the District of Columbia that required extensive travel as well.

57.     Because of his frequent absences and his ignorance of the city, people, laws and procedures he was called upon to administer, CJ Butler fashioned a hierarchial structure of ALJs to administer and adjudicate cases at OAH.  Those ALJs, one of whom was called a "Deputy ALJ," and the others "Principal ALJs", formed a law firm structure for OAH.  Like a law firm, the Principal ALJs acted as partners. And the Deputy ALJ acted as managing partner.

58.     As a consequence, ALJs at OAH were not treated or considered to be judicial peers, who were independent of each other. Instead, the culture, pattern and practice when plaintiff arrived at OAH was for ALJs to be treated as the equivilant of associates in a law firm.

59.     ALJs were supervised and evaluated by Principal ALJs. They were assigned work by Principal ALJs.  And they depended upon Principal ALJs for research and clerical assistance, and to determine whether, when and in what form their decisions would be released.

60.     If an ALJ disagreed with a Principal ALJ on the law, the ALJ was chastised and given special scrutiny and/or involuntarily reassigned and evaluated as "lacking judicial temperament" and as failing to be a "team player."

61.     At a March 7, 2005 Performance Oversight Hearing before the Judiciary Committee of the D.C. Council, agency after agency, attorney after attorney, and members of the public, uniformly criticized CJ Butler's management of OAH.

62.     Because of this uniform condemnation, and the chairman's own criticisms of CJ Butler, the chairman of the Judiciary Committee of the D.C. Council threatened to place substantial restrictions on OAH's ability to operate autonomously.

63.     In was in this context that plaintiff began his two year initial term at OAH. Plaintiff's subsequent personal experience with CJ Butler's administrative, budget, planning and other management skills confirmed the widely held view that the Chief Judge was grossly inept as an administrator, lawyer and Chief Judge.

64.     For example, plaintiff discovered that, despite the D.C. Council's intent to de-politicize administrative adjudication at OAH, under CJ Butler political considerations so dominated how decisions were made at OAH that the group of ALJs with whom plaintiff was assigned to hear Department of Public Works ("DPW") cases were told that if they did not agree in advance to rule in favor of DPW in hundreds of cases assigned to them, those cases would be reassigned to ALJs who would rule as instructed.

65.     By mandating favorable rulings for DPW, CJ Butler hoped to avoid the political backlash from DPW that he feared would result if those DPW cases were, instead, dismissed as the controlling law required.

66.     Plaintiff also discovered, as noted above, that CJ Butler had promoted some ALJs to positions – as Principal ALJs and Deputy CJ -- in which they supervised other ALJs, in violation of the OAH Act.

67.     The Principal ALJs administered a mandatory "peer review" system, in which the Principal ALJs determined whether, when and in what form a decision would be issued. Delays of up to two months, or more, resulted.  To ensure that their opinion on the legal issues in the cases of the ALJs they supervised would be reflected in the decisions of those ALJs, the Principal ALJs, and the Deputy CJ, were given evaluation authority over the ALJs whose decisions they reviewed.

68.      The OAH Ethics Code states that an ALJ shall *not* allow his relationship with any other person to influence his judicial conduct or judgment.  Chp. II(C), *Code of Ethics for OAH Administrative Law Judges* (Aug. 31, 2004). Plaintiff discovered that the hierarchial and multi-tiered OAH Peer Review System *required* that an ALJ to be influenced in his judgment of cases by his or her subordination to Principal ALJs.

69.     The OAH Ethics Code states that an ALJ may not be swayed by fear of criticism. Chp. III(B)(2), *Code of Ethics for OAH Administrative Law Judges* (Aug. 31, 2004).  Plaintiff discovered that the OAH Peer Review System necessarily required that an ALJ be swayed by the legal and political views and comments of Principal ALJs, because the Principal ALJs would be evaluating the ALJ.

70.     The OAH Ethics Code prohibits an ALJ from engaging in any activity that creates even an appearance that he or she is not independent. Chp. II(A), *Code of Ethics for OAH Administrative Law Judges* (Aug. 31, 2004).  Plaintiff discovered that he could not give the appearance of being independent of Principal ALJs because they determined whether his decisions were issued in a timely manner and they evaluated him.

71.     The OAH Ethics Code prohibits an ALJ from being mandated to communicate with anyone about a pending or impending case outside the presence of all parties to that case.

17

Chp. III(D)(2), *Code of Ethics for OAH Administrative Law Judges* (Aug. 31, 2004). Plaintiff discovered that the OAH Peer Review System *mandated* that he consult with at least a Principal ALJ outside the presence of the parties. Further, if the Principal ALJ required it, the OAH Peer Review mandated that thereafter plaintiff consult about a pending case, outside the presence of the parties, with all of the other ALJs at OAH (or, alternatively, with CJ Butler) before he could issue a decision.

72.     The OAH Ethics Code requires that an ALJ dispose of all judicial matters promptly. Chp. III(F), *Code of Ethics for OAH Administrative Law Judges* (Aug. 31, 2004). Plaintiff discovered that the mandatory OAH Peer Review System always delayed the disposition of his cases for periods of up to two months.

**E.      Plaintiff Becomes An Involuntary Whistleblower**

73.     The OAH Peer Review System, on its face and in practice, required plaintiff to violate his statutory oath to faithfully execute the laws of the District of Columbia. The OAH Peer Review system also appeared on its face, and in practice, to require plaintiff to violate any number of ALJ ethical and OAH statutory obligations.

74.     Plaintiff engaged in research and discussion with judicial and administrative experts before reaching these conclusions. In June 2005 plaintiff prepared and circulated a 19 page memorandum to CJ Butler, and other ALJs at OAH, on how the OAH Peer Review process appeared to violate the OAH Act, the D.C. Administrative Procedures Act and the OAH Code of Judicial Ethics.

75.     In his memorandum plaintiff constructively suggested how OAH could revamp the process and asked, alternatively, that CJ Butler refer the issue of whether the OAH Peer Review process violated the OAH Code of Ethics to the Commission on the Selection And Tenure of Administrative Law Judges for an advisory opinion. CJ Butler never, directly, responded to plaintiff.

76.     Even while expressing his concerns about the OAH Peer Review process, and seeking a review of it, plaintiff at all times complied with its procedures throughout his term of office.

77.     When the issues plaintiff raised were not addressed by CJ Butler, plaintiff e-mailed a letter to the Commission on the Selection And Tenure of Administrative Law Judges in July 2005.

78.     In his letter plaintiff provided an analysis of the Commission's authority (analogous to that of the D.C. Commission on Judicial Disabilities and Tenure, after which it was modeled) to provide an advisory ethical opinion on the OAH Peer Review process and attached a copy of his memorandum to CJ Butler.

79.     The Commission later concluded, without explanation, that it did not have the authority to provide an advisory opinion.  It thereby tacitly approved the policy and practice at OAH of Principal ALJs illegally interfering with the decisional independence of ALJs, in violation of the OAH Act, the D.C. Administrative Procedures Act and the OAH Code of Judicial Ethics.  And it ratified a culture in which ALJs were dependent upon Principal ALJs in every significant respect.

80.     Having no alternative way of resolving his ethical concerns, in February 2006 plaintiff, as a private citizen, prepared and delivered oral and written testimony to the Judiciary Committee of the D.C. Council in which he explained how the Peer Review process appeared to violate the OAH Act, the D.C. Administrative Procedures Act and the OAH Code of Judicial Ethics.

81.     Although it initially appeared that substantial changes would result, plaintiff learned, upon receiving his first evaluation in mid-November 2006, that the Peer Review System had only been cosmetically changed where he was concerned.

**F.     <u>Plaintiff Targeted For Retaliation</u>**

82.     The OAH Code of Ethics requires that "An Administrative Law Judge shall participate in establishing, maintaining and enforcing high standards of conduct and shall personally observe those standards of conduct . . ." Chpt. I(B).

83.     Additionally, the OAH Code of Ethics requires that ALJs "take appropriate action or initiate appropriate disciplinary measures against an Administrative Law Judge . . . for unprofessional conduct of which he may become aware." Chp. III(M), Code of Ethics.

84.     In plaintiff's interactions with CJ Butler he discovered that the Chief Judge engaged in unprofessional conduct, over an extended period of time, which appeared to violate multiple provisions of the OAH Code of Ethics.

85.     Those interactions included an instance in June 2005 when, after learning from plaintiff that plaintiff had communicated with the D.C. Council to determine the truth of a statement the Chief Judge had made to plaintiff about pending legislation, CJ Butler angrily strode into plaintiff's small office, shouted at plaintiff in a voice heard throughout the suite, and appeared poised to physically attack plaintiff.  In the culmination of this incident, and in violation of the Whistleblower Act, CJ Butler directed plaintiff not to communicate with the D.C. Council without first clearing the communication with him.

86.     Plaintiff later learned that the reason CJ Butler became outraged was that he realized that if plaintiff continued his inquiries of the D.C. Council plaintiff would discover that CJ Butler had been lying to plaintiff for two months about the impact of pending legislation on plaintiff's initial two year term.  Instead of admitting his false statements, CJ Butler sought to threaten plaintiff into abandoning his effort to clarify whether his initial two year term was the subject of pending legislation that would reduce it to one year – as CJ Butler had claimed for two months.

87.     Plaintiff's efforts to have the Chief Judge acknowledge that his duplicity and intimidating and physically threatening conduct was inappropriate and violated the OAH Code of Ethics and the Whistleblower Act fell on deaf ears.

88.     To prevent a recurrence of this outrageous conduct, plaintiff had only one option. Chpt. I(B) and Chpt. III(M) of the OAH Code of Ethics obligated plaintiff to report the Chief Judge's unprofessional conduct to the only person who had any power to "take appropriate action or initiate appropriate disciplinary measures" – the Mayor of the District of Columbia. D.C. Official Code § 2-1831.04(b)(7).

89.     In a letter to the Mayor in July 2005, that plaintiff copied to CJ Butler, plaintiff laid out the facts relevant to the Chief Judge's unprofessional, unethical and threatening conduct, and his violation of the Whistleblower Act, and about the attrition and low state of morale at OAH. Plaintiff concluded his letter by "requesting the initiation of an inquiry into whether good cause exist[ed] for Mr. Butler's removal."

90.     The Mayor's General Counsel subsequently responded that the ethical aspects of CJ Butler's misconduct were outside the Mayor's purview, and that the same was true for his administration of OAH at this early stage in OAH's history. The Mayor thereby tacitly approved the policy and practice at OAH of unethical conduct by CJ Butler and noncompliance with the Whistleblower Act.

91.     In response to plaintiff's communications with the D.C. Council and the Mayor, the Deputy Chief Judge at OAH orally advised plaintiff that the Commission on Selection and Tenure of Administrative Law Judges would remove him if he did not immediately "mend fences" with CJ Butler.  The Deputy CJ was apparently in a position to convey this threat to "remove" plaintiff because one member of the Commission, Henry Lavine, had been a law partner with the Deputy CJ at Squire, Sanders & Dempsey, LLP before they assumed their respective positions vis-à-vis OAH.

92.     Plaintiff, in an e-mail response, assured the Deputy CJ that he would always be civil toward CJ Butler but also explained why the Whistleblower Act made the Deputy CJ's threat of retaliation by the Commission for plaintiff's protected disclosures unlawful.

G.     **Plaintiff's Outstanding Performance As An ALJ**

93.     Aware that his protected disclosures about these matters of public concern had, and would, result in his being targeted by the Chief Judge and perhaps by the Commission, plaintiff studiously compiled an outstanding record as an ALJ to ensure there could be no legitimate basis for not reappointing him to a ten year term.

94.     The Commission's regulations mandate that the Commission "***shall*** reappoint the Administrative Law Judge if it finds that the Administrative Law Judge has ***satisfactorily*** performed the responsibilities of his or her <u>office</u> and is likely to continue to do so."  6 DCMR 3705.21.

95.     The 24 responsibilities of an ALJ's office are listed at D.C. Code § 2-1831.09(a) & (b).  Thirteen of the responsibilities relate to the conduct of cases before the ALJ, and simply enumerate the ALJ's powers.   D.C. Code § 2-1831.09(b).

96.     The remaining eleven responsibilities, listed in D.C. Code § 2-1831.09(a), record an ALJ's obligations.

97.     The first responsibility is an obligation to participate in an orientation program and in any continuing legal education mandated by the Chief Judge.

98.     Plaintiff participated in all orientation programs mandated by the Chief Judge, including a training course at the National Judicial College in Reno, Nevada in September 2005. Based on plaintiff's performance during the two week training course he was selected by its faculty to act as a course facilitator at a future training.  Only one other ALJ at OAH (a Principal ALJ) had been selected for that national honor prior to plaintiff's selection.

99.     The second responsibility is an obligation to meet annual performance standards that are applicable to an ALJ's duties. Those annual performance standards must be "objective standards for the management and disposition of cases."

100.    In plaintiff's only OAH evaluation, issued in November 2006, he received a rating of 3.0, out of a possible 3.0, when only objective standards are considered.   When prohibited subjective standards are also considered, plaintiff received a rating of 2.84 out of a

possible 3.0.  An ALJ who receives a rating of 2.5 or higher has met the annual performance standards applicable to his duties.

101.    The third responsibility is an obligation to not engage in conduct inconsistent with the duties, responsibilities and ethical obligations of an ALJ.

102.    Plaintiff, alone among all the ALJs at OAH, took affirmative steps to not engage in conduct inconsistent with his duties, responsibilities and ethical obligations by seeking review of the OAH Peer Review process by (in turn) the Chief Judge, the Commission and the Judiciary Committee of the D.C. Council.

103.    The fourth responsibility is an obligation to not be subject to the supervision or direction of anyone engaged in the performance of investigative, prosecutorial or advisory functions for another agency.  Plaintiff did not so subject himself.

104.    The fifth responsibility is an obligation to fully participate in OAH office management committees and management activities.

105.    Plaintiff was asked to participate in only one office management committee and was then excused because a more qualified ALJ sought to be substituted for him.  Plaintiff's requests, during his initial term, to serve on two other management committees (training and ethics) were not granted.  Plaintiff was asked to participate in only two management activities, both of which he fully participated in.

106.    The sixth responsibility is an obligation to supervise, direct and evaluate the work of employees assigned to the ALJ.  No employees were assigned to plaintiff or any other ALJ.  OAH support staff were assigned to work only for Principal ALJs.

107.    The seventh responsibility is an obligation to conform to all legally applicable standards of conduct.

108.    Because plaintiff's ability to conform to "legally applicable standards of conduct" depended upon those in supervisory roles at OAH adhering to "legally applicable standards of conduct," plaintiff worked throughout his initial term to bring OAH into conformance with

standards of conduct required by the OAH Act, the D.C. Administrative Procedures Act and the Code of Ethics for OAH ALJs.

109.   The eighth responsibility is an obligation to decide all cases in an impartial manner.  Plaintiff discharged this responsibility and received no complaints, at all, in this regard.

110.   The ninth responsibility is an obligation to devote full-time to the duties of the position and to not perform any duties that are inconsistent with the duties and responsibilities of an ALJ.

111.   Plaintiff devoted more than full time to his duties.  In his first 18 months as an ALJ plaintiff issued 45 decisions for publication by Lexis, a national on-line legal research service. The decisions thoroughly addressed issues of first impression, or addressed issues that other judges had ruled on but had failed to provide legal and logical analyses to support their decisions. Indeed, plaintiff's published decision in *DOH v. Sadeghi*, DH-I-05-A100273 (Final Order, April 25, 2006) foreshadowed the ruling that the U.S. Supreme Court later issued in *Jones v. Flowers,* 126 S. Ct. 1708 (2006). During plaintiff's initial 18 months no other ALJ, however experienced, issued more than six publishable decisions.

112.   Despite the remarkable number of precedent setting decisions written by plaintiff, to date not a single one of plaintiff's decisions has ever been reversed or modified by a higher court.

113.   In addition, plaintiff developed OAH administrative forms, acted as a mentor for a more senior ALJ, presenting a tutorial for all legal assistants at OAH, and served as a mentor and moot court judge for law students at the UDC School of Law and the Georgetown University School of Law.   Plaintiff was also an active member and/or served on committees of the Maryland/DC chapter of the National Association of Administrative Law Judges and the Judicial Council of the Washington Bar Association.

114.   The tenth responsibility is an obligation to cooperate with the Executive Director of OAH to achieve efficient and effective administration of the office.

115.    Plaintiff fully cooperated with, and deferred to the Executive Director on OAH administrative maters.

116.    The eleventh, and final, responsibility is an obligation to take an oath of office prior to the commencement of his duties.

117.    Plaintiff had to repeatedly remind supervisory ALJs at OAH of the oath-taking requirement.  More than one month passed before plaintiff, and other ALJs (many of whom were already hearing cases), were administered an oath.

**H.    Plaintiff's Outstanding Record Initially Prevents Retaliation**

118.    Based on and because of his outstanding record, on November 1, 2006 plaintiff submitted an application to the Commission for reappointment to a ten year term at OAH.

119.    In response to an application for reappointment as an ALJ, the OAH Act and regulations require that a series of deadlines be met.

120.    The Chief Judge is given no more than 120 days after the filing of a statement by the ALJ seeking reappointment (i.e., no later than March 1, 2007 in plaintiff's case) within which to submit a record to the Commission with respect to plaintiff's "efficiency, efficacy, and quality of performance over the period of his . . . appointment."   That record is the only opportunity members of the Commission have for inclusion of any information they wish to have placed in the reappointment record.

121.    The OAH Act requires that the record also include the Chief Judge's "recommendation as to whether the reappointment should be made . . ." D.C. Code § 2-1831.10(b).

122.    In every one of the reappointment records the Chief Judge had submitted to the Commission up to that point, CJ Butler had affirmatively and expressly stated whether he did, or did not, recommend that the ALJ in question be reappointed.

123.    As to plaintiff's reappointment, however, CJ Butler wrote to the Commission: ". . . I do not oppose the reappointment of Judge Pearson to a 10-year term."

124.   In response, plaintiff sent an e-mail to the Commission, and CJ Butler, pointing out that CJ Butler had failed to make the statutorily-required recommendation for or against plaintiff's reappointment.

125.   On March 8, 2007, in response to a request from the Commission that he comply with the statutory requirement that he submit either a favorable or unfavorable recommendation, CJ Butler amended his March 2nd statement to "clarify" that he recommended that plaintiff be reappointed to a 10 year term.

126.   Under the OAH Act CJ Butler's timely recommendation to the Commission must be given "significant weight."

127.   On March 9, 2007, plaintiff transmitted an e-mail to other ALJs at OAH, including CJ Butler.

128.   The e-mail contained four "protected disclosures": a) the disclosure of the Chief Judge's initial violation of the local law [the OAH Act] that required that he affirmatively or negatively recommend plaintiff's reappointment; (b) the disclosure of CJ Butler's abuse of authority in retaliating against plaintiff by initially providing a neutral, and not providing a positive recommendation; (c) the disclosure that the Chief Judge's record of abusing his authority made it advisable for other ALJs to compile an outstanding record to discourage his victimizing them; and (d) the disclosure of plaintiff's OAH history of "speaking truth to power."

129.   As a D.C. government employee plaintiff was privileged, if not required, to make those disclosures because they contained statements of opinion about public issues or referred to statements of fact concerning the Chief Judge's violation of the OAH Act and his abuse of his authority.

130.   As an ALJ plaintiff had an ethical obligation to make the disclosures because of his ethical obligation to establish and enforce high standards of conduct so that the integrity and independence of OAH would be preserved and encouraged.

131.    As a D.C. government employee plaintiff had the right to freely express his opinion on the public issues of: (a) the decisional independence of ALJs and (b) the freedom of Government employees to report abuses of authority and to report violations of law.

## I.    Off-The-Record Agreement On Reappointment

132.    Within ten days of receiving a copy of the reappointment record, including the Chief ALJ's recommendation, an ALJ who wishes to appear before the Commission must file a request to be heard in person.

133.    Because the Chief Judge issued a favorable recommendation, and because of plaintiff's outstanding record, plaintiff did not request an opportunity to meet with the Commission.

134.    On March 21, 2007, well after the deadline for transmission of plaintiff's reappointment record, CJ Butler submitted "supplemental information" to the Commission.  The submission was ostensibly in response to a request from the Commission (a request not disclosed or shown to plaintiff), made well after the mandatory March 1, 2007 deadline for the Commission to request that the Chief Judge submit information as part of plaintiff's reappointment record.

135.    In April of 2007 the Commission requested that plaintiff meet with it for a "preliminary discussion regarding your reappointment."    In advance of the "preliminary discussion" plaintiff submitted a detailed memorandum to the Commission on his rights and obligations under the Whistleblower Act.

136.    On April 24, April 29 and April 30, 2007, plaintiff had "preliminary discussions" with the Commission.

137.    In a "chance" meeting on the street after the second of the three meetings, Commissioner  Valentine bluntly revealed to plaintiff that all the Commissioner's knew and agreed that CJ Butler was grossly incompetent.  He counseled plaintiff to allow CJ Butler to save face with the Commission, and with other ALJs at OAH, by apologizing to the Chief Judge.  It

thus became clear that the series of "preliminary discussions" required of plaintiff by the Commission were part of a pattern and practice by the Commission of supporting the violator of the District's whistleblower laws and ethical rules, and not its victim.

138.    Commissioner Valentine, who acted as counsel to the Commission, assured plaintiff that he would be reappointed if he apologized.

139.    In recognition of the fact that CJ Butler had significantly reformed his conduct in 2007 as compared to 2005 and 2006, at his third meeting with the Commission on April 30, 2007 plaintiff acknowledged that he could have made [but not that he was required by any law or ethical rule to make] other choices in his communications with his colleagues and in his letter to the Mayor about CJ Butler in July 2005.

140.    In the spirit of settling the issue off-the-record plaintiff also stated that in early March of 2007 he sent an e-mail to other judges at OAH that lapsed back into "unnecessary and derogatory references to the Chief Judge."  Plaintiff stated that that particular e-mail evidenced "poor judgment and a lack of civility" although, as a matter of law, it could not.  And plaintiff stated he would communicate an apology regarding the Chief Judge to OAH ALJs.

141.    Commission Chairman Rigsby, in turn, advised plaintiff that the matter was not of substantial significance and expressed his expectation that plaintiff would be reappointed and go on to write landmark decisions for OAH during his new ten year term of office.

142.    Plaintiff then shook hands with each Commissioner and the informal "preliminary discussions" ended with that off-the-record agreement on plaintiff's reappointment application

**J.**     **Commission's Failure To Meet Statutory Deadline For Decision**

143.     Coincidentally, a consumer lawsuit that plaintiff filed two years earlier began to attract national attention and criticism in March and April of 2007.   Because of ethical restrictions, plaintiff was unable to respond to grossly inaccurate comments made to the media by defendants' counsel in the case.   As a result, over time the case attracted increased international media attention and criticism.

144.     Because defendants' specious assertions about the case went unrebutted in the media, the Washington Post and other media criticized CJ Butler upon learning that he had recommended that plaintiff be reappointed.

145.     Plaintiff's initial two year appointment expired at midnight on May 2, 2007. At about 2 pm. on that day plaintiff received a call from CJ Butler, who asked plaintiff to come to his office.   Deputy Chief Judge Mark Poindexter and OAH General Counsel Lisa Coleman were in CJ Butler's office when plaintiff arrived.

146.     CJ Butler asked plaintiff to read and sign a letter.   Plaintiff quickly skimmed the letter.   The letter, signed by CJ Butler, indicated that plaintiff would be notified of the Commission's decision on how it would proceed with plaintiff's request for reappointment in the next thirty days. It stated that "pending the Commission's review of this matter, as provided in 6 DCMR 3705.26, I [CJ Butler] have decided that you will remain at OAH at your same salary grade and step and you will receive non-judicial assignments as determined by my office."

147.     The   May   2nd   letter   contained   misstatements   about   the   off-the-record communications during plaintiff's meeting with the Commission on April 30, 2007.   When CJ Butler would not permit plaintiff to correct the statements in the letter, plaintiff prepared and e-mailed a correction of the misstatements to the Commissioners within an hour thereafter.

148.     Effective at midnight on May 2, 2007 plaintiff was demoted from his position as an ALJ and became an attorney-advisor at OAH.   He was therefore unable to hear and decide cases or to avail himself of training and other perquisites and opportunities available to ALJs.

149.   CJ Butler took the position that plaintiff's attorney-advisor position could and would be terminated upon the issuance of the Commission's ruling on plaintiff's reappointment application.

## K.   Chief Judge Violates OAH Act And Regulations

150.   On May 22, 2007, without seeking permission from the Commission, CJ Butler submitted a letter to the Commission purporting to withdraw his recommendation that plaintiff be reappointed.

151.   The May 22nd letter, instead, recommended that plaintiff not be reappointed.

152.   The letter based CJ Butler's reversal on four matters: (1) the March 9, 2007 protected disclosures plaintiff made at OAH after the Chief Judge recommended plaintiff's reappointment to the Commission on March 8, 2007; (2) an observation in 2002 (three years before plaintiff was appointed to his position as an ALJ) by a trial judge in a divorce case that plaintiff was responsible for driving up litigation expenses; and (3) an observation by a trial judge in the consumer lawsuit plaintiff filed in 2005 against a cleaners in which the trial judge expressed "significant concerns" about "bad faith" and a "misrepresentation" [the Chief Judge's letter did not reveal that, within six days thereafter, plaintiff completely addressed and resolved those mistaken concerns to the trial judge's satisfaction]; and (4) the number of media inquiries OAH had received about plaintiff's pending consumer lawsuit.

153.   The purported "withdrawal" of the Chief Judge's favorable recommendation and "substitution" of an unfavorable recommendation came three months after CJ Butler's favorable recommendation and three months after the mandatory statutory deadline for submission of the record containing the Chief Judge's recommendation.

154.   None of the matters in the Chief Judge's May 22nd letter related in any way to plaintiff's "efficiency, efficacy, and quality of performance over the period of his . . . appointment."

155.    None of the matters in the Chief Judge's May 22nd letter related in any way to the discharge of the 24 responsibilities of an ALJ on which a reappointment decision must be based.

156.    A disciplinary process exists at OAH by which claims of alleged judicial misconduct may be brought by a Chief Judge, at any time.   The disciplinary process is completely independent of the reappointment process.

157.    The Chief Judge did not request, and the Commission does not have authority to grant, leave for the Chief Judge to withdraw his favorable recommendation and substitute a three month late untimely adverse recommendation.

158.    Thereafter months passed with no action on plaintiff's request for reappointment. Unbeknownst to plaintiff Commissioner Lavine's term expired on April 30, 2007.   Nonetheless, a quorum sufficient to vote on plaintiff's application for reappointment existed at all times.

159.    On June 4, 2007 plaintiff inquired as to the status of his application.   The Commission responded orally that Mayor Adrian M. Fenty had requested that the Commission not act on plaintiff's reappointment application prior to the Mayor selecting a Commissioner to fill the expired term of Commissioner Lavine.

160.    On or about June 27, 2007 Mayor Fenty appointed Commissioner Josey-Herring to fill the seat on the Commission formerly occupied by Commissioner Lavine.

**L.**   **Plaintiff Repeatedly Denied Due Process And Equal Treatment**

161.   OAH regulations require that if the Chief Judge submits a timely unfavorable recommendation for reappointment the ALJ in question has ten days within which to request an opportunity to be heard by the Commission.  If the ALJ requests to be heard the Commission, the Commission may not issue a notice of possible denial of reappointment until after the ALJ has been heard.

162.   Because the Commission did not rule that CJ Butler could submit a second, untimely adverse recommendation three months after the mandatory deadline for submitting a recommendation, plaintiff was not on notice that the Commission would consider the untimely adverse recommendation.

163.   Thus, plaintiff was not given an opportunity to be heard by the Commission -- after the Chief Judge's May 22nd letter withdrawing his favorable recommendation and purporting to substitute an unfavorable recommendation --  before the Commission issued a notice on August 7th of possible denial of reappointment.

164.   Plaintiff had no way of knowing the Commission, in violation of the OAH Act and its own regulations, would tacitly authorize CJ Butler to unilaterally withdraw his favorable recommendation and substitute a 3-month late unfavorable recommendation.

165.   The August 7th notice relied on documents that were not part of the reappointment record and that involved protected disclosures: (a) 7 emails submitted by the Chief Judge to the Commission on March 21, 2007, which were therefore not part of the record, regarding plaintiff's protected disclosures; (b) the legally irrelevant claim that throughout plaintiff's initial term he was counseled not to exercise his right to make protected disclosures or to communicate his opinions regarding public issues; (c) a May 2, 2007 email to the Commission from plaintiff in which he minimized the off-the-record statements plaintiff made to the Commission on April 30, 2007; and (d) the Chief Judge's time-barred May 22, 2007 recommendation against plaintiff's reappointment.

166.    Without explaining its relevance, the Commission also noted the widespread adverse publicity generated by plaintiff's pending consumer lawsuit.   It claimed that the resulting publicity "demeaned you as a judicial officer and brought OAH, the entire judiciary and the judicial process into disrepute."

167.    Neither the demeaning of an OAH ALJ, nor bringing OAH or any other judiciary into "disrepute," are ethical standards or requirements in the OAH Code of Ethics.

168.    Thus, none of the grounds relied on in the August 7, 2007 notice of possible denial of reappointment implicated the 24 responsibilities of an ALJ's office, listed at D.C. Code § 2-1831.09(a) & (b), on which the Commission is required to base its decision regarding reappointment.  6 DCMR 3705.1.

**M.    Commission On Notice of Whistleblower And Constitutional Defenses**

169.    On August 22, 2007, plaintiff submitted a 22 page response to the August 7, 2007 notice from the Commission and requested an opportunity to appear before Commission at its meeting on September 26, 2007.

170.    In his response plaintiff requested rulings on four procedural matters.

171.    Plaintiff also presented four reasons why he should be reappointed: (1) he had complied with the off-the-record agreement he reached with the Commission; (2) he was entitled to the benefit of the Chief Judge's March 8, 2007 favorable recommendation; (3) the August 7 notice of grounds for possible denial of reappointment relied on statutory provisions that do not apply to a reappointment and relied on documents that were not part of the record; and (4) the specific conduct complained of in the Commission's August 7 letter is authorized by the OAH Code of Ethics and/or the D.C. Whistleblower Statue.

172.    Additionally, plaintiff asked the Commission what relevance the reference in their notice to his consumer lawsuit had to the reappointment process.

**N.**     **Commission Conducts Hearing In Plaintiff's Absence**

173.    On October 5, 2007 the Commission formally met with witnesses regarding plaintiff's reappointment but denied plaintiff 's request to attend the hearing.

174.    The Commission subsequently refused to apprise plaintiff of what the witnesses had stated to the Commission so that plaintiff, if necessary, could rebut their statements.

175.    The Commission's regulations entitle plaintiff to be present to hear testimony in support of, or in opposition to, his application for reappointment.

**O.**     **Commission's Express Reliance On Protected Disclosures**

176.    On October 11 and October 15, 2007 the Commission afforded plaintiff a hearing at which plaintiff responded to questions but was unable to learn of, or address, statements made to the Commission out of his presence on October 5, 2007.

177.    On October 30, 2007, the Commission issued an eight page decision denying plaintiff's application for reappointment to a 10 year term.

178.    In its decision the Commission expressly stated that it based its decision not to reappoint plaintiff on what it termed "intense personalized attacks on the integrity and character" of  CJ Butler and other Principal ALJs.

179.    Each such "attack" was authorized, or required, by the D.C. Whistleblower Act. The Commission's October 30, 2007 decision noted that plaintiff had invoked and explained the protections of the Whistleblower Act.  In violation of the Whistleblower Act, the decision did not address any of the Whistleblower Act's protections and requirements.

180.    In the only portion of its decision that did not relate to privileged Whistleblower communications, the Commission referred to unspecified e-mails from unidentified OAH staff about "the handling of matters before you," based upon which the Commission stated that it had "concerns regarding your lack of judicial temperament and judgment."

181.   The decision did not reveal that the unspecified e-mail had been thoroughly inquired into by Commissioner Willner, on behalf of the Commission, and found to have no basis.

**COUNT I**
**First Amendment**
**Freedom of Speech**
**42 U.S.C. § 1983**
**(As Against All Defendants)**

182.   Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs as if repeated herein.

183.   Defendants, and each of them, retaliated against plaintiff and refused to reappoint him because plaintiff reported to the D.C. Council that the decisional independence of ALJs at the OAH was compromised by a Peer Review system that delayed and coerced decisions, by among other things, making ALJs submit their decisions for review by the very Principal ALJs who evaluated them. It was similarly compromised by requiring ALJs to return hundreds of cases for reassignment if the ALJ refused to rule as instructed on the disposition of the cases.

184.   By reporting to the D.C. Council, as a private citizen, plaintiff was reporting outside his normal chain of command and his disclosures went beyond his official duties.

185.   By reporting on the lack of decisional independence at OAH and the extraordinary delays in the disposition of cases that resulted, plaintiff was speaking on a matter of public concern.

186.   Plaintiff's disclosures did not adversely affect the Defendants' efficiency interest nor did it cause a substantial disruption in the workplace.

187.    Because plaintiff was speaking outside of his official duties on a matter of public concern that did not adversely affect the efficiency interest of the Defendants, his speech was protected.

188.   Plaintiff's protected speech was a substantial or motivating factor in the Defendants' decision not to reappoint plaintiff and in their participation in actions which naturally and proximately caused the termination of his employment with OAH.

189.   Defendants would not have terminated plaintiff but for his protected speech.

190.   Defendants' failure to reappoint plaintiff and participation in actions which naturally and proximately caused the termination of plaintiff's employment with OAH deprived plaintiff of his right to freedom of speech.

191.   Defendants, and each of them, violated the First Amendment to the Constitution by terminating plaintiff's employment and participating in actions which naturally and proximately caused the termination of his employment with OAH and thereby deprived plaintiff of his right to freedom of speech.

192.   Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs caused plaintiff to suffer pecuniary losses, injuries, and damages, including, but not limited to, lost backpay, lost frontpay, and other commensurate benefits.

193.   Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs caused plaintiff to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

194.   Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs were egregious and taken in conscious disregard of or with deliberate indifference to plaintiff's rights under the First

Amendment to the Constitution, and were taken outrageously, wantonly, and oppressively with legal and actual malice.

**COUNT II**
**First Amendment**
**Freedom of Speech**
**42 U.S.C. § 1983**
**(As Against All Defendants)**

195.    Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs.

196.    Defendants, and each of them, retaliated against plaintiff and refused to reappoint him because plaintiff reported to the D.C. Council that the decisional independence of ALJs at the OAH was compromised by a Peer Review system that delayed and coerced decisions, by among other things, making ALJs submit their decisions to the Principal ALJs who evaluated them, and by requiring ALJs to rule as instructed in hundreds of cases, or to return those cases for reassignment to ALJs who would rule as instructed.

197.    Defendants' failure to reappoint plaintiff and participation in actions which naturally and proximately caused the termination of plaintiff's employment with OAH deprived plaintiff of his right to freedom of speech.

198.    Defendants, and each of them, violated the First Amendment to the Constitution and violated clearly established rights under the First Amendment to the Constitution of which a reasonable person would have known in terminating plaintiff's employment and participated in actions which naturally and proximately caused the termination of his employment with OAH and thereby deprived plaintiff of his right to freedom of speech.

199.    Defendants, and each of them, acted under color of the law of the District of Columbia in failing to reappoint plaintiff and in terminating plaintiff's employment and participating in actions which naturally and proximately caused the termination of plaintiff's employment with OAH and thereby deprived plaintiff of his right to freedom of speech.

200.    Defendants' actions were carried out by members of the Commission, who are officials with final decision-making authority to investigate and terminate plaintiff without due process of law in furtherance of the policy and custom of Defendant D.C.

201.    The individual defendants are liable in their individual capacities for constitutional violations as policymaking officials directly responsible for plaintiff's termination.

202.    Defendants, and each of them, violated 42 U.S.C. § 1983 in terminating plaintiff's employment and participating in actions which naturally and proximately caused the termination of plaintiff's employment with OAH by subjecting or causing plaintiff to be subjected to the deprivation of his rights and privileges secured under the First Amendment to the Constitution under color of the law of the District of Columbia

203.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs, caused plaintiff to suffer pecuniary losses, injuries and damages, including, but not limited to, lost backpay, lost frontpay, and other commensurate benefits.

204.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs, caused plaintiff to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

205.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs were egregious and taken in conscious disregard of or with deliberate indifference to plaintiff's rights under the First Amendment to the Constitution and 42 U.S.C. § 1983, and they were taken outrageously,

wantonly, and oppressively with legal and actual malice. Accordingly, the individual defendants are not protected by any qualified privilege for engaging in their unlawful actions.

**COUNT III**
**First Amendment**
**Freedom of Speech**
**42 U.S.C. § 1983**
**(As Against All Defendants)**

206.     Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs.

207.     Defendants, and each of them, retaliated against plaintiff and eventually refused to reappoint him because plaintiff exercised his First and Fifth Amendment right to file and prosecute a lawsuit, as a private attorney general, to enforce the D.C. Consumer Protection Procedures Act by seeking to enjoin and obtain damages for fraud and unfair trade practices a dry cleaners in plaintiff's neighborhood persisted in for seven years.

208.     The statutory oath plaintiff was required to take as an ALJ required him to "solemnly swear that I will faithfully execute the laws of the United States of American and of the District of Columbia."

209.     The D.C. Consumer Protection Procedures Act was drafted to encourage consumer law experts, such as plaintiff, to file and prosecute cases under that Act in the public interest.

210.     The ALJ Code of Ethics expressly authorizes an ALJ to file and prosecute a *pro se* lawsuit.

211.     At no point in the consumer litigation was plaintiff sanctioned for noncompliance with a court rule or practice. Rather, the opposing parties in the case were repeatedly sanctioned or compelled by the trial court to comply with court rules and court orders. Indeed, plaintiff was granted a protective order in the case because of the defendants' abusive discovery tactics.

212.   By filing and prosecuting a consumer lawsuit, as a private attorney general, plaintiff was acting outside of his normal chain of command and his filings and communications went beyond his official duties.

213.   By filing and prosecuting a consumer lawsuit, as a private attorney general, plaintiff was communicating on a matter of public concern.

214.   Because plaintiff was communicating outside of his official duties on a matter of public concern that did not adversely affect the efficiency interest of the Defendants, his speech was protected.

215.   Plaintiff's protected speech in this regard was a substantial or motivating factor in the Defendants' failure to reappoint plaintiff, their termination of plaintiff, and their participation in actions which naturally and proximately caused the termination of his employment with OAH.

216.   Defendants would not have failed to reappoint plaintiff but for his protected speech.

217.   Defendants' failure to reappoint plaintiff and participation in actions which naturally and proximately caused the termination of plaintiff's employment with OAH deprived plaintiff of his right to freedom of speech and of equal protection of the laws.

218.   Defendants, and each of them, violated the First and Fifth Amendments to the Constitution by failing to reappoint plaintiff and participating in actions which naturally and proximately caused the termination of plaintiff's employment with OAH because of plaintiff's exercise of his right to freedom of speech and of equal protection of the laws.

219.   Defendants violated clearly established rights under the First and Fifth Amendments to the Constitution of which a reasonable person would have known in failing to reappoint plaintiff and participating in actions which naturally and proximately caused the termination of plaintiff's employment with OAH and thereby deprived plaintiff of his right to freedom of speech and equal protection of the laws.

220.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs caused plaintiff to suffer pecuniary losses, injuries, and damages, including, but not limited to, lost backpay, lost frontpay, and other commensurate benefits.

221.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs, caused plaintiff to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

222.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs were egregious and taken in conscious disregard of or with deliberate indifference to Amos's rights under the First and Fifth Amendments to the Constitution, and were taken outrageously, wantonly, and oppressively with legal and actual malice.

### COUNT IV
**First  Amendment**
**Freedom of Speech**
**42 U.S.C. § 1983**
**(As Against All Defendants)**

223.    Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs.

224.    Defendants, and each of them, retaliated against plaintiff and eventually refused to reappoint him because plaintiff exercised his First and Fifth Amendment right to file and prosecute a lawsuit, as a private attorney general, to enforce the D.C. Consumer Protection Procedures Act by seeking to enjoin and obtain damages for fraudulent and unfair trade practices that a dry cleaners in plaintiff's neighborhood persisted in for seven years.

225. Defendants' failure to reappoint plaintiff and participation in actions which naturally and proximately caused the termination of plaintiff's employment with OAH deprived plaintiff of his right to freedom of speech and equal protection of the laws.

226. Defendants, and each of them, violated the First and Fifth Amendments to the Constitution and violated clearly established rights under the First and Fifth Amendment to the Constitution of which a reasonable person would have known by failing to reappoint plaintiff and participating in actions which naturally and proximately caused the termination of plaintiff's employment with OAH and thereby deprived plaintiff of his right to freedom of speech and to equal protection of the laws.

227. Defendants, and each of them, acted under color of the law of the District of Columbia in failing to reappoint plaintiff and in terminating plaintiff's employment and participating in actions which naturally and proximately caused the termination of plaintiff's employment with OAH and thereby deprived plaintiff of his right to freedom of speech and equal protection of the law.

228. Defendants' actions were carried out by members of the Commission, who are officials with final decision-making authority to investigate and terminate plaintiff without due process of law in furtherance of the policy and custom of Defendant D.C.

229. The individual defendants are liable in their individual capacities for constitutional violations as policymaking officials directly responsible for plaintiff's termination.

230. Defendants, and each of them, violated 42 U.S.C. § 1983 in failing to reappoint plaintiff and participating in actions which naturally and proximately caused the termination of plaintiff's employment with OAH by subjecting or causing plaintiff to be subjected to the deprivation of his rights and privileges secured under the First and Fifth Amendment to the Constitution under color of the law of the District of Columbia

231. Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the

termination of his employment with OAH as alleged in the above paragraphs caused plaintiff to suffer pecuniary losses, injuries and damages, including, but not limited to, lost backpay, lost frontpay, and other commensurate benefits.

232.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs caused plaintiff to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

233.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs were egregious and taken in conscious disregard of or with deliberate indifference to Amos's rights under the First and Fifth Amendments to the Constitution and 42 U.S.C. § 1983, and they were taken outrageously, wantonly, and oppressively with legal and actual malice.   Accordingly, the individual defendants are not protected by any qualified privilege for engaging in their unlawful actions.

## COUNT V
### Fifth Amendment
### Denial of Due Process And Equal Protection
### 42 U.S.C. § 1983
### (As Against All Defendants)

234.    Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs as if repeated herein.

235.    Defendants, and each of them, retaliated against plaintiff for the exercise of his First and Fifth Amendment rights by refusing to comply with the requirements of the OAH Act and the Commission's own regulations in considering and deciding plaintiff's application for reappointment.

236.    Defendants' denial of plaintiff's procedural and substantive rights, including their failure to comply with deadlines for record submission, to accord plaintiff the benefit of CJ Butler's timely recommendation for reappointment and to consider plaintiff's Whistleblower defenses to claims of lack of judicial temperament and failure to be a team player, were substantial or motivating factors in the Defendants' decision not to reappoint plaintiff and in their participation in actions which naturally and proximately caused the termination of his employment with OAH.

237.    Defendants would not have terminated plaintiff but for their refusal to comply with the OAH Act and regulations.

238.    Defendants' failure to reappoint plaintiff and participation in actions which naturally and proximately caused the termination of plaintiff employment with OAH deprived plaintiff of his right to due process and equal protection of the laws.

239.    Defendants, and each of them, violated the Fifth Amendment to the Constitution by terminating plaintiff's employment and participation in actions which naturally and proximately caused the termination of his employment with OAH and thereby deprived plaintiff of his right to due process and equal protection of the laws.

240.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs caused plaintiff to suffer pecuniary losses, injuries, and damages, including, but not limited to, lost backpay, lost frontpay, and other commensurate benefits.

241.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs caused plaintiff to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

242.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs were egregious and taken in conscious disregard of or with deliberate indifference to plaintiff's rights under the Fifth Amendment to the Constitution, and were taken outrageously, wantonly, and oppressively with legal and actual malice.

## COUNT VI
### Fifth Amendment
### Denial of Due Process And Equal Protection
### 42 U.S.C. § 1983
### (As Against All Defendants)

243.    Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs.

244.    Defendants, and each of them, retaliated against plaintiff for the exercise of his First and Fifth Amendment rights by refusing to comply with the requirements of the OAH Act and the Commission's own regulations in considering and deciding plaintiff's application for reappointment.

245.    Defendants' denial of plaintiff's procedural and substantive rights, including their failure to comply with deadlines for record submission, to accord plaintiff the benefit of CJ Butler's timely recommendation for reappointment and to consider plaintiff's Whistleblower defenses to claims of lack of judicial temperament and failure to be a team player, were substantial or motivating factors in the Defendants' decision not to reappoint plaintiff and in their participation in actions which naturally and proximately caused the termination of his employment with OAH.

246.    Defendants' failure to reappoint plaintiff and participation in actions which naturally and proximately caused the termination of plaintiff's employment with OAH deprived plaintiff of his right to freedom of speech.

247.   Defendants, and each of them, violated the Fifth Amendment to the Constitution by and violated clearly established rights under the Fifth Amendment to the Constitution of which a reasonable person would have known in terminating plaintiff's employment and participating in actions which naturally and proximately caused the termination of his employment with OAH and thereby deprived plaintiff of his right to due process and equal protection of the laws.

248.   Defendants, and each of them, acted under color of the law of the District of Columbia in failing to reappoint plaintiff and in terminating plaintiff's employment and participating in actions which naturally and proximately caused the termination of plaintiff's employment with OAH and thereby deprived plaintiff of his right to due process and equal protection of the laws.

249.   Defendants' actions were carried out by members of the Commission, who are officials with final decision-making authority to investigate and terminate plaintiff without due process of law in furtherance of the policy and custom of Defendant D.C.

250.   The individual defendants are liable in their individual capacities for constitutional violations as policymaking officials directly responsible for plaintiff's termination.

251.   Defendants, and each of them, violated 42 U.S.C. § 1983 in terminating plaintiff's employment and participating in actions which naturally and proximately caused the termination of plaintiff's employment with OAH by subjecting or causing plaintiff to be subjected to the deprivation of his rights and privileges secured under the Fifth Amendment to the Constitution under color of the law of the District of Columbia

252.   Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs caused plaintiff to suffer pecuniary losses, injuries and damages, including, but not limited to, lost backpay, lost frontpay, and other commensurate benefits.

253.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs caused plaintiff to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

254.    Defendants' actions in unlawfully failing to reappoint plaintiff, and in terminating his employment, and participating in actions which naturally and proximately caused the termination of his employment with OAH as alleged in the above paragraphs were egregious and taken in conscious disregard of or with deliberate indifference to plaintiff's rights under the First Amendment to the Constitution and 42 U.S.C. § 1983, and they were taken outrageously, wantonly, and oppressively with legal and actual malice.  Accordingly, the individual defendants are not protected by any qualified privilege for engaging in their unlawful actions.

## COUNT VII
### D.C. Whistleblower Protection Act
### (As Against All Defendants)

255.    Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs.

256.    D.C. Code § 1-615.53 prohibits any supervisor from threatening or taking a prohibited personnel action or otherwise retaliating against an employee because of the employee's protected disclosure.

257.    Because he is an employee of the District and is authorized to evaluate plaintiff's performance, CJ Butler is a "supervisor" within the meaning of § 1-1615.52(a)(8) of the Whistleblower Statute.

258.    Because Commissioners Rigsby and Josey-Herring are also employees of the District, and were authorized to both hire plaintiff and to evaluate his performance, they are supervisors within the meaning of § 1-615.52(a)(8) of the Whistleblower Statute

259.     Commissioners Willner, Rigsby and Josey-Herring also meet the definition of a supervisor because, among other things, they could take "corrective action" by rejecting the Chief Judge's violation of the Whistleblower Statute (e.g., his retaliatory recommendation that plaintiff not be reappointed).  CJ Butler meets the definition of a supervisor because he could remedy his own retaliatory recommendation by rescinding it.

260.     By purporting to rescind his favorable recommendation that plaintiff be reappointed, and substituting a recommendation that plaintiff not be reappointed, CJ Butler took a "prohibited personnel action" (i.e., a failure to take favorable personnel action) where plaintiff was concerned.  D.C. Code § 1-615.52(a)(5).

261.     By failing to reappoint plaintiff by the May 2, 2007 statutory deadline (or reasonably soon thereafter) the Commission took a "prohibited personnel action" (i.e., a failure to hire) where plaintiff was concerned.

262.     By unanimously issuing a notice advising plaintiff of a possible denial of reappointment, the Commission engaged in a "prohibited personnel action" (i.e., the Commission failed to hire or take other favorable personnel action) where plaintiff was concerned.

263.     By unanimously issuing a decision denying plaintiff reappointment, the Commission engaged in a "prohibited personnel action" (i.e., the Commission failed to hire or take other favorable personnel action) where plaintiff was concerned.

264.     Both the Chief Judge, in his May 22, 2007 letter purporting to change his reappointment recommendation to a negative one, and the Commission in its August 7, 2007 notice advising plaintiff of a possible denial of reappointment, specifically list protected disclosures that plaintiff made as a contributing factor in their decision to take and/or threaten to take "prohibited personnel action" against plaintiff.

265.     Plaintiff was a "whistleblower" as defined in D.C. Code D.C. Code § 1-615.52(9), because, among other things, plaintiff made "protected disclosures" as defined in D.C. Code § 1-

615.52(6) regarding the lack of decisional independence of ALJs at OAH, the failure of CJ Butler to comply with the OAH Act and the failure to comply with the OAH Code of Ethics for ALJs and the regulations implementing the OAH Act.

266.    Plaintiff reasonably believed that the information he communicated to his supervisors, and to employees of public bodies such as the OAH and the D.C. Council, constituted evidence of: (1) gross mismanagement, (2) abuse of authority in connection with the administration of a pubic program; and (3) violation of local laws, rules and regulations.

267.    Because plaintiff made protected disclosures to his supervisors and to employees of public bodies, he was intentionally, repeatedly and maliciously subject to retaliation by, for example, involuntary reassignment, a threat of termination, lowered ratings on his written evaluation, a notice of possible termination, and finally termination by defendant D.C., all of which constituted "prohibited personnel actions" under D.C. Code § 1-615.52(5), for making protected disclosures regarding decisional independence and exposing violations of judicial ethics, all in violation of D.C. Code § 1-615.53.

268.    Neither CJ Butler nor the Commission can show by clear and convincing evidence that their actions would have occurred for legitimate, independent reasons even if plaintiff had not engaged in activities protected by the Whistleblower Statute.

## COUNT VIII
### Intentional Infliction of Emotional Distress
### (As Against All Defendants)

269.    Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs as if repeated herein.

270.    Because plaintiff was perceived as a whistleblower by the defendants, he was subjected to retaliatory reassignment, threatened with physical battery, threatened with termination and given notice of possible termination, among other adverse actions.

271.    Because the defendants believed that unrelated adverse publicity regarding plaintiff's pending consumer law case would provide cover for retaliating against plaintiff for his

whistleblower and constitutionally protected activities, defendants subjected plaintiff to an ongoing invasion of his right to have personnel information kept private, and failed to accord plaintiff the procedural and substantive rights guaranteed by the Whistleblower Act, the OAH Act and the Commission's own regulations.  The foregoing actions, and others, were taken to punish plaintiff and to deter other ALJs from exercising their statutory right to: (a) express their opinions, (b) disclose gross mismanagement,(c) disclose abuse of authority and (d) disclose illegal and unethical conduct.

272.    The wrongful actions of defendants Butler, Valentine, Rigsby, Willner and Josey-Herring, individually, and the District of Columbia under *respondeat superior*, constitute extreme and outrageous conduct because of the relationship of the parties, the duration of the conduct, the willfulness of the conduct, plaintiff's known vulnerabilities and defendants' ethical and fiduciary duties, among other reasons.

273.    These wrongful actions were calculated to intentionally or recklessly caused plaintiff physical illness, damage to his career and loss of employment, humiliation, damage to his reputation, economic damages and severe emotional distress.

## **PRAYER FOR RELIEF**

Wherefore, plaintiff requests that the Court enter judgment in his favor and award him the following relief:

1.    An order declaring that Defendants violated plaintiff's rights under the First and Fifth Amendments to the Constitution, 42 U.S.C. § 1983, and the D.C. Whistleblower Act, D.C. Code § 1-615.51, *et seq*. in punishing plaintiff and attempting to deter other ALJs from exercising their statutory right to: (a) express their opinions, (b) disclose gross mismanagement, (c) disclose abuse of authority and (d) disclose illegal and unethical conduct; and that plaintiff was wrongfully denied reappointment in violation of public policy;

2.      An injunction prohibiting all defendants, or their agents or subordinates, from retaliating in any manner, directly or indirectly, against plaintiff for any past and future protected disclosures and activities;

3.      An order reinstating plaintiff in the employ of OAH in the same position he held before the prohibited personnel actions were taken, retroactive to May 2, 2007;

4.      An order requiring immediate reinstatement of plaintiff's seniority rights;

5.      An order requiring record correction and expunction

6.      Retroactive payment of all lost wages and benefits, including back pay and interest on back pay;

7.      Compensatory damages in an amount to be determined at trial, in excess of $75,000 from all Defendants jointly and severally, to compensate plaintiff for pecuniary losses, injuries, and damages proximately caused by defendants' unlawful conduct;

8.      Pre-judgment and post-judgment interest;

9.      Punitive damages in an amount to be determined at trial but no less than ten times the amount of compensatory damages from all defendants jointly and severally;

10.     The attorneys' fees and costs incurred by plaintiff in the prosecution of this action from all defendants jointly and severally;

11.     A recommendation that disciplinary action be taken against defendant Butler.

12.     And such other relief as may be just and appropriate

### Demand for Jury Trial

Plaintiff demands a trial by jury for any and all issues proper to be so tried.

**I verify, under penalty of perjury, that the foregoing is true and correct.  Executed on May 1, 2008.**

_____

Roy L. Pearson, Jr.                                    Pro Se Attorney
3012 Pineview Court, N.E.
Washington, D.C.  20018
Telephone: (202) 269-1191