# Defendants' Exhibit No. 8A

## DISTRICT OF COLUMBIA
### OFFICE OF ADMINISTRATIVE HEARINGS



March 2, 2007

Hon. Robert R. Rigsby
Chair, Commission on Selection and Tenure of Administrative Law Judges
Moultrie Courthouse
500 Indiana Avenue, NW
Washington, D.C. 20001

      Re:  Reappointment of Judge Roy L. Pearson, Jr.

Dear Judge Rigsby:

Pursuant to D.C. Code § 2-1831.10(b), I transmit the record of Judge Roy L. Pearson, Jr.'s performance over the period of his appointment as an Administrative Law Judge (ALJ) at the Office of Administrative Hearings (OAH) for the use of the Commission on Selection and Tenure in determining Judge Pearson's reappointment.  As you know, Judge Pearson's current two-year appointment expires on May 2, 2007.

The record consists of this letter, one year of decisions authored by Judge Pearson (enclosed),[1] Judge Pearson's FY06 performance evaluation and response thereto (enclosed), and data on how Judge Pearson has met applicable objective performance standards (enclosed).

Pursuant to D.C. Code § 2-1831.10(b), I do not oppose the reappointment of Judge Pearson for a 10-year term.  Judge Pearson brought to OAH 17 years of legal experience, including serving as a Complaint Examiner for the Office of Police Complaints, and Assistant Director for Legal Operations for the District of Columbia Neighborhood Legal Services Program.  Judge Pearson also has served as a Teaching Fellow and Assistant Director for the Georgetown University Law Center–DC Project.  At OAH, Judge Pearson has been assigned primarily to cases under the jurisdiction of the Department of Public Works, Taxicab Commission, Department of Health, and the new Department of the Environment.

During his tenure at OAH, Judge Pearson's decisions have been generally well-written and timely issued, although I am aware of recent complaints from litigants concerning his judicial demeanor during hearings, and of inconsistencies in legal analyses.  As indicated in the enclosed FY06 performance evaluation, Judge Pearson received "Needs Improvement" ratings in two of the eight performance areas measured during the FY06 performance review, "Judicial

---

[1] As the Commission requested with respect to previous appointments, this transmittal contains a limited number of decisions, selected by the Judge.  The complete record of decisions is available at OAH's offices for review by members of the Commission.

Letter to the Hon. Robert R. Rigsby
Chair, Commission on the Selection and Tenure of Administrative Law Judges
March 2, 2007
Page 2 of 2

Temperament" and "Teamwork."[2]  In my opinion, Judge Pearson appears to have had some significant challenges transitioning to the environment of a start-up administrative court like OAH, particularly with regard to the tonality of his communications and his relationships with certain of his OAH colleagues.  Judge Pearson nevertheless has demonstrated a willingness to attempt to address these issues going forward.

The objective data regarding Judge Pearson's caseload shows a yearly output of 296 final orders (an average of 6 final orders per week) and 174 hearings conducted (an average of 3 per week). His productivity increased during the last fiscal year, with a yearly output of 347 final orders (an average of 7 per week).  In addition to his case assignments, Judge Pearson also has contributed to the mission of OAH by participating in some training sessions and DPW form improvement initiatives with OAH's legal assistants and other staff.

For these reasons, I do not oppose the reappointment of Judge Pearson to a 10-year term.

Please do not hesitate to contact me if you have any questions or require additional information.

Sincerely,

Tyrone T. Butler
Chief Administrative Law Judge

Enclosures

Cc:    Roy L. Pearson, Jr.
       Henry W. Lavine
       Peter M. Willner
       Pamela Satterfield

---

[2]  Judge Pearson filed a written response to his FY06 evaluation, and, as he has requested, a copy of this response has been attached to his performance review and made part of his personnel record.

**Office of Administrative Hearings**
**R. Pearson Statistics**
**May 2, 2005 - September 30, 2006**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/2/2005 | Pearson, Roy L. | 80% DPW; 10% DOH nonMA;10% Taxicab | | 420 | 296 | 25 | 6 | 246 | 174 | 14 | 3 | 467 |
| | | | | 562* | 397 | 33 | 8 | 188* | 133 | 11 | 3 | 595* |
| | | | Oct-05 | 40 | 480 | 40 | 10 | | | | | |
| | | | Nov-05 | 35 | 450 | 38 | 9 | | | | | |
| | | | Dec-05 | 22 | 388 | 32 | 8 | | | | | |
| | | | Jan-06 | 34 | 393 | 33 | 8 | | | | | |
| | | | Feb-06 | 19 | 360 | 30 | 7 | | | | | |
| | | | Mar-06 | 4 | 308 | 26 | 6 | | | | | |
| | | | Apr-06 | 30 | 315 | 26 | 6 | | | | | |
| | | | May-06 | 35 | 329 | 27 | 7 | | | | | |
| | | | Jun-06 | 43 | 349 | 29 | 7 | | | | | |
| | | | Jul-06 | 21 | 340 | 28 | 7 | | | | | |
| | | | Aug-06 | 30 | 341 | 28 | 7 | | | | | |
| | | | Sep-06 | 34 | 347 | 29 | 7 | | | | | |
| | | | **FY 2005 Total** | 347 | 347 | 29 | 7 | | | | | |

Judge Peason has requested that the following information be provided: For reasons beyond his control, he had no hearings for at least 2 weeks in November 2005 and only 4 hearings in March 2005, and was unable to log onto the OAH network for 2 weeks in December 2005.

*Total calibrated to current reappointment group's length of service

**DISTRICT OF COLUMBIA**
**OFFICE OF ADMINISTRATIVE HEARINGS**
**ALJ PERFORMANCE EVALUATION FORM**
**(For use in FY2006)**

| | |
|---|---|
| Name Administrative Law Judge (ALJ) Evaluated:<br>Last: Pearson   First: Roy          M.I. | Grade:    ES-9 |
| Initial Appointment Date: | Term<br>2 - year: from    5/2/2005    to  5/7/2007<br>6 - year: from   (date)    to   (date)<br>10 - year: from   (date)    to   (date) |
| | Evaluation/Rating Period:<br>October 1, 2005  to September 30, 2006 |
| Evaluating PALJ (s):<br><br> Janet James Mahon<br> John Dean | Hearing  Jurisdiction(s)  :  Department of Health,   Environment,   Taxicab,   Public Works |
| Date of Evaluation:<br>11/13/06 | Overall Rating: **2.84** |

## OAH Evaluation Rating Scale

**Level 5 = Significantly Exceeds Expectations:** This rating indicates that the ALJ's performance significantly exceeds standards in some pertinent aspects of the rated category, frequently exceeds standards in some pertinent aspects of the rated category and consistently meets the standard throughout the rating period.

**Level 4 = Exceeds Expectations:** This rating indicates the ALJ's performance frequently exceeds standards in some pertinent aspects of the rated category and meets the standard for all pertinent aspects of the rated category throughout the rating period.

**Level 3 = Meets Expectations:** This rating indicates the ALJ's performance consistently meets the standards in all pertinent aspects of the rated category throughout the rating period, but occasionally exceeds the standard.

**Level 2 = Needs Improvement:** This rating indicates that the ALJ's performance does not consistently meet the standard throughout the rating period. The reason for the rating

should be thoroughly explained in the Evaluator's comments, and a plan developed with the ALJ to improve performance.

**Level 1 = Does Not Meet Expectations:** This rating indicates that the ALJ's performance consistently fails to meet the standard throughout the rating period. The reason for the rating should be thoroughly explained in the Evaluator's comments, and a plan developed to improve performance.

## STEP I.        EVALUATION OF ALJ CORE COMPETENCIES

Review the following Competencies and discuss how each applies to the Administrative Law Judge's duties and responsibilities.  Performance on Competencies counts for 40% of the final performance rating.  Use the five point rating scale to rate the ALJ's performance relative to each Competency.  Competencies are based in part on the Section V of the *American Bar Association Guidelines for the Evaluation of Judicial Performance* (February 2005) *(Guidelines)*.  Comments to the *Guidelines* should be considered when rating an ALJ on Competencies. Include comments to support performance ratings.

---

| 1.        **Judicial Temperament** | **Rating     <u>2</u>** |
|---|---|

**Modeled after 6 DCMR 1407.2(a) and 1407.2(d)**
**Integrity and Impartiality (ABA Guideline 5-2)**
**Professionalism and Temperament  (ABA Guideline 5-4)**

Avoids impropriety and the appearance of impropriety.  Treats all people with dignity and respect and shows no favor or disfavor towards anyone, including, but not limited to, favor or disfavor based upon race, gender, religion, national origin, disability, age, sexual orientation, or socioeconomic status.  Acts fairly by giving people individual consideration.  Considers both sides of an argument before rendering a decision and bases decisions on the law and the facts without regard to the identity of counsel.  Considers all issues with an open mind.  Makes unpopular decisions when the unpopular decision is supported by the law and the facts.  Acts with patience and self control.  Conducts pro se litigation fairly and effectively.  Participates and provides leadership to an appropriate degree in administrative adjudication improvement activities and judicial education activities.  Participates in activities to promote public understanding and confidence in the judiciary and OAH.  Provides quality service to the public consistent with the ALJ's professional and ethical duties.

**Rating:**

☐**Significantly Exceeds Expectations**
☐**Exceeds Expectations**
☐**Meets Expectations**
<u>X</u> **Needs Improvement**
☐**Does Not Meet Expectations**

   **Comments:  Due to OAH's recent implementation of these interim performance standards, the rating of "Meets Expectations" is the highest for this FY2006 Evaluation Period.**

**2.Teamwork**                                    **Rating**        **2**

> **Modeled after 6 DCMR 1407(e)**
> **Administrative Capacity (ABA Guideline 5-5)**

Fosters a productive work environment with other judges and OAH staff.  Is punctual and prepared for hearings and staff meetings.  Appropriately enforces court rules, orders and guidelines.  Work to remedy problems without being told by a colleague or management.  Consistently seizes opportunities when they arise and produces quality work.  Is committed to ongoing improvement in work processes and adapts behavior or work methods in response to new information, changing conditions or unexpected obstacles.

**Rating:**

☐Significantly Exceeds Expectations
☐Exceeds Expectations
☐Meets Expectations
X Needs Improvement
☐Does Not Meet Expectations

   **Comments:  Due  to  OAH's  recent  implementation  of  these  interim performance standards, the rating of "Meets Expectations" is the highest for this FY2006 Evaluation Period.**

| | |
|---|---|
| **3.**     **Job Knowledge** | **Rating**   <u>**3**</u> |

**Modeled after 6 DCMR 1407.2(f)**
**Legal Ability (ABA Guideline 5-1)**

Knows and understands the substantive law, procedural rules, and rules of evidence applicable to case over which the ALJ presides.   Is current on developments in the law, procedure and evidence applicable to cases over which the ALJ presides.

**Rating:**

☐**Significantly Exceeds Expectations**
☐**Exceeds Expectations**
<u>X</u> **Meets Expectations**
☐**Needs Improvement**
☐**Does Not Meet Expectations**

    **Comments:  Due to OAH's recent implementation of these interim performance standards, the rating of "Meets Expectations" is the highest for this FY2006 Evaluation Period.**

**4. Communications (Oral)**        **Rating**     <u>**3**</u>

**Modeled after 6 DCMR 1407.2(i)**
**ABA Guideline 5-3**

Communicates orally during hearings in clear and logical manner.  Speaks so that what is expressed is understood. Presents the law of the case clearly and concisely. During hearings avoids negative verbal and non-verbal communications through tone of voice, facial expressions, eye contact, hand motions and posture.

**Rating**

☐**Significantly Exceeds Expectations**
☐**Exceeds Expectations**
<u>X</u> **Meets Expectations**
☐**Needs Improvement**
☐**Does Not Meet Expectations**

**Comments:  Due to OAH's recent implementation of these interim performance standards, the rating of "Meets Expectations" is the highest for this FY2006 Evaluation Period.**

**5.    Communications (Written)**                    **Rating        3**

     **Modeled after 6 DCMR 1407.2(a)**
     **ABA Guideline 5-3**

     Writes clear and logical decisions.  Writes so that what is expressed is understood.
     Expresses the law of a case clearly and concisely. (ABA Guideline 5-3).

**Rating**

☐**Significantly Exceeds Expectations**
☐**Exceeds Expectations**
<u>**X**</u> **Meets Expectations**
☐**Needs Improvement**
☐**Does Not Meet Expectations**

     **Comments:  Due to OAH's recent implementation of these interim performance
standards, the rating of "Meets Expectations" is the highest for this FY2006
Evaluation Period.**

## STEP II.  EVALUATE OAH S.M.A.R.T. GOALS

Use the five point rating scale to rate employee's performance relative to each OAH S.M.A.R.T. goal. (S.M.A.R.T. = Specific, Measurable, Attainable, Realistic, and Time-Related).  Include comments to support performance ratings.  In assessing SMART goals the Evaluator must consider whether OAH has provided resources or opportunities to meet the specific goals.

## GOAL 1 – Issuance of Final Orders

**GOAL #1.**  Issue the majority of final orders promptly after the record is closed.

**Rating**

☐**Significantly Exceeds Expectations**
☐**Exceeds Expectations**
X **Meets Expectations**
☐**Needs Improvement**
☐**Does Not Meet Expectations**

**Comments:   Due to OAH's recent implementation of these interim performance standards, the rating of "Meets Expectations" is the highest for this FY2006 Evaluation Period.**

**GOAL #2**
       Participates in at least one OAH management committee, or participates in at least one professional development association
**Rating**

☐**Significantly Exceeds Expectations**
☐**Exceeds Expectations**
X **Meets Expectations**
☐**Needs Improvement**
☐**Does Not Meet Expectations**

**Comments:   Due to OAH's recent implementation of these interim performance standards, the rating of "Meets Expectations" is the highest for this FY2006 Evaluation Period.**

**GOAL #3**

Participate in at least one OAH sponsored or funded continuing legal education program when made available.

**Rating**

☐ **Significantly Exceeds Expectations**
☐ **Exceeds Expectations**
X̲ **Meets Expectations**
☐ **Needs Improvement**
☐ **Does Not Meet Expectations**

**Comments:   Due to OAH's recent implementation of these interim performance standards, the rating of "Meets Expectations" is the highest for this FY2006 Evaluation Period.**

**STEP III.**

**Evaluator's Narrative of ALJ's Overall Performance (optional):**

The quality of Judge Pearson's writing is generally good.  He carefully researches and analyzes every issue and produces decisions that are often well written but often contrary to the decisions of his OAH colleagues.  This has sometimes resulted in confusion among certain OAH stakeholders.  He holds strong views about issues presented in his caseload, some of those views appear to have derived from his experience as an advocate.  He is generally diligent regarding his caseload and has held hearings and authored decisions in an amount that is in line with the rest of his colleagues.  He is an independent thinker and hold firmly to his beliefs; consequently, he has had disagreements with several colleagues, including a senior OAH judge who has refused to serve as Judge Pearson's peer reviewer, and another OAH judge who at one time requested that Judge Pearson not send her any more emails, generally characterizing his behavior as "confrontational, demeaning and not in the collegiate manner that we, in OAH, have worked to establish."  For the coming year, I would recommend that Judge Pearson makes an effort to attend more agency-wide meetings, take a more patient approach to the differing opinions of his colleagues, and work harder to become an integral part of the OAH team.  Judge Pearson has taken a special interest in ensuring that OAH forms are customer friendly and that pro se litigants understand the hearings process.  Recently, he gave a well-received presentation to the OAH clerk staff on how to handle incoming submissions from parties.  More of these proactive and positive undertakings would be beneficial to Judge Pearson's growth as an Administrative Law Judge as well as the continued growth and success of OAH.

Judge Pearson is an excellent writer, who disposes of his cases promptly.  I have several concerns about his performance, however.  He often seems bent on reaching a particular legal conclusion, regardless of the evidence, and regardless of whether it is necessary to reach that conclusion in the case before him.  He is usually unwilling to listen to any contrary opinions.  His approach on issues that he has not previously encountered is to write an opinion without asking for advice from others who may have dealt with the same issue previously.  Once committed to writing, his views are rarely open to re-examination in light of information of which he may not have been aware when he wrote the opinion.  Sometimes, his opinions are outside of the area in which, I believe, reasonable persons can disagree.

## STEP IV.   OVERALL PERFORMANCE RATING

Determine the Overall Performance Rating that consists of 40% of total competency rating and 60% of total OAH SMART goal rating.

Calculation:   Overall Performance Rating = (Total Competency Rating x .40) + (Total SMART Goal Rating x .60)

Total Rating   **2.84** *

| Performance Rating | Overall Performance Rating | Performance Category |
|---|---|---|
| 4.5 – 5.0 | 5 | Significantly Exceeds Expectations |
| 3.5 – 4.4 | 4 | Exceeds Expectations |
| 2.5 – 3.4 | 3 | Meets Expectations |
| 1.6 – 2.4 | 2 | Needs Improvement |
| 1.5 & below | 1 | Does Not Meet Expectations |

**\* Due to OAH's recent implementation of these interim performance standards, the rating of "Meets Expectations" is the highest for this FY2006 Evaluation Period.**

Evaluator
Print Name: Janet James Mahon

Date:   11/13/06

Evaluator
Print Name: John Dean

Date:  11/13/06

Deputy Chief Administrative Law Judge
Print Name: Mark D. Poindexter

Date:  11/13/06

I have read this performance evaluation and reviewed it with the Evaluator(s).  My signature does not imply agreement or disagreement with the information contained in this evaluation.

Administrative Law Judge
Date:

11

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Office of Administrative Hearings**



## MEMORANDUM

**TO:**        Chief Judge Tyrone Butler

**FROM:**    *Roy L. Pearson, Jr.*
              Roy L. Pearson, Jr.
              Administrative Law Judge

**SUBJECT:**  **Response To November 13, 2006 Evaluation**

**DATE:**      December 18, 2006

---

Please include this memorandum and attachment to it as my response to the November 13, 2006, evaluation of my judicial performance for the period of October 1, 2005-September 30, 2006.

    \*                  \*                  \*                  \*

The evaluation of my judicial performance consists of three parts: (1) Core Competencies, (2) S.M.A.R.T. Goals and (3) Evaluator's Narrative.  The portions of the evaluation that appear to be critical of me cannot be credited for two reasons.  First, the extraordinarily unfair way in which the evaluation process was conducted understandably shifts the reader's focus from the judge being evaluated to the motives of the evaluators.  Second, the substitution of irrelevant and/or harsh conclusions, innuendos and opinions, for facts, confirm that the Evaluators have no factual or legal basis for their conclusions, innuendos and opinions.

### I.
### The Shocking Unfairness Of This Evaluation Process

It is, frankly, embarrassing to reveal that a judicial body has subjected its judges to an "evaluation" process that is as obviously unfair and deficient in form and execution as the process that was sprung on the judges of this court on November 13, 2006.

Almost all of the Administrative Law Judges ("ALJs") at the Office of Administrative Hearings ("OAH") have in common that we are being retroactively evaluated based on factors that were not known to us during the evaluation period (October 2005-September 2006).  On November 13, 2006, we learned for the first time of the evaluation factors, the evaluation form that would be used and the evaluation period that would be covered.

The evaluation form attempts to compensate for some of the unfairness of its retroactive application by requiring the evaluators to provide the judge being evaluated with specific facts and details that will enable the judge to recall, and be in a position to disprove, those ratings that are not supported by facts.

Needless to say, an evaluator's failure to provide the detailed facts the evaluation form itself requires, in advance of meeting with the judge being evaluated, calls the fairness of the evaluation into question. If, in addition, the evaluators fail to provide the required facts either during or after the evaluation meeting, their conduct robs any criticism contained in the evaluation of any credibility whatsoever.

My evaluation is extraordinary in that it suffers from all three of these deficiencies. As a consequence, the criticisms in the evaluation I received regrettably offer more insight into the motivations and integrity of the evaluators than it does insight into my judicial performance.

## A.     Failure, And Then Refusal, To Provide Explanation Required By Form Itself

On pages 1-2 of the Judicial Evaluation form, under the general heading "OAH Evaluation Rating Scale," the evaluation form instructs Evaluators than any rating of "Needs Improvement" must be accompanied by a thorough written explanation of the basis for that rating, in the comment section for the rating:

> Level 2 - Needs Improvement: This rating indicates that the ALJ's performance does not consistently meet the standard throughout the rating period. *The reasons for the rating should be thoroughly explained in the Evaluator's comments, and a plan developed with the ALJ to improve performance.*" (italics supplied)

Obviously, a plan for improving allegedly deficient performance cannot be developed if the Evaluator cannot specify how the ALJ's performance was deficient. This is particularly true when each Core Competency consists of as many as 13 different performance factors on which the rating may be based. The judge being evaluated must know which of the 13 performance factors the Evaluator claims the judge needs to improve upon and the specific conduct of the judge the Evaluator relied on reached his or her conclusion that the judge's performance did not consistently meet the required standard throughout the one year rating period. If the judge's conduct allegedly occurred in a particular case (of the hundreds of cases handled by the judge during the evaluation period) the caption of the case must be disclosed and the judge given time to review the case files and refresh his memory of it. If the judge's conduct allegedly occurred outside the courtroom, the particulars of the claimed incident must be provided and the judge given to review e-mails or memoranda and other methods of refresh his memory of the date of the incident and its circumstances.

This requirement of specificity is so essential to a good-faith evaluation process that it is repeated again, on page 3 of the Evaluation form, when the evaluators begin the first step of the evaluation process. Under "STEP 1. EVALUATION OF ALJ CORE COMPETENCIES," the last sentence of the first paragraph emphasizes that the Evaluator is required to "Include comments to support performance ratings" with respect to each Core Competency. To implement that requirement, each Core Competency is followed by a section on the evaluation form that is reserved for the Evaluator's "Comments."

On November 13, 2006, I received ratings of "Needs Improvement" for the Core Competencies of "Judicial Temperament" and "Teamwork." However, no comments were provided in the comment section for either of those Core Competencies. So not only were the ratings not "*thoroughly* explained in the Evaluator's comments," they were not explained at all.

The morning after I received this conclusory evaluation I sent an e-mail to each evaluator requesting that the evaluation form be completed in accordance with its instructions, by providing the required facts, before our meeting.  My request was repeatedly rejected in an exchange of e-mails that same day and I attended the scheduled evaluation meeting on November 14, 2006, with no idea what factual basis the evaluators believed might exist for their ratings.

**B.     Inquiry Into Partial Explanation Provided At Evaluation Meeting Disproves It**

Another reason the evaluation form requires *written* particulars *in advance* of an evaluation meeting is because so little time is scheduled for the evaluation meeting itself (30 minutes).  And a judge cannot be expected to simultaneously engage multiple evaluators (three in my case) in a meaningful conversation, while taking notes about what is being revealed to him for the first time during the meeting.

Predictably, with three evaluators at the meeting, there was insufficient time to do more than touch on one "Core Competency" during the 55 minute evaluation meeting – the Core Competency of "Judicial Temperament."  Out of the thirteen factors on which that Core Competency can be based, Judges Mahon and Dean pointed to the single factor "Considers all issues with an open mind."

When I requested an example of any conduct of mine that justified this rating, Judge Mahon appeared flustered and said she would reveal the basis for the "Needs Improvement" rating at a later meeting with me on developing an Individual Development Plan.[1]  Judge Dean bit the bullet however and stated that in selecting the "Needs Improvement" rating he relied on: (1) a DPW case involving an Inspector Terrie Briscoe and (2) the case of *DPW v. Sheryle Elliot, Trustee*.

With the understanding that further information would be provided, and because signing the evaluation form does not indicate agreement with it and is a requirement for a merit pay raise, I signed the form to acknowledge having read it. But I emerged from the evaluation meeting with only Judge Dean's two-case claim to inquire into.

**C.     Following Refutation Of Judge Dean's Explanation, Evaluators Back Out of Follow Up Meeting**

Two days later, when Judge Mahon stopped by my office with a photocopy of the signed evaluation form, we agreed to set up a meeting to continue our discussion, before the evaluation was finalized and submitted to the Chief Judge.  That same day I sent two e-mails to Judge Dean to schedule a separate meeting with him on Monday, November 19 – when he would be done with other evaluation meetings.

In the two November 16 e-mails to Judge Dean I communicated to him the results of my review of the two case files he had mentioned during our November 14 evaluation meeting.  In each case it turned out that the facts he recalled were flatly contradicted by the case files.

---

[1] In an e-mail sent to me shortly after the evaluation meeting Judge Mahon reversed herself and stated she could provide no basis for the rating of "Needs Improvement" and so would not be providing any additional information.

In the first case (*DPW v. Nielsen*, PW-V-05-K108537, involving Inspector Terrie Briscoe), Judge Dean said he thought I failed to consider all the issues with an open mind. He reached this conclusion because he said he reviewed the file and discovered that I failed to cite and consider a photograph the Inspector introduced into evidence. However, the case file and decision in that case reveal that I not only cited and considered the single photograph the Inspector introduced, but that I spent most of my decision discussing the photograph and the reason it was insufficient to meet the requirements of 21 DCMR 700.3 (the alleged violation in that case). Judge Dean was mistaken. The file and decision in *DPW v. Nielsen*, PW-V-05-K108537 (available to any one for confirmation) contradicts his recollection that I failed to consider the photograph that was introduced into evidence in that case.

In the second case, *DPW v. Sheryle Elliot, Trustee*, PW-V-05-K10563, Judge Dean also stated that he thought I failed to consider all the issues with an open mind. However, the case file reveals that the defendant/respondent in that case purported to enter a plea of "Pay With Explanation" (along with her payment of the full fine). "Pay With Explanation" is not a legally permissible plea. Thus, the only issue was whether I should interpret her plea as: (1) a plea of Denial, (2) a plea of Admit with Explanation or (3) a plea of Admit.

The Government took no position on that issue. The Respondent provided no legal support for her plea. I thus raised and addressed the issue solely because I was required to in order to decide the case. In my decision I provided a lengthy explanation of the reason I concluded that the plea most resembled a plea of Admit with Explanation.

Again, the case file contradicts Judge Dean's recollection that I did not consider the single issue in this case with an open mind. Indeed, at the time I decided the case Judge Dean commented that I had *too* open a mind. It was his opinion that I should restrict myself to the single legal issue in the case and not address the Respondent's complaints about what she considered to be the Government's unfair enforcement practices. I disagreed, explaining that I (in common with a number of judges of the D.C. Court of Appeals) believe a parties' perception of fairness is as important as fairness in fact. In my November 16, 2006, e-mail to Judge Dean I pointed out that if my disagreement with *his* opinion in this regard was the basis for his "Needs Improvement" rating, it should not have been.

The requirement that a judge "Consider[] all issues with an open mind" is drawn from American Bar Association Guideline 5-4. The American Bar Association requires in its model Judicial Code of Ethics that a judge be free from the influence of others – including other judges. Thus, Judge Dean is criticizing me for doing what I am ethically required to do (not be influenced by <u>his</u> opinions). The OAH Code of Ethics For ALJs has the same requirement, in this regard, as the ABA Model Judicial Code of Ethics.

Following my two November 16 e-mails to Judge Dean, and Judge Mahon's written admission that she had no basis for concurring in Judge Dean's evaluation, Judge Poindexter intervened. In a series of e-mail to me he called off my scheduled follow up meetings with Judges Mahon and Dean and claimed there was confusion about whether the two judges had agreed to meet with me to reconsider their ratings and comments. I then forwarded Judge Poindexter e-mails from Judge Dean agreeing to meet with me for exactly that purpose. And I related Judge Mahon's oral agreement to do the same. I copied Judge Dean and Mahon on my e-mails to Judge Poindexter and asked that they state their own understanding.

Judges Mahon and Dean made no response.

I am embarrassed for them.

\*                              \*                              \*

In the weeks since Judge Mahon and Dean backed out of their commitments to meet with me to reconsider their ratings, and introduced Judge Poindexter into the process, I have also been unable to get the three judges to schedule an Individual Development Plan ("IDP") meeting – at which Judge Dean and Mahon would at least theoretically have to reveal the factual "deficiencies" that they would have me improve upon.

After first vigorously attempting to substitute the IDP meeting for the reconsideration meeting, Judge Poindexter has consistently failed to set a date for the IDP meeting he had championed. Instead, he has set, and then broken, deadlines for setting a date to set a date for the Individual Development meeting – while pressing me to file this document first.

The inherent unfairness of applying retroactive evaluation standards, compounded by a failure to abide by a promise to reveal facts at, or even after, the evaluation meeting should causes any fair minded person to shift his or her focus from the judge being evaluated to the motives of the evaluators.

This is not a trivial matter. A failure to meet minimum evaluation standards during any two year period out of three is grounds for termination of an ALJ. Yet, as this evaluation illustrates, a rating that a judge does not meet a required standard has been given with no: (1) explanation, (2) right to reconsideration or (3) right to review. The fact that no explanation was provided conflicts with the evaluation form itself. The fact that no reconsideration is permitted was not revealed until reconsideration was initially agreed to by the Evaluators. And the fact that no review by the Chief Judge is permitted was not revealed until reconsideration was denied and I requested review by the Chief Judge. All of these review denials conflict with the unanimous recommendation of the ALJ committee that proposed a new evaluation process

It is not only embarrassing for judges to make up the rules as they go along, it deprives their evaluation of any weight or respect.

## II.
## The Criticisms In The Evaluation Neither Claim, Nor Have, And Basis In Fact

As **Attachment A** to this response I am providing the portions of my evaluation that I spent a full month vainly requesting that Judges Mahon and Dean provide clarification or factual support for. Had they provided the requested clarifications, or alleged facts, I would be in a position to understand or fully rebut their contentions. Because they agreed to provide clarification and alleged facts, and then failed to, any negative portion of the evaluation should be stricken and the "Needs Improvement" rating should be upgraded to the highest possible rating.

Attachment A has two parts. A "Teamwork" rating and an optional "Evaluator's Narrative of ALJ's Overall Performance." The narrative section has nothing to do with ratings, was revealed for the first time on November 13, 2006, and licenses an Evaluator who is so inclined to slander a judge unhindered by any requirement of relevance or logic.

## A.    Clarification Requests For Judge Mahon

As **Attachment A** evidences, I made two clarification requests of Judge Mahon with respect to her "Teamwork" rating and her contribution to the "Evaluator's Narrative of ALJ's Overall Performance."

### 1. Teamwork

With respect to the Core Competency of "Teamwork" I inquired whether, and how, it had any relevance to her "Evaluator's Narrative of ALJ's Overall Performance." Judge Mahon's failure to respond to my inquiry must, in fairness, be deemed a negative response.

### 2. Evaluator's Narrative of ALJ's Overall Performance

In **Attachment A** I have highlighted specific portions of Judge Mahon's "Evaluator's Narrative of ALJ's Overall Performance" about which I requested clarification, or the facts/conduct upon which she relied. Again, I received no response. As I briefly review them the reader can draw their own conclusions for the reasons for her silence.

The reader will note that Judge Mahon's narrative is striking for purporting to pass on the opinions of others, without stating whether Judge Mahon concurs in those opinions. This, of course, is supposed to be Judge Mahon's evaluation of my performance, and not someone else's. As if under orders, Judge Mahon seems so intent on following someone's mandate to include these irrelevant observations that she forgets that this is supposed to be *her* evaluation of my *judicial* performance. In her apparent haste to follow orders, one of the statements she inserts is misquoted,[2] did not occur during the evaluation period[3] and does not reflect the speaker's opinion during the evaluation period.[4]   The other instance she relates is the result of my compliance with Judge Mahon's guidelines on Peer Review and another judge's failure to. At the time this occurred Judge Mahon stated her agreement with my handling of the matter.[5]   The

---

[2] Judge Mahon's narrative states that an unidentified OAH judge "<u>generally</u> characterized [Judge Pearson's] behavior as 'confrontational, demeaning and not in the collegiate manner that we, in OAH, have worked to establish." The ALJ made no such sweeping general characterization of my behavior. Without explanation, the ALJ took issue only with "[my] approach to raising issues . . .."

[3] The unidentified OAH judge made her comment in an e-mail dated July 13, 2005 – three months *before* the period covered by this evaluation.

[4] The unidentified OAH judge was not advised that Judge Mahon would include, and mischaracterize, her e-mail in my evaluation. Upon being advised of that fact she personally advised Judge Mahon that the comments in her July 13, 2005 e-mail did not accurately reflect her views during the evaluation period – to no avail.

[5] As the Presiding Judge of the Department of Health jurisdiction at OAH, Judge Mahon issued an e-mail on June 28, 2006, in which she instructed judges hearing Department of Health cases to restrict themselves to such obvious and superficial matters as typos and misnumbered pages in performing "Peer Review" for another judge. She specifically directed us to "resist the (continued on bottom of next page . . .)

inclusion of these two out-of-the-evaluation-period and following-Judge Mahon's-directions incidents is shockingly unprofessional and unnerving.

Judge Mahon's narrative is also striking for what it reveals about her ignorance of fundamental ethical requirements binding on all OAH judges. She claims:

o   my decisions are "often contrary to the decisions of [my] OAH colleagues"
o   my contrary decisions have "resulted in confusion among certain OAH stakeholders"
o   I have had disagreements with several colleagues
o   I strongly believe the decisions I reach

Judges are under an ethical obligation not to be influenced by a fear of being criticized by others – including other judges or "stakeholders."[6] Apparently Judge Mahon is unaware of this basic ethical requirement despite the fact that the evaluation form she filled out defines the Core Competency of "Judicial Temperament" as including the requirement that a judge demonstrate the ability to "[m]ake[] unpopular decisions when the unpopular decision is supported by the law and the facts." *ALJ Performance Evaluation Form* at 3.

Judge Mahon's narrative states that I "hold[] strong views about issues presented in [my] caseload, some of those views appear to have derived from his experience as an advocate." OAH consciously recruits judges who have had a minimum of five years of litigation and administrative experience. That experience is supposed to be a qualification, not a liability. A judge may not, however, prejudge any matter before him. Judge Mahon's comment has the innuendo of prejudgment, but she offers not a single example of any prejudgment on my part. No party has accused me of prejudice. Of the hundreds of cases I have handled, and written

---

urge to restructure sentences." Her June 28, 2006, e-mail ruled out the prior practice of requiring a judge to meet with you about his or her opinion. Instead, her e-mail stated: "If there is a clear mistake of law or fact, email a note to the Judge . . ."

A senior judge refused to comply with Judge Mahon's new Peer Review guidelines and insisted on restructuring sentences in opinions I subsequently submitted to him. Indeed, he went so far as to "require" that I meet with him to discuss my opinions. I met with him to point out the new Peer Review procedures mandated by Judge Mahon. When he continued, thereafter, to restructure sentences in my Final Orders, and to "require" that I meet with him to discuss my Final Orders, I met with Judge Mahon to confirm my understanding of her policy. When she confirmed my understanding, I asked her to meet with the senior judge to confirm with him her requirements. Judge Mahon stated she would do so. She never, subsequently, communicated any disagreement with my handling of this matter – until the innuendo in my evaluation four months later ("[Judge Pearson] has had disagreements with several colleagues, including a senior OAH judge who has refused to serve as Judge Pearson's peer reviewer . . ."). The implication that the "senior judge" is justified in refusing to serve as my peer reviewer, when the reason for his refusal is his refusal to comply with *her* written Peer Review instructions is disingenuous at best. I really have no words for a judge who will blind side you in an evaluation for complying with *her* instructions, without revealing that the conduct she criticizes was at her behest.

[6] *See* Section III(b)(2), *Code of Ethics for OAH Administrative Law Judges* ("[A]n Administrative Law Judge shall not be swayed by . . . fear of criticism . . ."); *Code of Ethics for OAH Administrative Law Judges*, Section II(C) ("An Administrative Law Judge shall not allow . . . relationships to influence judicial conduct or judgment.").

extensively regarding, not a single one has been appealed. Judge Mahon's innuendo cites no factual support and has none.

Judge Mahon's narrative includes the recommendation that I attend more agency-wide meetings. She nowhere claims to have made this suggestion before. And it contradicts the guidance I received from Judge Poindexter. When I sent an e-mail to Judge Poindexter on May 11, 2006 to tell him that I understood work on decisions to take precedence over meetings, he did not communicate back a different view to me. Decisions on whether judicial work should take precedence over a meeting (when you arrange for a colleague to take notes for you) have always been understood to be a matter for the judge's discretion.

In her narrative Judge Mahon also suggests that I "take a more patient approach to the differing opinions of [my] colleagues." That comment suggests that I do not already do so. No examples of impatience are given. And none can be given. I expect my colleagues to have their own opinions. In memoranda to my colleagues, the Commission on Selection and Tenure, and the D.C. Council, I alone have championed their right to hold and express those opinions. I suspect that what Judge Mahon means is the exact opposite – which I should allow other judges not to respect my right to arrive at and hold my own opinions. She provides no ethical or other support for that contention, and there is no support for it.

## B.    Clarification Requests For Judge Dean

As **Attachment A** evidences, I also made two clarification requests of Judge Dean, with respect to his "Teamwork" rating and his contribution to the "Evaluator's Narrative of ALJ's Overall Performance."

### 1. Teamwork

With respect to the Core Competency of "Teamwork" I inquired whether, and how, it had any relevance to Judge Dean's "Evaluator's Narrative of ALJ's Overall Performance." Judge Dean's failure to respond to my inquiry must, in fairness, be deemed a negative response.

### 2. Evaluator's Narrative of ALJ's Overall Performance

In the "Evaluator's Narrative of ALJ's Overall Performance" section of my evaluation I highlighted specific statements and asked for clarification or the facts/conduct upon which Judge Dean relied.

After receiving the results of my inquiry into the limited "facts" he provided on November 14, 2006, Judge Dean failed to provide any additional "facts" to support his claims. Unsupported claims, such as "[Judge Pearson's] claims are outside of the area in which, I believe, reasonable persons can disagree" are rebutted by my record of not having a single opinion appealed, much less modified or reversed.

The bulk of Judge Dean's narrative appears to reflect his belief that I am under an obligation to solicit, listen to and accept the opinions of other judges about the disposition of cases before me. He has been overruled in that regard by Chief Judge Butler who during the evaluation period oversaw the revamping of the Peer Review process at OAH to unshackle judges from the politically inspired oversight of Judge Dean and others.

# ATTACHMENT

# CLARIFICATION REQUESTS FOR JUDGE MAHON

**STEP I.**

**Which sentence(s), if any, in the factors listed below for assessing the Core Competency of "Teamwork" did you rely on in concluding that Judge Pearson's performance did not consistently meet the "Teamwork" standard throughout the rating period, and therefore "needs improvement"?**

---

**2.Teamwork**                                   **Rating**   _____

      **Modeled after 6 DCMR 1407(e)**
      **Administrative Capacity (ABA Guideline 5-5)**

Fosters a productive work environment with other judges and OAH staff.  Is punctual and prepared for hearings and staff meetings.  Appropriately enforces court rules, orders and guidelines.  Work to remedy problems without being told by a colleague or management.  Consistently seizes opportunities when they arise and produces quality work.  Is committed to ongoing improvement in work processes and adapts behavior or work methods in response to new information, changing conditions or unexpected obstacles.

**Rating:**

☐**Significantly Exceeds Expectations**
☐**Exceeds Expectations**
☐**Meets Expectations**
X**Needs Improvement**
☐**Does Not Meet Expectations**

      **Comments:  Due to OAH's recent implementation of these interim performance standards, the rating of "Meets Expectations" is the highest for this FY2006 Evaluation Period.**

---

**Did you address the factor(s), above, that you relied on in making this rating in the "Evaluator's Narrative of ALJ's Overall Performance" section of Judge Pearson's evaluation?  If not, what facts did you rely on in reaching the conclusion that Judge Pearson performance in this regard "needs improvement"?**

_____
_____
_____
_____
_____
_____
_____

## STEP III.

## Evaluator's Narrative of ALJ's Overall Performance (optional):

### Judge Mahon:

The quality of Judge Pearson's writing is generally good. He carefully researches and analyzes every issue and produces decisions that are often well written **but often contrary to the decisions of his OAH colleagues.**[7] This **has sometimes resulted in confusion among certain OAH stakeholders.**[8] He holds strong views about issues presented in his caseload, **some of those views appear to have derived from his experience as an advocate.**[9] **He is generally diligent regarding his caseload**[10] and has held hearings and authored decisions in an amount that is in line with the rest of his colleagues. He is an independent thinker and hold firmly to his beliefs; consequently, **he has had disagreements with several colleagues,**[11] **including a senior OAH judge who has refused to serve as Judge Pearson's peer reviewer,**[12] **and another OAH judge who at one time requested that Judge Pearson not send her any more emails, generally characterizing his behavior as "confrontational, demeaning and not in the collegial manner that we, in OAH, have worked to establish."**[13] For the coming year, I **would recommend that Judge Pearson makes an effort to attend more agency-wide**

---

[7] Is your view that Judge Pearson's decisions are **"often contrary to the decisions of his OAH colleagues"** a criticism? Why did you criticize Judge Pearson's judicial performance during the evaluation period for that reason?

[8] Is your view that Judge Pearson's decisions **"ha[ve] sometimes resulted in confusion among certain OAH stakeholders"** a criticism? Why did you criticize Judge Pearson's judicial performance during the evaluation period for that reason? What stakeholders have communicated their confusion to you? What confusion have they communicated to you?

[9] Is your view that **"some of [Judge Pearson's] views [about issues presented in his caseload] appear to have derived from his experience as an advocate"** a criticism? Why did you criticize Judge Pearson's judicial performance for that reason? What views of Judge Pearson's appear to you to have derived from his experience as an advocate?

[10] Do you know of a single time period, during the evaluation period, when Judge Pearson has not been diligent regarding his caseload? If so, when and how did you arrive at that conclusion? If not, why did you modify your assessment of his diligence with the term **"generally"**?

[11] Is your view that **"[Judge Pearson] has had disagreements with several colleagues,"** as a consequence of being an independent thinker and holding firmly to his beliefs, a criticism? Why do you criticize Judge Pearson's judicial performance during the evaluation period for that reason?

[12] Is your statement that a **"senior OAH judge [] has refused to serve as Judge Pearson's peer reviewer"** a criticism? Why did you criticize Judge Pearson's judicial performance during the evaluation period for that reason?

[13] Is your statement that **"another OAH judge who at one time requested that Judge Pearson not send her any more emails, generally characterizing his behavior as "confrontational, demeaning and not in the collegiate manner that we, in OAH, have worked to establish"** a criticism? Did the OAH judge's request, and characterization, occur during the evaluation period? Why did you criticize Judge Pearson's performance during the evaluation period for that reason?

meetings,[14] take a more patient approach to the differing opinions of his colleagues,[15] and work harder to become an integral part of the OAH team.[16]

---

[14] During the evaluation period did you request or recommend to Judge Pearson that "**Judge Pearson make an effort to attend more agency-wide meetings**"?

[15] During the evaluation period did you request or recommend to Judge Pearson that he "**take a more patient approach to the differing opinions of his colleagues**"? If so, when and how did you do so? Do you contend that during the evaluation period Judge Pearson did not take a sufficiently "**patient approach to the differing opinions of his colleagues**"? If so, when and how did he fail to do so?

[16] During the evaluation period did you request or recommend to Judge Pearson that he "**work harder to become an integral part of the OAH team**"? If so, when and how did you do so? What do you mean by "**becom[ing] an integral part of the OAH team**"? Do you contend that the OAH Act, or any other authority binding on him, requires that Judge Pearson "**become an integral part of [an] OAH team**" where his decision making is concerned? If so, what authority do you rely on?

# CLARIFICATION REQUESTS FOR JUDGE DEAN

**STEP I.**

**Which sentence(s), if any, in the factors listed below for assessing the Core Competency of "Teamwork" did you rely on in concluding that Judge Pearson's performance did not consistently meet the "Teamwork" standard throughout the rating period, and therefore "needs improvement"?**

---

**2.Teamwork**                                    **Rating**        _____

> **Modeled after 6 DCMR 1407(e)**
> **Administrative Capacity (ABA Guideline 5-5)**

Fosters a productive work environment with other judges and OAH staff. Is punctual and prepared for hearings and staff meetings. Appropriately enforces court rules, orders and guidelines. Work to remedy problems without being told by a colleague or management. Consistently seizes opportunities when they arise and produces quality work. Is committed to ongoing improvement in work processes and adapts behavior or work methods in response to new information, changing conditions or unexpected obstacles.


**Rating:**

☐Significantly Exceeds Expectations
☐Exceeds Expectations
☐Meets Expectations
XNeeds Improvement
☐Does Not Meet Expectations

     **Comments: Due to OAH's recent implementation of these interim performance standards, the rating of "Meets Expectations" is the highest for this FY2006 Evaluation Period.**

---

**Did you address the factor(s), above, that you relied on in making this rating in the "Evaluator's Narrative of ALJ's Overall Performance" section of Judge Pearson's evaluation? If not, what facts did you rely on in reaching the conclusion that Judge Pearson's performance in this regard "needs improvement"?**

_____
_____
_____
_____
_____
_____

## STEP III.

## Evaluator's Narrative of ALJ's Overall Performance (optional):

<u>Judge Dean:</u>
Judge Pearson is an excellent writer, who disposes of his cases promptly.   I have several concerns about his performance, however. **He often seems bent on reaching a particular legal conclusion, regardless of the evidence, and regardless of whether it is necessary to reach that conclusion in the case before him.**[17]  **He is usually unwilling to listen to any contrary opinions.**[18]  **His approach on issues that he has not previously encountered is to write an opinion without asking for advice from others who may have dealt with the same issue previously.**[19]  **Once committed to writing, his views are rarely open to re-examination in light of information of which he may not have been aware when he wrote the opinion.**[20] **Sometimes, his opinions are outside of the area in which, I believe, reasonable persons can disagree.**[21]

---

[17] What cases and other facts did you rely on in reaching your conclusion that, during the evaluation period, Judge Pearson **"often seem[ed] bent on reaching a particular legal conclusion, regardless of the evidence, and regardless of whether it [was] necessary to reach that conclusion in the case before him"**?

[18] What cases and other facts did you rely on in reaching your conclusion that, during the evaluation period, Judge Pearson was **"usually unwilling to listen to any contrary opinions."** Do you mean that as a literal and unqualified statement?  If not, what did you mean?

[19] What cases and other facts did you rely on in reaching your conclusion that, during the evaluation period, Judge Pearson's **"approach on issues that he ha[d] not previously encountered [wa]s to write an opinion without asking for advice from others who may have dealt with the same issue previously"**?  Do you literally mean that a judge must or should ask for advice from others [judges?] before he or she writes an opinion on an issue he or she has not previously encountered?  If not, what did you mean?

[20] What cases and other facts did you rely on in reaching your conclusion that, during the evaluation period, **"[o]nce committed to writing, [Judge Pearson's] views are rarely open to re-examination in light of information of which he may not have been aware when he wrote the opinion"**?  Do you contend that, throughout the evaluation period, Judge Pearson was required by some law, ethical provision or other authority binding of him to re-examine his views **"in light of information of which he may not have been aware when he wrote the opinion"** that was brought to his attention by another ALJ at OAH?  If so, what authority is that, and when and how did you advise Judge Pearson of that authority during the evaluation period?

[21] What cases and other facts did you rely on in reaching your conclusion that, during the evaluation period, sometimes Judge Pearson's **"opinions [wer]e outside of the area in which, [you] believe, reasonable persons can disagree"**?

DISTRICT OF COLUMBIA
OFFICE OF ADMINISTRATIVE HEARINGS
441 4ᵗʰ Street, NW, Suite 540-S
Washington, DC  20001-2714

DISTRICT OF COLUMBIA
DEPARTMENT OF PUBLIC WORKS
      Petitioner,

     v.                               Case No.:   PW-V-06-15279

BELMAR SORTO COMPANY
      Respondent.

**FINAL ORDER**

**I.**    **Introduction**

     This matter came before the undersigned administrative law judge on June 8, 2006, for a hearing on a contested Notice of Violation.  Almost immediately, it became apparent that this case is strikingly different from the hundreds of Litter Control Act cases I have heard in the past year.  Although this case, too, is captioned as one brought by the Department of Public Works, no employee or agent of the Department of Public Works was involved in the issuance of the Notice of Violation in this case.  Instead, a police officer appeared at the hearing and testified that he issued the Notice of Violation, and that he was employed by the Environmental Crimes Unit of the Metropolitan Police Department.

     At the close of the evidence I undertook to briefly review the law on the authority of the Metropolitan Police Department to issue and prosecute Notices of Violation pursuant to the Litter Control Administration Act.  I then issued an order outlining the results of my preliminary research and inviting legal memoranda from the Metropolitan Police Department and the Department of Public Works on the issues.  Coincidentally, the District of Columbia Council is

engaged in a parallel legislative inquiry into the same issues. The result of the Council's inquiry is unknown at this writing. For the reasons that follow I conclude that the Metropolitan Police Department was not authorized to issue the Notice of Violation on which this case is based and that this petition must therefore be dismissed.

## II.    Procedural History

On February 27, 2006, an officer assigned to the Environmental Crimes Unit of the Metropolitan Police Department issued and served a Notice of Violation upon Respondent Belmar Sorto Company. The Notice of Violation form, supplied by the Department of Public Works ("DPW") and listing DPW as the citing party, alleged a violation of 21 DCMR 705.4, which requires that wrapped food waste be collected in vehicles that are enclosed. The Notice of Violation alleged that the violation occurred on February 23, 2006, in the 1300 block of 1st Street, S.E. and sought a fine of $300.

The Respondent served a timely plea of Deny and the Office of Administrative Hearings scheduled a hearing in this case for June 8, 2006 at 11:30 a.m. Carl E. Ruleman, the police officer who served the Notice of Violation, appeared and identified himself as an officer with the Environmental Crimes Unit of the Metropolitan Police Department. Ms. Belmar Sorto, who may or may not own a "Belmar Sorto Company"[1], appeared on behalf of the Respondent. Exhibit 100 was admitted into evidence at the request of Officer Ruleman.

---

[1] Even with the assistance of a translator the court was unable to understand, with any real certainty, Ms. Sorto's relationship to the "Belmar Sorto Company," or even whether such a company exists. Ms. Sorto testified "I don't have the company." She added that when she purchased the truck that was stopped in this case the dealership insisted on placing the registration for the truck in the name of "Belmar Sorto Company."

Susan Abila, an interpreter of English and Spanish, certified by Language Line, was accepted without objection as a translator in this case.

Because Officer Ruleman identified himself as an agent and employee of an agency other than the Petitioner, I issued a post-hearing order asking all interested persons to address the authority of the officer to issue the Notice of Violation in this case.[2]  In its memorandum the Department of Public Works does not contend that the officer was acting, or could act, as its agent.  For the reasons that follow I conclude that Officer Ruleman lacked the statutory authority to issue an enforcible Notice of Violation and that this petition must therefore be dismissed.

## III.    Can A Police Officer Issue A Notice of Violation?

### A.    The Litter Control Act Initially Limited Enforcement Authority To DPW

Because Officer Ruleman identified himself as a police officer, and not as an employee or agent of the Department of Public Works, the obvious threshold issue in this case is whether a police officer can enforce the Litter Control Administration Act of 1985, D.C. Code § 8-801, *et*

---

[2] On June 21, 2006, I issued an *Order For Briefing Of "Real Party In Interest" Issue*. The order invited the Department of Public Works ("DPW") and the Metropolitan Police Department to address existing and proposed laws on the authority of police officers to enforce the Litter Control Administration Act, D.C. Code § 8-801, *et seq.*, by issuing Notices of Violation.  On June 11, 2006, DPW submitted a memorandum of law on the issue.  DPW's memorandum does not contend that the Director of the Department of Public Works delegated Officer Ruleman the power to issue the Notice of Violation in this case. The memorandum, instead, argues that the enforcing agency is irrelevant because the District of Columbia is the real party in interest and should be substituted as the Petitioner in this case. I do not agree. DPW is authorized by the Litter Control Administration Act of 1985 to bring enforcement actions before the Office of Administrative Hearings, and is therefore a real party in interest.  D.C. Official Code § 8-802(a)(1); 24 DCMR 1300.2(a).  Under existing law, however, it must use its own employees to enforce the Act.

*seq..* through the issuance of a Notice of Violation.[3]

When the Litter Control Administration Act of 1985 was enacted, enforcement of its provisions was specifically limited by statute to employees of the Department of Public Works. D.C. Code § 6-2902 (1981 Ed.) ("The Mayor of the District of Columbia, *through the Department of Public Works*, shall enforce [Litter Control regulations]").   Indeed, the bill reported out by the Council's Committee on Public Works summarized its intent in these words: "To provide for administrative adjudication *and civil enforcement* of local laws *within the Department of Public Works of the District of Columbia*." Committee Report, Bill 6-297, *Litter Control Act of 1985*, Engrossed Original at 1 (Nov. 22, 1985).

**B.    The Regulation That Subsequently Extended Enforcement Authority To The Chief Of Police Is Invalid**

Notwithstanding the express limitation in the original statute, and legislative history that makes clear the Council's unmistakable intent, on December 4, 1987 a regulation was promulgated that purported to expand the number of agencies with authority to issue a Notice of Violation to enforce the Litter Control Administration Act.   *See* 24 DCMR 1300.2(b) (authorizing the Chief of Police, or his delegatees, to issue Notices of Violation).

At the time 24 DCMR 1300.2(b) was enacted it clearly conflicted with the explicit provision in the Litter Control Act limiting enforcement of the Litter Control Act to the Department of Public Works.  "[I]t is axiomatic that a regulation [must] be consistent with the

---

[3]   As I noted in the June 21, 2006 order seeking memoranda of law from all interested persons and entities, there is "room for doubt" on the question of whether the Metropolitan Police Department can enforce the Litter Control Administration Act.  My June 21, 2006 order observed that two committees of the D.C. Council were scheduled to take up the issues in a joint hearing on June 28, 2006.

statute under which it was promulgated." *District of Columbia v. Catholic University of America*, 397 A.2d 915, 919 (D.C. 1979). If a regulation is not authorized by an enabling statute, the regulation is void and of no effect.   *Id.* at 921 (regulation is invalid if, at the time it was promulgated, it was inconsistent with its enabling statute); *Kennecott Copper Corporation v. Industrial Commission*, 564 P.2d 407, 409 (Ariz. 1977) ("It is a fundamental principle of administrative law that an administrative agency must function in the exercise of its rule-making authority within the parameters of its statutory grant.   To otherwise operate would be an administrative usurpation of the constitutional authority of the legislature."); *cf. Ford v. Chartone, Inc.*, 834 A.2d 875, 879 (D.C. 2003) (court rule is void if it conflicts with substantive law).

## C.     The Invalid Regulation Did Not Subsequently Arise From Its Grave

Thirteen years after 24 DCMR 1300.2(b) was invalidly promulgated, the Council of the District of Columbia amended the language in the Litter Control Administration Act of 1985 that restricted the Mayor to enforcing Litter Control Act regulations through the Department of Public Works.  The amendment removed the words "through the Department of Public Works," D.C. Law 13-172 (effective Oct. 1, 2000), so that the first sentence of D.C. Official Code § 8-802(a)(1) currently reads: "The Mayor of the District of Columbia ("Mayor") shall enforce [the Litter Control regulations] . . ."

This amendment did not have the effect of reviving 24 DCMR 1300.2(b) from the dead and giving it legal effect for the first time.  Although the amendment authorized the Mayor to enforce the Litter Control Act through any agency of his choosing, the Mayor was required to do that choosing through a *subsequent* rulemaking process. D.C. Code § 8-810 ("The Mayor shall

issue rules to implement this chapter under the provisions of subchapter I of Chapter 5 of Title 2 . . ."). The rulemaking process gives the public an opportunity to comment on proposed rules. In the case of 24 DCMR 1300.2 the public never had that opportunity after October 1, 2000, because the Mayor did not, after that date, promulgate regulations that proposed to authorize the Chief of Police, or his designees, to issue Notices of Violation for alleged violations of the Litter Control Administration Act.

Thus, when Officer Rule issued the Notice of Violation in this case on February 23, 2006, in his capacity as a delegatee of the Chief of Police (and not of the Department of Public Works), he lacked the authority to do so.

Because the action of the police officer in this case exceeded his authority, it was *ultra vires* and of no effect.

## IV.   Order

Accordingly, it is, this __26th__ day of __July__, 2006:

**ORDERED**, that this case is **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED**, that the appeal rights of any party aggrieved by this Order are stated below.

_____
Roy L. Pearson, Jr.
Administrative Law Judge

# APPEAL RIGHTS

Pursuant to D.C. Official Code §§ 2-1831.16(c)-(e). any party suffering a legal wrong or adversely affected or aggrieved by this Order may seek judicial review by filing an original petition for review and six copies with the District of Columbia Court of Appeals at the following address:

Clerk
District of Columbia Court of Appeals
H. Carl Moultrie I Courthouse
500 Indiana Avenue, N.W.
Sixth Floor
Washington, DC 20001
202-879-2700

The petition for review (and required copies) may be mailed or delivered in person to the Clerk of the D.C. Court of Appeals, and must be received by the Clerk of the Court of Appeals within thirty (30) calendar days of the mailing date of this Order, pursuant to D.C. App. R. 15(a)(2). Information on petitions for review to the Court of Appeals can be found in Title III of the Rules of the District of Columbia Court of Appeals.

## IMPORTANT NOTICES:

**1.     By law, the amount of a lawfully imposed fine cannot be modified or reduced on appeal. D.C. Official Code § 2-1831.16(g).**

**2.     Filing of a petition for review does not stay (stop) the requirement to comply with a Final Order, including any requirement to pay a fine, penalty or other monetary sanction imposed by a Final Order.  If you wish to request a stay, you must first file a written motion for a stay with the Office of Administrative Hearings.  If the presiding Administrative Law Judge denies a stay, you then may seek a stay from the Court of Appeals.**

## Certificate of Service:

**By U.S. Mail (Postage Paid):**

Belmar Sorto Company
5605 37th Avenue
Hyattsville, Maryland 20782
**Attention:** Ms. Belmar Sorto

I hereby certify that on _____,
2006 this document was caused to be served
upon the parties named on this page at the
addresses listed and by the means stated.

_____
Clerk / Deputy Clerk

**By Inter-Agency Mail:**

Terry Ryan, General Counsel
Metropolitan Police Department
Room 4125
300 Indiana Avenue, N.W.
Washington, DC  20001

Officer Carl E. Ruleman
Metropolitan Police Department
Environmental Crimes Unit
3220 Pennsylvania Avenue, S.E.
Washington, DC  20020

Christine V. Davis
General Counsel
Department of Public Works
2000 14th Street, N.W.
6th Floor
Washington, DC  20009

**DISTRICT OF COLUMBIA**
**OFFICE OF ADMINISTRATIVE HEARINGS**
441 4th Street, NW, Suite 540-S
Washington, DC  20001-2714

| | |
|---|---|
| DISTRICT OF COLUMBIA<br>DEPARTMENT OF PUBLIC WORKS<br>      Petitioner, | |
| v. | Case No.   PW-V-05-K104507 |
| TALLEY R. HOLMES, JR.<br>      Respondent. | |

**FINAL ORDER**

**I.**    **Introduction**

On June 8, 2005, the Government served a Notice of Violation upon Talley R. Holmes, Jr. ("Respondent"). The Notice alleged that Respondent violated 21 DCMR 700.3 by failing to properly store solid waste.[1] The Notice alleged that the violation occurred on May 18, 2005, on the side of a commercial property located at 1120-7th Street, N.E. ("Property"), and sought a fine of $150. The Government did not require abatement of the alleged violation.

Respondent filed a timely answer with a plea of Deny to the charge. An evidentiary hearing was held on August 23, 2005. Deborah Alexander, the Government inspector who issued the Notice of Violation (the "Inspector"), appeared on behalf of the Government. The Respondent did not appear. Exhibit 100 was admitted into evidence.

---

[1] 21 DCMR 700.3 provides:

All solid wastes shall be stored and containerized for collection in a manner that will not provide food, harborage, or breeding places for insects or rodents, or create a nuisance or fire hazard.

**DISTRICT OF COLUMBIA**
**OFFICE OF ADMINISTRATIVE HEARINGS**
825 North Capitol Street, NE, Suite 4150
Washington, DC  20002-4210

DISTRICT OF COLUMBIA
DEPARTMENT OF HEALTH
        Petitioner,

            v.

SIYAMAK SADEGHI
        Respondent.

Case Nos.:  DH-I-05-A100273
            DH-I-05-A100331

## FINAL ORDER

### I.    Introduction

This case arises under the Civil Infractions Act of 1985, D.C. Official Code §§ 2-1801.01– 2-1802.05 and Title 21, Chapter 5 of the District of Columbia Municipal Regulations ("DCMR").  It presents issues regarding the Respondent's potential liability for two alleged violations of water quality regulations, and also the question of whether he can be penalized for filing a late (or no) response to the first and/or second Notice of Infraction issued in this case.

### II.    Procedural History

Because the attempted service of, and lack of or apparently late response to, the two Notices of Infraction in this case is of considerable relevance to two of my rulings, this opinion begins with a recounting of the service history in this case.

On August 22, 2005, the Department of Health ("DOH") attempted, by certified mail, to serve a first Notice of Infraction (No. A100273) upon Respondent Siyamak Sadeghi alleging that he violated 21 DCMR 538.1(f) (failure to protect stockpiled material with mulch or temporary

vegetation) and 21 DCMR 539.4 (failure to place adequate erosion control measures before and during exposure). These water quality regulations are collectively referred to herein as the "Regulations." The Notice of Infraction alleged that the violations occurred on July 1, 2005, at 1301 First Street, N.W. (the "Site"), and sought fines in the total amount of $1,010.[1]

The first Notice of Infraction was returned to DOH, by the U.S. Postal Service, stamped: "UNCLAIMED." As a consequence, the Respondent did not file an answer to the first Notice of Infraction within the required 20 days after service (15 days plus 5 additional days for service by mail pursuant to D.C. Official Code §§ 2-1802.02(e) and 2-1802.05). Accordingly, on October 3, 2005, the Office of Administrative Hearings issued a *Notice of Default* finding Respondent in default and subject to a statutory late-Answer penalty of $1,000, in addition to any fine the Respondent might be subject to for the alleged water quality violations. The *Notice of Default* required the Government to serve a second Notice of Infraction pursuant to D.C. Official Code §§ 2-1802.02(f) and 2-1801.04(a)(2)(A).

DOH issued and served a second Notice of Infraction (No. A100331) on October 13, 2005, again by certified mail. On October 18, 2005, the Office of Administrative Hearings received a Fax Cover Sheet from the Respondent, with no attachments to it (although it referenced a second page). In the body of the Fax Cover Sheet the words: "Re: Case # DH-I-05-A100273" were written.

On November 29, 2005, the Respondent dropped off a copy of the same Fax Cover Sheet and attached to it the reverse side of a Notice of Infraction. On the reverse side of the Notice of Infraction the Respondent's name, telephone number and his full address were filled in. An

---

[1] Ten dollars must be deducted from this total because an administrative fee in that amount is no longer charged.

OAH staff member subsequently placed a post-it on the document and wrote: "Called Respondent to tell him/her to clarify their plea by putting something in writing to request a hearing or checking appropriate plea."

On January 26, 2006 a *Request For Hearing* was filed by attorney Tuna Mecit, on behalf of the Respondent. A Case Management Order was then issued setting March 21, 2006 as the date for the hearing.

At the March 21 hearing, Peter Nwangwu, the charging Inspector, and attorney Caroline Burnett, were present for the Government. Respondent was represented by Tuna Mecit, Esquire. Exhibits 100-106 and 108-109 were admitted into evidence at the request of the Government. Exhibits 200-201 and 207 were admitted into evidence at the request of the Respondent. I permitted counsel for the Government an opportunity to submit a post-hearing memorandum on the issue of whether service of the first Notice of Infraction, that was returned "UNCLAIMED," was a sufficient basis for a statutory late-Answer penalty. And I permitted Respondent's counsel an opportunity to respond to that memorandum. A memorandum of law was received from the Government and I have considered the analyses contained in it.

Upon consideration of the entire record, including the summary below of the parties' testimony, I have made the findings of fact and reached the conclusions of law that follow the Summary of Testimony.

## III.     Summary of Testimony

## A.     Inspector's Testimony

The Inspector testified that on July 1, 2005, he came upon 1301 First Street, N.W. while

he was in the area near the building observing construction sites to see if they were in compliance with sediment control regulations.

At 1301 First Street, N.W. the Inspector observed that the construction underway there did not appear to be in compliance with sediment control regulations. The Inspector first drove around the perimeter of the site. He observed debris and run off along a portion of the Site that bordered an alley. He similarly observed that other areas along the perimeter of the Site had no barriers that would prevent sediment from running off.

In addition, the Inspector observed a stockpile of excavated dirt on the Site, and that the stockpile was close enough to a sidewalk for the dirt to run off onto it if it rained. The Inspector concluded that the dirt had been sitting there for a long time. He reached that conclusion based on his observation of the depth of the foundation that had been dug for the building being constructed at the Site. It appeared that the stockpile of dirt had been dug up from the foundation and placed on the perimeter of the Site.

While at the Site the Inspector spoke with a Brie Husted, who identified herself as the architect for the project.[2]  The Inspector communicated the violations he had found to Ms. Husted, who said she would relay that information to the owner and ensure the violations were corrected.

On August 12, 2005, the Inspector completed a first Notice of Infraction. And on August 22, 2005 the first Notice of Infraction was sent by certified mail to the address, and to the owner,

_____

[2] The Inspector initially identified the architect as a male.  On cross examination, and consistent with his written notes recording the spelling of the architect's first name, the Inspector corrected himself and acknowledged that the architect he spoke with on July 1, 2005 was a woman.

of the property recorded in the computerized real property records of the District of Columbia government.

On cross-examination the Inspector acknowledged that Exhibit 102 shows a silt fence along a small section of the perimeter of the Site.

## B.   Respondent's Testimony

The Respondent testified that he was not at the Site on July 1, 2005 and that he found out about the inspection that took place on that date from his architect. He related that the architect advised him that the Inspector took some photographs, told the architect that a silt fence was not in the proper place and that no #2 stone was in the driveway at the Site.

The Respondent testified that there had previously been a building on the Site and that it had burned down. However, as a result of the earlier building there was still a concrete pad, or driveway, at the entrance to the Site. He stated that it would have made no sense to put #2 stone on top of the concrete at the entrance to the Site. He testified that the old concrete pad provided the same stabilization that #2 stone would have provided. The Respondent stated that the concrete pad at the entrance was covered by dirt on July 1, 2005, as a result of dirt falling off trucks as they exited the Site.

As to the stockpiled dirt on the site, the Respondent testified that it constituted a small percentage of the dirt that had been excavated for the new building's foundation. In total, the dirt from the excavation at the Site had filled forty trucks. The relatively small amount of dirt that remained stockpiled at the Site was being used to backfill the walls of the new building as it was being constructed. During work hours the dirt was not covered by plastic because plastic

provides slippery, and dangerous, footing for workmen.  The Respondent testified that after work hours the dirt was always covered with plastic.

The Respondent emphasized that a portion of the perimeter of the Site had a silt fence around it.  A silt fence could not be placed around other portions of the perimeter because the concrete from the former driveway prevented a silt fence from being completely anchored in the dirt where the concrete pad was.

## IV.     Findings of Fact

On July 1, 2005, the Respondent failed to protect stockpiled material with mulch or temporary vegetation. However, the stockpiled material had not been stripped from the topsoil and was not being stockpiled for later use on areas to be stabilized by permanent vegetation.

On July 1, 2005, the Respondent failed to place adequate soil erosion and sediment control measures in place before and during exposure.

Neither personal, substituted or first class mail service of the first Notice of Infraction was attempted.

An attempt to serve the first Notice of Infraction by certified mail was made.  The envelope containing the notice was returned "unclaimed" to the Petitioner by the United States Postal Service.  No attempt to re-serve the first Notice of Infraction was made.

## V.      Analysis And Conclusions of Law

On this record, the issues before me are: (1) whether the Respondent is liable for a _fine_ for a violation of 21 DCMR 538.1(f); (2) whether the Respondent is liable for a _fine_ for a

violation of 21 DCMR 539.4; (3) whether the Respondent is liable for a <u>penalty</u> for not responding to the first Notice of Infraction at all; and (4) whether the Respondent is liable for a <u>penalty</u> for not responding in a timely manner to the second Notice of Infraction.  I address each issue in turn.

## A.    Liability For Violating 21 DCMR 538.1(f)?

The first regulation the Respondent is charged with violating is 21 DCMR 538.1(f).  That regulation was drafted as one of the "guidelines for erosion and sediment control planning in the District of Columbia . . ." 21 DCMR 538.1. It reads as follows:

> Strip and stockpile topsoil for later use on areas to be stabilized by permanent vegetation.  Protect the stockpiled material with mulch or temporary vegetation

As I read this regulation, it provides instructions, or "guidelines," on what to do with topsoil that has been stripped for later use on areas the stripper intends to stabilize with permanent vegetation.  In that case, the "stripper" is instructed to protect the stockpiled material with mulch or temporary vegetation.

The evidence in this case does not support the application of § 538.1(f) to the Respondent's activities.  The Respondent did not strip topsoil, much less strip it "for later use on areas to be stabilized by permanent vegetation."   Rather, he *excavated* forty truck loads of *subsoil* to carve out the foundation for a multi-story building.

The evidence is undisputed that the Respondent stockpiled a portion of the forty truckloads of excavated subsoil for use as backfill for the building he was constructing. Thus, §538.1(f)'s guidelines on how to protect stockpiled *topsoil*, that is intended to be used to stabilize