# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**ROY L. PEARSON, JR.**                                   :
3012 Pineview Court, N.E.                                 :
Washington, D.C. 20018                                   :
(202) 269-1191                                           :
                                                         :
                         Plaintiff,                       :
                                                         :
              v.                                          :        Civil Action No. 08-cv-0758 (ESH)
                                                         :        (Jury  Trial Requested)
**DISTRICT OF COLUMBIA**                                  :
   **Serve:**       Office of the Attorney General        :
                    One Judiciary Square                   :
                    441-4[th] Street, N.W.                 :
                    Suite 600 South                        :
                    Washington, D.C.  20001                :
                                                         :
                    and                                   :
                                                         :
**TYRONE T. BUTLER**                                      :
D.C. Office of Administrative Hearings                    :
825 N. Capitol Street, N.E.                               :
Suite 4150                                                :
Washington, D.C.  20002                                  :
                                                         :
                    and                                   :
                                                         :
**PETER M. WILLNER**                                      :
Council For Court Excellence                              :
1111 14th Street, N.W.                                  :
Suite 510                                                 :
Washington, D.C.  20036                                  :
                                                         :
                    and                                   :
                                                         :
**ROBERT R. RIGSBY**                                      :
500 Indiana Avenue, N.W.                                  :
Chambers 1620                                             :
Washington, D.C.  20001                                  :
                                                         :
                    and                                   :
                                                         :
**ANITA JOSEY-HERRING**                                   :
500 Indiana Avenue, N.W.                                  :
Chambers 2640                                             :
Washington, D.C.  20001                                  :                                    :

|  | | |
|---|---|---|
| and | : | |

**GEORGE C. VALENTINE**      :
441 4th Street, N.W.                   :
Suite 600 South                         :
Washington, D.C.  20001            :
                                               :
                     Defendants.     :
_____:

## AMENDED COMPLAINT FOR EQUITABLE AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL

### Introduction

1.    This is a Civil Action for damages, injunctive and declaratory relief, and other appropriate legal and equitable relief, brought by plaintiff Roy L. Pearson, Jr. ("plaintiff"), a former Administrative Law Judge ("ALJ") with the District of Columbia Office of Administrative Hearings ("OAH") until his retaliatory demotion, subjection to a virulent and life-endangering campaign of harassment, and defendants' retaliatory refusal to reappoint him.

2.    Plaintiff brings this action against each of the retaliating parties: the District of Columbia ("D.C."), OAH Chief Judge Tyrone T. Butler ("CJ Butler"), Commissioner Peter M. Willner ("Willner"), Commissioner Robert R. Rigsby ("Rigsby"), Commissioner Anita Josey-Herring ("Josey-Herring") and Commissioner George C. Valentine ("Valentine").  The named commissioners, and CJ Butler, are members of the Commission on Selection and Tenure of Administrative Law Judges of the Office of Administrative Hearings ("Commission").

3.    The Commission, pursuant to the Office of Administrative Hearings Establishment Act of 2001 (OAH Act), D.C. Code § 2-1831.01 *et. seq*. and 6 DCMR 3700 *et. seq*., has final decision making authority over the appointment, retention, discipline and reappointment of ALJs at the OAH. D.C. Code § 2-1831.06(b).  Additionally, the Commission is authorized by statute to act as the final policy and rule making body with respect to the appointment, discipline, removal and reappointment of ALJs at OAH.  D.C. Code § 2-1831.11.

4.     The Commission, and CJ Butler, are prohibited by law from considering -- as a negative factor in CJ Butler's reappointment recommendation, or the Commission's decision on whether to reappoint – an ALJs exercise of First Amendment rights as a private citizen, an ALJ's expressions of opinion about any public issue, including those relating to his duties; an ALJ's criticisms of management at OAH; an ALJ's criticism of the alleged abuse by OAH supervisors of their positions, or an ALJ's criticism of an OAH supervisor's alleged failure to comply with ethical rules.

5.     The local and federal laws protecting speech on these matters of public concern – whether the speech is expressed as fact or opinion -- take precedence over all other laws.  Thus, these protections may not be evaded by claiming an employee's speech evidences a lack of "judicial temperament and judgment," or that it amounts to "personalized attacks on the integrity and character" of a Chief Judge or other ALJs at OAH.  Indeed, the purpose of these statutory and constitutional protections is to encourage "personalized attacks" on conduct of this sort and to encourage District employees to demonstrate just this "temperament and judgment."

6.     From the outset of his initial term of office plaintiff was repeatedly required or authorized, by these broadly protective laws, to freely express his opinions and to make factual statements about the lack of ethics and the gross mismanagement he discovered at OAH, including a secret regimen the Chief Judge designed to coerce plaintiff and other ALJs into ruling on matters as the Chief Judge, political considerations, or D.C. agency heads dictated.

7.     In response to the written alarm plaintiff raised over this illegal regimen and culture, which the Chief Judge established and the Commission tacitly approved, plaintiff was targeted by the Commission and/or CJ Butler for, among other things, verbal assaults, involuntary reassignment, threatened with termination, demoted, effectively placed under 24-hour-a-day life-threatening national and international pressure to abandon his request for reappointment, and finally not reappointed by the Commission.

3

8.      This retaliatory blitzkrieg was unleashed despite plaintiff's outstanding judicial record; indeed because of it.  Both the Commission's notice of possible denial of reappointment, and its written decision to not reappoint plaintiff, squarely rested on plaintiff's exercise of his statutory, ethical or constitutional right or obligation to <u>freely</u> express his opinion on public issues and to disclose what he reasonably believed to be unlawful or unethical conditions and actions at OAH.  In a nutshell -- his right or obligation to "speak truth to power."

9.      In response to plaintiff's forced bravery, the members of the Commission singled plaintiff out for disparate treatment during his reappointment process by flagrantly refusing to comply with the mandatory statutory and regulatory requirements, standards and deadlines for determining whether to reappoint plaintiff.  The Commission similarly gave CJ Butler free rein to disregard mandatory statutory and regulatory requirements, standards and deadlines.

10.     The single non-retaliatory "concern" mentioned in the Commission's written decision not to reappoint plaintiff is conclusively rebutted by digital recordings of plaintiff's hearings, by the results of the Commission's own investigations into the conduct of plaintiff's hearings and by the Commission's repeated admissions to plaintiff that there was no basis for any concern over the conduct of his hearings or the treatment of parties before him.

11.     The defendants were emboldened to retaliate against plaintiff, despite his outstanding record as an ALJ, by the coincidence that plaintiff was being vilified in the media for exercising his constitutional right, as a private citizen, to file and prosecute an unrelated *pro se* public interest lawsuit as a statutory private attorney general acting in the interest of thousands of consumers in the District of Columbia.

12.     Confident that this media storm could, if strategically manipulated, provide cover for a resumption of the defendants' retaliatory harassment, as well as a demotion and refusal to reappoint, defendant Butler unlawfully reversed his previously favorable recommendation that plaintiff be reappointed and the defendants as a group resumed and escalated their campaign to

punish plaintiff for daring to act as a model for fellow judges and consumers on the permissible exercise of their statutory, common law and constitutional rights and obligations as judicial officers and private citizens.

13.     The fact that the politically connected defendants are either seasoned lawyers and/or judges, or in one case a veteran member of an organization ostensibly dedicated to the improvement of judicial administration, makes the sustained, malicious and unconscionable reign of terror they worked to fuel a particularly shocking and reprehensible breach of: (a) the public trust reposed in them, (b) fundamental public policies codified in statutes enacted by the D.C. Council that plaintiff persisted in championing, (c) District of Columbia civil and criminal laws protecting plaintiff, and (d) plaintiff's fundamental constitutional rights and freedoms.

14.     Never before has this court had defendants before it who for months, if not years, unabashedly disdained their oath of office and –with the whole world watching-- at the behest of all three branches of the District of Columbia Government, unlawfully abused their powers to systematically crush a judicial officer and private citizen for conforming his conduct to judicial, legal and ethical requirements, privileges and/or obligations deeply embedded in the Constitution of the United States and the laws of the District of Columbia.  Thus, this is the prototypical case for effectuating the deterrence and punishment goals of punitive damages, by imposing those damages against the District of Columbia and each defendant in this landmark case.

## **JURISDICTION AND VENUE**

15.     This court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1331 because there is a federal question that arises under the First Amendment to the Constitution, the Fifth Amendment to the Constitution, and the laws of the United States, specifically 42 U.S.C. § 1983.

16.     Venue in this district is appropriate pursuant to 28 U.S.C. § 1391, because Defendants' unlawful actions were taken within the District of Columbia in this judicial district.

17.     Pursuant to D.C. Code §§ 1-615.54(a) and 12-309, plaintiff provided Notice to the Mayor of his claims on October 29, 2007 and on April 24, 2008.

**PARTIES**

18.     Plaintiff is a resident of the District of Columbia and was appointed to the Excepted Service of the District of Columbia Government as an ALJ (a statutory officeholder pursuant to D.C. Code § 1-609.08) for a two year term of office, D.C. Code § 2-1831.08**,** "subject to removal **for cause** . . ." D.C. Code § 1-609.08(15); D.C. Code § 2-1831.10(d).  At the end of the two year term the Commission is pointedly instructed, that by law it "***shall*** reappoint [an] Administrative Law Judge [to a ten year term] if it finds that the Administrative Law Judge has *satisfactorily* performed the responsibilities of his or her office and is likely to continue to do so."  6 DCMR 3705.21.

19.     Defendant D.C., although designated pursuant to Article I, Section 8 of the constitution as the capital of the United States, is a municipal corporation which governs D.C. pursuant to The District of Columbia Self-Government and Governmental Reorganization Act, P.L. No. 93-108, 87 Stat. 774, D.C. Code § 1-211.  OAH, plaintiff's former employer, is an independent agency of D.C. Its functions, under the Office of Administrative Hearings Act of 2001, include adjudicating contested cases brought pursuant to the D.C. Administrative Procedures Act and other substantive statutes and regulations.

20.     Tyrone T. Butler ("CJ Butler") was appointed and confirmed as the Chief Administrative Law Judge for the D.C. Office of Administrative Hearings effective in mid-2003. During D.C. Council hearings on his nomination on June 25, 2003, Mr. Butler unequivocally **admitted:** "ALJs must be free from interference in their decisional obligations and free from influence *outside of the adversarial arena*."   He was, thus, fully aware of and capable of understanding the requirements of the OAH Act, the D.C. Whistleblower Act, District of

6

Columbia employment law, and the protections afforded ALJs in the U.S. Constitution and case law construing 42 U.S.C. § 1983.  CJ Butler's term expires in mid-2009.

21.     CJ Butler, pursuant to the Office of Administrative Hearings Establishment Act of 2001 (OAH Act), D.C. Code § 2-1831.01 *et. seq*., has final decision making authority, alone or in conjunction with the Commission, over the operations of the OAH.  D.C. Code § 2-1831.05(a)(1). CJ Butler is sued here in his official and his individual capacities.

22.     The Commission on Selection and Tenure of Administrative Law Judges of the Office of Administrative Hearings ("Commission") is comprised of five persons, three of whom by statute are authorized to be voting members of the Commission.  D.C. Code § 2-1831.07(a).

23.     In a written statement submitted on behalf of the Commission to the Committee on the Judiciary of the D.C. Council on February 18, 2004, then-Commissioner Henry W. Lavine **admitted** that "[T]he Commission does <u>not</u> have . . . immunity for our public actions."

24.     In a February 25, 2004 letter from the then-D.C. Office of the Corporation Counsel to the Committee on the Judiciary of the D.C. Council, the Corporation Counsel **admitted** that: "[T]he commission members will essentially function like a personnel authority for the District of Columbia Office of Administrative Hearings, . . . policy concerns justifying unqualified immunity . . . are <u>not</u> present."

25.     For those reasons, effective December 7, 2004, the D.C. Council permanently enacted D.C. Code § 2-415 (b-1) to indemnify, *not immunize*, members of the Commission on Selection and Tenure of Administrative Law Judges of the Office of Administrative Hearings "from claims and suits in law or equity arising from acts or omissions in the course and scope of their official duties, other than willful or bad faith misconduct."

26.     Unlike OAH, the Commission is not a quasi-judicial body.  For example, the Commission both promulgates policy and monitors compliance with its policies. Its proceedings are not adversarial.  It solicits hearsay, hears from unsworn witnesses and insists it can consider

ex parte (secret) evidence.  Its members are not required to be professional hearing officers. Its members are not insulated from political influence, but are appointed to **renewable** three-year terms by elected office holders.  Its members are not obligated to follow precedent.  ALJs appearing for reappointment before the Commission have no right to compel the attendance of witnesses, to cross-examine witnesses or to engage in discovery.  No verbatim transcripts are provided. No record is made of the evidence presented at reappointment proceedings. Commission members (unlawfully) make statements to the press during the pendency of reappointment proceedings.  And no appeal is normally available to correct erroneous reappointment decisions by the Commission.

27.     By statute, CJ Butler, as OAH's Chief Judge, is a non-voting member of the Commission.  However, it has long been the custom and practice of the Commission to permit CJ Butler to vote on each and every matter that comes before the Commission, and he has so voted.

28.     The District of Columbia's attorney general, or his or her designee, is also by statute a non-voting member of the Commission. However, it has long been the custom and practice of the Commission to permit the attorney general or his or her designee to vote on each and every matter that comes before the Commission, and he or she has so voted.

29.     At all times relevant to this complaint the attorney general's designee to the Commission was George C. Valentine, who has been a member of the D.C. Bar for over twenty-five years and was/is the Deputy Attorney General for the Civil Litigation Division of the Office of Attorney General.  At all times relevant to this complaint Commissioner Valentine was thoroughly familiar with the requirements of the D.C. Whistleblower Act, District of Columbia employment law, the protections contained in the U.S. Constitution and case law construing 42 U.S.C. § 1983.  Mr. Valentine acted as counsel to the Commission.

30.   The members of the Commission who are authorized by statute to vote on matters before the Commission are appointed, respectively, by the Chief Judge of the Superior Court of the District of Columbia, the Chairman of the D.C. Council (with the approval of a majority of the Council) and the Mayor of the District of Columbia.

31.   At all times relevant to this complaint Robert R. Rigsby ("Rigsby") was the Chief Judge's appointee to the Commission and served as Chairman of the Commission.  Mr. Rigsby is a former D.C. Corporation Counsel (now called "Attorney General") and has been a judge serving on the D.C. Superior Court since July 2002. He was, thus, thoroughly familiar with the OAH Act, the requirements of the D.C. Whistleblower Act, District of Columbia employment law, the protections contained in the U.S. Constitution and case law construing 42 U.S.C. § 1983. Defendant Rigsby is sued here in his official and individual capacities.

32.   At all times relevant to this complaint Peter M. Willner ("Willner") was the D.C. Council Chairman's appointee to the Commission.  Mr. Willner is a Senior Policy Analyst for the D.C. Council for Court Excellence.

33.   In 1999 the Council for Court Excellence received a contract from the then-D.C. Office of Corporation Counsel to examine the District's administrative adjudicatory system and to research the practices of 25 other jurisdictions which had unified hearing agency systems at the time.   Under Mr. Willner's direction the Council for Court Excellence researched and published a report in September 1999 examining the deficiencies of the District's administrative adjudicatory system and urging the creation of a unified administrative hearing agency, with independent ALJs, for the District of Columbia. He was and is, thus, thoroughly familiar with the provisions of the OAH Act and the intent of the D.C. Council in enacting the OAH Act. Defendant Willner is sued here in his official and individual capacities.

34.   Henry W. Lavine was Mayor Anthony A. William's appointee to the Commission for the three years ending on April 30, 2007. Thereafter, Mayor Adrian Fenty requested that the

Commission not act on plaintiff's highly publicized reappointment request until the mayor named a replacement for Commissioner Lavine. On June 27, 2007 Mayor Fenty appointed Anita Josey-Herring ("Josey-Herring") to the Commission.  Commissioner Josey-Herring has served as a judge on the D.C. Superior Court since 1997.  She was, thus, fully capable of mastering the provisions and requirements of the OAH Act, the D.C. Whistleblower Act, District of Columbia employment law, the protections contained in the U.S. Constitution and case law construing 42 U.S.C. § 1983.  Defendants Josey-Herring is sued here in her official and individual capacities.

## ADDITIONAL FACTUAL ALLEGATIONS

**A.**     **History and Scope of the D.C. Whistleblower Act**

35.     In 1979, as one of its first steps after obtaining legislative authority from the United States Congress, the District of Columbia Council adopted the District of Columbia Comprehensive Merit Personnel Act ("Personnel Act").  The Personnel Act included a title, with the heading, "Whistleblower Protection", that sought to protect employees of the District Government from reprisal when they report waste, fraud or abuse in the workplace, or when they refuse a supervisors' instruction to violate state or federal laws.  The title was modeled after a federal whistleblower statute.

36.     However, in the eight years that followed its enactment "few District government employees c[a]me forward as whistleblowers." Report of the Committee on Government Operations, Council of the District of Columbia, on Bill 12-191, April 28, 1998, at 3. In response to that discovery, on April 1, 1997, a member of the D.C. Council introduced the substantially stronger and far more comprehensive D.C. Whistleblower Reinforcement Act of 1997 ("Whistleblower Reinforcement Act").

37.     The proposed Act went far beyond simply extending protection to employees of the District Government from reprisal when they report waste, fraud or abuse in the workplace, or when they refuse a supervisors' instruction to violate state or federal laws.

38.     The Whistleblower Reinforcement Act was referred to the Council's Committee on Government Operations for consideration.  At hearings on the bill witnesses proposed and supported provisions that made the bill far more comprehensive and protective of whistleblowers than any federal whistleblower statute. The resulting legislation was titled the District of Columbia Whistleblower Amendment Act of 1998 ("D.C. Whistleblower Act").  That legislation was unanimously adopted by the D.C. Council and took effect on October 7, 1998.

39.     The amended D.C. Whistleblower Act begins with a statement of what "the Council declares as its policy . . ."

40.     Unlike the federal whistleblower statute, the listed policy objectives include: (a) enhancing the right of District employees to challenge the actions and failures of their agencies and to **express their views** without fear of retaliation through appropriate channels within the agency and through **free access** to oversight agencies of the executive branch of government and by appropriate communication with the public; (b) ensuring that acts of the Council enacted to protect individual citizens are properly enforced; (c) providing new rights and remedies to guarantee and ensure that public offices are truly **public trusts**; (d) holding public employees personally accountable for failure to enforce the laws and for negligence in the performance of their public duties; (e) ensuring that rights of employees to expose **dishonesty, incompetence, or administrative failure** are protected; (f) guaranteeing the rights of employees to contact and communicate with the Council and to be protected in that exercise; (g) protecting employees from reprisal or retaliation for the performance of their duties; and (h) motivating employees to do their duties **justly** and efficiently.  D.C. Code § 1-615.51.

41.     In furtherance of these policy objectives the D.C. Whistleblower Act lists specific rights, as well as obligations, of District of Columbia Government employees.

42.     Unlike the federal whistleblower statute, those rights include: (a) "the right **freely** to express their **_opinions_** on all public issues, including those related to the duties they are

11

assigned to perform . . ."; (b) the right to "disclose information which would involve expenditure of public funds, and *the protection of the constitutional rights of citizens* and the rights of government employees under this chapter and under any other laws, rules, or regulations for the protection of the rights of employees . . ."; (c) "[t]he right to communicate *freely* and openly with members of the Council . . ." (d) the right to assemble in public places for the *free* discussion of matters of interest to themselves and to the public and the right to notify, on their own time, fellow employees of these meetings; (e) "[t]he right to . . . the *unhindered* discharge of job responsibilities; and (f) "[t]he right to *individual privacy*."  D.C. Code § 1-615.58(1)-(6)

43.     The D.C. Whistleblower Act also includes obligations that District employees have, including the requirement that "each employee of the District government **shall** make all protected disclosures concerning any violation of law, rule, or regulation or other disclosures enumerated in D.C. Code § 1-615.52(a)(6)."  D.C. Code § 1-615.58(7).

44.     D.C. Code § 1-615.52(a)(6), which lists the disclosures a D.C. government employee is obligated to make, defines a "protected disclosure" as "any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee *reasonably believes* evidences: (A) Gross mismanagement . . . (C) Abuse of authority in connection with the administration of a public program; [or] (D) A violation of a federal, state, or local law, rule or regulation . . ."

45.     Unlike the federal whistleblower statute, the D.C. Whistleblower Act expansively defines a "whistleblower" as "an employee who makes *or is perceived to have made* a protected disclosure as that term is defined in this section."  D.C. Code § 1-615.5(a)(9).

46.     To safeguard the discharge of a District employee's Whistleblower obligations and rights, the central prohibition contained in the D.C. Whistleblower Act is stated very simply: "A supervisor shall not *threaten to take* or take a prohibited personnel action or otherwise

retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order."  D.C. Code § 1-615.53.

47.     Unlike the federal whistleblower statute, in a civil action brought pursuant to the D.C. Whistleblower Act when a plaintiff demonstrates by a preponderance of the evidence that an activity proscribed by § 1-615.53 was a contributing factor in an alleged prohibited personnel action against the plaintiff, ***the burden of proof shifts*** to the employing District agency to prove by clear and convincing evidence that the alleged action would have occurred for ***legitimate*** ***independent*** reasons even if the employee had not engaged in the activities protected by § 1-615.53.  D.C. Code § 1-615.54(b).

48.     Unlike the federal whistleblower statute, an "independent reason" for taking adverse action cannot be shown if the reason for the adverse action relates in any way to the <u>manner</u> in which an employee communicates a "protected disclosure."

49.     Unlike the federal whistleblower statute, the D.C. Whistleblower Act makes clear that "[n]otwithstanding any other provision of law, a violation of § 1-615.53 constitutes a ***complete*** affirmative defense for a whistleblower to a prohibited personnel action in a . .. challenge, or adjudication of that action."  D.C. Code § 1-615.54(c).  Thus, in considering a reappointment request, the Commission is required to give the D.C. Whistleblower Act precedence over any other District of Columbia law, regulation or rule – including the OAH Act.

## B.     <u>The D.C. Office of Administrative Hearings</u>

50.     The right, if not the obligation, of each D.C. Government employee to ***freely*** express opinions about public issues and to make critical factual statements about administrative ineptitude and dishonesty that the employee reasonably believes he has encountered, applies with special force to ALJs in the D.C. Office of Administrative Hearings ("OAH"), who have that and related rights or obligations under ethical rules that apply only to them.

51.     The OAH came into existence with the unanimous adoption, effective March 6, 2002, of the Office of Administrative Hearings Establishment Act of 2001 ("OAH Act").  The OAH began accepting cases in March of 2004, with just a handful of administrative law judges.

52.     The purpose of the OAH Act was to professionalize the adjudication of administrative cases in the District of Columbia.  It sought to accomplish that goal by, over time, consolidating into a central hearing office responsibility for the adjudication of a large number of District of Columbia administrative cases that would otherwise often be heard by the same agency that was a party to the case.

53.     The key way the legislation hoped to professionalize the adjudication of cases was by attracting, selecting, training and retaining a professional cadre of experienced attorneys to act as administrative law judges ("ALJs") and to require those judges to act independently in performing their judicial duties.

54.     The OAH Act sought to assure the quality of an OAH ALJ's decisions by:

    a)  explicitly requiring that a Commission on the Selection And Retention of Administrative Law Judges "competitively recruit and retain highly qualified, effective, and efficient Administrative Law Judges from the public and private sectors,"  D.C. Code § 2-1831.11(c);

    b)  encouraging the Chief ALJ of the OAH to make case assignments based on "expertise, case complexity, and other appropriate criteria," D.C. Code § 2-1831.05(a) (3);

    c)  requiring the Chief ALJ to establish "standard and special training programs for Administrative Law Judges," D.C. Code § 2-1831.051(4);

    d)  requiring that the Chief ALJ provide "continuing education programs for Administrative Law Judges . . .," D.C. Code § 2-1831.051(4); and

e)   permitting ALJs to "supervise, direct and evaluate the work of employees assigned to him or her," D.C. Code § 2-1831.09(a) (6).

55.   The OAH Act sought to assure the independence of ALJs by:

a)   requiring the adoption, and *implementation*, of a code of judicial ethics, D.C. Code § 2-1831.05(a)(9);

b)   barring the Chief ALJ from implementing any program for quality assurance that "shall require that an outcome in any case be altered," D.C. Code § 2-1831.05(b) (12);

c)   giving ALJs responsibility for their case load from the time a case is filed until the case is disposed of, D.C. Code § 2-1831.05(a) (12);

d)   making ALJs exclusively ". . . accountable and responsible for the fair, impartial, effective and efficient disposition of cases . . .," D.C. Code § 2-1831.09(a);

e)   requiring that "[a]ll components of the District of Columbia . . . cooperate with the . . . Administrative Law Judges in the discharge of their duties," D.C. Code § 2-1831.13(a);

f)   authorizing ALJs to "[f]ully participate in office management committees and management activities to set and steer policies relating to Office operations . . .," D.C. Code § 2-1831.09(a)(5);

g)   placing the exclusive power to appoint, select and discipline ALJs in a Commission, and not the Chief ALJ, D.C. Code § 2-1831.06;

h)   granting ALJs the same immunity from suit, liability, discovery and subpoena in a civil action relating to actions taken in the performance of their duties, as judges of the D.C. Superior Court, D.C. Code § 2-1831.09(g); and

    i)   prohibiting the Chief Judge from promoting one Administrative Law Judge to a position over another Administrative Law Judge.  D.C. Code § 2-1831.05(a)(5);

56.    Finally, the OAH Act sought to assure the integrity of OAH ALJs by:

    a)   requiring that ALJs engage in no conduct inconsistent with the duties, responsibilities, and ethical obligations of an Administrative Law Judge . . .," D.C. Code § 2-1831.09(a)(3;.

    b)   requiring that ALJs "[c]onform to all legally applicable standards of conduct . . .," D.C. Code § 2-1831.09(a)(7);

    c)   requiring that ALJs "decide all cases in an impartial manner," D.C. Code § 2-1831.09(a)(8);

    d)   prohibiting an ALJ from engaging in the practice of law, D.C. Code § 2-1831.09(a)(7), except when representing him or her self; and

    e)   requiring that ALJs take an oath of office prior to the commencement of duties, D.C. Code § 2-1831.09(a)(11).

57.    In the above ways the D.C. Council hoped to remove the perception that had developed, up to that point, that District of Columbia administrative law judges and hearing officers "lack[ed] *independence* and . . . ha[d] a bias in favor of th[e] agency" for whom they heard cases. Finding No. 3, Office of Administrative Hearings Establishment Act of 2001.

58.    The Council also hoped to "*expedite* the fair and just conclusion of contested cases." Finding No. 4, Office of Administrative Hearings Establishment Act of 2001.

59.    As mandated by the OAH Act, in August 2004 the Chief Judge of OAH adopted a *Code of Ethics for OAH Administrative Law Judges* ("OAH Code of Ethics") (unpublished). The OAH Code of Ethics is binding on CJ Butler, to the same extent it is on every other ALJ at OAH.

60.     The OAH Code of Ethics, in its opening paragraph, requires that "An Administrative Law Judge shall participate in establishing, maintaining and enforcing high standards of conduct and shall personally observe those standards of conduct . . ." Chpt. I(B).  To that end, it requires that all of its provisions be construed and applied to further the "integrity and *independence* of this administrative court."

61.     Indeed, the OAH Code of Ethics goes so far as to *require* that administrative law judges "take appropriate action or initiate appropriate disciplinary measures against an[other] Administrative Law Judge . . . for unprofessional conduct of which he may become aware." Chp. III(M), Code of Ethics.

## C.     Plaintiff's Selection From Hundreds Of Applicants Nationwide

62.     Presumably to realize these statutory goals of independence, integrity and scrupulous ethics, in September of 2004 the Commission solicited applicants for positions as administrative law judges to handle the case load the OAH began assuming in March 2004.  The nation-wide advertisement emphasized the **decisional independence** from the Chief ALJ that ALJs would enjoy:

> The Office of Administrative Hearings ("OAH"), a newly **independent tribunal** of the District of Columbia, seeks applications from qualified attorneys interested in becoming an Administrative Law Judge ("ALJ"). . . .
> *          *          *          *
> . . .ALJs will hold hearings, decide motions, write orders and opinions, and manage a litigation docket.  . . .ALJs report to the Chief Administrative Law Judge or his designee on administrative matters, **but decide cases independently under applicable law**. . . .
> Requirements include: 1) A minimum of 5 years' practice experience, including litigation; 2) a record of strong legal and organizational skills; 3) judicial temperament; 4) the ability to write and speak clearly and concisely; 5) a strong interest in public service and in working as part of a team in a start-up organization; and 6) D.C. Bar membership or eligibility for admission without examination.  Finalists will be required to undergo a background check and take an analytical writing exam. . . .  (emphasis supplied)

63.     By September of 2004 plaintiff had enjoyed an almost 30-year career of public service as a law school clinical instructor and administrator, legal services attorney, legal services administrator, hearing examiner and *pro bono* (without fee) community volunteer.

64.     As a Georgetown University Law School clinical instructor, and Assistant Director of the D.C. Project clinic, plaintiff supervised Georgetown University School of Law students who assisted the D.C. Council and District of Columbia administrative agencies in drafting legislation and enacting laws.

65.     As a legal services attorney for twelve years, and Assistant Director of the city-wide D.C. Neighborhood Legal Services Program for thirteen years, plaintiff directly provided or supervised the delivery of a wide range of civil and administrative legal services to indigent District of Columbia residents in federal and D.C. courts and federal and D.C. administrative agencies.   After leaving NLSP in 2002 plaintiff contracted with NLSP for eight months as Special Counsel.

66.     Thereafter, as a hearing examiner with the D.C. Office of Police Complaints, plaintiff for a number of years served on a select panel of veteran attorneys who heard and adjudicated administrative claims of police misconduct in the District of Columbia.

67.     Throughout his legal career plaintiff also volunteered his services, and served on the boards, of legal and community organizations such as the Columbia Heights Youth Club, the Washington Council of Lawyers, the National Conference of Black Lawyers and the Ft. Lincoln Civic Association, Inc.

68.     In response to OAH's nation-wide advertisement in September 2004, plaintiff initially submitted a rèsumè and a letter explaining his interest, as part of the first stage of the application process.

69.     In December of 2004, in the second stage of the application process, plaintiff completed and submitted responses to a 21 page questionnaire and application form to facilitate a

thorough investigation into his background.  Plaintiff completely and honestly answered all questions on the questionnaire about his personal and professional history and swore to the veracity of his responses before a notary public.

70.     In February of 2005, in the third stage of the application process, plaintiff was one of approximately 37 attorneys from around the United States who were selected from the pool of hundreds of initial applicants to sit for a three hour analytical legal writing examination.

71.     In March of 2005 plaintiff was notified that he was one of only three attorneys, of the thirty-seven who survived screening and were selected to take the examination from the nation-wide pool of applicants, who passed the rigorous analytical legal writing examination.

72.     Because plaintiff was one of only three attorneys who passed the ALJ Writing Examination, the Commission on the Selection and Tenure of Administrative Law Judges subsequently rescinded its regulations requiring that OAH ALJs pass an analytical writing examination, so that it could interview and hire additional attorneys as ALJs in August of  2005.

73.     In the fourth, and final stage in his application process plaintiff was interviewed by the 5-person Commission on the Selection and Tenure of Administrative Law Judges ("Commission") on March 29, 2005.

74.     On April 4, 2005 plaintiff was one of only three applicants, of the hundreds who applied, who was offered a position as an Administrative Law Judge with the D.C. Office of Administrative Hearings ("OAH"), at a salary of $92,484, with a start date of April 18, 2005. Shortly thereafter plaintiff was notified that his start date had been postponed to May 2, 2005.

75.     Plaintiff commenced work as an ALJ with OAH on May 2, 2005.

**D.     Discovery That "Court" Was Actually A Law Firm**

76.     Shortly after assuming office plaintiff discovered that CJ Butler was widely viewed, within and outside OAH, as grossly inept as an administrator.  CJ Butler, a former career

police officer in New York, had never practiced law or lived in the District of Columbia before being selected as Chief Judge of the OAH in June 2003.

77.     Despite his ignorance of District of Columbia law, and of the District of Columbia, and despite the newness of the agency he had been selected to start up, CJ Butler spent large amounts of time traveling around the United States in 2005 as the president-elect of the National Association of Administrative Law Judges.   He also sought to burnish his credentials by volunteering to serve on various boards outside the District of Columbia that required extensive travel as well.

78.     Because of his frequent absences and his ignorance of the city, people, laws and procedures he was called upon to administer, CJ Butler fashioned a hierarchial structure of ALJs to administer and adjudicate cases at OAH.   Those ALJs, one of whom was called a "Deputy Chief ALJ," and the others "Principal ALJs", formed a law firm structure for OAH.   Like a law firm, the Principal ALJs acted as partners. And the Deputy Chief ALJ acted as managing partner.

79.     As a consequence, ALJs at OAH were not treated or considered to be judicial peers, who were privileged to exercise judicial judgment independent of each other. Instead, the custom and practice when plaintiff arrived at OAH was for ALJs to be treated as the equivalent of associates in a law firm, who were beholden to their supervisors.

80.     ALJs were supervised and evaluated by Principal ALJs.   They were assigned cases by Principal ALJs.   Principal ALJs determined whether and for how long ALJs would be assigned law clerks.   And Principal ALJS determined whether, when and in what form an ALJs orders and decisions would be released.

81.     At a March 7, 2005 Performance Oversight Hearing before the Judiciary Committee of the D.C. Council, agency after agency, attorney after attorney, and members of the public, uniformly criticized CJ Butler's management of OAH and insensitivity to its predominantly *pro se* litigants.

20

82.     Because of this uniform condemnation, and the chairman's own criticisms of CJ Butler, the chairman of the Judiciary Committee of the D.C. Council threatened to place substantial restrictions on OAH's ability to operate autonomously.

83.     It was in this context that plaintiff began his two year initial term of office at OAH.  Plaintiff's subsequent personal experience with CJ Butler's administrative, budget, legal, planning, management skills and ethics confirmed the widely held view that the Chief Judge was grossly inept as an administrator, lawyer and Chief Judge.

84.     For example, plaintiff discovered that, despite the D.C. Council's expressed goal in enacting the OAH Act of removing the perception that ALJs were not independent of the agencies whose cases they heard, agency heads and others were able to use CJ Butler to direct how decisions were made at OAH.  Thus, the group of ALJs with whom plaintiff was assigned to hear Department of Public Works ("DPW") cases were told by CJ Butler, through the Deputy Chief ALJ and a Principal ALJ, that if they did not agree in advance to rule in favor of DPW in thousands of cases assigned to them, those cases would be reassigned to ALJs who agreed to rule as instructed.

85.     By violating the OAH Act and mandating favorable rulings for DPW, CJ Butler hoped to avoid the political backlash from DPW and the Judiciary Committee of the D.C. Council that he feared would result if (as a result of DPW's failure to meet deadlines set in regulations adopted by OAH) those DPW cases were dismissed as OAH regulations dictated.

86.     Plaintiff also discovered, as noted above, that CJ Butler had promoted some ALJs to positions – as Principal ALJs and Deputy Chief ALJ -- in which they supervised other ALJs, in violation of the OAH Act.

87.     The Principal ALJs administered a secret and mandatory "peer review" system, in which the Principal ALJs determined whether, when and in what form a decision would be issued. Delays of up to two months, or more, resulted.  To ensure that their opinion on the legal

issues in the cases of the ALJs they supervised would be followed in the decisions of those ALJs, the Chief ALJ gave the Principal ALJs, and the Deputy Chief ALJ, evaluation authority over the ALJs whose decisions they reviewed.  In turn, the Deputy Chief ALJ evaluated Principal ALJs. And the Chief ALJ evaluated the Deputy ALJ.

88.     As one of the few ALJs at OAH with decades of expertise in District of Columbia civil and administrative law and litigation, from the outset of his term of office plaintiff occasionally disagreed with "supervising" Principal ALJs (who had no background in D.C. administrative law) on the law.  As a consequence, plaintiff was chastised by CJ Butler in late-May 2005, involuntarily reassigned in June 2005 and evaluated as "need[ing] improvement" in "judicial temperament" and "team work" in November 2006.

89.     The OAH Ethics Code states that an ALJ shall *not* allow his relationship with any other person to influence his judicial conduct or judgment.  Chp. II(C), *Code of Ethics for OAH Administrative Law Judges* (Aug. 31, 2004). Plaintiff discovered that the hierarchial and multi-tiered OAH Peer Review System *required* that an ALJ to be influenced in his judgment of cases by his or her subordination to Principal ALJs and the Deputy Chief ALJ.

90.     The OAH Ethics Code states that an ALJ may not be swayed by fear of criticism. Chp. III(B)(2), *Code of Ethics for OAH Administrative Law Judges* (Aug. 31, 2004).  Plaintiff discovered that the OAH Peer Review System necessarily required that an ALJ be swayed by the legal and political views and comments of Principal ALJs and Deputy Chief ALJ, because the Principal ALJs and Deputy Chief ALJ would be evaluating the ALJ.

91.     The OAH Ethics Code prohibits an ALJ from engaging in any activity that creates even an appearance that he or she is not independent. Chp. II(A), *Code of Ethics for OAH Administrative Law Judges* (Aug. 31, 2004).  Plaintiff discovered that he could not give the appearance of being independent of Principal ALJs and Deputy Chief ALJ because they determined whether his decisions were issued in a timely manner and they evaluated him.

92.     The OAH Ethics Code prohibits an ALJ from being mandated to communicate with anyone about a pending or impending case outside the presence of all parties to that case. Chp. III(D)(2), *Code of Ethics for OAH Administrative Law Judges* (Aug. 31, 2004).  Plaintiff discovered that the OAH Peer Review System *mandated* that he consult with at least a Principal ALJ outside the presence of the parties. Further, if the Principal ALJ required it, the OAH Peer Review mandated that thereafter plaintiff consult about a pending case, outside the presence of the parties, with <u>all</u> of the other ALJs at OAH (or, alternatively, with CJ Butler) before he could issue a decision.

93.     The OAH Ethics Code requires that an ALJ dispose of all judicial matters promptly.  Chp. III(F), *Code of Ethics for OAH Administrative Law Judges* (Aug. 31, 2004). Plaintiff discovered that the mandatory OAH Peer Review System always delayed the disposition of his cases for periods of up to two months.

**E.      Plaintiff Becomes An Involuntary Whistleblower**

94.     The secret OAH peer review system, on its face and in practice, exerted tremendous pressure on plaintiff to violate his statutory oath to perform his judicial duties based only on the laws of the District of Columbia, judicial ethics and the United States Constitution.

95.     Plaintiff engaged in research and discussion with judicial and administrative experts before reaching that conclusion.  Based on that research, in June 2005 plaintiff prepared and circulated a 19 page memorandum to CJ Butler, and other ALJs at OAH, on how the secret OAH peer review process appeared to violate the OAH Act, the D.C. Administrative Procedures Act and the OAH Code of Judicial Ethics.

96.     In his memorandum plaintiff constructively suggested how OAH could revamp the process and asked, alternatively, that CJ Butler refer the issue of whether the OAH peer review process violated the OAH Code of Ethics to the Commission on the Selection And

23

Tenure of Administrative Law Judges for an advisory opinion.  CJ Butler never, directly, responded to plaintiff and ignored a suggestion by a second ALJ for discussion of the issues.

97.     Even while expressing his concerns about the appearance and fact of the coercive and time-consuming OAH peer review process, and seeking a review of it, plaintiff at all times complied with its procedures throughout his term of office.

98.     When the issues plaintiff raised were not addressed by CJ Butler, plaintiff e-mailed a letter to the Commission on the Selection And Tenure of Administrative Law Judges in July 2005.

99.     In his letter plaintiff provided an analysis of the Commission's authority (analogous to that of the D.C. Commission on Judicial Disabilities and Tenure, after which it was modeled) to provide an advisory ethical opinion on the OAH peer review process and attached a copy of his memorandum to CJ Butler.

100.    The Commission later concluded, without explanation, that it did not have the authority to provide an advisory opinion.  It thereby ratified the policy and custom at OAH of Principal ALJs illegally interfering with and retaliating for the decisional independence of ALJs, in violation of the OAH Act, the D.C. Administrative Procedures Act and the OAH Code of Judicial Ethics.  And it ratified a culture in which ALJs were dependent upon Principal ALJs and the Deputy Chief ALJ in every significant respect, including for their reappointment.

101.    Having no alternative way of resolving his concern over the appearance and fact of being coerced into issuing orders and rulings based on his concern over job security, rather than based on the parties' right to a decision based on the governing law, in February 2006 plaintiff, as a private citizen, took annual leave from his duties at OAH and on his own time prepared and delivered testimony to the Judiciary Committee of the D.C. Council.

102.    Speaking and writing only on his own behalf, and as a private citizen, plaintiff revealed to the listening public and the Committee that a secret and misnamed "peer review"

system existed at the Office of Administrative Hearings, whose operation appeared to violate the OAH Act, the D.C. Administrative Procedures Act, the OAH Code of Judicial Ethics and deprived parties in OAH cases of their right to a decision based on the record in their case and the independent judgment of the ALJ who heard their evidence and arguments.

103.    In his response to plaintiff, and under oath before the Committee, CJ Butler falsely stated that plaintiff had never "come forward to discuss these issues" with him.    CJ Butler also falsely stated under oath that only new judges were required to have their decisions reviewed by a Principal ALJ, and that it was simply part of their initial training.  And  CJ Butler falsely stated, under oath, that as ALJs became "more knowledgeable as to the processes here, they are engaging in peer review with their actual peers, not their supervisory ALJs."

104.    Contrary to this sworn testimony, plaintiff and most ALJs continued to be required to submit their decisions to a Principal ALJ for more than one year after February 2006. In retaliation for his decision not to adopt changes "suggested" by Principal ALJs during that period plaintiff was evaluated by those same Principal ALJs as "lacking judicial temperament" and as failing to be a "team player" in November 2006. The Chief ALJ refused plaintiff's request in December 2006 that he review these retaliatory evaluations by Principal ALJs and the Deputy Chief ALJ.

105.    At a February 2007 hearing before the D.C. Council's Judiciary Committee the Chief ALJ falsely stated, under oath, that a quarterly rotating system of peer review was in place at OAH at that time to ensure that persons other than Principal ALJs reviewed the decisions of an ALJ.  The Chief ALJ also falsely stated, under oath, that he had heard no complaints that any ALJ felt he was being pressured to reach a particular decision.

**F.    Plaintiff Targeted For Retaliation**

106.    The OAH Code of Ethics requires that "An Administrative Law Judge shall parti-

cipate in establishing, maintaining and enforcing high standards of conduct and shall personally observe those standards of conduct . . ." Chpt. I(B).

107.    Additionally, the OAH Code of Ethics requires that ALJs "take appropriate action or initiate appropriate disciplinary measures against an Administrative Law Judge . . . for unprofessional conduct of which he may become aware."  Chp. III(M), Code of Ethics.

108.    In plaintiff's early interactions with CJ Butler he discovered that the Chief Judge engaged in unprofessional conduct, over an extended period of time, which appeared to violate multiple provisions of the OAH Code of Ethics.

109.    Those interactions included an instance in June 2005 when, after learning from plaintiff that plaintiff had communicated with the D.C. Council to determine the truth of a statement the Chief Judge had made to plaintiff about pending legislation, CJ Butler angrily strode into plaintiff's small office, shouted at plaintiff in a voice heard throughout the suite of adjoining offices, and appeared poised to physically attack plaintiff.  While appearing poised to strike plaintiff, and in violation of the Whistleblower Act, D.C. Official Code § 1-615.58(3), and a D.C. criminal statute, D.C. Official Code § 1-301-43, CJ Butler unlawfully directed plaintiff not to communicate with the D.C. Council without first clearing the communication with him.

110.    Plaintiff later learned that the reason CJ Butler became outraged was that he realized that if plaintiff continued his inquiries of D.C. Council staff plaintiff would discover that CJ Butler had been lying to plaintiff for two months about the impact of pending legislation on plaintiff's initial two year term.  Instead of admitting his false statements, CJ Butler sought to threaten plaintiff into abandoning his effort to clarify whether his initial two year term was the subject of pending legislation that would reduce it to one year – as CJ Butler had claimed for two months by that point.

111.    Plaintiff's efforts to have the Chief Judge acknowledge that the Chief Judge's duplicitous, illegal and physically threatening conduct was grossly inappropriate and violated the

OAH Code of Ethics and the D.C. Whistleblower Act, and should not be repeated, fell on deaf ears.

112. To prevent a recurrence of this physically threatening and publicly humiliating conduct, plaintiff had only one option. Chpt. I(B) and Chpt. III(M) of the OAH Code of Ethics obligated plaintiff to report the Chief Judge's unprofessional conduct to the only person who had any power to "take appropriate action or initiate appropriate disciplinary measures" – the Mayor of the District of Columbia. D.C. Official Code § 2-1831.04(b)(7).

113. In a letter to the Mayor in July 2005, that plaintiff copied to CJ Butler, plaintiff laid out the facts relevant to the Chief Judge's unprofessional, illegal and threatening conduct, his violation of the Whistleblower Act, as well as the attrition and low state of morale evident at OAH. Plaintiff concluded his letter by "requesting the initiation of an inquiry into whether good cause exist[ed] for Mr. Butler's removal."

114. The Mayor's General Counsel subsequently responded that the ethical aspects of CJ Butler's misconduct were outside the Mayor's purview, and that the same was true for his administration of OAH at that early stage in OAH's history. The Mayor thereby tacitly approved the custom and policy at OAH of infringing plaintiff's First Amendment Rights and CJ Butler's violation of the D.C. Whistleblower Act.

115. In response to plaintiff's communications with the D.C. Council and the Mayor, the Deputy Chief Judge at OAH orally advised plaintiff in August 2005 that the Commission on Selection and Tenure of Administrative Law Judges would retaliate against him by removing him from office if he did not immediately "mend fences" with CJ Butler. The Deputy CJ was apparently in a position to convey the threat to "remove" plaintiff because one member of the Commission, Henry Lavine, had been a law partner with the Deputy CJ at Squire, Sanders & Dempsey, LLP before they assumed their respective positions vis-à-vis OAH.

116.    Plaintiff, in an e-mail response, assured the Deputy CJ that he would always be civil toward CJ Butler but also explained why the D.C. Whistleblower Act made the Deputy CJ's threat of retaliation by the Commission for plaintiff's protected disclosures unlawful.

**G.    Plaintiff's Outstanding Performance As An ALJ**

117.    Aware that his protected disclosures about these matters of public concern had, and would, result in his being targeted by the Chief Judge and perhaps by the Commission, plaintiff assiduously developed an outstanding record as an ALJ to ensure there could be no legitimate basis for not reappointing him to a ten year term.

118.    The Commission's regulations mandate that the Commission "***shall*** reappoint the Administrative Law Judge if it finds that the Administrative Law Judge has ***satisfactorily*** performed the responsibilities of his or her office and is likely to continue to do so."  6 DCMR 3705.21.

119.    The 24 responsibilities of an ALJ's office are listed at D.C. Code § 2-1831.09(a) & (b).  Thirteen of the responsibilities relate to the conduct of cases before the ALJ, and simply enumerate the ALJ's powers.    D.C. Code § 2-1831.09(b).

120.    The remaining eleven responsibilities, listed in D.C. Code § 2-1831.09(a)(1)-(11), record an ALJ's obligations.

121.    The first responsibility is an obligation to participate in an orientation program and in any continuing legal education mandated by the Chief Judge.

122.    Plaintiff participated in all orientation programs mandated by the Chief Judge, including a training course at the National Judicial College (NJC) in Reno, Nevada in September 2005. Based on plaintiff's performance during the NJC two week training course he was selected by its faculty to act as a course facilitator at a future training.  Only one other ALJ at OAH (a Principal ALJ) had been selected for that rare national honor prior to plaintiff's selection.

123.    The second responsibility is an obligation to meet annual performance standards that are applicable to an ALJ's duties. Those annual performance standards must be "***objective*** standards for the management and disposition of cases." D.C. Code § 2-1831.10(b).

124.    In plaintiff's only OAH evaluation, issued in November 2006, he received a rating of 3.0, out of a possible 3.0, when only objective standards are considered. When prohibited subjective standards ("judicial temperament" and "team work") are also considered, plaintiff received a rating of 2.84 out of a possible 3.0. An ALJ who receives a rating of 2.5 or higher has met the annual performance standards applicable to his duties.

125.    The third responsibility is an obligation to not engage in conduct inconsistent with the duties, responsibilities and ethical obligations of an ALJ.

126.    Plaintiff, alone among all the ALJs at OAH, took affirmative steps to not engage in conduct inconsistent with his duties, responsibilities and ethical obligations by seeking review of the OAH peer review process by (in turn) the Chief Judge, the Commission and the Judiciary Committee of the D.C. Council.

127.    The fourth responsibility is an obligation to not be subject to the supervision or direction of anyone engaged in the performance of investigative, prosecutorial or advisory functions for another agency. Plaintiff did not so subject himself.

128.    The fifth responsibility is an obligation to fully participate in OAH office management <u>committees</u> and management <u>activities</u> when asked.

129.    Plaintiff was asked to participate in only one office management committee and was then excused because a more qualified ALJ sought to be substituted for him. Plaintiff's requests, during his initial term, to serve on two other management committees (training and ethics) were not granted. Plaintiff was asked to participate in only two management activities, both of which he fully participated in.

130.    The sixth responsibility is an obligation to supervise, direct and evaluate the work of employees assigned to the ALJ.  No employees were assigned to plaintiff or any other ALJ. OAH support staff were assigned to work only for Principal ALJs.

131.    The seventh responsibility is an obligation to conform to all legally applicable standards of conduct.

132.    Because plaintiff's ability to conform to "legally applicable standards of conduct" depended upon those in supervisory roles at OAH adhering to "legally applicable standards of conduct," plaintiff worked throughout his initial term to bring OAH into conformance with legally applicable standards of conduct required by the OAH Act, the D.C. Administrative Procedures Act and the Code of Ethics for OAH ALJs.  In addition, plaintiff affirmatively filed a number of requests with OAH's Ethics Committee for guidance on ethical issues -- such as one raised by his public interest lawsuit -- and abided by the Committee's advice.

133.    The eighth responsibility is an obligation to decide all cases in an impartial manner.  Plaintiff discharged this responsibility and received no complaints, at all, in this regard.

134.    The ninth responsibility is an obligation to devote full-time to the duties of the position and to not perform any duties that are inconsistent with the duties and responsibilities of an ALJ.

135.    Plaintiff devoted more than full time to his duties.  In his first 18 months as an ALJ plaintiff issued 45 decisions for publication by Lexis, a national on-line legal research service. The decisions thoroughly addressed issues of first impression, or addressed issues that other judges had ruled on but had failed to provide legal and logical analyses to support their decisions. Indeed, plaintiff's published decision in *DOH v. Sadeghi*, DH-I-05-A100273 (Final Order, April 25, 2006) foreshadowed the ruling that the U.S. Supreme Court later issued in *Jones v. Flowers,* 126 S. Ct. 1708 (2006). During plaintiff's initial 18 months no other ALJ, however experienced, issued more than six publishable decisions.

136.    Despite the remarkable number of precedent setting decisions written by plaintiff, to date not a single one of plaintiff's decisions has ever been reversed or modified by a higher court.

137.    In addition, plaintiff developed OAH administrative forms, acted as a mentor for a more senior ALJ, presented a tutorial for all legal assistants at OAH, and served as a mentor and moot court judge for law students at the UDC School of Law and the Georgetown University School of Law.   Plaintiff was also an active member and/or served on committees of the Maryland/DC chapter of the National Association of Administrative Law Judges and the Judicial Council of the Washington Bar Association.

138.    The tenth responsibility is an obligation to cooperate with the Executive Director of OAH to achieve efficient and effective administration of the office.

139.    Plaintiff fully cooperated with, and deferred to the Executive Director on OAH administrative maters.

140.    The eleventh, and final, responsibility is an obligation to take an oath of office prior to the commencement of his duties.

141.    Plaintiff had to repeatedly remind supervisory ALJs at OAH of the oath-taking requirement.  More than one month passed before plaintiff, and other ALJs (many of whom were already hearing cases), were administered an oath.

**H.    Plaintiff's Outstanding Record Initially Prevents Retaliation**

142.    Based on and because of his outstanding record, on November 1, 2006 plaintiff submitted an application to the Commission for reappointment to a ten year term at OAH.

143.    In response to an application for reappointment as an ALJ, the OAH Act and regulations require that a series of deadlines be met.

144.    The Chief Judge is given no more than 120 days after the filing of a statement by the ALJ seeking reappointment (i.e., no later than March 1, 2007 in plaintiff's case) within which

to submit a record to the Commission with respect to plaintiff's "efficiency, efficacy, and quality of performance over the period of his . . . appointment." D.C. Code § 2-1831.10(b). That record is the only opportunity members of the Commission have for inclusion of any information they wish to have placed in the reappointment record. *Id.*

145.   The OAH Act requires that the record also include the Chief Judge's "recommendation as to whether the reappointment should be made . . ." *Id*.

146.   In every one of the reappointment records the Chief Judge had submitted to the Commission up to that point, CJ Butler had affirmatively and expressly stated whether he did, or did not, recommend that the ALJ in question be reappointed.

147.   As to plaintiff's reappointment, however, CJ Butler wrote to the Commission: ". . . I do not oppose the reappointment of Judge Pearson to a 10-year term."

148.   In response, plaintiff sent an e-mail to the Commission, and CJ Butler, pointing out that CJ Butler had failed to make the statutorily-required recommendation for or against plaintiff's reappointment.

149.   On March 8, 2007, in response to a request from the Commission that he comply with the statutory requirement that he submit either a favorable or unfavorable recommendation, CJ Butler amended his March 2nd statement to "clarify" that he affirmatively recommended that plaintiff be reappointed to a 10 year term.

150.   Under the OAH Act CJ Butler's timely recommendation to the Commission must be given "significant weight." D.C. Code § 2-1831.10(b).

151.   On March 9, 2007, plaintiff transmitted an e-mail to other ALJs at OAH, including CJ Butler.

152.   The e-mail contained four "protected disclosures:" a) the disclosure of the Chief Judge's initial violation of the local law [the OAH Act] that required that he affirmatively or negatively recommend plaintiff's reappointment; (b) the disclosure of CJ Butler's abuse of

authority in retaliating against plaintiff by initially providing a neutral, and not providing a positive recommendation; (c) the disclosure that the Chief Judge's record of abusing his authority made it advisable for other ALJs to compile an outstanding record to discourage his victimizing them; and (d) the disclosure of plaintiff's OAH history of "speaking truth to power."

153.   As a D.C. government employee plaintiff was privileged, if not required, to make those disclosures because they contained statements of opinion about public issues or contained statements of fact concerning the Chief Judge's violation of the OAH Act and his abuse of his authority.  D.C. Code §§ 1-615.58(1) & 1-615.52(a)(6).

154.   As an ALJ plaintiff had an ethical obligation or right to make the disclosures because of his ethical obligation to encourage high standards of conduct so that the integrity and independence of OAH would be preserved and encouraged.

155.   As a D.C. government employee plaintiff had the right to <u>freely</u> express his opinion on the public issues of: (a) the decisional independence of ALJs and (b) the freedom of Government employees to report abuses of authority and to report violations of law.

**I.     Off-The-Record Agreement On Reappointment**

156.   Within ten days of receiving a copy of the reappointment record, including the Chief ALJ's recommendation, an ALJ who wishes to appear before the Commission must file a request to be heard in person.  6 DCMR 3705.10.

157.   Because the Chief Judge issued a favorable recommendation, and because of plaintiff's outstanding record, plaintiff did not request an opportunity to meet with the Commission.

158.   On March 21, 2007, well after the deadline for transmission of plaintiff's reappointment record, CJ Butler submitted "supplemental information" to the Commission.  The submission was ostensibly in response to a request from the Commission (a request not disclosed or shown to plaintiff), made well after the mandatory March 1, 2007 deadline for the

Commission to request that the Chief Judge submit information as part of plaintiff's reappointment record.  D.C. Code § 2-1831.10(b).

159.    In April of 2007 the Commission requested that plaintiff meet with it for an unexplained "preliminary discussion regarding your reappointment."   Out of an abundance of caution, plaintiff submitted a detailed memorandum to the Commission on his rights and obligations under the Whistleblower Act, in advance of the "preliminary discussion".

160.    On April 24, April 27 and April 30, 2007, plaintiff had "preliminary discussions" with the Commission.

161.    At the 8 p.m., April 24, 2007 meeting plaintiff was barred for over two hours while the Commissioners ate dinner and then secretly heard from three OAH Principal ALJs.

162.    During the April 27, 2007 meeting Commissioner Willner, on behalf of the Commission, stated to plaintiff that he had "good news:" He stated he had carefully listened to digital recordings of hearings conducted by plaintiff, about which the Commission had received complaints, and had concluded that there was no basis at all for any complaint about plaintiff's judicial temperament, plaintiff's treatment of parties before him or plaintiff's conduct of his hearings.

163.    In a "chance" meeting on the street after the April 27, 2007 meeting, Commissioner  Valentine candidly revealed to plaintiff that all of the Commissioners recognized that he was amply qualified for reappointment – far more qualified than most of the other ALJs who had thus far been reviewed and reappointed.   He admitted that for that reason the Commission had not served plaintiff with a notice of possible denial of reappointment, but had instead asked him to attend meetings to "preliminarily discuss his reappointment."

164.    Commissioner Valentine admitted that the Commission had only scheduled the "preliminary meetings" at the insistence of CJ Butler.   Commissioner Valentine bluntly acknowledged that the Commissioners were well aware that CJ Butler was grossly incompetent.

Nonetheless, he counseled plaintiff to allow CJ Butler to save face with the Commission by apologizing to the Chief Judge for having publicly disclosed the fact of his incompetence.

165.    It thus became clear that the series of "preliminary discussions" required of plaintiff by the Commission were a continuation of the Commission's custom and practice of supporting the violator of the District's whistleblower laws and ethical rules and of plaintiff's First and Fifth Amendment rights, and not its victim.

166.    Commissioner Valentine, who acted as counsel to the Commission, assured plaintiff that he would be reappointed if he apologized.

167.    In recognition of the fact that CJ Butler had significantly improved and reformed his conduct in 2007 as compared to 2005 and 2006, at his third meeting with the Commission on April 30, 2007 plaintiff acknowledged that he could have made [but not that he was required by any law or ethical rule to make] other choices in his communications with his colleagues and in his letter to the Mayor about CJ Butler in July 2005.

168.    At Commissioner Valentine's urging on April 27, 2007, and in the spirit of settling the issue off-the-record, plaintiff also stated that in early March of 2007 he sent an e-mail to other judges at OAH that lapsed back into "unnecessary and derogatory references to the Chief Judge."  Plaintiff stated that that particular e-mail evidenced "poor judgment and a lack of civility" although, as a matter of law, it could not. D.C. Code § 1-615.58(1).  And plaintiff stated he would communicate an apology regarding the Chief Judge to OAH ALJs.

169.    Commission Chairman Rigsby, in turn, advised plaintiff that the matter was not of substantial significance and expressed his expectation that plaintiff would be reappointed and go on to write landmark decisions for OAH during his new ten year term of office.

170.    Plaintiff then shook hands with each Commissioner and the informal "preliminary discussions" ended with that off-the-record agreement on plaintiff's reappointment application.

**J.     Commission's Failure To Meet Statutory Deadline For Decision**

171.    Coincidentally, a public interest consumer lawsuit that plaintiff filed two years earlier began to attract national attention and criticism in April and May of 2007.  Because of ethical restrictions, plaintiff was unable to respond to grossly inaccurate comments made to the media by defendants' counsel in the case.  As a result, over time misinformation about the case attracted increased national and international media attention and criticism.

172.    Because specious assertions by the defendants' counsel in the public interest case went unrebutted in the media, the Washington Post and other media criticized CJ Butler upon learning that he had recommended that plaintiff be reappointed.

173.    Plaintiff's initial two year appointment expired at midnight on May 2, 2007. At about 2 pm. on that day plaintiff received a call from CJ Butler, who asked plaintiff to come to his office.  Deputy Chief Judge Mark Poindexter and OAH General Counsel Lisa Coleman were in CJ Butler's office when plaintiff arrived.

174.    CJ Butler asked plaintiff to read and sign a letter.  Plaintiff quickly skimmed the letter.   The letter, signed by CJ Butler, indicated that plaintiff would be notified of the Commission's decision on how it would proceed with plaintiff's request for reappointment in the next **thirty days**. It stated that "pending the Commission's review of this matter, as provided in 6 DCMR 3705.26, I [CJ Butler] have decided that you will remain at OAH at your same salary grade and step and you will receive non-judicial assignments as determined by my office."

175.    The May 2, 2007 letter contained misstatements about the off-the-record communications during plaintiff's meeting with the Commission on April 30, 2007.  When CJ Butler would not permit plaintiff to correct the statements in the letter, plaintiff prepared and e-mailed a correction of the misstatements to the Commissioners within an hour thereafter.

176.    Effective at midnight on May 2, 2007 plaintiff was demoted from his position as an ALJ and became an attorney-advisor at OAH.  He was therefore unable to hear and decide cases or to avail himself of training and other perquisites and opportunities available to ALJs.

177.    CJ Butler took the position that plaintiff's attorney-advisor position could and would be terminated upon the issuance of the Commission's ruling on plaintiff's reappointment application.

**K.    Chief Judge Violates OAH Act And Regulations**

178.    On May 22, 2007, without seeking permission from the Commission, CJ Butler submitted a letter to the Commission purporting to withdraw his recommendation that plaintiff be reappointed.

179.    The May 22, 2007 letter, instead, recommended that plaintiff not be reappointed.

180.    The letter based CJ Butler's reversal on four matters: (1) the March 9, 2007 protected disclosures plaintiff made at OAH after the Chief Judge recommended plaintiff's reappointment to the Commission on March 8, 2007; (2) an observation in 2002 (three years before plaintiff was appointed to his position as an ALJ) by a trial judge in a divorce case that plaintiff was responsible for driving up litigation expenses; (3) an observation by a trial judge in the public interest consumer lawsuit plaintiff filed in 2005 in which the trial judge expressed "significant concerns" about "bad faith" and a "misrepresentation" [the Chief Judge's letter did not reveal that, within six days after the trial judge's speculation, plaintiff filed a document in the case that completely addressed and resolved those mistaken concerns to the trial judge's satisfaction]; and (4) the number of media inquiries OAH had received about plaintiff's pending consumer lawsuit.

181.    The purported "withdrawal" of the Chief Judge's favorable recommendation and "substitution" of an unfavorable recommendation came three months after CJ Butler's favorable recommendation and three months after the mandatory statutory cut-off for submission of the

37

record containing the Chief Judge's recommendation.  D.C. Code § 2-1831.10(b).  The Chief Judge had never previously purported to withdraw or submit a recommendation regarding an ALJ after the statutory deadline for doing so had expired.

182.    None of the matters in the Chief Judge's May 22, 2007 letter related in any way to plaintiff's "efficiency, efficacy, and quality of performance over the period of his . . . appointment."  D.C. Code § 2-1831.10(b).

183.    None of the matters in the Chief Judge's May 22, 2007 letter related in any way to the discharge of the 24 responsibilities of an ALJ on which a reappointment decision must be based. D.C. Code § 2-1831.09(a) & (b).

184.    A disciplinary process exists at OAH, with strict due process protections, by which charges of alleged judicial misconduct may be brought by the Chief Judge, at any time. D.C. Code § 2-1831.10(d). Thus, the Chief Judge was free to raise any matters about plaintiff that came to his attention after March 1, 2007 in the form of a request for discipline and had no need to attempt to belatedly subvert the much less protective and more informal reappointment process for that purpose.

185.    The Chief Judge did not request, and the Commission does not have authority to grant, leave for the Chief Judge to withdraw his favorable recommendation and substitute a three month late untimely adverse recommendation.  D.C. Code § 2-1831.10(b); 6 DCMR § 3705.5.

186.    Thereafter months passed with no action on plaintiff's request for reappointment. Unbeknownst to plaintiff, Commissioner Lavine's term expired on April 30, 2007.  Nonetheless, a quorum sufficient to vote on plaintiff's application for reappointment existed at all times.  D.C. Code § 2-1831.07(b).

187.    Adverse publicity about plaintiff's pending public interest case and reappointment request continued to build during this time period, with thousands of newspaper articles and cable and network television reports being devoted to the subject all over the world.

188.    On information and belief, the defendants were told by members or heads of the District of Columbia's legislative, judicial and executive branches of government to deny plaintiff's request for reappointment because of plaintiff's exercise of his First Amendment right to petition the D.C. Superior Court for the redress of his grievances as a consumer, a private citizen, and a private attorney general under the D.C. Consumer Protection Procedures Act.  D.C. Code § 28-3901, *et seq*.

189.    On information and belief, members of the Commission illegally spoke off-the-record (and in some cases, on the record) to members of the media in order to make false, critical or statutorily-prohibited statements about plaintiff and his reappointment request in an effort to continue fueling local, national and international media and racially motivated public pressure on plaintiff to abandon his application for reappointment.  One direct and predictable result was that plaintiff repeatedly received anonymous death threats over a six month period.   Plaintiff's objections to the Commission about their illegal and life-threatening statements to the media were ignored.

190.   On June 4, 2007, because more than 30 days had passed, plaintiff formally inquired as to the status of his request for reappointment.  The Commission responded that it had granted Mayor Adrian M. Fenty's until-then undisclosed request that the Commission not act on plaintiff's reappointment application until the Mayor selected a Commissioner to fill the expired term of Commissioner Lavine.

191.    On or about June 27, 2007 Mayor Fenty appointed defendant Anita Josey-Herring to fill the seat on the Commission formerly occupied by Commissioner Lavine.  On information and belief, prior to or after her appointment Mayor Fenty urged or instructed Commissioner Josey-Herring to vote against plaintiff's reappointment.

192.    Mayor Fenty, from 2006 to the present time, has repeatedly responded to unfavorable media reports about Executive Branch operations, employees and office holders by

urging or directing that, on that basis alone, employees or office holders be fired, removed or not reappointed without regard to the actual facts, due process of law or any governing law.

193.   On information and belief, Commissioner Josey-Herring planned to apply for the position of Chief Judge of the D.C. Superior Court and wished, in June 2007, to obtain Mayor Fenty's support for her candidacy the following year.

**L.**   **Plaintiff Repeatedly Denied Due Process And Equal Treatment**

194.   Despite Commissioner Josey-Herring's appointment on June 27, 2007, the Commission continued for weeks to not communicate with plaintiff, as the adverse media publicity they orchestrated reached unprecedented peaks in every media outlet around the world.

195.   OAH regulations provide that if the Chief Judge submits a *timely* unfavorable recommendation for reappointment the ALJ in question has ten days within which to request an opportunity to be heard by the Commission.  6 DCMR 3705.11.  If the ALJ requests to be heard by the Commission, the Commission may not issue a notice of possible denial of reappointment until after the ALJ has been heard.  6 DCMR 3705.15.

196.   Because the Commission did not rule that CJ Butler could submit a second, untimely, adverse recommendation three months after the statutory deadline for submitting a recommendation, plaintiff was not on notice that the Commission would allow the untimely adverse recommendation to replace the timely favorable recommendation.

197.   Thus, plaintiff was not given an opportunity to be heard by the Commission -- after the Chief Judge's May 22, 2007 letter withdrawing his favorable recommendation and purporting to substitute an unfavorable recommendation -- before the Commission issued a notice on August 7, 2007 of a possible denial of reappointment.

198.   Plaintiff had no way of knowing the Commission, in violation of the OAH Act and its own regulations, would tacitly authorize CJ Butler to unilaterally withdraw his favorable recommendation and substitute a 3-month late unfavorable recommendation.

199.    The August 7, 2007 notice relied on documents that were not part of the reappointment record and that involved protected disclosures: (a) 7 e-mails submitted by the Chief Judge to the Commission on March 21, 2007, which were therefore not part of the record, regarding plaintiff's protected disclosures; (b) the legally irrelevant claim that throughout plaintiff's initial term he was counseled not to exercise his right to make protected disclosures or to communicate his opinions regarding public issues; (c) a May 2, 2007 e-mail to the Commission from plaintiff in which he minimized the off-the-record statements plaintiff made to the Commission on April 30, 2007; and (d) the Chief Judge's time-barred May 22, 2007 recommendation against plaintiff's reappointment.

200.    Without explaining its relevance, or disclosing the Commission's calculated and illegal off-the-record contribution to it, the August 7, 2007 notice referenced the widespread adverse publicity generated by plaintiff's pending public interest lawsuit.  It claimed that the resulting publicity "demeaned you as a judicial officer and brought OAH, the entire judiciary and the judicial process into disrepute."

201.    Neither the demeaning of an OAH ALJ, or bringing OAH or any other judiciary into "disrepute," are ethical standards or requirements in the OAH Code of Ethics.

202.    Thus, none of the grounds relied on in the August 7, 2007 notice of possible denial of reappointment implicated the 24 responsibilities of an ALJ's office, listed at D.C. Code § 2-1831.09(a) & (b), on which the Commission is required to base its decision regarding reappointment.  6 DCMR 3705.21.

**M.    Commission On Notice of Whistleblower And Constitutional Defenses**

203.    On August 22, 2007, plaintiff submitted a 22 page response to the August 7, 2007 notice from the Commission and requested an opportunity to appear before Commission at its meeting on September 26, 2007.

204.    In his response plaintiff requested rulings on four procedural matters.

41

205.    Plaintiff also presented four reasons why he should be reappointed: (1) he had complied with the off-the-record agreement he reached with the Commission; (2) he was entitled to the benefit of the Chief Judge's March 8, 2007 favorable recommendation; (3) the August 7 notice of grounds for possible denial of reappointment relied on statutory provisions that do not apply to a reappointment and relied on documents that were not part of the record; and (4) the specific conduct complained of in the Commission's August 7 letter is authorized by the OAH Code of Ethics and/or the D.C. Whistleblower Statue.

206.    Additionally, plaintiff asked the Commission what relevance the reference in their notice to his public interest lawsuit had to the reappointment process.  Plaintiff never received a substantive response to that inquiry.  Moreover, prior to plaintiff's meeting with the Commission in October 2007 the Commission promised to, but never ruled on the four procedural matters plaintiff raised in his August 22, 2007 response.

**N.      Commission Conducts Hearing In Plaintiff's Absence**

207.    On October 4, 2007 the Commission formally met with witnesses regarding plaintiff's reappointment but denied plaintiff 's written request to attend the meeting.

208.    The Commission subsequently refused to apprise plaintiff of what the witnesses had communicated to the Commission on October 4, 2007 so that plaintiff could respond to the witnesses' statements.

209.    The Commission's regulations entitle plaintiff to be present to hear testimony in support of, or in opposition to, his application for reappointment.  6 DCMR § 3705.19.

**O.      Commission's Express Reliance On Protected Disclosures**

210.    On October 11 and October 15, 2007 the Commission afforded plaintiff a hearing at which plaintiff responded to the Commission's August 7, 2007 notice but was unable to learn of, or address, statements made to the Commission out of his presence by the witnesses who appeared before the Commission on October 4, 2007.

211.    The Commission's regulations and the Fifth Amendment to the Constitution entitled plaintiff to an opportunity to know of and respond to all comments received by the Commission regarding plaintiff's reappointment.  6 DCMR § 3705.19.

212.    As was true at the April 2007 "preliminary discussions" regarding plaintiff's reappointment, on October 11 and 15, 2007 the Commission focused almost exclusively on plaintiff's protected disclosures, his statements regarding issues of public concern, and the publicity surrounding the public interest lawsuit plaintiff was prosecuting.  Plaintiff submitted memoranda of law to the Commission on plaintiff's defense, under the D.C. Whistleblower Act and the OAH Code of Ethics, to any thought by the Commission of not reappointing him to a 10 year term because of his protected disclosures.

213.    Some months before, in May 2007, on behalf of the Commission, Commissioner Willner had requested that OAH prepare a CD containing digital recordings of 28 selected hearings conducted by plaintiff between August 17, 2005 and April 17, 2007. Plaintiff had no involvement in selecting the hearings to be reviewed. On May 11, 2007, OAH transmitted the requested CD to Commissioner Willner.

214.    During the October 11, 2007 Commission meeting with plaintiff Commissioner Willner, on behalf of the Commission, stated to plaintiff that he had listened to the digital recordings of the additional 28 hearings at which plaintiff presided and had again concluded that there was no basis for any complaint about plaintiff's judicial temperament, plaintiff's treatment of parties before him or plaintiff's conduct of his hearings.

215.    Notwithstanding that admission, on October 30, 2007, the Commission issued an eight page decision denying plaintiff's application for reappointment to a 10 year term.

216.    In its decision the Commission expressly stated that it based its decision not to reappoint plaintiff on what it termed "intense personalized attacks on the integrity and character" of  CJ Butler and other Principal ALJs.

217.    Each such "attack" was authorized, or required, by the D.C. Whistleblower Act, and/or the First Amendment to the United States Constitution.

218.    The Commission's October 30, 2007 decision noted that plaintiff had invoked and explained the protections of the D.C. Whistleblower Act.  However, in violation of the D.C. Whistleblower Act, the decision did not acknowledge, much less address the "complete affirmative defense" the D.C. Whistleblower Act extends to persons invoking its protections. D.C. Code § 1-615.54(c).

219.    In the only portion of its decision that did not relate to communications authorized by the D.C. Whistleblower Act or the First Amendment, the Commission referred to unspecified e-mails from unidentified OAH staff about "the handling of matters before you," based upon which the Commission stated that it had "concerns regarding your lack of judicial temperament and judgment."

220.    The decision did not reveal that the handling of matters before plaintiff had been thoroughly inquired into by Commissioner Willner, on two separate occasions (in April 2007, and again in May 2007) on behalf of the Commission, and that Commissioner Willner had repeatedly admitted to plaintiff in the presence of all the Commissioners that any "concerns regarding . . . lack of judicial temperament and judgment" had no basis in fact.

**COUNT I**
**First Amendment**
**Freedom of Speech**
**42 U.S.C. § 1983**
**(As Against All Defendants)**

221.    Plaintiff hereby incorporates each of the factual allegations stated in the foregoing paragraphs as if repeated herein.

222.    Defendants, and each of them, seized on and fueled adverse media reports about plaintiff's public interest lawsuit as public relations cover to reverse themselves and retaliate against plaintiff for (among other privileged communications) plaintiff's public disclosure to a

committee of the D.C. Council in February 2006, and his private disclosure to staff of the D.C. Council in February 2007, that the obligation of ALJs to decide cases on their merits was chilled and frustrated by a secret and misnamed "peer review" system that delayed and coerced decisions at OAH. Decisional independence was similarly chilled or defeated by the refusal of Principal ALJs to permit plaintiff to issue orders reflecting his view of the law in his cases, and by requiring plaintiff and other ALJs to return hundreds of cases for reassignment when plaintiff and other ALJs refused to rule as instructed on the disposition of the cases.

223.    Defendants' actions were carried out by members of the Commission who, by custom and persistent practice, as a five-person group exercised final decision-making and policy making authority over the discipline and reappointment of ALJs at the OAH.  Members of the Commission, under enormous pressure from, but anticipating political cover from, highly placed members of all three branches of the District Government and the media, illegally rescinded CJ Butler's favorable recommendation, issued a notice of possible denial of reappointment, and refused to reappoint plaintiff.  Plaintiff's disclosure of matters of public concern to the public, the D.C. Council and/or to the staff of the D.C. Council was the moving force behind the defendants' deprivation of plaintiff's constitutional rights.

224.    Defendants, and each of them, acted under color of the law of the District of Columbia in threatening and failing to reappoint plaintiff and in terminating plaintiff's employment and participating in actions which naturally and proximately caused the termination of plaintiff's employment with OAH and thereby deprived plaintiff of his right to freedom of speech.

225.    In disclosing information as a private citizen to a committee and to the staff of the D.C. Council in February 2006 and February 2007 plaintiff was not speaking as an employee, or within his normal chain of command and his disclosures went beyond his official duties.

226.    By reporting on, among other matters, the appearance or fact of coerced and illegally manipulated decision making at OAH and the extraordinary delays in the disposition of cases that resulted, plaintiff was speaking on matters of public concern.  Those matters were of such public concern that the D.C. Council enacted the Office of Administrative Hearings Establishment Act of 2001 to ensure decisional independence and to reduce delays, and a committee of the D.C. Council held Performance Oversight hearings in February or March of each year after 2004 to monitor adherence to the provisions of the Act.

227.    Plaintiff's disclosures did not adversely affect OAH's efficiency interest nor did it cause a substantial disruption in the workplace.  To the contrary, plaintiff's disclosures promoted the efficiency and independence that the D.C. Council expressly adopted as legislative goals for OAH in enacting the Office of Administrative Hearings Establishment Act of 2001.

228.    Because plaintiff was speaking outside of his official duties on matters of public concern that did not adversely affect the efficiency interest of the Defendants, his speech was protected.  The defendants first learned of plaintiff's February 2007 disclosure to D.C. Council staff on October 11, 2007.

229.    Defendants' actions as alleged in the above paragraphs violated plaintiff's clearly established rights under the First Amendment to the Constitution.  Long before April 2007 it was clearly established by U.S. Supreme Court and federal circuit court precedent that plaintiff was entitled to First Amendment protection because he was not speaking pursuant to his official duties when he took leave from his job and testified before the D.C. Council in February 2006, or when he spoke privately with staff of the D.C. Council in February 2007, regarding coerced  and illegally manipulated decision making and other matters that were of such public concern that they were the subject of remedial legislation.

230.    Accordingly, the individual defendants are not protected by any qualified privilege for engaging in their unlawful and retaliatory actions.

231.    The defendants' October 30, 2007 decision acknowledges that plaintiff's protected speech was a motivating force for their retaliatory actions. And the defendants and their counsel repeatedly admitted to plaintiff in April 2007 and again in October 2007 that their actions were not motivated by legitimate, non-pretextual grounds, viz "concerns regarding your lack of judicial temperament and judgment."

232.    The defendants' actions were taken outrageously, wantonly, and oppressively with legal and actual malice and caused plaintiff to suffer pecuniary losses, injuries, and damages, including, but not limited to, lost back pay, lost front pay, and other commensurate benefits.

233.    Defendants' actions as alleged in the above paragraphs caused plaintiff to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

## COUNT II
**First Amendment**
**Freedom of Speech**
**42 U.S.C. § 1983**
**(As Against All Defendants)**

234.    Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs.

235.    Defendants, and each of them, retaliated against plaintiff and eventually refused to reappoint him because plaintiff exercised his First and Fifth Amendment right to file and prosecute a public interest lawsuit, as a private attorney general, to enforce the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.* by seeking to enjoin and obtain damages for fraud and unfair trade practices that an interstate, dry cleaning chain in plaintiff's neighborhood persisted in for seven years.

236.    Defendants, and each of them, acted under color of the law of the District of Columbia in failing to reappoint plaintiff and in terminating plaintiff's employment and

participating in actions which naturally and proximately caused the termination of plaintiff's employment with OAH and thereby deprived plaintiff of his right to freedom of speech and equal protection of the law.

237.    The D.C. Consumer Protection Procedures Act ("CPPA") was enacted to encourage consumer law experts, such as plaintiff, to file and prosecute cases under the CPPA in the public interest as private attorney generals.

238.    The ALJ Code of Ethics expressly authorizes an ALJ to file and prosecute a *pro se* lawsuit.

239.    By filing and prosecuting a public interest consumer lawsuit, as a private attorney general, plaintiff was acting as a private citizen and his filings and communications went beyond his official duties.

240.    By filing and prosecuting a public interest consumer lawsuit as a private attorney general, and seeking injunctive relief and punitive damages among other remedies, plaintiff was clearly acting and communicating on a matter denominated by the D.C. Council as one of public concern.  For that reason the D.C. Consumer Protection Procedures Act grants standing as a private attorney general to plaintiffs seeking to enforce its provisions and authorizes an award of attorneys' fees to a prevailing plaintiff.

241.    Because, by filing and prosecuting his lawsuit plaintiff was communicating outside of his official duties on a matter of public concern that did not adversely affect the efficiency interest of the defendants, his petition to the D.C. Superior Court for the redress of his consumer grievances was protected by the First Amendment.

242.    Plaintiff's protected speech in this regard was a substantial or motivating factor in the defendants' failure to reappoint plaintiff, their termination of plaintiff, and their participation in actions which naturally and proximately caused the termination of his employment with OAH.

243.    Defendants would not have failed to reappoint plaintiff but for his protected speech.

244.    Defendants' actions as alleged in the above paragraphs violated plaintiff's clearly established rights under the First Amendment to the Constitution.  Long before April 2007 a reasonable person in the defendants' position would have known that it violated clearly established U.S. Supreme Court and federal circuit court First Amendment precedent to refuse to reappoint plaintiff to a ten year term of office because he was prosecuting a public interest consumer lawsuit as a private citizen, addressing matters that were of such public concern that the consumer statute plaintiff proceeded under invested him with standing as a private attorney general and entitled him to an award of attorneys' fees if he prevailed.  A reasonable person in defendants' position would know that plaintiff's interest in pursuing a public interest lawsuit in the D.C. Superior Court vastly outweighed any governmental interest in promoting the efficiency of the almost completely unrelated public service OAH performed.  And a reasonable person would know that defendants could not refute plaintiff's showing that the Commission would not have failed to reappoint plaintiff had it not become aware of (and sought to punish) plaintiff's lawsuit filing in April of 2007. Accordingly, the individual defendants are not protected by any qualified privilege for engaging in their unlawful actions.

245.    Defendants' actions as alleged in the above paragraphs caused plaintiff to suffer pecuniary losses, injuries, and damages, including, but not limited to, lost back pay, lost front pay, and other commensurate benefits.

246.    Defendants' actions as alleged in the above paragraphs, caused plaintiff to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

## COUNT III
**Fifth Amendment**
**Denial of Due Process And Equal Protection**
**42 U.S.C. § 1983**
**(As Against All Defendants)**

247.    Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs as if repeated herein.

248.    Defendants, and each of them, also retaliated against plaintiff for the exercise of his First Amendment right to petition the D.C. Council and the D.C. Superior Court, by refusing to treat plaintiff in the same manner as similarly situated ALJ applicants for reappointment, by repeatedly refusing to comply with the requirements of the OAH Act, the Commission's own regulations, or any notion of fundamental fairness in considering and deciding plaintiff's application for reappointment.

249.    Defendants' reasons for treating plaintiff differently from all other ALJs who have sought reappointment by the Commission bear no rational relationship to a legitimate state purpose.

250.    Plaintiff had a protected property interest in his office as an ALJ because the OAH Act and regulations placed substantive limitations on the Commission's power to not reappoint plaintiff and provided plaintiff with a legitimate expectation of continued employment.

251.    Defendants deliberately flouted the OAH Act and their own regulations by, *inter alia*, refusing to comply with the statutory deadlines for record submission, refusing to accord plaintiff the benefit of CJ Butler's initial timely recommendation for reappointment, refusing to permit plaintiff to hear or subsequently learn the substance of the testimony given by witnesses opposing his reappointment, and by refusing (as required by statute) to consider plaintiff's affirmative Whistleblower defenses to the assertions set forth in the Commission's August 7, 2007 notice of possible denial of reappointment.  Thus, as a matter of law, a "thorough and fair evaluation of plaintiff's candidacy by an impartial commission" did not take place.  Defendants'

actions naturally and proximately caused the termination of plaintiff's employment with OAH and denied plaintiff procedural and substantive due process and equal protection of the laws.

252.    Defendants' actions, as stated above, violated plaintiff's clearly established rights under the Fifth Amendment to the Constitution of which a reasonable person would have known. Because of the defendants' unique expertise with respect to each of the governing laws, and their privileged standing in the legal community, their conduct was a flagrant, inexcusable and repeated abuse of their reappointment power which shocks the conscience.

253.    Defendants, in acting as stated above, acted under color of the law of the District of Columbia and thereby deprived plaintiff of his right to procedural and substantive due process and equal protection of the laws.

254.    Defendants' actions were carried out by members of the Commission who are officials with final policy and decision-making authority with respect to the determination of plaintiff's reappointment request.

255.    Defendants' actions, as stated above, naturally and proximately caused the termination of plaintiff's employment with OAH, caused plaintiff to suffer pecuniary losses, injuries, and damages, including, but not limited to, lost back pay, lost front pay, and other commensurate benefits.

256.    Defendants' actions, as stated above, naturally and proximately caused the termination of plaintiff's employment with OAH and caused plaintiff to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

**<u>COUNT IV</u>**
**D.C. Whistleblower Protection Act**
**(As Against All Defendants)**

257.    Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs.

258.    The protections, rights and remedies in the D.C. Whistleblower Act supplement and do not "diminish the rights and remedies of an employee pursuant to any other federal or District law."   D.C. Code § 1-615.56(c).    Thus, in addition to remedies under the U.S. Constitution, remedies under 42 U.S. § 1983, and remedies under any other D.C. common law cause of action, plaintiff may also recover under the D.C. Whistleblower Act.

259.    D.C. Code § 1-615.53 prohibits any **supervisor** from threatening or taking a prohibited personnel action or otherwise retaliating against an employee because of the employee's protected disclosure.

260.    Because he is an employee of the District and is authorized to evaluate plaintiff's performance, CJ Butler is a "supervisor" within the meaning of § 1-1615.52(a)(8) of the D.C. Whistleblower Act.

261.    Because Commissioners Valentine, Rigsby and Josey-Herring are also employees of the District, and pursuant to the custom and policy of the Commission could both hire plaintiff and evaluate his performance, they are supervisors within the meaning of § 1-615.52(a)(8) of the D.C. Whistleblower Act.

262.    Commissioners Valentine, Willner, Rigsby and Josey-Herring also meet the definition of a supervisor because, among other things, pursuant to the custom and policy of the Commission they could take "corrective action" by rejecting the Chief Judge's violation of the D.C. Whistleblower Act (e.g., his retaliatory recommendation that plaintiff not be reappointed). CJ Butler meets the definition of a supervisor because he could remedy his own retaliatory recommendation by rescinding it.

263.    By purporting to rescind his favorable recommendation that plaintiff be reappointed, and substituting a recommendation that plaintiff not be reappointed, CJ Butler took a "prohibited personnel action" (i.e., a failure to take favorable personnel action) where plaintiff was concerned.  D.C. Code § 1-615.52(a)(5).

264.    By failing to reappoint plaintiff by the May 2, 2007 statutory deadline (or reasonably soon thereafter) the Commission took a "prohibited personnel action" (i.e., a failure to hire) where plaintiff was concerned.

265.    By deliberately flouting the OAH Act and their own regulations by, *inter alia*, refusing to comply with the statutory deadlines for record submission, refusing to accord plaintiff the benefit of CJ Butler's initial timely recommendation for reappointment, refusing to permit plaintiff to hear or subsequently learn the substance of the testimony given by witnesses opposing his reappointment, and by refusing (as required by statute) to consider plaintiff's affirmative Whistleblower defenses to the assertions set forth in the Commission's August 7, 2007 notice of possible denial of reappointment the Commission took a "prohibited personnel action" (i.e., the Commission failed to hire or take other favorable personnel action) where plaintiff was concerned.

266.    By unanimously issuing a notice advising plaintiff of a possible denial of reappointment, the Commission engaged in a "prohibited personnel action" (i.e., the Commission failed to hire or take other favorable personnel action) where plaintiff was concerned.

267.    By unanimously issuing a decision denying plaintiff reappointment, the Commission engaged in a "prohibited personnel action" (i.e., the Commission failed to hire or take other favorable personnel action) where plaintiff was concerned.

268.    Both the Chief Judge, in his May 22, 2007 letter purporting to change his reappointment recommendation to a negative one, and the Commission in its August 7, 2007 notice advising plaintiff of a possible denial of reappointment, specifically list protected disclosures that plaintiff made as a contributing factor in their decision to take and/or threaten to take "prohibited personnel action" against plaintiff.

269.    Plaintiff was a "whistleblower" as defined in D.C. Code § 1-615.52(9), because he was "perceived to have made a protected disclosure as that term is defined in . . ." the D.C. Whistleblower Act.  For that reason, and until the defendants calculated that the tide of public opinion and the heads of the three branches of government in the District of Columbia would provide them with political cover, the defendants initially dared not fail to recommend, and to reappoint, plaintiff.

270.    Plaintiff was also a "whistleblower" as defined in D.C. Code § 1-615.52(9), because, among other things, plaintiff made "protected disclosures" as defined in D.C. Code § 1-615.52(6) regarding the lack of decisional independence of ALJs at OAH, and the failure of CJ Butler and/or the Commission to comply with the OAH Act, the OAH Code of Ethics for ALJs and the regulations implementing the OAH Act, among other laws.

271.    Plaintiff reasonably believed that the information he communicated to his supervisors, and to employees and members of public bodies such as the OAH, the D.C. Council and the Commission, constituted evidence of: (1) gross mismanagement, (2) abuse of authority in connection with the administration of a pubic program; and (3) the violation of federal or local laws, rules and regulations.

272.    Because plaintiff made, or was perceived to have made, protected disclosures to his supervisors and to employees of public bodies, he was intentionally, repeatedly and maliciously subjected to retaliation by, for example, involuntary reassignment, a threat of termination, lowered ratings on his written evaluation, a refusal to treat his reappointment request in the same manner as other reappointment requests, a notice of possible termination, and finally a refusal to reappoint by defendants, all of which constituted "prohibited personnel actions" under D.C. Code § 1-615.52(5).

273.    In meetings with plaintiff in April and October 2007 the Commission tacitly admitted that it could not show that its actions in response to plaintiff's reappointment request

would have occurred for legitimate, *independent* reasons even if plaintiff had not engaged in activities protected by the D.C. Whistleblower Act.

**<u>COUNT V</u>**
**Intentional Infliction of Emotional Distress**
**&**
**Wrongful Retaliation In Violation of Public Policies**
**(As Against All Defendants)**

274.    Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs.

275.    Each member of the Commission was appointed, or was otherwise designated by law, a member of the Commission because the OAH Act contemplated that he or she was peculiarly qualified to advance OAH's legislative mission of providing independent and efficient administrative adjudication services to tens of thousands of primarily *pro se* parties with cases before the OAH each year.

276.    Defendant Willner, the only non-lawyer on the Commission, was nonetheless intimately familiar with the failings of the old system of administrative adjudication in the District of Columbia and the goals of the D.C. Council in enacting the Office of Administrative Hearings Establishment Act of 2001.  Thus, he concurred in the issuance of a September 2004 advertisement by the Commission for ALJ positions at OAH that recognized and promised that ALJs would "decide cases *independently* under applicable law."

277.    Defendant Butler was aware, as the first Chief Judge of OAH, and by virtue of the *admissions* he made during the hearings on his nomination before the D.C. Council, that it was critically important that ALJs at OAH have decisional independence from him and that he comport himself with unimpeachable integrity and ethical rectitude, so that he might set an example of those qualities and encourage that culture among ALJs in the OAH.

278.    Defendant Valentine, as a member of the D.C. Bar for over twenty-five years and the Deputy Attorney General for the Civil Litigation Division of the Office of Attorney General,

and counsel to the Commission, was at all times thoroughly familiar with the policies and protections codified in the OAH Act, the D.C. Whistleblower Act, District of Columbia employment law, and the protections extended plaintiff by the U.S. Constitution and case law construing 42 U.S.C. § 1983.

279.   Defendant Rigsby, a former Attorney General for the District of Columbia, a judge since 2002 and the chairperson of the Commission since 2003, was thoroughly familiar with the policies and protections codified in the OAH Act, the D.C. Whistleblower Act, District of Columbia employment law, and plaintiff's rights under the U.S. Constitution and case law construing 42 U.S.C. § 1983. He was bound by both Rules of Professional Conduct for attorneys as well as the Canon of Judicial Conduct for judges of the D. C. Superior Court.

280.   Defendant Josey-Herring, a veteran of the D.C. Public Defender Service and of membership on the D.C. Superior Court, had the same ethical constraints as defendant Rigsby and should have had a special sensitivity to the needs of the predominantly *pro se* parties who depended upon ALJs at OAH to exercise *independent* judgment in hearing and deciding their matters.  She, instead, became Mayor Fenty's willing handmaiden in an apparent scheme to advance her own personal career ambitions.

281.   Defendant District of Columbia, through its Mayor, D.C. Council and members of the D.C. Superior Court -- all sworn to uphold the rule of law -- should also have had a special sensitivity to and respect for independent judicial decision making and the constitutional right of every person to petition the courts for the redress of legal grievances.

282.   As a government, and individually, each defendant effectively repudiated the oath he or she took and the public trust they assumed upon taking judicial office, or upon becoming a member of the Commission charged with determining how best to select, retain, discipline and reappoint judges to the OAH.

283.     Instead of applauding and encouraging plaintiff's principled and selfless conduct, and the example he set, the defendants abused the powers entrusted in them and  used it to run roughshod over plaintiff's legitimate expectation of reappointment, his right to have his personnel matters kept private, and the rights he championed for tens of thousands of District of Columbia employees, residents and consumers that D.C. Council legislation and the United States Constitution were crafted to benefit.

284.     Defendants, in a shocking abdication of their legal and ethical experience, learning and training, and despite plaintiff's repeated invocation of the relevant laws, steadfastly refused to discharge their obligation, under the D.C. Whistleblower Act, to act in accordance with the fact "that public offices are truly *public trusts* . . ." D.C. Code § 1-615.51(3).

285.     The members of the Commission similarly refused to discharge their obligation to ensure the "*integrity* and ***independence***" of the Office of Administrative Hearings.

286.     The up to 2-1/2 year long illegal, cynical, malicious and self-aggrandizing actions of defendants Butler, Valentine, Rigsby, Willner and Josey-Herring, individually, and the District of Columbia under *respondeat superior*, constitute extreme and outrageous conduct because of: (a) *the relationship of the parties* -- the defendants illegally used their physical and legal control over plaintiff and his personal information to devastating effect at OAH, in the media and at Commission meetings; (b) *the duration of defendants' conduct* – the defendants extended plaintiff's purgatory for ***six months*** past the mandatory statutory deadline for ruling on plaintiff's reappointment; (c) *the willfulness of defendants' conduct* – the defendants persisted in prolonging the reappointment process so that they could utilize the media to ratchet up the pressure on plaintiff to abandon his reappointment request, even as they privately admitted to plaintiff, both through their counsel and as a Commission, that there was no non-pretextual reason for not reappointing him; (d) *plaintiff's known vulnerabilities* –the Commission knew plaintiff was constrained by ethical prohibitions from publicly responding to their offensive

against him, and they knew (because they secretly launched an exhaustive investigation in April 2007 into every aspect of plaintiff's personal, career and financial history) how to exploit all of plaintiff's financial and other vulnerabilities; and (e) *defendants' ethical and fiduciary duties* – because plaintiff was entitled to expect so much more from lawyers, judges and other members of the Commission charged with honoring a fundamental public trust, he was devastated by the reality he increasingly had to confront and endure month after month, and year after year.

287.   Instead of being humbled by the public trust reposed in them, the defendants were made arrogant by the knowledge that: (a) because their numbers include the Chief Judge of OAH and a then-candidate for Chief Judge of the D.C. Superior Court, no lawyer who desired to practice before OAH or the D.C. Superior Court would dare represent the plaintiff in this case against them; and (b) should plaintiff attempt to proceed *pro se,* despite the fact this area of law is foreign to him, the defendants would be represented, free of charge, by upwards of 350 expert lawyers in the D.C. Office of Attorney General -- in the trial court and throughout any appeal.

288.   For all of the above reasons, and in all of the above ways, the defendants' illegal, inhumane and unrelenting campaign to "break" the plaintiff went beyond all possible bounds of decency, in an effort to force plaintiff to walk away from, and to abandon his obligations and rights as a judicial officer and American citizen.  Their overt and covert conduct and campaign was calculated to, and did, intentionally or recklessly subject plaintiff to month after month of oral and written death threats; ongoing racial epithets by telephone, postal and e-mail; physical illness and 40 pound weight loss, irreparable damage to his career, loss of employment, humiliation, damage to his reputation, and financial ruin – in short, such unrelenting, severe and ongoing emotional distress that no reasonable man could be expected to endure it.

## **Punitive Damages**

289.   Plaintiff hereby incorporates as though restated each of the factual allegations stated in the foregoing paragraphs.

290.    It is impossible to conceive of a more appropriate case than this one -- followed nationally and internationally for almost three years now – for the imposition of punitive damages against <u>each</u> defendant, under federal and/or local law.  It is the only way to realize the goal of deterring and punishing a jurisdiction and its policy makers for manipulating the media and their reappointment powers to crush a judicial officer and private citizen because he dared exercised his statutory and constitutional right and/or obligation to model and urge high ethical standards in the workplace, to urge clearly mandated independent decision making in tens of thousands of administrative cases, and to petition the D.C. Superior Court to address fraud and unfair trade practices that victimized thousands of consumers in the District of Columbia.

## **PRAYER FOR RELIEF**

Wherefore, plaintiff requests that the Court enter judgment in his favor and award him the following relief:

1.    An order declaring that defendants violated plaintiff's rights under the First and Fifth Amendments to the Constitution, 42 U.S.C. § 1983, and the D.C. Whistleblower Act, D.C. Code § 1-615.51, *et seq*. by punishing plaintiff and attempting to deter other ALJs and other employees of the District Government from exercising their statutory or constitutional right to: (a) express their opinions, (b) speak on matters of public interest; (c) disclose gross mismanagement, (c) disclose abuse of authority; (d) disclose illegal and unethical conduct; and (e) promote District of Columbia public policies;

2.    An injunction prohibiting all defendants, or their agents or subordinates, from retaliating in any manner, directly or indirectly, against plaintiff for any past and future protected disclosures and activities;

3.    An order reinstating plaintiff in the employ of OAH for a ten year term of office as an Administrative Law Judge, retroactive to May 2, 2007, at the salary currently paid other

ALJs; or if no such position is currently available, damages for a ten and a subsequent six year term of office;

4.      An order requiring immediate reinstatement of plaintiff's seniority rights;

5.      An order requiring record correction and expunction;

6.      Retroactive payment of all lost wages and benefits, including back pay and interest on back pay;

7.      Compensatory damages in an amount to be determined at trial, but in excess of $1,000,000 from each defendant, to compensate plaintiff for all losses, injuries, and damages proximately caused by each defendant's separate and jointly unlawful conduct;

8.      Pre-judgment and post-judgment interest;

9.      Punitive damages in an amount to be determined at trial but no less than ten times the amount of compensatory damages from each defendant;

10.     Attorneys' fees and costs from all defendants jointly and severally;

11.     Appropriate disciplinary action, and a civil fine of up to $1,000, against each defendant that the jury finds violated the D.C. Whistleblower Act; and

12.     Such other relief as may be just and appropriate

### Demand for Jury Trial

Plaintiff demands a trial by jury for any and all issues proper to be so tried.

**I verify, under penalty of perjury, that the foregoing is true and correct.  Executed on January 26, 2009.**

/s/ *Roy L Pearson, Jr*
_____
Roy L. Pearson, Jr.                              Pro Se Attorney
3012 Pineview Court, N.E.
Washington, D.C.  20018
Telephone: (202) 269-1191

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of January, 2009, a true and correct copy

of the foregoing *Amended Complaint For Equitable And Monetary Relief And Demand For Jury*

*Trial* has been served upon the following via ECF:

        Andrew J. Saindon, Esquire
        Assistant Attorney General
        Office of the Attorney General for the District of Columbia
        441 4th Street, N.W.
        Sixth Floor South
        Washington, D.C. 20001

        *Counsel for all Defendants*

                                          /s/ Roy L. Pearson, Jr._____
                                          Roy L. Pearson, Jr.     D.C. Bar No. 955948