## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ROY L. PEARSON, JR.** | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| **DISTRICT OF COLUMBIA** | : | |
| A Municipal Corporation, | : | |
| | : | |
| **TYRONE T. BUTLER** | : | |
| In his official and individual capacities, | : | Civil Action No. 08-cv-758 (ESH) |
| | : | (Jury Trial Requested) |
| **PETER M. WILLNER** | : | |
| In his official and individual capacities, | : | |
| | : | |
| **ROBERT R. RIGSBY** | : | |
| In his official and individual capacities, | : | |
| | : | |
| **ANITA JOSEY-HERRING** | : | |
| In her official and individual capacities, | : | |
| | : | |
| **GEORGE C. VALENTINE** | : | |
| In his official and individual capacities, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## PLAINTIFF'S MOTION AND REQUEST FOR EXPEDITED RULING ON MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT III OF THE AMENDED COMPLAINT AND FOR INJUNCTIVE RELIEF

Plaintiff, pursuant to Fed. R. Civ. P. 56(a), LCvR. 56.1 and Fed. R. Civ. P. 65(a), hereby moves this Honorable Court for: (1) partial summary judgment establishing each defendant's liability on the procedural due process claim in Count III of the Amended Complaint, and corresponding (2) declaratory and (3) preliminary injunctive relief.

Pursuant to LCvR. 7(m), counsel for the parties have spoken by telephone regarding the relief requested in this motion, and other potential areas of agreement. No agreements were reached and the defendants oppose this motion.

Because the arguments presented in support of plaintiff's request for partial summary judgment on Count III of the Amended Complaint also support plaintiff's request for entry of a preliminary injunction – and because plaintiff has suffered and continues to suffer irreparable harm -- plaintiff requests an expedited ruling on this motion.

The grounds for and relief sought by this motion are set forth more fully in the accompanying Memorandum of Points and Authorities and proposed Order.

As required by LCvR. 56.1, a Statement Of Material Facts As To Which No Genuine Dispute Exists and Affidavit/Declaration[1] are attached.

Respectfully submitted,

/s/ *Roy L. Pearson, Jr.*

Roy L. Pearson, Jr.                                    #955948
3012 Pineview Court, N.E.
Washington, D.C. 20018
Telephone: (202) 269-1191

Counsel for Plaintiff

---

[1] The two terms have the same practical meaning and effect.  28 U.S.C. § 1746; LCvR. 11.2.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ......................................................................................... 1

    A. Count III Of The Amended Complaint ................................................... 2
    B. Contextual Facts Relevant To This Motion ........................................... 2
        1. Establishment Of OAH And Plaintiff's Appointment ................... 2
        2. Pre-Termination Proceedings ........................................................ 7
        3. Post-Termination Proceedings ...................................................... 12
    C. Federal Rule of Civil Procedure 56 ....................................................... 15

II. THE DEFENDANTS DEPRIVED PLAINTIFF OF HIS PROPERTY
    INTERESTS WITHOUT, FIRST, PROVIDING PLAINTIFF WITH
    DUE PROCESS OF LAW ............................................................................ 16

    A. Plaintiff Was Deprived Of His Legitimate Expectation Of A Timely
       Reappointment, And Freedom From Retaliation ................................... 16
        1. The Commission's Regulations, And The OAH Act, Gave
           Plaintiff A Protected Entitlement To Timely Reappointment ...... 17
        2. The D.C. Whistleblower Act Gave Plaintiff A Protected
           Entitlement To Freedom From Retaliation .................................... 18
        3. D.C. Common Law Also Gave Plaintiff A Protected Entitlement
           To Freedom From Retaliation ....................................................... 20

    B. The Procedures The Commission Followed In Depriving Plaintiff Of
       His Property Interests Did Not Meet Longstanding, Minimum Due
       Process Requirements ............................................................................ 21
        1. The Commission's Pre-Deprivation Procedures Clearly,
           And Repeatedly, Denied Plaintiff Due Process Of Law ............... 23
           a) Plaintiff Was Not Provided Meaningful Notice ............... 25
           b) Plaintiff Was Not Provided A Meaningful Opportunity
              To Be Heard .................................................................... 28
           c) Plaintiff Was Not Afforded Neutral Decisionmakers ..... 29
           d) Plaintiff Was Not Provided Findings Or A Ruling With
              Respect To "Extraordinary Circumstances" Or His
              Complete Whistleblower Defenses ................................. 30
           e) Plaintiff Was Harmed By The Denial Of Pre-Deprivation
              Due Process ..................................................................... 32
        2. The Commission's Post-Deprivation Procedures Clearly,
           And Repeatedly, Denied Plaintiff Due Process Of Law ............... 34
           a) Plaintiff Was Not Provided A Post-Termination
              Hearing At A Meaningful Time ....................................... 34
           b) Plaintiff Was Again Not Afforded Neutral Decision-
              Makers ............................................................................ 35
           c) Plaintiff Was Again Not Provided A Meaningful
              Opportunity To Be Heard ................................................ 37
           d) Plaintiff Was Again Not Provided Findings Or A Ruling
              With Respect To His Complete Whistleblower Defense .. 39
           e) Plaintiff Was Again Not Provided A Meaningful
              Hearing ........................................................................... 41

III.    ENTRY OF PARTIAL SUMMARY JUDGMENT ON COUNT III
        AND ENTRY OF PRELIMINARY INJUNCTION                     43

CONCLUSION                                                       45

AFFIDAVIT/DECLARATION OF  ROY L. PEARSON, JR.                    1-13
ATTACHMENTS – (Separate PDF Files)
    #1-CONFIRMATION TESTIMONY OF TYRONE BUTLER (June 25, 2003)
    #2-CODE OF ETHICS FOR OAH ALJs (Aug. 31, 2004; amen'd June 15, 2005)
    #3-OVERSIGHT TESTIMONY OF TYRONE BUTLER (March 7, 2005)
    #4-VACANCY ANNOUNCEMENT-OAH (Sept. 13, 2004)
    #5-TESTIMONY OF R. PEARSON, JR. BEFORE DC COUNCIL  (w/out
    Attachment) (Feb. 13, 2006)
    #6-APPLICATION FOR REAPPOINT. OF HON. R. PEARSON (Nov. 1, 2006)
    #7-ALJ PERFORMANCE EVALUATION: R. PEARSON (Nov. 13, 2006)
    #8-RESPONSE TO ALJ PERFORMANCE EVALUATION (w/out Attachment)
     (Dec. 18, 2006)
    #9-PEER REVIEW ASSIGNMENTS (February 21, 2007)
    #10-LETTER FROM CHIEF ALJ BUTLER TO COMM'N (March 8, 2007)
    #11-E-MAIL FROM HON. R. PEARSON TO OAH ALJs (March 9, 2007)
    #12-LETTER FROM OAH CHIEF ALJ BUTLER TO COMMISSION
     (w/out attachments) (March 21, 2007)
    #13-E-MAIL FROM COMMISSIONER P. WILLNER TO HON.R. PEARSON
     (April 4, 2007)
    #14-MEMORANDUM FROM HON. R. PEARSON TO COMMISSION (w/out
    attachments) (April 19, 2007)
    #15-PRESS RELEASE FROM R. PEARSON TO MEDIA (April 27, 2007)
    #16-LETTER FROM COMMISSION TO HON. R. PEARSON (May 2, 2007)
    #17-NOTIFICATION OF PERSONNEL ACTION (May 2, 2007)
    #18-E-MAIL FROM R. PEARSON TO COMM'N w/Attachment (May 2, 2007)
    #19-LETTER FROM OAH CJ BUTLER TO COMMISSION & R. PEARSON
     (May 22, 2007)
    #20-E-MAIL FROM R. PEARSON TO COMMISSION (June 4, 2007)
    #21-LETTER FROM MAYOR FENTY TO COMMISSION (May 7, 2007)
    #22-LEGAL TIMES ARTICLE (Aug. 6, 2007)
    #23-LETTER FROM COMMISSION TO R. PEARSON (Aug. 7, 2007)
    #24-MEMORANDUM FROM R. PEARSON TO COMMISSION (Aug. 22, 2007)
    #25-LETTER FROM COMMISSION TO R. PEARSON (Oct. 1, 2007;
     received Oct. 2, 2007)
    #26-E-MAIL FROM R. PEARSON TO COMMISSION (Oct. 3, 2007)
    #27-LETTER FROM COMMISSION TO R. PEARSON (Oct. 30, 2007)
    #28-LETTER FROM OAH CJ BUTLER TO R. PEARSON (Oct. 30, 2007)
    #29-PETITION FOR REHEARING OR REHEARING EN BANC (Dec. 23, 2008)
    #30-LETTER FROM T. BUTLER TO MENDELSON (excerpt) (March 5, 2009)

MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE          1-11

PROPOSED ORDER

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ROY L. PEARSON, JR.** | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| **DISTRICT OF COLUMBIA** | : | |
| A Municipal Corporation, | : | |
| | : | |
| **TYRONE T. BUTLER** | : | |
| In his official and individual capacities, | : | Civil Action No. 08-cv-758 (ESH) |
| | : | |
| **PETER M. WILLNER** | : | |
| In his official and individual capacities, | : | |
| | : | |
| **ROBERT R. RIGSBY** | : | |
| In his official and individual capacities, | : | |
| | : | |
| **ANITA JOSEY-HERRING** | : | |
| In her official and individual capacities, | : | |
| | : | |
| **GEORGE C. VALENTINE** | : | |
| In his official and individual capacities, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.
## INTRODUCTION

This motion for partial summary judgment on Count III of the Amended Complaint, and for injunctive and declaratory relief, presents three overarching issues:

- Whether undisputed material facts establish that the defendants willfully disregarded fundamental principles of due process in peremptorily removing plaintiff from office as an administrative law judge;

- Whether undisputed material facts establish that the defendants willfully continued to deny plaintiff even elemental post-deprivation due process following his removal from office as an administrative law judge; and

1

- Whether proof of defendants' due process violations, unconstitutional municipal policies, and strong evidence of First Amendment violations (*Thomas v. City of Blanchard*, 548 F.3d 1317 (10th Cir. 2008)), constitutes continuing irreparable injury and supports entry of a preliminary injunction.

## A.   Count III Of The Amended Complaint

In May 2005, following a seven month long screening process by the Commission on the Selection and Tenure of Administrative Law Judges of the Office of Administrative Hearings ("Commission"), plaintiff was appointed to a renewable term of office as an administrative law judge with the newly formed D.C. Office of Administrative Hearings ("OAH").

In Count III of the *verified* Amended Complaint plaintiff alleges that the Commission deliberately and repeatedly deprived him of the process he was due in considering his timely application for reappointment to a ten year term, to begin May 2007.  Each member of the Commission is named as a defendant -- OAH Chief Administrative Law Judge ("Chief ALJ") Tyrone Butler, Commissioner Peter Willner, Commissioner Robert Rigsby, Commissioner George Valentine and Commissioner Anita Josey-Herring -- in their official and individual capacities.

Count III also names the District of Columbia as a defendant, because of the unconstitutional municipal policies, in the form of the Commission's unconstitutional regulations (on their face or as applied) and the unconstitutional decisions and actions defendants took as final policy makers, that denied plaintiff due process of law.  *See infra* at pgs. 25-42.

## B.   Contextual Facts Relevant To This Motion

### 1.   Establishment Of OAH And Plaintiff's Appointment

The D.C. Office of Administrative Hearings ("OAH") came into existence with the unanimous adoption, effective March 6, 2002, of the Office of Administrative Hearings Establishment Act of 2001 ("OAH Act").

The OAH Act was enacted to overhaul and centralize the adjudication of a large number of the local administrative law cases in the District of Columbia.  By centralizing adjudicative functions in a single tribunal, the Council sought to "*expedite* the fair and just conclusion of contested cases."  Finding No. 4, Office of Administrative Hearings Establishment Act of 2001.

By enacting the Office of Administrative Hearings Establishment Act of 2001 the D.C. Council also hoped to remove the perception that had developed, up to that point, that persons who heard administrative law cases (formerly often only "hearing officers") "lack[ed] *independence* and . . . ha[d] a bias in favor of th[e] agency" for whom they heard cases. Finding No. 3, OAH Act of 2001.

Defendant Tyrone T. Butler, an out-of-state New York lawyer, was appointed by the Mayor, and then confirmed by the D.C. Council in September 2003, as the first Chief Administrative Law Judge ("Chief ALJ") for OAH.  [Ex.1]  During a D.C. Council hearing on his nomination on June 25, 2003, Mr. Butler affirmed his awareness of and commitment to the key way in which the OAH Act reformed the previous system of administrative adjudication: "ALJs must be free from interference in their decisional obligations and free from influence outside of the adversarial arena."  [*Id*.]

The OAH began accepting cases in March of 2004, with fewer than 8 administrative law judges ("grandfathered" from a pilot program that existed for two years prior to passage of the OAH Act). [Ex. 1] The small pilot program was contained within the D.C. Department of Health ("DOH") and the ALJs in the pilot program did not operate under a code of judicial ethics.  [*Id*.]

However, as mandated by the OAH Act, D.C. Code § 2-1831.05(a)(9), and as a key part of the administrative reform it ushered in, in August 2004 the Chief ALJ for OAH adopted the *OAH Administrative Law Judges Code of Ethics* ("OAH Code of Ethics").  [Ex. 2]

The OAH Code of Ethics was drawn from the ABA's Model Code of Judicial Conduct and the Model Code of Ethics for State Administrative Law Judges. [Ex. 3]  It is substantially

3

identical to the Code of Conduct for U.S. Judges.   For example, it requires that <u>all</u> of its provisions be construed and applied to further the "integrity and ***<u>independence</u>*** of this administrative court."  *Id*.

In September 2004 the Commission solicited applicants for 12 additional positions as administrative law judges to handle the case load the OAH began assuming in March 2004.  [Ex. 4]  The Commission stressed the new ALJs' <u>decisional</u> independence from the Chief ALJ:

> The Office of Administrative Hearings ("OAH"), a new **<u>independent tribunal</u>** of the District of Columbia, seeks applications from qualified attorneys interested in becoming an Administrative Law Judge ("ALJ"). . . .  The **<u>new</u>** tribunal is the product of comprehensive legislation designed to reform and restructure the District of Columbia's administrative litigation system.
> . . . ALJs will hold hearings, decide motions, write orders and opinions, and manage a litigation docket.  . . .**<u>ALJs report to the Chief Administrative Law Judge or his designee on administrative matters, but decide cases independently</u>** <u>under applicable law</u> . . .  (emphasis supplied)

After a seven month application, examination, investigation and interview process, the Commission appointed plaintiff to a two year term of office as an ALJ with OAH, effective May 2, 2005. [Amend. Compl. ¶¶ 68-75]    To ensure his independence, plaintiff could only be terminated or disciplined "for cause" during his term of office.  D.C. Code § 2-1831.10(d).

Plaintiff was a District of Columbia public interest attorney and legal services administrator for more than twenty-five years before May 2005.  For that reason he had decades of first hand experience with the chronically delayed and agency-biased administrative system that preceded the OAH.  [Affid./Decl. of R. Pearson at ¶ 2] Thus, he accepted a position as an ALJ at OAH in large part because the Commission's advertisement for ALJs in September 2004 assured applicants they would ". . . ***decide cases independently*** under applicable law . . ."  [*Id*.]

Despite the OAH Chief ALJ's sworn assurances during his confirmation hearing that he would respect and aggressively safeguard ALJ decisional independence, the same written

assurance in the Commission's vacancy announcement, and explicit safeguards in the OAH Act itself, shortly after plaintiff commenced serving his initial term of office in May 2005 he discovered that a culture existed at OAH that was at war with those guarantees. For example, a mandatory, coercive and decision-delaying "peer review" system existed, by which every decision issued by an ALJ was subjected to a highly politicized review process. [Ex. 5]

To enforce that review process, and in violation of D.C. Code § 2-1831.05(a)(5) and the OAH Code of Ethics, Chief ALJ Butler administered a hierarchy at OAH under which he evaluated a Deputy Chief ALJ, who in turn evaluated three (later four) Principal ALJs. The Principal ALJs reviewed every decision prepared by an ALJ in the different divisions into which OAH was organized.   And the Principal ALJs, and Deputy ALJ, also evaluated each ALJ.  [*Id.*]

The Deputy ALJ and each Principal ALJs previously worked in the DOH pilot program, which operated without a code of judicial conduct or the strictures of a judicial oath. [Ex. 3]

The Principal ALJs to whom plaintiff was required to submit his decisions also evaluated plaintiff.  Within weeks after May 2, 2005 it became clear to plaintiff that the OAH Chief ALJ, Deputy Chief ALJ and the Principal ALJs used their evaluation and/or decision-review powers as leverage to compel ALJs to rule in accordance with their dictates about what was in OAH's political best interests (rather than what the governing law, facts and ethics required).  [Ex. 5]

For example, despite the D.C. Council's expressed goal in enacting the OAH Act of removing the perception that ALJs were extrajudicially influenced by the agencies whose cases they heard, OAH Chief ALJ Butler sought to require ALJs to base their decisions on agency preferences and the Chief ALJ's political views.  Thus, in violation of D.C. Code § 2-1831.08(a), the group of ALJs with whom plaintiff was assigned to hear Department of Public Works ("DPW") cases were told by Chief ALJ Butler, through the Deputy Chief ALJ and a Principal ALJ, that if they did not agree in advance to rule in favor of DPW in thousands of cases ***assigned to them***, those cases would be reassigned to ALJs who agreed to rule as instructed.  [Ex. 5]

By mandating favorable rulings for DPW, Chief ALJ Butler hoped to avoid the political backlash he feared would result if those DPW cases were, instead, dismissed as the controlling law plainly required.  [Amend. Compl. ¶¶ 84-85]

After discovering, in this and other ways, that the OAH Chief ALJ had re-created within OAH the very political and extra-judicial decision making that the D.C. Council enacted the OAH Act to eliminate, plaintiff spent many hours advocating within OAH for compliance with: (1) the oath of office each ALJ was required to take, (2) the OAH Act, (3) the Code of Ethics for OAH Administrative Law Judges and (4) the D.C. Administrative Procedure Act ("A.P.A.")

The OAH Chief ALJ did not respond directly to plaintiff's June 2005 research memorandum explaining why the *mandatory* and coercive OAH "peer review" process appeared to institutionalize violations of the OAH Act, the OAH Code of Ethics and the D.C. A.P.A.  And the Commission declined to provide an advisory ethical opinion on the issue when plaintiff formally requested one in a memorandum to the Commission in July 2005.  [The Commission is modeled after the D.C. Commission on Judicial Disabilities and Tenure, D.C. Code § 1-204.31(d), which routinely provides informal advisory ethical opinions to D.C. Superior Court judges.]

By petitioning the Chief ALJ and the Commission in June and July 2005 plaintiff clearly, and completely, satisfied any ethical or Whistleblower obligations arising from his job duties.

On the other hand, the D.C. Council is clearly not in plaintiff's reporting-chain or employment-chain, *Thomas v. City of Blanchard*, 548 F.3d 1317 (10th Cir. 2008); *City of Madison v. Wisc. Employment Relations Comm'n*, 429 U.S. 167, 172 (1976), and so disclosing information to the Council is not part of plaintiff's job duties. However, plaintiff felt an independent civic obligation as a longstanding public interest-minded D.C. resident to expose the "peer review" system to the Council, because of the thousands of parties who were being denied the appearance or fact of a fair decision in their cases and because the Council has the power to enforce its statutory mandate in that regard. Thus, in February 2006, speaking on his own time

while on Annual Leave, and while identified exclusively as a private citizen, plaintiff testified before the D.C. Council about the OAH "peer review" system, and the correspondingly coercive and politicized culture, delays and manipulated decision making at OAH that resulted. [Ex. 5]

Because of plaintiff's disclosure, the OAH Chief ALJ was pointedly questioned by the chairman of the D.C. Council's Committee on Public Safety and the Judiciary about the OAH "peer review" process at the same hearing at which plaintiff delivered his testimony in February 2006.  As part of his response, the OAH Chief ALJ assured the chairman that Principal ALJs were only temporarily involved in the "peer review" process as a short-term training measure. [Amend. Compl. ¶¶ 103-104]   One year later, however, Principal ALJs were still reviewing ALJ decisions in each of OAH's divisions, and were still evaluating every ALJ.  Plaintiff privately disclosed that fact to staff of the Committee in February 2007 (a disclosure the Commission learned of on October 11, 2007). [Id.] After being publicly confronted again by the chairman of the Committee in February 2007, the OAH Chief ALJ finally removed Principal ALJs from their controlling role in the "peer review" system in most divisions of OAH in February 2007.  [Ex. 9]

## 2.   Pre-Termination Proceedings

Because of his advocacy of "good government" at OAH, [Amend. Compl. ¶¶ 88-116], plaintiff was targeted for retaliation in a variety of ways by the Chief ALJ, Deputy Chief ALJ and Principal ALJs at the OAH.  To counter their fervent desire for revenge plaintiff recognized that, in addition to meeting his ethical obligations as an ALJ, and his transcendent statutory (Whistleblower) obligations as a D.C. Government employee, he would have to compile such an outstanding performance record that any form of retaliation would be obvious.

Thus, in his first 18 months as an ALJ plaintiff drafted and issued 45 decisions for public-cation by LEXIS, a national on-line legal research service.  During plaintiff's initial 18 months no other ALJ, however experienced, issued more than six decisions of publishable quality. [Ex. 6]   Additionally, based on plaintiff's performance during a two week training course at the

National Judicial College in Reno, Nevada in September 2005, plaintiff was selected by its faculty for the rare national honor of acting as a course facilitator at an upcoming training. [*Id.*]

And in his only OAH evaluation, issued in November 2006, plaintiff received a rating of 3.0 out of a possible 3.0, when only objective standards are considered.  When subjective standards ("judicial temperament" [2] and "team work") are also considered, plaintiff received a rating of 2.84 out of a possible 3.0.  [Ex. 7 & 8]  An ALJ who receives a rating of 2.5 or higher has met the annual performance standards applicable to his duties.  [Amend. Compl. ¶ 124]

Plaintiff was required to, and did, submit an application for reappointment to a second term of office by November 1, 2006.  D.C. Code § 2-1831.10(b). [Ex.6].  The 14-page document: (1) explained why, because of his familiarity with the widespread disfunction and dissatisfaction that preceded enactment of the Office of Administrative Hearings Establishment Act of 2001, plaintiff strongly identified with its reforms; (2) explained how he had been compelled as an ALJ and private citizen to advocate for decisional independence for ALJs and for unbiased decisions for the parties appearing before them,  (3) recounted his repeated first hand exposure to OAH Chief ALJ Butler's lack of ethics and professionalism; (4) detailed his unmatched accomplishments as an ALJ over an 18 month period and (4) catalogued his other contributions to OAH and to the District of Columbia and its legal community during that same time period.

Under the OAH Act the OAH Chief  ALJ (and the Commission) had a statutory deadline of March 1, 2007 (120 days after November 1, 2006), D.C. Code § 2-1831.10(b), by which to finalize a reappointment record relating to plaintiff's performance – including in it any

---

[2]  By "judicial temperament" the Principal ALJs and Deputy ALJ – on whom plaintiff "blew the whistle" – wrote that they meant plaintiff was not receptive to their (illegal) instructions on how to decide his cases. [Ex. 7 & 8]   They complained he was an "independent thinker," and not a "team player." *Id.* To prevent this form of not-so-subtle retaliation the OAH Act prohibits the Chief ALJ from using subjective evaluation standards as measures of an ALJ's performance. D.C. Code § 2-1831.05(a)(10); D.C. Code § 2-1831.10(b).  *Cf. Bishopp v. District of Columbia,* 788 F.2d 781, 787 (D.C. Cir. 1986) ("heightened scrutiny" must be applied when an employer relies on subjective factors rather than objective ones).

information the Commission requested be included -- so that the Commission could complete all steps necessary to review and vote on plaintiff's application for reappointment before plaintiff's first term expired on May 2, 2007.

The Chief ALJ's preparation of plaintiff's reappointment record, containing documents relevant to his "efficiency, efficacy, and quality of performance over the period of his . . . appointment," D.C. Code § 2-1831.10(b), was completed on March 2, 2007. That record must include a recommendation for or against plaintiff's reappointment by the OAH Chief Administrative Law Judge.  D.C. Code § 2-1831.10(b).  After initially writing only that he did "not oppose the reappointment of Judge Pearson for a ten-year term," OAH Chief ALJ Butler clarified, in writing on March 8, 2007, that he *affirmatively* recommended that plaintiff be reappointed to a ten year term of office. [Ex.10] That recommendation was entitled to "significant weight" unless the Commission "determined that the recommendation [was] not founded on substantial evidence."  *Id.* [3]

---

[3] On March 21, 2007, well after the March 1, 2007 deadline set by the OAH Act and the Commission's regulations, Chief ALJ Butler purported to submit a "supplemental" record to the Commission. D.C. Code § 2-1831.10 (b) ("The record shall be prepared and transmitted to the Commission *within 120 days* of the filing of [the ALJ's application for reappointment]"; 6 DCMR 3705.5 ("The Chief Administrative Law Judge **_shall_** file the record required by section 3705.4 with the Clerk *within 120 days* of the filing of a statement by the Administrative Law Judge in accordance with section 3705.1."). The over 200 page "supplement," and an accompanying narrative, accused plaintiff of incivility, unethical conduct, lack of collegiality, deficiencies in his legal analyses and claimed he received repeated "counseling."  [Ex. 12]

The untimely and illegal "supplemental" record followed an e-mail that plaintiff circulated on March 9, 2007 to all ALJs at OAH (including defendant Butler). [Ex. 11] Plaintiff's e-mail contained four Whistleblower "protected disclosures:" a) a disclosure of Butler's initial violation of the local law [the OAH Act] that required that he affirmatively make a recommendation for or against plaintiff's reappointment; (b) a disclosure of Butler's abuse of authority in retaliating against plaintiff for his Whistleblower activities by initially providing a neutral, and not providing a positive, recommendation for reappointment; (c) a disclosure that Butler's record of abusing his authority made it advisable for other ALJs to compile an outstanding record to discourage his victimizing them; and (d) a disclosure of plaintiff's OAH history of "speaking truth to power" at OAH.  *See* D.C. Code §§ 1-615.52(a)(6)(A), (C) & (D).

As an ALJ, plaintiff had an ethical obligation or right to make those disclosures because of his ethical obligation to encourage high standards of conduct so that the integrity and independence of OAH would be preserved and encouraged. Chp. I(B), *Code of Ethics For OAH*

The Commission's regulations provide that before it can deny reappointment to an ALJ it must first issue a notice of grounds for possible denial of reappointment "specify[ing] the reasons why the Commission is considering the possible denial of his or her application for reappointment . . .," 6 DCMR §3705.17, and setting a date on which the Commission will meet to vote on the application for reappointment.  The meeting may not take place sooner than twenty days after issuance of the notice of possible denial of reappointment.  *Id.*

An ALJ may file a response to the notice within fifteen days, in which event he has a right to appear at the scheduled Commission meeting.  6 DCMR § 3705.18.  In this case the Commission did not issue a notice of possible denial of reappointment prior to May 2, 2007 -- the "drop dead" date for acting on plaintiff's reappointment application.[4]

On or about April 3, 2007 defendant George Valentine joined the Commission as the designee of the D.C. attorney-general.  D.C. Code § 2-1831.07(a). Mr. Valentine was and is a Deputy Attorney General, and the head of the Civil Litigation Division for the Office of the Attorney General.  He acted as counsel to the Commission.  On April 4, 2007, through defendant Peter Willner, the Commission invited plaintiff to a "discussion" on April 24, 2007, with no

*Administrative Law Judges* (unpublished). And as a D.C. government employee, plaintiff was *required* to promptly make these disclosures, D.C. Code § 1-615.58(7), using any language he desired. D.C. Code § 1-615.52(a)(6). Plaintiff also had a statutory right to freely express his opinion on public issues that related to his assigned duties; in this case: (a) the decisional independence of ALJs and (b) the freedom of Government employees to report abuses of authority and to report violations of law. D.C. Code § 1-615.58(1), § 1-615.58(2) and §1-615.52(a)(6).

In response to Butler's plainly retaliatory March 21, 2007 "supplement," plaintiff submitted a memorandum to the Commission on April 19, 2007 in which he documented and explained how the documents and statements in Butler's March 21, 2007 filing provided further evidence of plaintiff's Whistleblower activities and ethical obligations, and of Butler's retaliation.  [Ex. 14]

[4]  Although plaintiff was served by the OAH Chief ALJ with the OAH Chief ALJ's March 21, 2007 "supplement" containing non-record, retaliatory accusations, those accusations had not been reviewed and adopted in whole or part by the Commission as its reasons for potentially denying reappointment.  *Board of Regents v. Roth*, 408 U.S. 564, 566 n.16 (1972) (if the court finds there is a "'common law' of re-employment, *see Perry v. Sindermann*, [408 U.S. 593 (1971)]" then the employee must be given "a statement of reasons [by the decision maker] and a hearing on their decision not to rehire him.").

more of an explanation than that the Commission wished to have a "***preliminary*** discussion regarding your reappointment." [Ex. 13]  Plaintiff was not advised that he was being invited to an official, on-the-record meeting or hearing of any kind.  Out of an abundance of caution, however, on April 19, 2007 plaintiff provided the Commission with a memorandum on his rights and obligations under the D.C. Whistleblower Act and the OAH Code of Ethics. [Ex. 14]

The first "preliminary discussion" with the Commission was scheduled for April 24, 2007.  Thereupon the Commission orally set another "preliminary discussion" for April 27, 2007.  And, on April 27, 2007, the Commission orally set yet another "preliminary discussion" for April 30, 2007 – a date falling two days before plaintiff's term of office expired. [Ex. 24]

The April 24, 2007 "preliminary discussion" was scheduled for 8 pm.  However, it was after 10 p.m. when the Commission finally called plaintiff into its conference room, only to advise him that a new date would have to be set.  During that more than two hour delay the members of the Commission had dinner and then met, out of plaintiff's presence, with a number of Principal ALJs and the Deputy Chief ALJ from OAH.  [*Id.*]

 After its meeting with the OAH Principal ALJs and the Deputy Chief ALJ on April 24, 2007 the Commission did not advise plaintiff of what the Principal ALJs and Deputy Chief ALJ communicated to the Commission out of plaintiff's presence.  [*Id.*]

On April 27, 2007 the Commission again did not advise plaintiff, in writing or orally, of any charges it had concluded might justify a denial of reappointment.  [*Id.*]  Indeed, the time had expired on that possibility.  6 DCMR §3705.17.  Its members, instead, generally discussed plaintiff's two year term with him, as well as an unfavorable April 26 Washington Post column about an unrelated public interest lawsuit plaintiff was prosecuting as a private attorney general.

Thereafter, in a chance meeting on the street, minutes after the April 27 Commission meeting concluded, Commissioner Valentine essentially stated to plaintiff that the last-minute "preliminary discussions" were a sop for Chief ALJ Butler.  He stated that the Commissioners

11

realized that plaintiff was imminently qualified for reappointment, and for that reason had not served him with a notice of possible denial of reappointment.  He added that plaintiff was much more qualified for reappointment than most of the ALJs the Commission had thus far reappointed. [Amend. Compl. ¶¶ 163]

However, he urged plaintiff to help Butler save face by apologizing to Butler for making public [i.e., whistleblower] disclosures that were critical of Butler.  [*Id.*]

Because the Chief ALJ had by then (been forced to) dismantle the Principal ALJ run "peer review" system, at his April 30, 2007 meeting with the Commission plaintiff extended an olive-branch off-the-record "apology" to the OAH Chief ALJ. [*Id.*] The April 30th meeting lasted only long enough for the Commission to again raise plaintiff's public interest lawsuit, for plaintiff to rebuff an effort to have him abandon the lawsuit, and for plaintiff to extend the off-the-record apology. Chairman Rigsby minimized any issue, referred to the highly publicized arrest/fining of D.C.  Superior Court Judge Susan Winfield, and expressed his expectation that plaintiff would be reappointed and go on to write landmark decisions in his second term.

Instead, on May 2, 2007 the Commission served plaintiff with a written statement that it would "decide on how it would proceed in the next thirty days." [Ex. 16]

Thus, effective May 2, 2007, plaintiff was terminated as an ALJ.  [Ex. 17]

### 3.    Post-Termination Proceedings

The Commission's surprise May 2, 2007 letter advising plaintiff that it had not taken a vote on his application for reappointment also advised plaintiff he would be placed in a terminable-at-will position as an attorney-advisor with the Office of Administrative Hearings (making plaintiff dischargeable from that non-judicial staff attorney position at any time, for any reason or no reason). [Ex. 28]

Plaintiff was thus stripped of his hearing calendar and was unable to hear cases, to participate in continuing judicial education programs at OAH or elsewhere, or to act on the honor

extended to him by the National Judicial College to act as a training facilitator at an upcoming training.  His expectation of ten years of employment security commencing May 2, 2007, and his statutory, ethical, professional and D.C. Bar rights and other perquisites as an administrative law judge thus came to a shockingly abrupt, unexplained and publicly humiliating end.

Despite its actions the Commission stated in its letter that it expected plaintiff to issue a public apology to the OAH Chief ALJ and to nurture better relations with supervisory ALJs. [Ex.16] Presumably it was, in effect, establishing a 30-day post-termination  probationary period.

On April 30, 2007, Commissioner Lavine's term expired.  Plaintiff was not made aware of that fact until after June 4, 2007 when he wrote the Commission because 30 days had passed with no communication about how the Commission "would proceed." [Ex. 20]  During that time period adverse publicity about plaintiff's public interest lawsuit increased exponentially. [Ex. 22] The Commission responded to plaintiff's inquiry by providing him with a copy of a May 7, 2007 letter from Mayor Fenty to the Commission in which the Mayor asked the Commission not to act on plaintiff's application for reappointment until the Mayor appointed a replacement for Commissioner Lavine.  [Ex. 21]  On or about June 27, 2007 Mayor Fenty appointed defendant Anita J+osey-Herring as Commissioner Lavine's successor.  [Amend. Compl. ¶ 191]

The Commission, however, did not communicate further with plaintiff until August 7, 2007 – three months *after* his final termination.[5] On that date it served plaintiff with a post-termination notice of  possible denial of reappointment. [Ex. 23]

On August 22, 2007, plaintiff submitted a 22 page response to the August 7, 2007 notice of possible denial of reappointment from the Commission. [Ex. 24]  In his response plaintiff

---

[5]   The complete disregard for the governing OAH Act continued after plaintiff's term expired on May 2, 2007.  Three weeks later, on May 22, 2007 -- despite the March 1, 2007 statutory deadline for submission of the record, 6 DCMR 3705.5, defendant Butler purported to "withdraw" the portion of the record containing his favorable recommendation in the record submitted on March 2, 2007 and purported to "supplement" the record a second time -- to substitute an unfavorable recommendation.  [Ex. 17]

alleged, and explained how, the August 7, 2007 notice of possible denial of reappointment violated the D.C. Whistleblower Act.  [*Id*.]

He explained that the August 7th notice cited and relied upon non-record (March 21, 2007) "supplemental" documents that contained "protected disclosures" under the D.C. Whistleblower Act. Because the August 7 notice relied on those "protected disclosures" as grounds for a possible denial of reappointment, and because commission members were "supervisors" to whom plaintiff made the protected disclosures, the threat of non-reappointment in the August 7, 2007 notice was itself a violation of the D.C. Whistleblower Act.  [*Id*.]

On Oct. 4, 2007, plaintiff was not permitted to be present while the Commission heard from at least seven persons on that date who (the Commission later stated in its October 30, 2007 decision) opposed plaintiff's reappointment. [Ex. 25, 26& 27]  The Commission also did not disclose, until it issued its October 30, 2007 decision, that the persons it secretly heard from on October 4, 2007 included the Chief ALJ (who also deliberated with the Commission, participated in all of its discussions with plaintiff, and signed the Commission's October 30, 2007 decision).  *Id*.

On October 11 and 15, 2007 plaintiff finally received a hearing on the Commission's August 7, 2007 notice of possible denial of reappointment.  [Ex. 27]

The Commission's October 30, 2007 decision denying plaintiff's application for reappointment expressly relied upon the opposition to plaintiff's reappointment of the Chief ALJ, Deputy Chief ALJ and Principal ALJs who appeared in the secret *ex parte* hearing before it on October 4, 2007, as grounds for denying plaintiff's application for reappointment. [*Id*.]

The Commission's October 30, 2007 decision noted that, with respect to his statements, plaintiff had invoked the D.C. Whistleblower Act's protections. However, without in any way addressing the "complete" protections, rights and _obligations_ codified in the Whistleblower Act, the OAH Code of Ethics, or acknowledging plaintiff's factual defenses, the Commission simply concluded that plaintiff's statements evidenced a lack of judicial temperament and judgment.

14

**C.**   **Federal Rule of Civil Procedure 56**

Against this factual background this memorandum turns, first, to the standard for considering a motion of partial summary judgment. Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party's "initial responsibility" consists of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

If the moving party meets its burden, the burden then shifts to the non-moving party to establish that a genuine issue as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). To meet this burden, the non-moving party must show that "'the evidence is such that a reasonable jury could return a verdict'" in its favor. *Laningham v. United States Navy,* 813 F.2d 1236, 1241 (D.C. Cir.1987) (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Such evidence must consist of more than mere unsupported allegations or denials; rather, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 321 n.3. If the evidence is "merely colorable" or "not significantly probative," summary judgment should be granted. *Anderson,* 477 U.S. at 249-50.

**II**.
**THE DEFENDANTS DEPRIVED PLAINTIFF OF HIS PROPERTY INTEREST WITHOUT, FIRST, PROVIDING PLAINTIFF WITH DUE PROCESS OF LAW**

The Fifth Amendment to the United States Constitution states, in relevant part: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . ." For that reason, in order for a plaintiff to establish that he or she has been deprived of property, without

due process of law, he or she must prove: (1) a deprivation of a protected property interest, and (2) a deprivation of process the plaintiff was due. *Univ. Professors v. Bd. of Trustees of the Univ. of the Dist. of Columbia*, 312 U.S. App. D.C. 399, 56 F.3d 1469, 1471 (D.C. Cir. 1995).

**A.      Plaintiff Was Deprived Of His Legitimate Expectation Of A Timely Reappointment, And Freedom From Retaliation**

The first issue this memorandum addresses, therefore, is whether as a matter of law plaintiff had a "property interest" in: (1) his continued employment as an administrative law judge with the D.C. Office of Administrative Hearings, (2) his protection from retaliation for being a Whistleblower, (3) his First Amendment right to free speech, and (4) his First Amendment right to petition in an unrelated, non-frivolous public interest lawsuit as a private attorney-general in the D.C. Superior Court for the redress of his grievances.  [Ex. 29]

"To have a property interest in a benefit, a person . . . must . . . have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).  "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source *such as state law*.'" C*leveland Board of Education v. Loudermill*, 470 U.S. 532, 538 (1985) (emphasis supplied).

There are three different District of Columbia legal sources that provide an administrative law judge of the D.C. Office of Administrative Hearings with a property interest in a timely reappointment, and that safeguard that interest against retaliation for the exercise of Whistleblower and First Amendment rights.

**1.      The Commission's Regulations, And The OAH Act, Gave Plaintiff A Protected Entitlement To Reappointment**

The first set of District of Columbia laws that provided plaintiff with a property interest in continued employment, and timely reappointment, are contained in the regulations of the Commission, 6 DCMR § 3705, and the OAH Act, D.C. Code § 2-1831.10(c).

The Commission's regulations setting forth reappointment standards and procedures are found at 6 DCMR § 3705. The regulations provide that by no later than the conclusion of plaintiff's first term of office, the Commission is required to reappoint plaintiff to a second, ten year term of office, if he has "satisfactorily performed his responsibilities [during his first term] and is likely to continue to do so." 6 DCMR § 3705.21.

In *Perry v. Sinderman*, 408 U.S. 593, 600-01 (1976), the Supreme Court held that when "satisfactory service" is the standard for reappointment to a public position, an employee has a legitimate expectation of continued employment that he may not be deprived of without due process of law. *See also Hall v. Ford*, 856 F.2d 255, 258 (D.C. Cir. 1988); *Hallack v. Berliner*, 427 F.Supp. 1225, 1236-37 (D.D.C. 1977); *Bason v. Judicial Council of Dist. of Columbia Circuit*, 86 B.R. 744, 749 (D.D.C. 1988); *Richardson v. Koshiba*, 693 F.2d 911 (9th Cir. 1982) ("if judicial incumbents are entitled to reappointment unless they are unqualified to remain in office, we would be inclined to think that a constitutionally cognizable "entitlement" exists").

Plaintiff's "legitimate expectation" was of a <u>timely</u> reappointment to the office of administrative law judge. D.C. Code § 2-1831.10(c) (vote required *before* expiration of term). That statutory office, in turn, entitled plaintiff to other perquisites and protections – including maintaining his seniority vis-à-vis other ALJs, protection from discipline, suspension or termination except "for cause" for the next ten years, decisional independence, entitlement to ethical treatment, protection from coercion, judicial training opportunities, the right to hear and adjudicate contested cases, the professional and D.C. Bar benefits available to ALJs, etc.

Additionally, because OAH administrative law judges are currently paid a salary of $129,325.00 per year, plus health insurance and other fringe benefits with a cost of $21,336, the financial value of a <u>guaranteed</u> ten year term of office as an administrative law judge in the OAH exceeds $1.5 million dollars. [Ex. 30] Upon completion of a ten year term, an administrative law

judge may request reappointment to additional six year terms.  D.C. Code § 2-1831.08(c)(1). The financial value of each six year term currently exceeds $900,000.

In very real terms, then, the right to _timely_ reappointment as an administrative law judge in the OAH is an extremely valuable property interest, with both intangible and tangible benefits.

**2.     The D.C. Whistleblower Act Gave Plaintiff A Protected
Entitlement To Freedom From Retaliation**

Another District of Columbia law also entitled plaintiff to, and safeguarded, his property interest in continued employment, and _timely_ reappointment, as an administrative law judge.  It is codified in the D.C. Whistleblower Act, D.C. Code § 1-615.51 _et. seq._

The D.C. Whistleblower Act mandates that "A _supervisor_ shall not threaten to take or take a _prohibited personnel action_ or _otherwise retaliate_ against an _employee_ because of the employee's _protected disclosure_ or because of an employee's refusal to comply with an illegal order."  D.C. Code § 1-615.53.  (emphasis supplied) [6]

Each of the defendants in this case was a "supervisor" within the meaning of the D.C. Whistleblower Act.[7]   A "protected disclosure" is "_any_ disclosure of information," however

---

[6]  The D.C. Whistleblower Act created in plaintiff a property right within the meaning of the Fifth Amendment regardless of whether he was an at-will employee, an applicant for reappointment, or an employee who could only be discharged "for cause."   D.C. Code § 1-615.52(a)(3) ("'Employee' means _any person_ who is a former or current District employee, _or an applicant for employment_ by the District government . .. ") (emphasis supplied)

[7]  D.C. Code § 1-617.01(d) states, in relevant part:

> Supervisor means **_an employee_** having authority, in the interest of an agency, **_to hire_**, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, **_or to evaluate their performance_**, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of authority is not of a merely routine or clerical nature, but requires the use of independent judgment. (emphasis added)

Thus, as government employees with the power to _recommend_, reward or evaluate plaintiff's performance, defendants Butler, Rigsby, Valentine and Josey-Herring were "supervisors."

phrased, to a supervisor or to a public body (e.g. OAH), by any District of Columbia employee, that a supervisor's conduct violates a law, rule or regulation, if the employee reasonably believes that to be the case.  D.C. Code § 1-615.52(a)(6). A failure to reappoint or to take other favorable action falls within the broad definition of a "prohibited personnel action." D.C. Code § 1-615.52(a)(5) ("'Prohibited personnel action" includes but is not limited to: . . . failure to promote or hire or take other favorable personnel action . . ."). A failure to make a _timely_ reappointment is also a way in which to "otherwise retaliate" against an employee.  D.C. Code § 1-615.53.

Thus, the D.C. Whistleblower Act invested plaintiff with a property right within the meaning of the Fifth Amendment because he came within the scope of persons whose timely reappointment could not be denied in retaliation for making a protected disclosure.[8]

In this regard, the D.C. Whistleblower Act is more than a passive admonition to not take adverse action against a District of Columbia employee for certain specified reasons. D.C. Code § 1-615.58.   The D.C. Whistleblower Act goes much further and explicitly states that "[n]_otwithstanding any other provision of law_, a violation of § 1-615.53 constitutes a complete affirmative defense for a whistleblower to a prohibited personnel action _in an administrative_ . . .

---

D.C. Code § 1-615.52(a)(8) defines a "supervisor" as anyone who "has the authority to effectively recommend or take remedial or corrective action for the violation of a law, rule, regulation or contract term, or the misuse of government resources that an employee may allege or report pursuant to [the Whistleblower Statute] . . ." Defendant Willner had the authority to recommend or take corrective action in response to plaintiff's oral and repeated written disclosures (beginning in July 2005, with plaintiff's memo to the Commission on the peer review process) of each defendant's retaliatory conduct. Thus, defendant Willner was also a "supervisor."

[8]
> . . . A reasonable expectation or entitlement is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms. Although procedural requirements ordinarily do not transform a unilateral expectation into a protected property interest, such an interest is created if the procedural requirements are intended to be a significant substantive restriction on . . . decision making.

_Wedges/Ledges of Cal., Inc. v. City of Phoenix_, 24 F.3d 56, 62 (9th Cir. 1994) (internal citations and quotations omitted).

*challenge . . . of that action*.  D.C. Code § 1-615.54(c).  Through his April 19, 2007 and August 22, 2007 filings (among others) plaintiff interposed a Whistleblower administrative challenge to defendant Butler's and the Commission's proposed personnel actions.  [Ex. 14 & 24]

As a District of Columbia employee plaintiff was *required* to make the Whistleblower disclosures he made. D.C. Code §1-615.54(c).  As a pragmatic *quid pro quo* for that obligation, the D.C. Whistleblower Act expressly authorized plaintiff to interpose its protections as a "<u>complete</u> affirmative defense."  D.C. Code § 1-615.54(c).  Thus, this "state statute . . . secured his interest in re-employment . . ."  *Board of Regents v. Roth*, 408 U.S. 564, 578 (1972).

### 3.  D.C. Common Law Also Gave Plaintiff A Protected Entitlement To Freedom From Retaliation

As this memorandum previously explained, "[p]roperty interests, . . . stem from an independent source such as state law . . ."  *Cleveland Bd. of Education, supra*, 470 U.S. at 538.  "State law" includes the common law of the District of Columbia.  *Supra* at 16.

"The common law that the courts of the District of Columbia have developed over the years is that employment is at will, unless a contract or a statute provides otherwise, or unless there is a 'public policy' exception."  *Carl v. Children's Hospital*, 702 A.2d 159, 163 (D.C.1997) (en banc) (Terry, J., with whom Wagner, Farrell and Ruiz join, concurring).  In *Carl* a plurality of the D.C. Court of Appeals concluded that the District's public policy exception "must be solidly based on a statute or regulation that reflects the particular public policy to be applied, or (if appropriate) on a constitutional provision concretely applicable to the defendant's conduct.")  *Id*. (footnote omitted)

In this case the Amended Complaint alleges that the defendants retaliated against plaintiff because he exercised rights that advanced public policies codified in a number of regulations, statutes and constitutional provisions – including the regulations governing reappointment of ALJs, the OAH Act, the D.C. Whistleblower Act, D.C. Code § 1-301.43, the Code of Ethics for

OAH Administrative Law Judges, the free speech clause of the First Amendment, the petition clause of the First Amendment, and the due process clause of the Fifth Amendment.  *See also Opposition To Defendants' Renewed Motion To Dismiss, Or Alternatively, For Summary Judgment* at 57-59 (April 6, 2009).

In *Carl*, the *en banc* court specifically expanded the public policy exception to include "the rights of employees to speak out publicly on issues affecting the public interest without fear of retaliation by their employers."  *Id.* at 159; s*ee also Washington v. Guest Servs., Inc*., 718 A.2d 1071 (D.C. 1998) (reversing grant of summary judgment in favor of an employer where the at-will employee claimed that her firing was in retaliation for protesting health, food and safety violations); *Byrd v. VOCA Corp. of Washington, D.C.,* 962 A.2d 927, 933 (D.C. 2008) (finding "persuasive" the reasoning of the Maryland Court of Appeals in recognizing that a claim for wrongful discharge in violation of public policy is also available to ***non-at-will*** employees).

The Amended Complaint alleges that the defendants' entire course of conduct with respect to plaintiff is explained by their sudden realization in late April 2007 that they could actually get away – politically -- with retaliating against plaintiff for the exercise of his constitutional, statutory and ethical rights or obligations.  The adverse publicity over plaintiff's public interest lawsuit that began in late April 2007 made it politically feasible to retaliate, or support retaliation, for plaintiff's disclosures in June, July & Oct. 2005, in Feb., Nov. & Dec. 2006, and Feb., April, August and October 2007, despite plaintiff outstanding record of performance.

**B.     The Procedures The Commission Followed In Depriving Plaintiff Of His Property Interests Did Not Meet Longstanding, Minimum Due Process Requirements**

For summary judgment purposes, the second part of a procedural due process claim has two elements – a showing that certain procedures were constitutionally required, and a showing that it is undisputed that one or more of those procedures were not followed by the Commission

(ie, all five of them) in considering plaintiff's application for reappointment.  *Thompson v. District of Columbia*, 428 F.3d 283, 289 (D.C. Cir. 2005) (Edwards, J. concurring).[9]

In its procedural due process decisions the Supreme Court has distinguished the minimum process that is due an employee <u>before</u> he or she is deprived of a property interest from the minimum process that is due an employee <u>after</u> he or she is deprived of a property interest.

Generally, the Supreme Court has approved lesser due process protections[10] before an employee is suspended from or deprived of his job, so long as the procedures *provided reasonably soon thereafter* include all of the customary due process protections.[11]    The

_____

[9]  For due process purposes, it is legally irrelevant whether plaintiff should or could have been reappointed as an ALJ.  *Carey v. Piphus*, 435 U.S. 247, 266 (1978) (a denial of procedural due process is actionable under 42 U.S.C. § 1983 even if the due process violation had no effect on the correctness of the ultimate decision that was reached.)

[10]  In *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 545-46 (1985), the Court held that at the pre-termination stage, an employee is at least "entitled to oral or written notice of the **charges** against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." (emphasis supplied) However, the Court's holding that an evidentiary hearing was not required at the pre-termination stage was partially based on the fact that a "full post-termination" hearing was available to the employee thereafter, under Ohio law. *Id.* at 546.  Note that "charges" are not simply accusations.  When the decision maker is not the employer, "charges" result when the decision maker, after reviewing accusations lodged by someone, provides notice to the employee of any "charges" the <u>decision maker</u> is making.

[11]  The notion of <u>post</u>-deprivation process – particularly where the deprivation involves *terminating* a term of office -- is unheard of in the judicial reappointment context.  Case law (and the Commission's regulations) addressing judicial reappointments assume a single, formal <u>pre</u>-deprivation evidentiary hearing on a judge's application for reappointment, following service of a notice of charges (or its equivilant, a notice of a possible denial of reappointment).  *E.g*., *Hallack v. Berliner*, 427 F.Supp. 1225, 1236-37 (D.D.C. 1977) (the due process clause of the Fifth Amendment entitles a judge seeking reappointment to a "thorough and fair evaluation of his candidacy by an impartial Commission; and . . . such process as would insure that the Commission's evaluation of his candidacy for reappointment . . . safeguarded plaintiff from arbitrary governmental action, . . .").  A decision maker cannot avoid the requirement of full <u>pre</u>-deprivation due process through the strategem of simply refusing to vote on a judge's reappointment until after his statutory term expires.   "[A] failure to rehire a government employee constitutes a discharge even though, in form, the term of the appointment had expired."  *Mumford v. Zieba*, 4 F.3d 429, 431 (6th Cir. 1993) (citing *Branti v. Finkel,* 445 U.S. 507 (1980)).  No extraordinary circumstances were alleged, or could possibly exist, to justify not voting on plaintiff's application prior to May 2, 2007.  *See infra* at 30-31 (the Commission's regulations anticipate emergency circumstances by granting it the power to investigate,

"customary due process protections" include "timely and adequate notice, an 'opportunity to defend' through cross-examination of adverse witnesses, an opportunity to present evidence and to argue the case orally, the assistance of counsel, an impartial decision maker, a decision based solely upon the evidence, and a reasoned statement of decision." *Money v. Cullianane*, 392 A.2d 998, 1003 (D.C. 1978) (quoting *Goldberg v. Kelly,* 397 U.S. 254, 266-71 (1970); *Mathews v. Eldridge,* 424 U.S. 319, 325 n.4 (1976)).

As the undisputed facts of this case show, the Commission never provided plaintiff with either pre-deprivation abbreviated due process <u>*or*</u> post-deprivation full due process protections. Because the delay in providing any post-deprivation due process was so extended, and because no extraordinary circumstances were alleged or existed to justify abbreviated (much less non-existent) pre-deprivation due process, as a matter of law full due process protections were required <u>before</u> plaintiff was deprived of his office as an administrative law judge on May 2, 2007.

   1.   **The Commission's Pre-Deprivation Procedures Clearly,**
        <u>**And Repeatedly, Denied Plaintiff Due Process Of Law**</u>

More than thirty years ago, in *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976), the Supreme Court articulated a three-factor test for evaluating the constitutional sufficiency of the procedures followed by decision makers in depriving one of a property interest. [12]

 A court will consider: (1) the interests of the party affected by the deprivation; (2) the probable value of improvements to the procedures that were followed, and (3) whether, and how, the public interest would be negatively or positively impacted by proposed improvements to the procedures that were followed.  *Id.*

---

summarily suspend, discipline and/or terminate an ALJ even after his reappointment -- but in accordance with strict substantive requirements, time limits and other due process protections).

   [12]  "[T]he constitutional requirement of opportunity for *some* form of hearing before deprivation of  a protected interest, of course, does not depend upon such a narrow balancing process. . . ."  *Board of Regents v. Roth*, 408 U.S. 564, 570 n. 7 (1972) (emphasis in original).

In the language of *Mathews*, plaintiff's "private interests" included: (1) retaining his decisional independence, job security, statutory and ethical protections and the professional perquisites of a guaranteed ten year-plus term of office as an administrative law judge; (2) Whistleblower protection from retaliation for his disclosure to "supervisors" and public bodies that the conduct of OAH Chief ALJ Butler (and other OAH supervisors), and later the Commission, violated District of Columbia laws, rules and regulations; and (3) the right to exercise his First Amendment right to freedom of speech before the D.C. Council and to petition the D.C. Superior Court for redress of his grievances.  The importance of plaintiff's private interests were magnified, in this case, because of "the length" and "finality of the deprivation" that the Commission's procedures subjected him to.  *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982).

With respect to "the risk of an erroneous deprivation," because of the Commission's refusal to provide plaintiff with <u>any</u> pre-deprivation due process, or even basic post-deprivation due process, the risk of an erroneous deprivation as a result of its failure to provide time-tested, truth-ensuring procedures (notice of charges, neutral decision-makers, ability to hear witnesses against you, sworn witnesses, cross-examination, etc.) was not just high, it was guaranteed.

As for the public interest, although the Commission's August 7, 2007 notice (agreed to and signed by all five Commissioners) claimed to be concerned about the possibility of unethical conduct and speculative harm to OAH's operations, it never invoked its own regulations that were specifically drafted and adopted to facilitate the investigation and remediation of any legitimate concerns of that kind – apparently because those same regulations required the Commission to provide <u>reasons</u> and strict due process protections. 6 DCMR §§ 3729 to 3741.

And in terms of burdensomeness, the small and rolling number of ALJs who will be considered for reappointment at any given time, at 6-10 year intervals in most cases, D.C. Code § 2-1831.08(c)(1) and the fact that the same Commission will have already subjected the ALJ to an exhaustive initial screening and application process, in many cases just 9-18 months earlier,

makes administrative and cost considerations in reappointment cases non-factors.  6 DCMR §§ 6-3702 to 6-3704.

Needless to say, the public's interest coincides with that of the plaintiff.  The public obviously benefited from plaintiff's *successful*, almost two year long, by-the-book efforts to promote decisional independence and reasonably prompt administrative adjudication at OAH. It will likewise benefit from this lawsuit to enforce Whistleblower and due process rights and the constitutional exercise of the right to petition for redress of grievances and freedom from retaliation.  Indeed, the highly publicized and broadly chilling infringement of those rights in this case constitute irreparable harm *per se* and compels immediate injunctive relief.  *Infra* at 43-45.

a) **Plaintiff Was Not Provided Meaningful Notice (Of Any Charges Justifying Denial Of Reappointment)**

The statute governing plaintiff's reappointment explicitly states that "[t]he voting members of the Commission ***shall*** vote on the request for reappointment ***prior*** to the expiration of the Administrative Law Judge's term . . . " D.C. Code §  2-1831.10(c).  The OAH Act, thus, plainly prohibits the Commission from delaying a vote on a reappointment application – as it did in this case -- until *after* (many months after) an administrative law judge's term has expired.

To emphasize the mandatory nature of the May 2, 2007 deadline the OAH Act also states: "A reappointment approved by the Commission is effective upon expiration of the previous appointment."[13] D.C. Code § 2-1831.10(c).  Logically, a reappointment could not be

---

[13]   The OAH Act, in mandatory and unequivocal terms required that the Commission vote on plaintiff's request for reappointment by May 2, 2007 (the last day of his first term), so that his reappointment would be "effective upon expiration of the previous appointment." D.C. Code § 2-1831.10(c). In contradiction to this statutory requirement the Commission's regulations purport to give it the power to ignore its governing statute:

> 370.26  If the Commission does not vote on the reappointment of an Administrative Law Judge before the expiration of his or her current term, the Administrative Law Judge may, in the discretion of the Chief  Administrative Judge, be retained as a non-judicial

effective upon the *expiration* of a previous appointment if the previous appointment has already

lapsed and an ALJ has already lost his power to act as an administrative law judge.  D.C. Code §

2-1831.10 (a) ("No Administrative Law Judge shall be reappointed upon the expiration of any 2-

year, 6-year, or 10-year term without the affirmative vote of a majority of the voting members of

the Commission.")  If an ALJ attempted to hear a case after his or her term expired, and before

being reappointed, any party to the case before him would have grounds for objecting to the

proceeding and/or for having the decision rendered by the ALJ vacated.

Because the only Commission meeting at which an OAH administrative law judge can be

reappointed must therefore take place before the ALJ's term expires, that is the only Commission

meeting that can "definitively resolve the propriety" of any decision not to reappoint an ALJ.

---

> employee of the Office, without reduction in grade or step, until
> the Commission votes on his or her reappointment.
>
> \*          \*          \*
>
> 3705.25 An Administrative Law Judge who is reappointed
> pursuant to this section shall serve a term of ten years, beginning
> on the expiration date of his or her current term, or on the date he
> or she is notified in writing of the Commission's vote, <u>whichever is</u>
> <u>later</u>. (underlining added)

Thus, in plain conflict with its governing statute, the Commission purports to be able to ignore the statutory deadline and to vote on a request for reappointment whenever it chooses. *Fonville v. District of Columbia*, 448 F. Supp. 2d 21, 27 (D.D.C. 2006)(regulation that conflicts with governing statute is null and void). It also purports to be able to ignore the statutory requirement that a new term of office be "effective upon expiration of the previous appointment," D.C. Code § 2-1831.10(c), and claim to instead be able to make that new term of office take effect "on the date he or she is notified in writing of the Commission's vote, [if] later."

The public policy reasons for setting a deadline for acting on a reappointment application are manifold and obvious. *E.g., Bason v. Judicial Council of the District of Columbia Circuit*, 86 B.R. 744, 751 (D.D.C. 1988) (denying application for temporary restraining order, by judge who was not reappointed, because a vacancy in the judge's office is "a situation that will cause confusion and delay in the administration and resolution of the matters now pending . . ."). For the ALJ the consequences also include a loss of seniority vis-à-vis other ALJs. For the public the consequences include missed mandatory statutory deadlines for adjudicating cases and/or the addition of cumbersome and time-consuming layers to the administrative adjudication process. *See e.g.*, D.C. Code § 2-509(d).

Because of plaintiff's skills and experience his reinstatement will be much less jolting.

*Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 545 (1984) (noting that a full adversarial pre-termination evidentiary hearing was required in *Goldberg v. Kelly*, 397 U.S. 254 (1970) because at the pre-termination stage the issue of eligibility for benefits was *definitively* resolved in *Goldberg*); *Hall v. Ford*, 856 F.2d 255, 260 (D.C. Cir. 1988) ("Due process requirements vary according to the severity of the threatened loss.").

Because such a meeting would be "definitive," without further review or appeal of the Commission's decision, 6 DCMR § 3705.24, an ALJ is entitled to "a full adversarial evidentiary hearing," prior to the expiration of his or her two year term. That obviously includes written notice of the <u>*Commission's*</u> charges, and a reasonable amount of time in advance of a hearing on those charges to prepare. *Cf.* 6 DCMR § 3705.17 (mandating 20 days advance notice). It is undisputed in this case that not only was no *full adversarial hearing* held before plaintiff's initial term ended on May 2, 2007, <u>no</u> notice of a "hearing" on Commission "charges" was provided.

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542 (1984) (citation omitted). In this case the Commission did not issue a notice of possible denial of reappointment, or (to the same effect) notice of any "charges" against the plaintiff, prior to May 2, 2007 -- the "drop dead" date for acting on plaintiff's reappointment application.[14]

On April 4, 2007 the Commission (for reasons Commissioner Valentine explained in a chance meeting with plaintiff on the street on April 27, 2007) at the 11th hour orally and by e-mail invited plaintiff to a "discussion" with no more of an explanation than that the Commission

---

[14] Although plaintiff was served by the OAH Chief ALJ with the Chief ALJ's March 21, 2007 memorandum containing untimely, non-record, "supplemental" and retaliatory accusations, those were not the charges of the Commission. Plaintiff had no knowledge which, if any, of the accusations in the 200+ page March 21, 2007 document would be adopted by the Commission as "charges." Or if, in light of its obvious retaliatory purpose and untimeliness, the March 21, 2007 document would be considered by the Commission at all. D.C. Code § 2-1831.10(b).

wished to have a "*__preliminary__* discussion regarding your reappointment."  (emphasis supplied) *See Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1112 (D.C. Cir. 1985) ("The March 24, 1981, meeting with her supervisors at which she was initially accused of unprofessional conduct surely did not satisfy her due process rights. The plaintiff was not given any notice whatsoever of the charges against her prior to that meeting; indeed, she was told that the meeting would consist of a routine briefing. *See supra* p. 1096. Due process requires that an individual be given notice before a hearing if there is to be a meaningful opportunity to respond. *See* [*Board of Regents v*.] *Roth*, 408 U.S. 564, 573; *Boddie v. Connecticut*, 401 U.S. 371, 378, (1971); *Old Dominion Dairy* [*v. Secretary of Defense*, 631 F.2d 953, 966-67 (D.C.Cir.1980)].")

> **b)** **Plaintiff Was Not Provided A Meaningful Opportunity To Be Heard (An Opportunity To Hear, And Rebut, Witnesses Against Him)**

Prior to May 2, 2007, when plaintiff's term expired, the Commission did not issue a notice of possible denial of reappointment or any equivilant "charges."  Obviously, then, it did not provide plaintiff with an opportunity to be heard on any grounds he was advised it had adopted, as a body, for potentially not reappointing him.[15] *Wilkinson v. Austin*, 545 U.S. 209, 214 (2005), quoting  *Baldwin* v. *Hale,* 68 U.S. 223, 1 Wall. 223 (1864) ("For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified'").

After its meeting with the OAH Principal ALJs and the Deputy Chief ALJ on April 24, 2007, the Commission did not advise plaintiff of what the Principal ALJs and Deputy Chief ALJ communicated to the Commission out of plaintiff's presence.

---

[15] In so acting the Commission not only denied plaintiff due process, it again violated its own regulation.  6 DCMR § 3705.17  (notice of possible denial of reappointment must "specify the reasons why the Commission is considering the possible denial of his or her reappointment and shall set a date, at least twenty (20) days after service of the notice, on which the Commission will meet to consider final action on the request for reappointment.").

On April 27, 2007 the Commission again did not advise plaintiff, in writing or orally, of any grounds it had concluded would justify a denial of reappointment. *Perry v. Sindermann*, 408 U.S. 593, 602 (1972) (if the professor could prove the existence of a property interest it would "obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency."). Commission members, instead, generally discussed plaintiff's two year term with him, as well as publicity about an unrelated public interest lawsuit plaintiff was prosecuting as a private attorney general and that was the subject of an unfavorable Washington Post article.  [Plaintiff was unable to publicly respond to the adverse and uninformed publicity about his pending public interest lawsuit because of the ethical restrictions imposed on him as a lawyer and administrative law judge. [Ex. 15] *Infra* at 33.

> ### c)  Plaintiff Was Not Afforded Neutral Decisionmakers

Despite the unmistakably adversarial and retaliatory role Chief ALJ Butler had assumed vis-à-vis plaintiff by making his illegal March 21, 2007 "supplemental" filing, the Commission permitted the OAH Chief ALJ to fully participate in its deliberations and its March 24, 27 & 30 "preliminary discussions" with plaintiff.

In a chance meeting on the street after plaintiff's April 27, 2007 "preliminary meeting" with the Commission, Commissioner Valentine essentially stated to plaintiff that the last-minute "preliminary meetings" were a sop for defendant Butler.  He stated that the Commission was aware plaintiff was imminently qualified for reappointment, and said for that reason the Commission had not served plaintiff with a notice of possible denial of reappointment.

However, he urged plaintiff to help Butler save face by apologizing to Butler for making public [i.e., whistleblower] disclosures that were critical of Butler.  *Coe v. Armour Fertilizer Works*, 237 U.S. 413, 424, 59 L. Ed. 1027, 35 S. Ct. 625 (1915) ("Nor can extra-official or casual notice . . . be deemed a substitute for the due process of law that the Constitution requires.")

The final "preliminary meeting," on April 30th lasted only long enough for the Commission to again discuss plaintiff's public interest lawsuit, for one Commissioner to urge plaintiff to abandon the lawsuit, and for plaintiff to extend an off-the-record olive branch to Butler. Chairman Rigsby minimized the apology and expressed his expectation that plaintiff would be reappointed and go on to write landmark decisions for OAH in his second term. Plaintiff therefore expected to be notified in writing of his reappointment by May 2, 2007.[16]

   **d)**  **Plaintiff Was Not Provided Findings Or A Ruling With Respect To "Extraordinary Circumstances" Or His Complete Whistleblower Defense**

Instead, and without explanation, on May 2, 2007 the Commission served plaintiff with a letter in which it stated it would "decide on how it would proceed in the next thirty days."

In its surprise May 2, 2007 letter the Commission gave no reason for failing to vote on plaintiff's application for reappointment (filed six months earlier, on November 1, 2006). *UDC Chairs Chapter, American Association of University Professors v. Board of Trustees of the University of the District of Columbia*, 56 F.3d 1469, 1472 (D.C. Cir. 1995) ("a post-deprivation opportunity to be heard is sufficient [only] in some extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event") (quoting *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993)).    As a matter of law, no extraordinary circumstance existed.

There is no "extraordinary circumstance" that would justify peremptorily *terminating* (as opposed to suspending) a public employee who has "for cause" job protection. If some *exigent* circumstance arose after the Commission's meeting with plaintiff ended on April 30, 2007, the Commission was required to reappoint plaintiff because it had not provided him with reasonable

---

[16] *Kelly v. Smith*, 764 F.2d 1412, 1415 (11th Cir. 1985) ("The formality that accompanies an evidentiary hearing provides the employee with notice that this is his one and only opportunity to present his case. The decision maker will also more fully appreciate his duty to decide the issue in a fair and impartial manner where a formal setting is provided.")

notice and a hearing on any "charges" arising from those circumstances. D.C. Code § 2-1831.10(c) ("…The Commission **_shall_** vote on the request for reappointment **prior** to the expiration of the Administrative Law Judge's term . . ."). It could then *summarily* suspend plaintiff (for no more than 9 days), 6 DCMR §§ 3729 to 3741, if it could allege (within 48 hours of the suspension) <u>substantive</u> grounds that justified that action. 6 DCMR § 3741.1. The Fifth Amendment, and the Commission's own regulations, require that plaintiff be able to request a prompt hearing, *id.*, and that the Commission initiate a disciplinary or removal proceeding to establish grounds for disciplining or removing plaintiff for more than 9 days.  6 DCMR § 3729.

What the Commission clearly could not do, consistent with any notion of due process, was to simply *terminate* plaintiff as an ALJ on May 2, 2007, then search for three months *thereafter* to come up with charges, and then hold a hearing on those charges a total of six months later (in October 2007). The Fifth Amendment exists to prevent just such a shocking and arbitrary deprivation of property without due process of law.

In summary, effective May 2, 2007, plaintiff was terminated as an ALJ as a matter of statutory law and fact, without receiving meaningful written or oral notice of <u>charges</u> from the Commission, without learning of the unsworn testimony the Commission heard from at least four persons (in addition to the OAH Chief ALJ) opposed to his reappointment,[17] by a commission whose members included an obvious adversary of the plaintiff,[18] without being given reasons or a meaningful opportunity to address reasons identified by the Commission as a body for a denial of reappointment, and without having his complete whistleblower and other defenses to any

---

[17] *Sullivan v. Dept. of Navy*, 720 F.2d 1266, 1274 (Fed. Cir. 1983); *Nevels v. Hanlon*, 656 F.2d 372, 376 (8th Cir. 1981).

[18] *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 820 (1986) (Brennan, J., with Marshall, J., concurring) (". . . because this collegial exchange of ideas occurs in private, a reviewing court may never discover the actual effect a biased judge had on the outcome of a particular case.")

mystery allegations (which surfaced three months later) against him addressed. For any of the four reasons detailed above, plaintiff was indisputably, and shockingly, denied *pre*-termination due process of law. *Propert v. District of Columbia*, 948 F.2d 1327, 1330 (D.C. Cir. 1991).

e)   <strong><u>Plaintiff Was Harmed By The Denial Of Pre-Deprivation Due Process</u></strong>

The Commission's May 2, 2007 letter announcing that it had not voted on plaintiff's application for reappointment (thus terminating him) also advised plaintiff he would be placed in a terminable-at-will position as an attorney-advisor with the Office of Administrative Hearings (making him dischargeable from that position at any time, for any reason or no reason).[19]

Thus, effective May 3, 2007, plaintiff was stripped of his statutory office, and was unable to hear and adjudicate cases, to participate in continuing judicial education programs at OAH or elsewhere, or to act on the honor extended to him by the National Judicial College to be a training facilitator at an upcoming training. His expectation of ten years of employment security commencing May 2, 2007, and his statutory, ethical, professional and D.C. Bar rights and perquisites as an administrative law judge thus came to a shockingly abrupt, unexplained and publicly humiliating end. The message it *continues* to send to other ALJs is unmistakable.

In addition, anonymous leaks from the Commission and public comments by defendants Butler and Commission Chairperson Rigsby, hammered home the point to other ALJs.

As national attention in the summer of 2007 focused on plaintiff's long-delayed reappointment hearing and public interest lawsuit, defendant Butler volunteered a blistering assessment of plaintiff's competence as an ALJ, and made critical comments about plaintiff's still-pending reappointment application and public interest lawsuit, in an interview after

---

[19] The defendants could not lawfully deprive plaintiff of his property interests by removing him from his statutory office and demoting him to a "dischargeable at will" position. *See Thompson v. District of Columbia*, 530 F.2d 914, 919 (D.C. Cir. 2008) ("We hold that when an employer attempts to get rid of an employee by transferring him from a Career Service position to a job already scheduled for imminent elimination pursuant to an otherwise legitimate RIF, the employee is constructively removed from the Service at the time of the transfer.")

plaintiff's *de facto* termination on May 2, 2007.[20]   Brendan Smith, *Judge Who Sued Over Lost Pants May Lose Reappointment*, Legal Times at 4 (Aug. 6, 2007) ("In an interview last week with *Legal Times*, Butler said that Pearson 'is an annoyance like a mosquito bite.  The pants lawsuit was actually not unexpected, knowing the personality. Up to that time, I was still pretty sure he was not going to make a good judge,' Butler says. 'That's almost like another straw added to the others.'").[Ex. 22]Butler's interview lent credence to the many egregious errors in the article.

In the same newspaper article the Chairperson of the Commission, defendant Rigsby, joined in Butler's criticisms by claiming the *already ten months* since plaintiff submitted his reappointment application on November 1, 2006 was insufficient time to formally vote on plaintiff's reappointment because questions about plaintiff's "qualifications" merited extraordinary scrutiny. *Id.* ("We want to be able to thoroughly review qualifications for such an important appointment in the District of Columbia.") [*Id.*]

---

[20]   Defendant Butler's disparaging comments about plaintiff's reappointment and his pending lawsuit – made while Butler was serving on the Commission still scheduled to hear and rule on plaintiff's reappointment -- violated D.C. statutes, regulations and ethical rules.

There are, of course, longstanding prohibitions against commenting on D.C. government personnel matters.  D.C. Code § 1-615.56(6) (D.C. government employees' right to privacy);  6 DCMR § 3721.7; 6 DCMR § 3113.6 (prohibiting any disclosure to the public of information required to be included in an employee's official personnel folder); 6 DCMR 3107 (official personnel folder must contain all information regarding an employee's service and status).  Even the fact plaintiff was being considered for reappointment was non-disclosable.  6 DCMR 3113.1.

And, obviously, there are ethical prohibitions against adverse comments on a matter pending before the Commission on which Butler himself served, or about any matters pending before any other body. Chp. III(H), Code of Ethics For OAH Administrative Law Judges ("An Administrative Law Judge shall not, while ***a proceeding*** is pending or impending, make any public comment that might reasonably be expected to affect its outcome or impair its fairness or make any nonpublic comment that might substantially interfere with a fair hearing . . ." ). [Ex.2]

Because the OAH ethical rule covers "proceedings" and not just "actions" it is even broader than the prohibition contained in the Code of Conduct for United States Judges. *United States v. Microsoft Corp.,* 253 F.3d 34 (D.C. Cir. 2001) ("In forbidding federal judges to comment publicly 'on the merits of a pending or impending ***action***,' Canon 3A(6) applies to cases pending before ***any*** court, state or federal, trial or appellate. *See* JEFFREY M. SHAMAN ET AL., JUDICIAL CONDUCT AND ETHICS § 10.34, at 353 (3d ed. 2000). . . . An action remains 'pending' until 'completion of the appellate process.' CODE OF CONDUCT Canon 3A(6) cmt.; Comm. on Codes of Conduct, Adv. Op. No. 55 (1998).")  (emphasis supplied).

**2.      The Commission's Post-Deprivation Procedures Clearly,
        <u>And Repeatedly, Also Denied Plaintiff Due Process Of Law</u>**

This memorandum next addresses the systematic lack of post-deprivation due process

accorded plaintiff.

**(a)      Plaintiff Was Not Provided A Post-Termination Hearing
        <u>On His Application At A Meaningful Time</u>**

"The Due Process Clause requires that a hearing be provided 'at a meaningful time.'

*Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 547 (1984), quoting *Armstrong v.*

*Manzo*, 380 U.S. 545, 552 (1965).

The deadline of May 2, 2007 that D.C. Code § 2-1831.10(c) set for voting on plaintiff's

reappointment application, while absolutely necessary, is unconstitutional as applied to plaintiff

because the Commission's failure to act by that date occurred through no fault of the plaintiff.

*Logan v. Zimmerman Brush Company*, 455 US 422, 427 (1982) (the right to present a

discrimination claim is a "property right," and Mr. Logan was deprived of that property right,

without being accorded the process he was due, when the agency he filed his discrimination

claim with failed to meet the statutory 120 day deadline for acting on his claim.)

To compound its failure to provide plaintiff with pre-termination due process the

Commission did not serve plaintiff with a post-termination notice of charges and "possible"

denial of reappointment until August 7, 2007 – three months *after* his final termination.   And

plaintiff was not provided with a hearing on the charges preferred by the Commission in the

August 7, 2007 notice of possible denial of reappointment until October 11, 2007.[21]

---

[21] The Commission's near-complete disregard for the OAH Act continued after plaintiff's
term expired on May 2, 2007.  Three weeks later, on May 22, 2007 -- despite the March 1, 2007
statutory deadline for submission of the record, 6 DCMR 3705.5 ("The Chief Administrative
Law Judge **shall** file the record required by section 3705.4 with the Clerk within 120 days of the
filing of a statement by the Administrative Law Judge . . .") – defendant Butler purported to
unilaterally "withdraw" the portion of the record containing his favorable recommendation and
to file a second "supplemental" reappointment record  -- this one containing an unfavorable
recommendation. [Ex. 14] In explanation, Butler specifically pointed to plaintiff's exercise of his

Any regulation that authorizes, or is construed to authorize, that incredible delay is in patent violation of the Fifth Amendment.[22] A hearing that takes place almost six months after the *de facto* deprivation of plaintiff's property interest in his position as an administrative law judge, and deprivation of his right to protection under the First Amendment and as a Whistleblower, clearly does not take place at a "meaningful time." *Loudermill*, *supra*, 470 U.S. at 543 (1985) ("the only meaningful opportunity to invoke the discretion of the decision maker is likely to be before the termination takes effect"); *Gilbert v. Howar*, 520 U.S. 924, 929 (1997) (remand to permit trial court to rule on whether 17 day delay in conducting hearing constituted a "prompt post-suspension hearing" within the meaning of the Due Process clause).

### b)    Plaintiff Was Again Not Afforded Neutral Decisionmakers

On August 22, 2007, plaintiff submitted a 22 page response to the August 7, 2007 notice (which all five Commissioners deliberated on, agreed to and signed) of possible denial of reappointment from the Commission. In his response plaintiff alleged, and explained how, the August 7, 2007 notice of possible denial of reappointment violated the D.C. Whistleblower Act.

He explained that the August 7th notice cited and relied upon "supplemental" documents (submitted by Chief ALJ Butler well *after* the reappointment record closed) that were not properly part of the reappointment record.   And the documents submitted by Butler contained and relied upon "protected disclosures" under the D.C. Whistleblower Act as the basis for its

---

First Amendment right to petition the D.C. Superior Court for redress of his grievances and plaintiff's exercise of his rights as a Whistleblower in sending out an e-mail on March 8, 2007 disclosing Butler's unlawful and retaliatory "neutral" reappointment recommendation.  [*Id.*]

[22]   Defendants' reliance on 6 DCMR §§ 3705.25 & 3705.26 as authority to take more than five months past the May 2, 2007 deadline to provide a hearing on plaintiff's application for reappointment does not survive measurement against the decision of the Supreme Court in *Barry v. Barchi*, 443 U.S. 55 (1979) (statute as applied in *Barry* violated the Due Process Clause because it did not assure a prompt post-deprivation hearing).   The Commission construed virtually all of its reappointment regulations so as to deny plaintiff procedural due process.  *See* footnote 27, *infra*. Thus, both those regulations and the decisions and actions defendants took as final policy makers in considering plaintiff's reappointment denied plaintiff due process of law.

allegations against the plaintiff. Because the Commission members expressly relied on those documents to threaten plaintiff with termination, and were "supervisors" within the meaning of the Whistleblower Act, their August 7, 2007 notice was itself a violation of the Whistleblower Act. D.C. Code § 1-615.53.

As a consequence, the Commission was no longer even theoretically a neutral decision making body. The Commission's violation of the D.C. Whistleblower Act made it liable in common law and constitutional tort to plaintiff. D.C. Code § 1-615.56(c) ("[N]othing in this subchapter shall diminish the rights and remedies of an employee pursuant to any other federal or District law").

Despite plaintiff's August 22, 2007 response to the notice of possible denial of reappointment, Commission members did not consider recusing themselves. *Propert v. District of Columbia*, 948 F.2d 1327, 1331 (D.C. Cir. 1991) ("The constitutional requirement of some kind of hearing means, at a minimum, that the affected individual must have a meaningful opportunity to present his case before a neutral decision maker.")[23]

In particular, OAH Chief Judge Butler, against whom most of the claims of Whistleblower and First Amendment retaliation were directed, did not recuse himself from

---

[23]   It is axiomatic that an impartial decision maker is an essential element of "due process." *Republican Party of Minnesota v. White*, 536 U.S. 765, 775-777 (2002). By analogy to the "Law of Necessity" in court cases, however, the statutory voting members of the Commission could continue to hear and vote on plaintiff's application for reappointment if no other body was available to do so. *Cf. United States v. Will*, 449 U.S. 200 (1980) (Under the Rule of Necessity district court judges and Supreme Court justices could hear a case concerning their own salaries because there were no judges or justices to whom to transfer the case who were not similarly concerned.).

However, despite the obvious conflict of interest that was presented the Commission made no attempt to transfer plaintiff's application for reappointment to an alternative decision-making body. The extraordinary delay in providing plaintiff with a post-termination hearing certainly allowed enough time for the Commission to promulgate emergency regulations authorizing alternative decision makers in the event of the recusal of a majority of the statutory voting members, D.C. Code § 2-1831.11(a) (authorizing Commission to promulgate emergency rules that will take effect immediately), or to request that the D.C. Council enact emergency legislation to that effect.

participating in the Commission's deliberations, the issuance of its August 7, 2007 notice of possible denial of reappointment, its meetings with plaintiff on October 11 and 15, 2007, or its vote on procedural matters and on plaintiff's reappointment application.[24]   With respect to plaintiff's reappointment Butler acted as investigator, record preparer and then (re)preparer, grand juror, prosecutor, (secret) witness, interlocutor and *ultra vires* decision maker.

<strong>c)   Plaintiff Was Again Not Provided A Meaningful Opportunity To<br>Be Heard (No Opportunity To Hear, And Thus Rebut, Evidence)</strong>

On October 4, 2007, plaintiff was not permitted to be present while the Commission heard from at least seven persons (five of whom were Principal ALJs and the Deputy Chief ALJ at OAH; another was the General Counsel for the agency plaintiff testified to the D.C. Council he had been instructed to (but refused to) rule in favor of in hundreds of cases for political reasons) who opposed plaintiff's reappointment, and whose testimony in opposition to plaintiff's reappointment the Commission disclosed for the first time in its October 30, 2007 written decision refusing to reappoint plaintiff. [Ex. 27] *Greene v. McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 1404 (1959) ("Where governmental action seriously injures an individual, and the reason-ableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.").

The Commission also did not disclose, until it issued its October 30, 2007 decision, that the persons it secretly heard from on October 4, 2007 included Chief ALJ Butler (who also deliberated with the Commission and signed the Commission's Oct. 30, 2007 decision) [Ex. 27].

---

[24]   During its October 11, 2007 meeting with plaintiff the Commission voted on a procedural issue raised by plaintiff.  In plaintiff's presence on that occasion defendant Butler (and defendant Valentine) participated in the voting. [Aff./Decl. Of R. Pearson ¶ 17] *See also Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 820 (1986) (Brennan, J., with Marshall, J., concurring) ("[T]he collegial decision-making process that is the hallmark of multimember courts [could] lead the author [of a decision] to alter the tone and actual holding of the opinion to reach a majority, or to attain unanimity. And because this collegial exchange of ideas occurs in private, a reviewing court may never discover the actual effect a biased judge had on the outcome of a particular case.")

Plaintiff did not receive a hearing on the Commission's August 7, 2007 notice of possible denial of reappointment until October 11 and 15, 2007.  On October 11, 2007, the Commission denied plaintiff's request to be apprised of the testimony of the persons it barred plaintiff from observing or hearing on October 4, 2007. [Amend.Compl. ¶ 210] As a consequence, plaintiff had no way of knowing what he could say, or what witnesses he should call, to rebut the secret testimony the Commission heard on October 4, 2007.  It is well established, and fundamental, that *ex parte* communications with a decision maker can void a proceeding. *See Sullivan v. Dept. of Navy*, 720 F.2d 1266, 1274 (Fed. Cir. 1983); *Nevels v. Hanlon*, 656 F.2d 372, 376 (8th Cir. 1981).[25]

Because of the Commission's secrecy plaintiff was not cued to the importance of presenting witnesses and other specific rebuttal evidence demonstrating his excellent relations with OAH staff and other non-supervisory ALJs.  Nor was he cued to present evidence that it was he who suggested and took ALJ Little to lunch on the occasion referred to in the Commission's decision.   Nor was he given an opportunity to correct ALJ Little's recollection of their conversation at that lunch and to detail their subsequent conversations and congenial relationship on and off the job over the 18 month period that followed their lunch. Because of the Commission's curtain of secrecy, plaintiff could not impeach Judge Little with her *volunteered* assurance to plaintiff that she *supported* his reappointment, or with the reasons why she would now seek to curry favor with the Chief ALJ at the expense of telling the truth.  Nor was he cued to

---

[25]   Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots.

*Goldberg v. Kelly*, 397 U.S. 254, 260 (quoting *Greene v. McElroy*, 360 U.S. 474, 496-497 (1959)).

present evidence that Principal ALJ Mahon agreed to write a letter to the Commission supporting plaintiff's reappointment -- until Chief ALJ Butler barred her from doing so.  [Aff./Decl. ¶ 21]

As this lawsuit itself illustrates, each of the OAH witnesses who appeared on October 4, 2007 depend for their livelihood on staying in the good graces of Chief ALJ Butler.  And each OAH Principal ALJ and the Deputy Chief ALJ operated the very "peer review" system on which plaintiff "blew the whistle" on legal and ethical grounds within OAH, to the Commission, and in very public testimony live and on cable before the D.C. Council.  Thus, the OAH Principal ALJs and the Deputy Chief ALJ – who were the subject of plaintiff's Whistleblower disclosures in 2005, 2006 and 2007 -- were as far removed from being unbiased witnesses as is imaginable.  Additionally, their testimony regarding plaintiff's alleged "refusal to be a team player" penalizes speech and protected disclosures in violation of the First Amendment, the OAH Code of Ethics, the D.C. Whistleblower Act, and the fundamental values and policies underlying each protection.

### d)   Plaintiff Was Again Not Provided Findings Or A Ruling With Respect To His Complete Whistleblower Defense

The Commission's October 30, 2007 decision noted that plaintiff had invoked and explained the protections of the D.C. Whistleblower Act to the Commission as his defense to the Commission's August 7, 2007 notice of possible denial of reappointment.  Nonetheless, the October 30, 2007 decision did not address plaintiff's arguments and evidence regarding the D.C. Whistleblower Act, much less claim there was "clear and convincing evidence" that rebutted plaintiff's testimony and analysis.[26]  Nor did it address plaintiff's ethics defense and evidence.

Because of the centrality of the D.C. Whistleblower Act and OAH Code of Ethics to plaintiff's defense to the Commission's August 7, 2007 notice of grounds for possible denial of

---

[26]   D.C. Code § 1-615.54(b) ("In a[n] . . . administrative proceeding, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by  § 1-615.53 was a contributing factor in the alleged prohibited personnel action against an employee, the burden of proof shall be on the employing District agency to prove by clear and  convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section.")

reappointment, the due process clause of the Fifth Amendment required that the Commission state – at least briefly – whether or how: (1) plaintiff failed to adduce evidence that a protected disclosure was a "contributing factor" in the OAH Chief ALJ's recommendation that plaintiff not be reappointed, and in the Commission's issuance of its August 7, 2007 notice of possible denial of reappointment, or in what way (2) clear and convincing evidence existed that both actions would have been taken for legitimate, _independent_ reasons even if plaintiff had not engaged in protected activities. D.C. Code § 1-615.54(b); *Foster v. Ripley*, 645 F.2d 1142, 1146 (D.C. Cir. 1981) (due process requirement satisfied, in part, because committee "adequately stated its grounds for decision").

Without some explanation of its reasoning and findings in that regard there is no means of reasonably assuring that the Commission did not arbitrarily disregard plaintiff's complete Whistleblower and other defenses. D.C. Code § 1-615.54(c); *Wilkinson v. Austin*, 545 U.S. 209, 214 (2005) ("If the recommendation is OSP placement, Ohio requires that the decision maker provide a short statement of reasons. This requirement guards against arbitrary decision-making."); *Slochower v. Board of Education*, 350 U.S. 551, 559 (1956) ("The 'protection of the individual against arbitrary action' . . . [is] the very essence of due process"); *Hallack v. Berliner*, 427 F.Supp. 1225, 1237 (D.D.C. 1977) (Fifth Amendment requires that the judicial evaluation process "adequately safeguard[] plaintiff from arbitrary governmental action.")

The need for this safeguard was particularly important to this plaintiff because his application for reappointment was clearly not decided by neutral decision makers. The witnesses the Commission secretly heard from were clearly biased. And the procedures the Commission followed were far from "neutral"  -- the Commission disdained the protections in the OAH Act and "construed" the due process safeguards in its own regulations out of existence.[27]

---

[27]   *E.g.*, the Commission failed to vote on plaintiff's application by the May 2, 2007 statutory deadline.   D.C. Code § 2-1831.10(c).   The AOH Chief ALJ submitted subjective

The requirement that the Commission provide some rationale for apparently rejecting plaintiff's "complete affirmative defense," and ethics defense, imposed no burden on the Commission it was not already under.   6 DCMR § 3705.22 ("The Commission shall issue a written statement of reasons for every decision to reappoint or not to reappoint . . .")

### e)     Plaintiff Was Again Not Provided A Meaningful Hearing

Another major reason plaintiff did not receive a meaningful hearing was because the Commission ignored the fact that its August 7, 2007 notice of possible denial of reappointment charged plaintiff with multiple underlined disciplinary offenses that would stigmatize him. [Ex. 23].   *E.g.* 6 DCMR § 3729.1(a)("any violation of a code of professional responsibility"); 6 DCMR § 3729.2(a) ("( . . . habitual intemperance) that has persisted for a period of at least one (1) year . . ."); 6 DCMR § 3729.2(b) ("conduct . . .which brings the judicial office into disrepute").

Because of the severity, and fact intensive nature, of those charges (and plaintiff's factual, ethical and Whistleblower defenses to them) the Fifth Amendment required that plaintiff be accorded "contested case procedures" such as those set forth in the D.C. Administrative

---

evaluations in connection with plaintiff's reappointment application.  D.C. Code § 2-1831.10(b). The Commission failed to observe the 120 day deadline for inclusion of documents in plaintiff's reappointment record. D.C. Code § 2-1831.10(b). It permitted the Chief ALJ to submit a 200 page "supplemental record" three weeks after the mandatory statutory deadline for submission of plaintiff's reappointment record. *Id*. It permitted the OAH Chief ALJ to "rescind" his favorable recommendation and submit an unfavorable recommendation three months after the mandatory statutory deadline.  *Id*. It did not issue an order approving the three month late "recission" of the OAH Chief ALJ's favorable recommendation, so that plaintiff could then request an opportunity to appear before the Commission to present reasons why it should not issue a notice of possible denial of reappointment.  6 DCMR §§ 3705.10 to 3705.15. It excluded plaintiff from the October 4, 2007 hearing where it heard from persons opposed to plaintiff's reappointment. 6 DCMR § 3705.19. It did not advise plaintiff, until its written decision did so, that among the persons it would hear from on October 4, 2007 was the OAH Chief ALJ.  *Id.*  It refused plaintiff's request to be advised of what the witnesses on October 4, 2007 stated to the Commission.  *Id.*
    The above regulations were therefore unconstitutional as applied to deny plaintiff his right to due process of law.  *Boddie v. Connecticut*, 401 U.S. 371, 379 (1970) ("Our cases . . . establish that a statute or a rule may be held constitutionally invalid as applied when it operates to deprive an individual of a protected right . . .")
    The record is therefore clear that the Commission's regulations and its actions and decisions as final policy makers denied plaintiff his right to even minimal due process.

Procedure Act, D.C. Code§ 1-1509,[28] or (tellingly) those the Commission itself mandates in its disciplinary regulations.   *See* 6 DCMR §§ 3729 to 3741.

It has long been established that "the nature of the relevant inquiry," *Mathews v. Eldridge*, 424 U.S. 319, 343 (1976), is a key factor in determining what process is "due." Once the Commission served plaintiff with its August 7, 2007 notice accusing him of conduct, which if proven would also be stigmatizing grounds for discipline or removal from office, the nature of the resulting fact-intensive inquiry mandated a full evidentiary hearing.[29]   6 DCMR §§ 3279 to 3741.   *Hallack v. Berliner*, 427 F.Supp. 1225, 1236-37 (D.D.C. 1977) (candidate for judicial re-appointment had an interest in possible reappointment which entitled him to a thorough and fair evaluation of his candidacy and such process as would insure that the Commission's evaluation of his candidacy for reappointment safeguarded plaintiff from arbitrary governmental action).

For the above catalogue of reasons, plaintiff was denied <u>post</u>-termination due process of law as clearly as he was denied <u>pre</u>-termination due process of law.[30]

---

[28]   *Money v. Cullianane*, 392 A.2d 998, 1003 (D.C. 1978) ("Because the existing departmental procedures are inadequate for a final determination of petitioners' rights, procedures similar to those established by the DCAPA, which conform to the traditional forms of fair procedure, are required.").

[29]   The Commission's August 7, 2007 notice raised multiple issues of ethics, lack of judicial temperament and alleged plaintiff's public interest lawsuit demeaned plaintiff as a judicial officer "and brought OAH, the entire judiciary and the judicial process into disrepute." However, in his August 6, 2007 interview with the Legal Times Butler is quoted as saying publicity over plaintiff's public interest lawsuit had had no effect on OAH's reputation. [Ex. 22]

[30]   Plaintiff incorporates his *Opposition To Defendants' Renewed Motion To Dismiss, Or Alternatively, For Summary Judgment* at 23-26 (April 6, 2009) as his analysis of how the defendants acted "under color of law" and were "final policymakers" implementing an "official policy" through their unconstitutional application of the OAH Act, the Commission's regulations, and their decisions and actions in systematically and blatantly denying plaintiff due process of law.  Indeed, this showing establishes a violation of substantive due process as well.
The defendants have the burden of establishing any claim of qualified immunity. They clearly cannot meet that burden with respect to their violations of the long established procedural due process case law cited in this motion.  Additionally, there is no full or qualified immunity from the relief sought in a motion for injunctive and declaratory relief.  "An official is not entitled to immunity from [motion]s seeking . . . injunctive and declaratory relief."  *Davis v. Scherer*, 468 U.S. 183, 187 (1984).

### III.
### ENTRY OF PARTIAL SUMMARY JUDGMENT ON COUNT III
#### AND ENTRY OF PRELIMINARY INJUNCTION

Finally, this memorandum turns to the issue of whether 42 U.S.C. § 1983 was intended to, and does, authorize entry of a preliminary injunction to restore the status quo ante.[31] *Cf.* D.C. Whistleblower Act, D.C. Code § 1-615.54(a) (authorizing full status quo ante by injunction).

In *Lightfoot v. District of Columbia*, 355 F. Supp.2d 414, 439-441 (D.D.C. 2005), *reversed on other grounds*, *Lightfoot v. District of Columbia*, 448 F.3d 392 (D.C. Cir. 2006), the Honorable Colleen Kollar-Kotelly of this court concluded that overwhelming D.C. Court of Appeals and federal District and appellate court authority authorize the entry of an *interim* order reinstating both an employee and an employee's benefits when either has been terminated without due process of law.  Thus, ample binding authority settles this question.

On appeal from that ruling the U.S. Court of Appeals determined that the interim relief ordered by Judge Kollar-Kotelly was tantamount to a preliminary injunction.  This memorandum therefore next turns to the proof requirements for a preliminary injunction mandating, *inter alia*: (1) that plaintiff be reinstated to the position and/or salary he would have had he not been unlawfully terminated (continuing until at least such time as the Whistleblower and constitutional claims in this case have been decided, or until such time as the Commission reforms and adopts regulations that meet due process requirements and there is a new hearing on plaintiff's reappointment application); (2) backpay to plaintiff, and (3) a requirement that the Commission both promulgate and enforce its regulations so that they will not continue to deny

---

[31] "Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation." *Mitchum v. Foster*, 407 U.S. 225, 239 (1972).  Thus the purpose of 1983 is to interpose the federal courts between the states and the people, as guardians of the people's federal rights and to protect the people from unconstitutional action under color of state law, ""whether that action be executive, legislative, or judicial.'"   *Id.* at 242 (quoting *Ex parte Virginia*, 100 U.S. 339, 346 (1879)).

due process [e.g., a requirement that the Commission: (1) rescind its regulations authorizing the Commission to ignore the mandatory deadline in the OAH Act for voting on a reappointment application, (2) adopt regulations excluding the OAH Chief ALJ from participating in reappointment deliberations when he is a potential witness or when he has recommended that an ALJ not be reappointed; (3) adopt regulations establishing procedures for designating alternative decision makers when an ALJ alleges voting Commission members are supervisors and have violated the D.C. Whistleblower Act; (4) enact regulations providing for contested case procedures when the factors listed by the U.S. Supreme Court in *Goldberg v. Kelly* are anticipated in a reappointment proceeding; (5) adopt regulations requiring that the procedures set forth in 6 DCMR §§ 1-3734 to 1-3737 be followed when a notice of possible denial of reappointment alleges one of the causes for discipline or removal set forth in 6 DCMR § 3729].

To obtain a preliminary injunction a movant ordinarily must show: (1) a substantial likelihood of success on his claim for denial of procedural due process; (2) that he would suffer irreparable injury if a preliminary injunction is not granted; (3) that a preliminary injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by entry of a preliminary injunction. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 313 U.S. App. D.C. 178, 58 F.3d 738, 746 (D.C. Cir. 1995); *Columbia Broadcasting Sys., Inc. v. American Soc. Of Composers, Authors & Publishers,* 320 F.Supp. 389, 392 (D.C.N.Y. 1970).  Plaintiff has satisfied each element.  He has shown not just a <u>likelihood of success </u>in proving a violation of due process.  He has actually <u>proven</u> *multiple* denials of pre-deprivation *and* post-deprivation due process. *Friends For All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 828 (DC 1984). "When an <u>alleged</u> deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11A C.Wright & A. Miller, *Federal Practice and Procedure* § 2948.1 (1995); *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("a prospective violation of a constitutional

right constitutes irreparable injury"); *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987) ("Damages and reinstatement would not remedy the coercive and inhibitory effects upon the employees' organizational rights . . . Such harm is irreparable."). "It even has been held that when the acts sought to be enjoined . . . clearly are against the public interest, plaintiff need show neither irreparable injury nor a balance of hardship in his favor, nor a likelihood of success on the merits. This especially is true when a statute expressly authorizes interlocutory injunctive relief." 11A C. Wright & A. Miller, *Federal Practice and Procedure* § 2948.4 (1995). 42 U.S.C. § 1983; D.C. Code § 1-615.54(a) (both authorizing injunctive relief).

Although Fed. R. Civ. P. 65(c) requires the giving of security as a condition precedent to the granting of a preliminary injunction, where the public interest, or important federal rights, or a low-income plaintiff[32] are involved, the Court has discretion to require only a nominal bond, or no bond at all. *See, e.g., Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964); *Brown v. Artery Org., Inc.*, 691 F. Supp. 1459, 1462 (D.D.C. 1987). Clearly no bond should be required when a constitutional violation has been proven on motion for summary judgment.

## CONCLUSION

For the foregoing reasons plaintiff requests expedited consideration and entry of the order of summary judgment, for declaratory relief and for preliminary injunction attached hereto.

Respectfully submitted,

/s/ *Roy L. Pearson, Jr.*

Roy L. Pearson, Jr.                    #955948
3012 Pineview Court, N.E.
Washington, D.C. 20018
Telephone: (202) 269-1191

Counsel for Plaintiff

---

[32] Plaintiff's only income since being removed from the OAH payroll in 2007 has been receipt of soon-to-expire unemployment compensation benefits. *Perry v. Larson*, 794 F.2d 279, 285-86 (7th Cir. 1986) (the collateral source rule applies to § 1983 actions, and it was error to reduce the plaintiff's judgment by the amount of unemployment compensation he had received). Plaintiff has no health insurance and is insolvent. [Affid./Decl. of R. Pearson ¶ 26.]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ROY L. PEARSON, JR.** | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| **DISTRICT OF COLUMBIA** | : |
| A Municipal Corporation, | : |
| | : |
| **TYRONE T. BUTLER** | : |
| In his official and individual capacities, | :    Civil Action No. 08-cv-758 (ESH) |
| | : |
| **PETER M. WILLNER** | : |
| In his official and individual capacities, | : |
| | : |
| **ROBERT R. RIGSBY** | : |
| In his official and individual capacities, | : |
| | : |
| **ANITA JOSEY-HERRING** | : |
| In her official and individual capacities, | : |
| | : |
| **GEORGE C. VALENTINE** | : |
| In his official and individual capacities, | : |
| | : |
| Defendants. | : |
| _____ | : |

## STATEMENT OF MATERIAL FACTS AS TO WHICH NO GENUINE DISPUTE EXISTS

1.      At all times relevant to this complaint defendants Robert R. Rigsby, Peter Willner and Tyrone T. Butler were members of the Commission.  [Amend. Comp. ¶¶ 31, 32,]

2.      Robert R. Rigsby was appointed by the Chief Judge of the D.C. Superior Court to the Commission and served as Chairman of the Commission.  Mr. Rigsby is a former D.C. Corporation Counsel (now called "Attorney General") and has been a judge serving on the D.C. Superior Court since July 2002.  [Amend. Comp. ¶¶ 31]

3.      Peter M. Willner was the D.C. Council Chairman's appointee to the Commission. Mr. Willner is a Senior Policy Analyst for the D.C. Council for Court Excellence.  [Amend. Comp. ¶ 32]

4.      On or about April 3, 2007 defendant George Valentine joined the Commission as the designee of the D.C. attorney-general.  {Ex. 13}  Mr. Valentine was and is a Deputy Attorney General, and the head of the Civil Litigation Division for the Office of the Attorney General.  He acted as counsel to the Commission.  [Amend. Comp. ¶¶ 29]

5.      Henry W. Lavine was Mayor Anthony A. William's appointee to the Commission for the three years ending on April 30, 2007. On June 27, 2007 Mayor Fenty appointed Anita Josey-Herring ("Josey-Herring") to the Commission.  Commissioner Josey-Herring has served as a judge on the D.C. Superior Court since 1997.  [Amend. Comp. ¶¶ 31, 32,]

6.      Plaintiff was appointed to the Excepted Service of the District of Columbia Government as an ALJ for a two year term of office.  [Amend. Compl. ¶ 18]

7.      Plaintiff commenced work as an ALJ with OAH on May 2, 2005. [Amend. Compl. ¶75]

8.      Defendant Tyrone T. Butler, an out-of-state New York lawyer, was appointed by the Mayor, and then confirmed by the D.C. Council in September 2003, as the first Chief Administrative Law Judge ("Chief ALJ") for OAH.  [Ex.1]

9.      During a D.C. Council hearing on his nomination on June 25, 2003, Mr. Butler testified: "ALJs must be free from interference in their decisional obligations and free from influence outside of the adversarial arena."  [*Id*.]

10.     The OAH began accepting cases in March of 2004, with fewer than 8 administrative law judges ("grandfathered" from a pilot program that existed for two years prior to passage of the OAH Act). [Ex. 1] The small pilot program was contained within the D.C.

Department of Health ("DOH") and the ALJs in the pilot program did not operate under a code of judicial ethics.  [*Id.*]

11.    In August 2004 the Chief ALJ for OAH adopted the *OAH Administrative Law Judges Code of Ethics* ("OAH Code of Ethics").  [Ex. 2]

12.    The OAH Code of Ethics was drawn from the ABA's Model Code of Judicial Conduct and the Model Code of Ethics for State Administrative Law Judges. [Ex. 3]

13.    In September 2004 the Commission solicited applicants for additional positions as administrative law judges to handle the case load the OAH began assuming in March 2004.  [Ex. 4]  The Commission's advertisement stated in part:

> The Office of Administrative Hearings ("OAH"), a new **independent tribunal** of the District of Columbia, seeks applications from qualified attorneys interested in becoming an Administrative Law Judge ("ALJ"). . . .  The **new** tribunal is the product of comprehensive legislation designed to reform and restructure the District of Columbia's administrative litigation system.
>         . . . ALJs will hold hearings, decide motions, write orders and opinions, and manage a litigation docket.  . . .**ALJs report to the Chief Administrative Law Judge or his designee on administrative matters, but decide cases independently** under applicable law . . .  (emphasis supplied)

14.    Plaintiff was a District of Columbia public interest attorney and legal services administrator for more than twenty-five years before May 2005.  [Amend. Compl. ¶¶ 63-65]  For that reason he had decades of first hand experience with the chronically delayed and agency-biased administrative system that preceded the OAH.  [Affid./Decl. of R. Pearson at ¶ 2]

15.    At OAH Chief ALJ Butler evaluated a Deputy Chief ALJ, who in turn evaluated three (later four) Principal ALJs. In 2005 the Principal ALJs reviewed decision prepared by ALJs in the different divisions into which OAH was organized.   And the Principal ALJs and Deputy ALJ also evaluated each ALJ.  [Amend. Compl. ¶ 87]

16.     The Deputy ALJ and each Principal ALJs previously worked in the DOH pilot program, which operated without a code of judicial conduct or the strictures of a judicial oath. [Ex. 3]

17.     The Principal ALJs to whom plaintiff was required to submit his decisions also evaluated plaintiff.  [Ex. 7 & 8]

18.     On October 26, 2005, the group of ALJs with whom plaintiff was assigned to hear Department of Public Works ("DPW") cases were told by Chief ALJ Butler, through the Deputy Chief ALJ and a Principal ALJ, that if they did not agree in advance to rule in favor of DPW in cases assigned to them, those cases would be reassigned to ALJs who agreed to rule in favor of DPW.  [Ex. 5]

19.     The OAH Chief ALJ did not respond directly to plaintiff's June 2005 research memorandum on why the *mandatory* and coercive OAH "peer review" process appeared to institutionalize violations of the OAH Act, the OAH Code of Ethics and the D.C. A.P.A.  And the Commission declined to provide an advisory ethical opinion on the issue when plaintiff formally requested one in a memorandum to the Commission in July 2005. [Amend. Compl. ¶¶ 95-100]

20.     In February 2006, speaking on his own time while on Annual Leave, and while identified exclusively as a private citizen, plaintiff testified before a committee of the D.C. Council about the OAH "peer review" system. [Ex. 5; Amend. Compl. ¶¶101-102 ]

21.     On February 13, 2006, the OAH Chief ALJ was questioned by the chairman of the D.C. Council's Committee on Public Safety and the Judiciary about the OAH "peer review" process at the same hearing at which plaintiff delivered his testimony.  As part of his response, the OAH Chief ALJ assured the chairman that Principal ALJs were only temporarily involved in the "peer review" process as a short-term training measure. [Amend. Compl. ¶¶ 103-104]

22.     One year later, however, Principal ALJs were still reviewing ALJ decisions in each of OAH's divisions, and were still evaluating every ALJ.  Plaintiff privately disclosed that fact to staff of the Committee in February 2007 (a disclosure the Commission learned of on October 11, 2007). [*Id*.]

23.     After being publicly confronted again by the chairman of the Committee in February 2007, the OAH Chief ALJ finally removed Principal ALJs from their controlling role in the "peer review" system in most divisions of OAH in February 2007.  [Ex. 9]

24.     In his first 18 months as an ALJ plaintiff drafted and issued 45 decisions for publication by LEXIS, a national on-line legal research service.  During plaintiff's initial 18 months no other ALJ, however experienced, issued more than six decisions of publishable quality. [Ex. 6]   Additionally, based on plaintiff's performance during a two week training course at the National Judicial College in Reno, Nevada in September 2005, plaintiff was selected by its faculty for the to act as a course facilitator at an upcoming training. [*Id*.]

25.     In his only OAH evaluation, issued in November 2006, plaintiff received a rating of 3.0 out of a possible 3.0, when only objective standards are considered.  When subjective standards ("judicial temperament" and "team work") are also considered, plaintiff received a rating of 2.84 out of a possible 3.0.  [Ex. 7 & 8]  An ALJ who receives a rating of 2.5 or higher has met the annual performance standards applicable to his duties.  [Amend. Compl. ¶124]

26.     On November 1, 2006 plaintiff submitted an application to the Commission for reappointment to a ten year term at OAH.  [Amend. Complaint ¶ 142]

27.     The Chief ALJ's preparation of plaintiff's reappointment record was completed on March 2, 2007. [Amend. Complaint ¶¶ 147-149] After initially writing only that he did "not oppose the reappointment of Judge Pearson for a ten-year term," OAH Chief ALJ Butler clarified, in writing on March 8, 2007, that he *affirmatively* recommended that plaintiff be reappointed to a ten year term of office. [Ex.10]

28.     On March 21, 2007, Chief ALJ Butler purported to submit a "supplemental" record to the Commission. The over 200 page "supplement," and an accompanying narrative, accused plaintiff of incivility, unethical conduct, lack of collegiality, deficiencies in his legal analyses and claimed he received repeated "counseling." [Ex. 12]

29.     The "supplemental" record followed an e-mail that plaintiff circulated on March 9, 2007 to all ALJs at OAH (including defendant Butler). [Ex. 11]

30.     Plaintiff's March 9, 2007 e-mail read as follows:

**From:** Pearson, Roy (OAH)
**Sent:** Friday, March 09, 2007 10:10 AM
**To**: OAH-ALJs
**Subject:** FYI: THE RISK CALCULUS AT OAH

Colleagues:

Some of you have expressed interest in whether, despite my history at OAH of publicly "speaking truth to power," the Chief Judge would recommend my reappointment to a 10 year term.

You certainly take a risk at OAH when you stand on principle and expose wrongdoing, and you can certainly expect retaliation.  But if you compile a record that makes a retaliatory motive obvious you can at least make it difficult for CJ Butler to knife you.

The Chief Judge initially submitted a statement of neutrality regarding my reappointment request. However, when the Commission on the Selection and Tenure of Administrative Law Judges rejected it, and demanded he comply with the OAH Act, he was forced to submit a favorable recommendation for my reappointment.

I recognize that most of you don't believe you have the luxury of putting your job at risk by standing up for judicial independence, or any other fundamental ethical or legal principle at OAH. As an African American however, I am conscious, that the "risks" I take pale in comparison with the life and death consequences my for[e]bearers in struggle faced in speaking truth to power – when there were no laws on the books to even theoretically protect them.

If they could risk losing their lives, I can't justify being paralyzed by fear of losing a paycheck.

31.     On April 4, 2007, through defendant Peter Willner, the Commission invited plaintiff to a "discussion" on April 24, 2007, with no more of an explanation than that the Commission wished to have a "***preliminary*** discussion regarding your reappointment." [Ex. 13]

32.     On April 19, 2007 plaintiff provided the Commission with a memorandum on his rights and obligations under the D.C. Whistleblower Act and the OAH Code of Ethics. [Ex. 14]

33.     The first "preliminary discussion" with the Commission was scheduled for April 24, 2007.  Thereupon the Commission orally set another "preliminary discussion" for April 27, 2007.  And, on April 27, 2007, the Commission orally set yet another "preliminary discussion" for April 30, 2007 – a date falling two days before plaintiff's term of office expired. [Ex. 24]

34.     The April 24, 2007 "preliminary discussion" was scheduled for 8 pm.  However, it was after 10 p.m. when the Commission finally called plaintiff into its conference room, only to advise him that a new date would have to be set.  During that more than two hour delay the members of the Commission had dinner and then met, out of plaintiff's presence, with a number of Principal ALJs and the Deputy Chief ALJ from OAH.  [*Id*.]

35.      After its meeting with the OAH Principal ALJs and the Deputy Chief ALJ on April 24, 2007 the Commission did not advise plaintiff of what the Principal ALJs and Deputy Chief ALJ communicated to the Commission out of plaintiff's presence.  [*Id*.]

36.     On April 27, 2007 the Commission again did not advise plaintiff, in writing or orally, of any charges it had concluded might justify a denial of reappointment.  [*Id*.]  Its members, instead, generally discussed plaintiff's two year term with him, as well as an unfavorable April 26 Washington Post column about an unrelated public interest lawsuit plaintiff was prosecuting as a private attorney general.  [Aff./Decl. Of R. Pearson ¶ 12]

37.     In a meeting on the street after the April 27, 2007 meeting, Commissioner Valentine revealed to plaintiff that all of the Commissioners recognized that he was amply qualified for reappointment – far more qualified than most of the other ALJs who had thus far been reviewed and reappointed.  He admitted that for that reason the Commission had not served plaintiff with a notice of possible denial of reappointment, but had instead asked him to attend meetings to "preliminarily discuss his reappointment." [Amend. Compl. ¶163]

38.     Commissioner Valentine admitted that the Commission had only scheduled the "preliminary meetings" at the insistence of CJ Butler.  Nonetheless, he counseled plaintiff to

7

allow CJ Butler to save face with the Commission by apologizing to the Chief Judge. [Amend. Compl. ¶164]

39.    At the April 30th "preliminary discussion" the Commission again discussed plaintiff's public interest lawsuit, and plaintiff to rebuff an effort to have him abandon the lawsuit. Plaintiff extended an "apology" to the OAH Chief ALJ. [*Id.*]. Chairman Rigsby minimized any issue, referred to the highly publicized arrest/fining of D.C.  Superior Court Judge Susan Winfield, and expressed his expectation that plaintiff would be reappointed and go on to write landmark decisions in his second term.  [Aff./Decl. Of R. Pearson ¶ 13]

40.    Plaintiff's initial two year appointment expired at midnight on May 2, 2007. At about 2 pm. on that day plaintiff received a call from CJ Butler, who asked plaintiff to come to his office.  Deputy Chief Judge Mark Poindexter and OAH General Counsel Lisa Coleman were in CJ Butler's office when plaintiff arrived.  [Amend. Compl. at ¶173]

41.    CJ Butler asked plaintiff to read and sign a letter. The letter, signed by CJ Butler, indicated that plaintiff would be notified of the Commission's decision on how it would proceed with plaintiff's request for reappointment in the next **thirty days**. It stated that "pending the Commission's review of this matter, as provided in 6 DCMR 3705.26, I [CJ Butler] have decided that you will remain at OAH at your same salary grade and step and you will receive non-judicial assignments as determined by my office."  [Amend. Compl. at ¶174]

42.    Effective at midnight on May 2, 2007 plaintiff was removed from his position as an ALJ and became an attorney-advisor at OAH.  He was therefore unable to hear and decide cases or to avail himself of training and other perquisites and opportunities available to ALJs. [Amend. Compl. ¶176]

43.    CJ Butler took the position that plaintiff's attorney-advisor position could and would be terminated upon the issuance of the Commission's ruling on plaintiff's reappointment application.  [Amend. Compl. ¶177]

44.     On May 22, 2007, without seeking permission from the Commission, CJ Butler submitted a letter to the Commission purporting to withdraw his recommendation that plaintiff be reappointed.  [Amend. Compl. ¶178]

45.     The May 22, 2007 letter, instead, recommended that plaintiff not be reappointed. [Amend. Compl. ¶179]

46.     The Chief Judge had never previously purported to withdraw or submit a recommendation regarding an ALJ after the statutory deadline for doing so had expired. [Amend. Complaint at ¶181]

47.     Commissioner Lavine's term on the Commission expired on April 30, 2007. Nonetheless, a quorum sufficient to vote on plaintiff's application for reappointment existed at all times.  [Amend. Compl. ¶186]

48.     On June 4, 2007, because more than 30 days had passed, plaintiff formally inquired as to the status of his request for reappointment.  The Commission responded that it had granted Mayor Adrian M. Fenty's until-then undisclosed request that the Commission not act on plaintiff's reappointment application until the Mayor selected a Commissioner to fill the expired term of Commissioner Lavine.  [Amend. Compl. ¶190]

49.     On or about June 27, 2007 Mayor Fenty appointed defendant Anita Josey-Herring to fill the seat on the Commission formerly occupied by Commissioner Lavine.  [Amend. Compl.¶191]

50.     The Commission issued a notice to plaintiff on August 7, 2007 of a possible denial of reappointment.   [Amend. Compl. ¶197]

51.     The Commission's August 7, 2007 notice of a possible denial of reappointment was signed by all five defendants in this case.  [*Id*.]

52.     On August 22, 2007, plaintiff submitted a 22 page response to the August 7, 2007 notice from the Commission and requested an opportunity to appear before Commission at its meeting on September 26, 2007.  [Amend. Compl. ¶203]

53.     In his response plaintiff presented four reasons why he should be reappointed: (1) he had complied with the off-the-record agreement he reached with the Commission; (2) he was entitled to the benefit of the Chief Judge's March 8, 2007 favorable recommendation; (3) the August 7 notice of grounds for possible denial of reappointment relied on statutory provisions that do not apply to a reappointment and relied on documents that were not part of the record; and (4) the specific conduct complained of in the Commission's August 7 letter is authorized by the OAH Code of Ethics and/or the D.C. Whistleblower Statue.  [Amend. Compl. ¶205]

54.     Additionally, plaintiff asked the Commission what relevance the reference in their notice to his public interest lawsuit had to the reappointment process.  Plaintiff never received a substantive response to that inquiry. [Amend. Compl. ¶206]

55.     On October 4, 2007 the Commission formally met with witnesses regarding plaintiff's reappointment but denied plaintiff 's written request to attend the meeting.  [Amend. Compl. ¶207]

56.     On October 11 and October 15, 2007 the Commission afforded plaintiff a hearing at which plaintiff responded to the Commission's August 7, 2007 notice but was unable to learn of, or address, statements made to the Commission out of his presence by the witnesses who appeared before the Commission on October 4, 2007.  [Amend. Compl. ¶210]

57.     On October 1, 2007, plaintiff submitted a memorandum of law to the Commission on plaintiff's defense, under the D.C. Whistleblower Act and the OAH Code of Ethics.  [Amend. Compl. ¶212]

58.     During plaintiff's meeting with the Commission on October 11, 2007 the Commission voted on his request for leave to submit a memorandum to the Commission.  Each

of the five commissioners voted; including George C. Valentine and Tyrone T. Butler. [Aff./Decl. Of R. Pearson ¶ 17]

59.     On October 30, 2007, the Commission issued an eight page decision, with attachments, denying plaintiff's application for reappointment to a 10 year term.  [Ex. 27]

60.     The Commission's October 30, 2007 decision was signed by all five defendants in this case.  [*Id.*]

61.     OAH administrative law judges are currently paid a minimum salary of $129,325 per year, plus health insurance and other fringe benefits.

Respectfully submitted,


*/s/ Roy L. Pearson, Jr.*

Roy L. Pearson, Jr.               #955948
3012 Pineview Court, N.E.
Washington, D.C. 20018
Telephone: (202) 269-1191

Counsel for Plaintiff

11

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 13th day of June, 2009, a true and correct copy of the foregoing *Plaintiff's Motion And Request For Expedited Ruling On Motion For Partial Summary Judgment On Count III Of The Amended Complaint And For Injunctive Relief* has been served upon the following via ECF:

> Andrew J. Saindon, Esquire
> Assistant Attorney General
> Office of the Attorney General for the District of Columbia
> 441 4th Street, N.W.
> Sixth Floor South
> Washington, D.C. 20001
>
> *Counsel for all Defendants*

/s/ *Roy L. Pearson, Jr.*
Roy L. Pearson, Jr.     D.C. Bar No. 955948