UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ROY L. PEARSON, JR.** : | |
| : | |
| Plaintiff, : | |
| v. : | |
| : | |
| **DISTRICT OF COLUMBIA** : | |
| A Municipal Corporation, : | |
| : | |
| **TYRONE T. BUTLER** : | |
| In his official and individual capacities, : | Civil Action No. 08-cv-758 (ESH) |
| : | |
| **PETER M. WILLNER** : | |
| In his official and individual capacities, : | |
| : | |
| **ROBERT R. RIGSBY** : | |
| In his official and individual capacities, : | |
| : | |
| **ANITA JOSEY-HERRING** : | |
| In her official and individual capacities, : | |
| : | |
| **GEORGE C. VALENTINE** : | |
| In his official and individual capacities, : | |
| : | |
| Defendants. : | |
| : | |

## CORRECTED AFFIDAVIT/DECLARATION OF ROY L. PEARSON, JR.

DISTRICT OF COLUMBIA, ss:

I, Roy L. Pearson, Jr., *upon penalty of perjury*, do depose and state as follows:

1. I incorporate, by this reference, the sworn averments in plaintiff's Amended Complaint.

2. My entire legal career has been devoted to public interest work; primarily as a civil legal services lawyer, and as an administrator, in a federally funded citywide legal services program for the poor in the District of Columbia. For that reason I had decades of first hand experience with the chronically delayed and agency-biased administrative adjudication system that preceded the D.C. Office of Administrative Hearings.

3.      Because I devoted my legal career to public interest work before accepting an appointment as an ALJ, I was accustomed to working with colleagues who have high ideals, integrity and values and who are motivated by the public interest and not by money, the need for security or by an obsession with what will enhance their career opportunities.

4.      I am not at all interested in being a judge in appearance only; with some behind-the-scenes person pulling my strings and instructing me on how to rule.  The *function* of judging is what is important to me. And so I am interested in providing litigants with the qualities that I admire in a judge – industriousness, impartiality, imperviousness to pressure, ethical rectitude, sensitivity, independence and fidelity to the rule of law.

5.      As a result, I was motivated to pursue appointment as an Administrative Law Judge because the position vacancy announcement and the OAH Act plainly promised, and assured, decisional independence and a culture that valued and nourished the qualities I believe are essential in a judge.

6.      In the verified Amended Complaint I have described the culture, and my shock at the culture, I found at OAH in May of 2005, and how that culture forced me into the role of Whistleblower.  Peter Willner's response, in 2005, was to ask why I didn't resign if I was unhappy.

7.      The D.C. Whistleblower Act defines a "protected disclosure" as "***any*** disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee *reasonably believes* evidences " one of a number of illegal acts.  D.C. Code § 1-615.52(a)(6).  The use of the adjective "any" makes it absolutely clear that it is irrelevant what language an employee uses in making his or her disclosure to a supervisor or to an employee of a public body. However communicated, the disclosure is completely protected if: (1) it is not specifically prohibited by statute and (2) it is a disclosure that the employee reasonably believes evidences one of the abuses listed in § 1-615.52(a)(6).  *See also* D.C. Code § 1-615.58(1) (D.C. gov't employees have an unfettered right to express their opinions); D.C.

Code § 1-615.54(c) ("... a violation of § 1-615.53 constitutes a *complete* affirmative defense for a whistleblower to a prohibited personnel action ..."); *cf. Greenspan v. Dept. of Veterans Affairs*, 464 F.3d 1297, 1305 (Fed. Cir. 2006).

8. In this regard, and others, the D.C. Whistleblower Statute is far more expansive and protective of employees of the District government than federal whistleblower protections are of federal employees. *Cf.* 5 U.S.C. § 2302 and 5 U.S.C. § 1221(e). In fact, the 1998 amendments to the D.C. Whistleblower Act were drafted in large part by the Government Accountability Project (a watchdog group for whistleblowers), and the amendments were intended to ensure that the gaps, ambiguities and deficiencies that exist in the federal law were not repeated in the District's Whistleblower Statute. Attachment C, Fiscal Impact Statement at 1 (April 27, 1998), Report of the Committee on Government Operations, Council of the District of Columbia, on Bill 12-191, April 28, 1998.

9. The legislative history of the District of Columbia Whistleblower Amendment Act of 1998 reflects the D.C. Council's explicit consideration of, and rejection of, all efforts to make Whistleblower protections a partial or conditional defense that would not apply (or would be outweighed) if an employee's language or conduct in making his disclosure would otherwise justify disciplinary action. Report of the Committee on Government Operations, Council of the District of Columbia, on Bill 12-191, April 28, 1998, at 8 (rejecting recommendation by the D.C. Director of Personnel that the word "complete" be deleted from the phrase "complete affirmative defense" in what became D.C. Code § 1-615.54(c)). *See also id.* at Attachment C, Testimony of Larry A. King (Director of Personnel) at 4 ("[A]s written, the provision could be misused by providing employees with the opportunity to claim 'a complete affirmative defense' whenever they have committed an act of misconduct for which they also have made a protected disclosure; or when a legitimate personnel action is brought against them for cause. Thus, the Executive recommends that the word 'complete' be deleted from the bill."); *see also* Attachment C,

Testimony of Professor Robert Vaughn at 3 ("This language may be more expansive than the federal law because it makes clear that if the employee's disclosure raises issues about the management and organization of the office in which the employee works, that the employee can not be retaliated against (for example through transfer) on the grounds that an agency is only responding to the conditions disclosed. The reasons for the action would not be 'independent' of the protected disclosure. This interpretation, however, creates some difficulties when the employee's disclosures show that the employee was guilty of misconduct that would justify disciplinary action.")

10. Despite these thoughtful policy arguments against providing complete and unconditional Whistleblower protection the Council rejected them and refused to condition the Whistleblower defense on anything except the requirement: (1) that a protected disclosure not be specifically prohibited by statute and (2) that the disclosure be one the employee reasonably believed evidences one of the abuses listed in § 1-615.52(a)(6). Thus, a whistleblower need not concern him or herself with after-the-fact scrutiny of every pronoun, adjective and metaphor used in communicating a protected disclosure. The statute requires <u>prompt</u> disclosures.

11. George Valentine was appointed to the Commission between March 22, 2007 and April 3, 2007 as the designee of the District of Columbia attorney general.

12. Commission members briefly raised the issue of my public interest lawsuit at my "preliminary discussion" with them on April 27, 2007. More time was spent on the topic at our "preliminary discussion" on April 30, 2007. In response to their questions I corrected misleading statements and misstatements about the lawsuit in the Washington Post and fully answered their questions about the purpose, history and substance of the lawsuit. And I explained my expertise in the area of consumer law.

13. On April 30, 2007, Chief ALJ Butler responded to the apology I tendered to him, at the urging of Commissioner Valentine, by insisting to the Commission that it was not genuine.

Chairman Rigsby, however, stated that the issue of my relations with the Chief Judge was not a substantial matter. He made reference to the highly publicized arrest/fining of D.C. Superior Court Judge Susan Winfield as a comparison. He then stated his expectation that I would go on to write landmark decisions in my second term. I then shook hands with each Commissioner.

14. I generally had excellent relations with all OAH staff and ALJs. And even though I had philosophical differences with the Chief ALJ, Deputy ALJ, and three of the Principal ALJs over the dependent and politicized culture at OAH [and when they felt they could mask it, they retaliated against me], by and large, we had a productive and even cordial relationship on the surface. Because ALJs have offices at four different locations I only saw the Deputy ALJ, and perhaps Principal ALJ Mahon in passing on a daily basis. The Chief ALJ traveled extensively.

15. I proposed, coordinated and took the only group picture of the OAH ALJs in 2006 and I made it a point to meet with each ALJ, in their office or over lunch, after they or I began work at OAH. There is no ALJ at AOH with whom I did not have a relatively leisurely one-on-one introductory conversation within a short time after I began or they began. I made it a point to do so; particularly because our offices were spread so far apart.

16. I also had excellent relations with OAH support staff. As should be apparent, I would not and could not have spent almost 30 years as a lawyer and administrator with a citywide legal services program for the poor in a city as diverse as the District of Columbia if I did not enjoy people, value relationships and have considerable people skills.

17. During my meeting with the Commission on October 11, 2007 the Commission voted on my request for leave to submit a memorandum. Each of the five commissioners voted; including George C. Valentine and Tyrone T. Butler. Chairman Rigsby insisted they do so, and it was clear to me – and it is confirmed by every Commission-signed document in this case -- that it was the established policy of the Commission to have non-voting members deliberate and vote on every matter that came before the Commission.

18. On October 11, 2007, the Commission refused my request to be advised of the testimony of persons who appeared as witnesses before the Commission regarding my reappointment application on October 4, 2007. The Commission never mentioned to me on October 11 or 15 that Chief ALJ Butler was among those who testified on October 4, 2007.

19. As a consequence, on October 11 and October 15, 2007, I had no way of knowing what I could say, or what witnesses I should call, to rebut the secret testimony the Commission heard on October 4, 2007.

20. Because of the Commission's secrecy I was not cued to the importance of presenting witnesses and other specific rebuttal evidence demonstrating my excellent relations with OAH staff and other non-supervisory ALJs. Nor was I cued to present evidence that it was I who suggested and took ALJ Little to lunch on the occasion referred to in the Commission's decision. Nor was I given an opportunity to correct ALJ Little's recollection of our conversation at that lunch and to detail our subsequent conversations and congenial relationship on and off the job over the 18 month period that followed our lunch.

21. Because of the Commission's curtain of secrecy, I could not impeach Judge Little with her *volunteered* assurance to me that she *supported* my reappointment, or with the reasons why she would now seek to curry favor with the Chief ALJ at the expense of telling the truth. Nor was I cued to present evidence that Principal ALJ Mahon agreed to write a letter to the Commission supporting my reappointment -- until Chief ALJ Butler barred her from doing so.

22. The OAH Principal ALJs and the Deputy Chief ALJ – who were the subject of my Whistleblower disclosures in 2005, 2006 and 2007 -- were as far removed from being unbiased witnesses as is imaginable. The Commission was on notice that I placed their credibility at issue by my April 19, 2007, August 22, 2007 and October 1, 2007 submissions to the Commission about whistleblower incidents involving the Chief, Deputy Chief and Principal ALJs. Despite flagging credibility as an issue, I was deprived of an opportunity to cross examine them.

23. The public interest lawsuit that I filed with the D.C. Superior Court, *Pearson v. Chung*, C.A. No. 4302-05, remained pending before the D.C. Superior Court, or before the D.C. Court of Appeals, from June 2005 until March 2009. And so it was pending when Chief ALJ Butler was interviewed by the Legal Times in August 2007.

24. Anita Josey-Herring has been a District of Columbia government employee since at least June 27, 2007.

25. My only income since being removed from the OAH payroll in 2007 has been receipt of extended unemployment compensation benefits, now totaling $382 per week, that will end on September 2, 2009. After that date I will have no income to meet my expenses, and will depend upon food stamps to purchase any food. Even now, my minimum monthly expenses (rent, gas, electricity, telephone, Internet, groceries, transportation, stamps, litigation-related expenses and professional expenses) exceed my income from unemployment compensation by an average of $400 per month. As a result, I could not afford to turn on the heat this winter, nor will I be able to turn on air conditioning this summer, except to accommodate guests. I do not have a cable subscription or anything except stripped down basic telephone service.

26. My assets, including clothing and household furnishings, total less than $5,000. I have been insolvent for at least one year and have defaulted on all of my debts to credit card companies. I have no health insurance. I have had to forego medical check-ups and treatment for illness and injuries since 2007. My eyesight has deteriorated since 2007 but I have been unable to afford to replace my eyeglasses. I cannot afford to take depositions or incur any other significant expense to prosecute this case. I expect to exhaust my modest savings in October 2009, after my unemployment compensation ends. I may have to abandon prosecuting this lawsuit at that point if my request for a preliminary injunction is not granted by October 2009.

27. I cannot afford to replace or to even have my seven year old computer checked. And so I waste many hours because it repeatedly freezes or shuts down when I attempt to reach

the Internet, transmit document over the Internet, or type documents for this case. I cannot afford to subscribe to an on-line electronic research service to respond to motions and oppositions in this case efficiently. I must travel to Catholic University Law School Law Library to do any meaningful research. I do not own an automobile.

28.     My prospects for employment in the legal field are non-existent. I have had no positive responses to the dozens of employment applications and résumés I have sent out since 2007. No one is interested in hiring a former administrative law judge who is suing his last employer to be returned to his position. Because of the time that prosecution of this lawsuit consumes it would be impossible for me to work a full-time job in any event. Over the past twelve months I have averaged 70-80 hours a week researching the relevant law and prosecuting this case.

29.     Prior to filing this motion I spoke by telephone with defendants' counsel on June 4, 2009, to advise him that I would scan and e-mail to him each of the exhibits I anticipated relying on in this motion over the weekend of June 6-7. I asked that he review the exhibits and advise whether the defendants were willing to stipulate to either the identity, authenticity, or admissibility for summary judgment purposes of any of the exhibits.

30.     On June 7, 2009, I scanned and sent exact duplicates of the 30 exhibits listed below to counsel for plaintiff, along with the numbers and descriptions of each exhibit that are listed on pg. 2 of the Table Of Contents for this motion. We subsequently agreed, on June 8, 2009, to discuss the proposed stipulations by telephone on June 9, 2009.

31.     On June 9 defendants' counsel indicated that his clients were unwilling to stipulate to either the identity, authenticity (as business or public records), or admissibility for summary judgment purposes of any of the exhibits provided to their counsel for that purpose. Hence the recital below.

32. Exhibit 1 is a 7 page document. It is a written copy of the testimony provided by defendant Tyrone Butler to the D.C. Council's Committee on the Judiciary, at his confirmation hearing on June 25, 2003. His testimony regarding decisional independence for OAH ALJs is admissible as the admission of a party-opponent.

33. Exhibit 2 is a 12 page document, entitled the Code Of Ethics For Office of Administrative Hearing Administrative Law Judges. It was adopted on August 31, 2004 and amended on June 15, 2005. I maintained in the ordinary course of business as a business record after receiving it from the then-Executive Director of the Office of Administrative Hearings on May 2, 2005.

34. Exhibit 3 is a 3 page document. It is an excerpt of the written testimony provided by defendant Tyrone Butler to the D.C. Council's Committee on the Judiciary, at the Performance Oversight hearing for the Office of Administrative Hearings on March 7, 2005. <u>It is a public record</u> and his testimony regarding adoption of the Code of Ethics For OAH Administrative Law Judges and the number of ALJs at OAH is admissible as admissions of a party-opponent. I maintained in the ordinary course of business as a business record after <u>requesting and receiving it from the D.C. Council's Legislative Support Office</u>.

35. Exhibit 4 is a 1 page document. It is a print out of the classified advertisement placed with American Lawyer Media by the Commission that was posted on September 13, 2004. I maintained in the ordinary course of business as a business record after receiving it from another OAH ALJ on or about October 2005.

36. Exhibit 5 is a 20 page document. It is a copy of the testimony I provided to the D.C. Council's Committee on the Judiciary, at the Performance Oversight hearing for the D.C. Office of Administrative Hearings on February 23, 2006. The attachments to it are not included with the exhibit. I maintained in the ordinary course of business as a business record after preparing it.

37. Exhibit 6 is a 13 page document. It is a copy of the application for reappointment I prepared, signed and submitted to the Commission on November 1, 2006. I maintained it in the ordinary course of business as a business record thereafter.

38. Exhibit 7 is an 11 page document. It is a copy of an ALJ Performance Evaluation Form for Roy Pearson, signed by Deputy Chief ALJ Poindexter and Principal ALJs Janet Mahon and John Dean on November 13, 2006, and signed by me on November 14, 2006. I maintained it in the ordinary course of business as a business record after receiving a copy on November 14 2006.

39. Exhibit 8 is an 8 page document, and is a copy of a memorandum on the subject of "Response To November 13, 2006 Evaluation." The attachments to it are not included with the exhibit. It is dated December 13, 2006 and signed by me. I printed out, signed and copied the original on December 13 2006, and maintained it in the ordinary course of business as a business record thereafter.

40. Exhibit 9 is a copy of a 1 page document, with the caption "Peer Review Assignments (As of February 21, 2007). It was prepared by OAH Principal ALJ John Dean for OAH ALJs who heard cases brought by the Department of Public Works. I maintained it in the ordinary course of business as a business record after receiving a copy from Judge Dean around February 28, 2007.

41. Exhibit 10 is a copy of a two page letter from Chief ALJ Tyrone Butler to the Commission regarding "Reappointment of Judge Roy L. Pearson, Jr." It is dated March 8, 2007. I maintained it in the ordinary course of business as a business record after receiving a copy from Butler on that date.

42. Exhibit 11 is a copy of a 1 page e-mail from Roy Pearson to OAH ALJs. It is dated March 9, 2007. I printed it out and maintained it in the ordinary course of business as a business record after preparing and transmitting it on that date.

43. Exhibit 12 is a copy of a seven page letter from Chief ALJ Tyrone Butler to the Commission regarding "Reappointment of Judge Roy L. Pearson, Jr." It is dated March 21, 2007. The attachments to it are not included with the exhibit. I maintained it in the ordinary course of business as a business record after receiving a copy from Butler on that date.

44. Exhibit 13 is a copy of a 1 page e-mail from Peter Willner to Roy Pearson. It is dated April 4, 2007. I printed it out and maintained it in the ordinary course of business as a business record after receiving it on that date.

45. Exhibit 14 is a 15 page document. It is a copy of a memorandum I prepared and submitted to the Commission on April 19, 2007. The attachments to it are not included with the exhibit. I maintained in the ordinary course of business as a business record after preparing and submitting it to the Commission.

46. Exhibit 15 is a 1 page document. It is a copy of a Press Release that I prepared and placed inside two open brown klasp envelopes; one taped to the outside of my office door at OAH and another taped to the entrance door to my home on or about April 27, 2007. I maintained copies in the ordinary course of business as a business record thereafter.

47. Exhibit 16 is a copy of a 2 page letter from the Commission to Roy Pearson. It is dated May 2, 2007. I maintained it in the ordinary course of business as a business record after receiving it on that date.

48. Exhibit 17 is a copy of a 1 page form, captioned Notification Of Personnel Action. It is dated May 2, 2007. I maintained it in the ordinary course of business as a business record after receiving it on that date.

49. Exhibit 18 is a copy of a 3 page e-mail from Roy Pearson to the Commission, with an attachment. It is dated May 2, 2007. I printed it out maintained it in the ordinary course of business as a business record after receiving it on that date.

50. Exhibit 19 is copy of a 4 page letter from Tyrone Butler to Roy Pearson to the Commission. It is dated May 22, 2007. I maintained it in the ordinary course of business as a business record after receiving it on that date.

51. Exhibit 20 is a copy of 1 page e-mail from Roy Pearson to the Commission. It is dated June 4, 2007. I printed it out maintained it in the ordinary course of business as a business record after that date.

52. Exhibit 21 is a copy of 1 page letter from Mayor Fenty to the Commission. It is dated May 7, 2007. I maintained it in the ordinary course of business as a business record after receiving it from Tyrone Butler on or around June 8, 2007.

53. Exhibit 22 is a 4-page print-out from the website of the Legal Times of an article that appeared on page 4 of the Aug. 6, 2007 edition of the Legal Times, written by Brendan Smith and entitled, *Judge Who Sued Over Lost Pants May Lose Reappointment*. It is not offered for the truth of the statements in it. It is offered to show that defendants Tyrone Butler and Robert Rigsby consented to interviews to criticize plaintiff's reappointment application, and plaintiff's public interest lawsuit, while those matters were pending.

54. Exhibit 23 is 5 pages, and is a letter from the Commission to Roy Pearson. It is dated August 7, 2007. I maintained it in the ordinary course of business as a business record after receiving it on that date.

55. Exhibit 24 is 22 pages, and is a copy of a memorandum I prepared, signed and hand-delivered to the chambers of Judge Robert Rigsby, in his capacity as chairman of the Commission, on August 22, 2007. I maintained this file-stamped copy in the ordinary course of business as a business record after having it stamped on that date.

56. Exhibit 25 is 2 pages, and is a letter from the Commission to Roy Pearson. It is dated October 1, 2007, but I received it from Chief ALJ Butler by hand on October 2, 2007. I

maintained it in the ordinary course of business as a business record after receiving it on that date.

57.    Exhibit 26 is a 1 page e-mail from Roy Pearson to the Commission. It is dated October 3, 2007. I printed it out and maintained it in the ordinary course of business as a business record after that date.

58.    Exhibit 27 is 10 pages, and is a letter and attachments from the Commission to Roy Pearson. It is dated October 30, 2007. I maintained it in the ordinary course of business as a business record after receiving it on that date.

59.    Exhibit 28 is copy of a 3 page letter from Tyrone Butler to Roy Pearson. It is dated October 30, 2007. I maintained it in the ordinary course of business as a business record after receiving it on that date.

60.    Exhibit 29 is 11 pages, and is a court-stamped copy of the *Petition For Rehearing Or Rehearing En Banc* I filed with the D.C. Court of Appeals in *Pearson v. Chung*, Appeal No. 07-CV-872 on December 23, 2008. It is a public record, as well as a business record that I maintained in the ordinary course of business as a business record after filing it with the D.C. Court of Appeals on December 23, 2008.

61.    Exhibit 30 is 3 pages, and is an excerpt from a copy of a letter dated March 5, 2009, signed by OAH Chief ALJ Tyrone Butler, in which he responds to questions from the D.C. Council's Committee on the Judiciary and Public Safety. The letter was provided to me as an attachment to an e-mail from Brian Moore, legislative counsel to the D.C. Council's Committee on the Judiciary and Public Safety. It is a public record. Additionally, Butler's statements in it regarding the salary and fringe benefits of OAH ALJs is admissible as the admission of a party-opponent.

                                                              */s/ Roy L. Pearson, Jr.*
                                                                  Roy L. Pearson, Jr.