**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
**ROY L. PEARSON, JR.,**                   )
                                                        )
                 **Petitioner,**              )
                                                        )
          **v.**                                    )   **Civil Action No. 08-758 (ESH)**
                                                        )
**DISTRICT OF COLUMBIA,** *et al.*,     )
                                                        )
                                                        )
                 **Respondents.**              )
_____)

## <u>MEMORANDUM OPINION</u>

Proceeding *pro se*, plaintiff Roy L. Pearson, Jr., brings this lawsuit against the District of

Columbia ("the District"), Hon. Tyrone T. Butler, Chief Administrative Law Judge of the Office

of Administrative Hearings ("Chief ALJ Butler"), and four members of the Commission on

Selection and Tenure of Administrative Law Judges of the Office of Administrative Hearings

(the "Commission") – Peter M. Willner; Hon. Robert R. Rigsby, Associate Judge for the D.C.

Superior Court; Hon. Anita Josey-Herring, Associate Judge for the D.C. Superior Court; and

George C. Valentine, Deputy Attorney General for the District (collectively, "the Commission

Members").

Before the Court are defendants' renewed motion to dismiss, or alternatively, for

summary judgment (Dkt. No. 16) and plaintiff's opposition thereto (Dkt. No. 23); plaintiff's

motion for expedited ruling, motion for partial summary judgment on Count III of the amended

complaint, and motion for preliminary injunction (Dkt. No. 26) and defendants' opposition

thereto (Dkt. No. 29).  For the reasons stated below, the Court will grant the motion to dismiss

1

Counts I, II, and III and will decline to exercise supplemental jurisdiction over plaintiff's

remaining state law claims (Counts IV and V).

## STANDARD

A case must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure

to state a claim upon which relief can be granted if the complaint does not plead "enough facts to

state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).   The allegations in plaintiff's

complaint are presumed true at this stage and all reasonable factual inferences must be construed

in plaintiff's favor. *Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375

(D.C. Cir.1995).

However, "the court need not accept inferences drawn by plaintiffs if such inferences are

unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d

1271, 1276 (D.C. Cir. 1994).   "Something stated as fact does not make it fact." *Herbage v.

Meese*, 747 F. Supp. 60, 65 (D.D.C. 1990), *aff'd without op.*, 946 F.2d 1564 (D.C. Cir. 1991).

"Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal*, 16

F.3d at 1276; *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (explaining that

courts need not consider wholly conclusory statements for which no supporting evidence is

offered); *Herbage*, 747 F. Supp. at 65 ("A plaintiff's bare conclusions of law, or sweeping and

unwarranted averments of fact, will not be deemed admitted for purposes of a motion to

dismiss.") (internal quotation marks omitted).

On a motion to dismiss, the Court may consider "the facts alleged in the complaint,

documents attached as exhibits or incorporated by reference in the complaint," *Gustave-Schmidt

v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), or documents "upon which the plaintiff's

complaint necessarily relies" even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss. *Hinton v. Corrections Corp. of Am.*, __ F. Supp.2d __, 2009 WL 1636100, at *1 (D.D.C. 2009) (internal quotation omitted); *see also Marshall v. Honeywell Technology Solutions, Inc.*, 536 F.Supp.2d 59, 65 (D.D.C.2008) ("[W]here a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion [to dismiss] to one for summary judgment.") (internal quotation and citation omitted).[1]

In this case although plaintiff is proceeding *pro se*, he is a lawyer with a law degree from Northwestern University Law School and nearly thirty years of legal experience, including twenty-five years of litigation experience for the D.C. Neighborhood Legal Services Program and two years of service as an administrative law judge. He therefore cannot be heard to complain that he should receive the same treatment as a *pro se* litigant. Moreover, even a "*pro se* complaint, like any other, must present a claim upon which relief can be granted by the court." *Henthorn v. Dept. of Navy*, 29 F.3d 682, 684 (D.C. Cir. 1994).

## FACTUAL BACKGROUND

Plaintiff filed this action against the District, Chief ALJ Butler, and the Commission Members for damages and declaratory and injunctive relief, claiming, *inter alia*, that the

---

[1] To reach its decision in this case, the Court has relied on the amended complaint and documents referenced therein, including Defs.' Ex. 2 (Plaintiff's memorandum to Chief ALJ Butler and OAH ALJs) (referred to in Amd. Compl. ¶ 95), Defs.' Ex. 3 (Plaintiff's e-mail to Commission) (referred to in Amd. Compl. ¶¶ 98-99), Defs.' Ex. 4 (Plaintiff's letter to the Mayor) (referred to in Amd. Compl. ¶ 113), Defs.' Ex. 6 (Plaintiff's testimony before the D.C. Council) (referred to in Amd. Compl. ¶¶ 101-02), Defs.' Ex. 7 (Plaintiff's reappointment application) (referred to in Amd. Compl. ¶ 142), Defs.' Ex. 8 (Chief ALJ Butler's submission to the Commission) (referred to in Amd. Compl. ¶¶ 146, 149), Defs.' Ex. 9 (Chief ALJ Butler's recommendation of plaintiff) (referred to in Amd. Compl. ¶ 149), Defs.' Ex. 11 (Plaintiff's submission to the Commission) (referred to in Amd. Compl. ¶ 159), Defs.' Ex. 12 (Chief ALJ Butler's supplement to the Commission) (referred to in Amd. Compl. ¶ 158), Defs.' Ex. 13 (Commission's notice of possible denial) (referred to in Amd. Compl. ¶¶ 199-200), Defs.' Ex. 14 (Plaintiff's submission to the Commission) (referred to in Amd. Compl. ¶¶ 203-06), and Defs.' Ex. 15 (Commission's decision) (referred to in Amd. Compl. ¶¶ 216-20).

Commission's decision not to reappoint him to a ten-year term of service as an Administrative

Law Judge ("ALJ") violated his constitutional and statutory rights to report his supervisors'

misconduct and to file private lawsuits without fear of retaliation.

## I.      Laws Governing the Selection and Tenure of ALJs

The Office of Administrative Hearings Establishment Act ("OAH Act"), D.C. Law. 14-

76, 48 D.C. Reg. 11442 (effective March 6, 2002), *codified as amended at* D.C. CODE § 2-

1831.01 *et seq.*, established the Commission on Selection and Tenure of Administrative Law

Judges of the Office of Administrative Hearings.[2]   *See* D.C. CODE § 2-1831.06.   The

Commission has "final authority to appoint, reappoint, discipline, and remove Administrative

Law Judges."   *Id.* at § 2-1831.06(b).   The Commission is also empowered to "amend or repeal, in

whole or in part, or may add to" the rules "govern[ing] the process of selecting Administrative

Law Judges."   *Id.* at §§ 2-1831.11(b), (d).

Eligible and qualified ALJs are appointed, after an application and interview process, by

an affirmative vote by a majority of the voting members of the Commission.   D.C. CODE § 2-

1831.08(b); 6 D.C. CODE MUN. REGS. § 3701.   The Commission is also charged with

determining whether an ALJ seeking reappointment "has satisfactorily performed the

responsibilities of his or her office and is likely to continue to do so."   6 D.C. CODE MUN. REGS.

§ 3705.21.   In doing so, the Commission "may seek any information concerning an applicant that

will assist it in determining whether the applicant satisfies any of the standards of this Chapter."

*Id.* at § 3703.7; *see also* D.C. CODE § 3703.8 ("No person may be appointed or re-appointed to

any term as an Administrative Law Judge who fails to provide any necessary release or fails to

---

[2] The Commission consists of three voting members – one appointed by the Mayor of the District, one
appointed by the Chairman of the D.C. Council (with the approval of a majority of the Council), and one
appointed by the Chief Judge of the D.C. Superior Court.   D.C. CODE § 2-1831.07(a).   The Attorney
General, or his or her designee, and the Chief ALJ of OAH serve as non-voting, *ex officio* members of the
Commission.   *Id.*

cooperate in any other way with the efforts of the Commission or any of its designees to obtain any of the information described in section 3703.7.").

Under the applicable regulations, the Commission must provide the ALJ seeking reappointment an opportunity to "appear and be heard at the meeting" provided that he or she makes a timely request.  6 D.C. CODE MUN. REGS. § 3705.19.   "In its discretion, the Commission may permit other persons to testify at the meeting, either in support of, or in opposition to, the request for reappointment."  *Id.*  "The Commission's decision on whether to reappoint the Administrative Law Judge shall be final, and a decision not to reappoint an Administrative Law Judge shall not be deemed to be disciplinary action."  *Id.* at § 3705.23.

## II.    Plaintiff's Initial Term at OAH

On March 29, 2005, plaintiff was appointed to an initial term of office as an ALJ at the Office of Administrative Hearings ("OAH").  His initial term began on May 2, 2005, and was set to expire two years later, on May 2, 2007.

Within his first few weeks in office, plaintiff began expressing discontent with OAH's operating procedures.[3]  On June 20, 2005, plaintiff wrote and distributed to Chief ALJ Butler and his fellow ALJs a nineteen-page memorandum questioning OAH's use of a "peer review" system.  (Amd. Compl. ¶ 95; Defs.' Ex. 2.)  According to plaintiff, the peer review system, whereby senior ALJs review and comment upon other ALJs' opinions, "appeared to violate the OAH Act, the D.C. Administrative Procedures Act and the OAH Code of Judicial Ethics." (Amd. Compl. ¶ 95.)[4]

---

[3] "[F]rom the outset of his term of office plaintiff occasionally disagreed with 'supervising' Principal ALJs . . . on the law" (Amd. Compl. ¶ 88), and he states that he experienced "widespred upheaval and dissatisfaction" during his first year at OAH.  (Defs.' Ex. 14 at 3.)

[4] *But see* D.C. CODE §§ 2-1831.05(a)(8) – (b)(11) (authorizing Chief ALJ to "[m]onitor and supervise the quality of administrative adjudication," and to "[i]mplement a program for ongoing quality assurance and performance review; provided, that no such review shall require that an outcome in any case be altered").

On July 18, 2005, after becoming "increasingly frustrated in [his] efforts to settle in and to begin making a meaningful contribution towards achieving OAH's mission," plaintiff sent a lengthy e-mail to the Commission, requesting that it provide an advisory ethical opinion on the peer review process.  (*Id.* ¶¶ 98-99; Defs.' Ex. 3.)  He also sent the Commission a copy of his nineteen-page June 2005 memorandum challenging the peer review system.  (Amd. Compl. ¶ 99.)  The Commission ultimately declined to take any action.  (*Id.* ¶ 100.)

On July 21, 2005, plaintiff sent a letter to the Mayor regarding defendant Chief ALJ Butler.  (Amd. Compl. ¶ 113; Defs.' Ex. 4.)  In the letter, plaintiff asserted that Chief ALJ Butler had engaged in "unprofessional, unethical and threatening conduct" and had violated the D.C. Whistleblower Act.[5]  Plaintiff requested an inquiry into whether good cause existed for Chief ALJ Butler's removal.  The Mayor's office ultimately declined to take action against Chief ALJ Butler.[6]  (*See* Defs.' Ex. 5.)

On February 13, 2006, plaintiff, still displeased with internal operations at OAH, provided oral and written testimony to the Judiciary Committee of the D.C. Council on "Proposed Amendments to Clarify and Strengthen Decisional Independence for Administrative Law Judges in 'the Office of Administrative Hearings Establishment Act of 2001.'"  (Amd. Compl. ¶ 101; Defs.' Ex. 6 at 1.)  Plaintiff testified that a "secret and misnamed 'peer review' system" existed at OAH that, in his opinion, violated the law.  (Amd. Compl. ¶ 102.)

---

[5] He also claimed that Chief ALJ Butler's "misconduct . . . reveal[ed] deeply rooted character, judgment and ethical deficiencies."  (Defs.' Ex. 4 at 1; *see also id.* (asserting that OAH is "a leaderless office, approaching free fall"); *id.* (referring to Chief ALJ Butler's "corrupt ethics, demonstrably poor judgment and failed leadership"); *id.* at 4 (accusing Chief ALJ Butler of "astoundingly inappropriate conduct" and a "gangsta effort" to intimidate plaintiff); *id.* at 5 (stating that Chief ALJ Butler's "Mafioso-style of 'leadership,' his poor thinking and thinking and judgment, and his lack of professionalism and ethics, does not begin to describe his leadership deficiencies").

[6] The Mayor's office concluded, "[t]he alleged conduct [by Chief ALJ] was not illegal, it did not have the effect of impairing the operations of the OAH, and, without more, it does not warrant the Chief Judge's removal from office."  (Defs.' Ex. 5 at 4-5.)

### III.   Plaintiff's Reappointment Proceedings

On November 1, 2006, plaintiff submitted a statement to the Commission requesting reappointment to a ten-year term as an ALJ to begin on May 2, 2007.  (*Id.* ¶ 142; Defs.' Ex. 7; *see also* 6 D.C. CODE MUN. REGS. § 3705.)  The Commission published notice of plaintiff's statement in the D.C. Register and sought comments on plaintiff's reappointment.  *See* 53 D.C. REG. 9265 (Nov. 10, 2006).

On March 2, 2007, as required by law, Chief ALJ Butler submitted materials to the Commission regarding plaintiff's suitability for reappointment.  (Amd. Compl. ¶¶ 146, 149; Defs.' Ex. 8; *see also* D.C. CODE § 2-1831.10(b); 6 D.C. CODE MUN. REGS. § 3705.4.)  At that time, Chief ALJ Butler indicated that he did "not oppose" the reappointment of plaintiff, but he noted some areas of concern.  (Defs.' Ex. 8A at 1-2 (noting "recent complaints from litigants concerning [plaintiff's] judicial demeanor during hearings, and of inconsistencies in legal analyses," stating plaintiff had "some significant challenges transitioning to the environment . . particularly with regard to the tonality of his communications and his relationships with certain of his OAH colleagues," and stating plaintiff's performance evaluation revealed needed improvement in "judicial temperament" and "teamwork").

On March 8, 2007, after the Commission asked Chief ALJ Butler to clarify whether he affirmatively supported plaintiff's reappointment, Chief ALJ Butler stated that he would recommend plaintiff for reappointment "[b]ecause I believe that [plaintiff] has demonstrated a willingness to attempt to address [my] concerns going forward."  (Defs.' Ex. 9 at 1; Amd. Compl. ¶ 149.)

The following day, on March 9, 2007, plaintiff sent a global e-mail to all ALJs at OAH encouraging them to "speak[] truth to power" while "compil[ing] a record" that will "make it difficult for CJ Butler to knife [them]."[7]  (Amd. Compl. ¶¶ 151-52; Defs.' Ex. 12 at 2.)

The Commission requested supplemental information from Chief ALJ Butler regarding his initial concerns about plaintiff's reappointment.  In response, on March 21, 2007, Chief ALJ Butler submitted additional materials.  (Amd. Compl. ¶ 158; Defs.' Ex. 10.)

In April and May 2007, a private lawsuit filed by plaintiff two years earlier in D.C. Superior Court began to attract national attention and criticism.  (Amd. Compl. ¶ 171.)  In that case, plaintiff sought approximately $65 million dollars in damages relating to a pair of pants that had been allegedly misplaced by a small dry cleaners establishment in Washington, DC.  *See Pearson v. Chung et al.*, Dkt. No. 05 CA 4302.

---

[7] The email stated,

> Colleagues:
>
> Some of you have expressed interest in whether, despite my history at OAH of publicly "speaking truth to power," the Chief Judge would recommend my reappointment to a 10 year term.
>
> You certainly take a risk at OAH when you stand on principle and expose wrongdoing, and you can certainly expect retaliation.  But if you compile a record that makes a retaliatory motive obvious you can at least make it difficult for CJ Butler to knife you.
>
> The Chief Judge initially submitted a statement of neutrality regarding my reappointment request.  However, when the Commission on the Selection and Tenure of Administrative Law Judges rejected it, and demanded he comply with the OAH Act, he was forced to submit a favorable recommendation for my reappointment.
>
> I recognize that most of you don't believe you have the luxury of putting your job at risk by standing up for judicial independence, or any other fundamental ethical or legal principle at OAH.  As an African American however, I am conscious, that the "risks" I take pale in comparison with the life and death consequences my forbearers in struggle faced in speaking truth to power – when there were no laws on the books to even theoretically protect them.
>
> If they could risk losing their lives, I can't justify being paralyzed by fear of losing a paycheck.

(Defs.' Ex. 12 at 2.)

On or about April 19, 2007, plaintiff submitted a fifteen-page written response to the Commission, addressing Chief ALJ Butler's March 21 submission.  (Amd. Compl. ¶ 159; Defs.' Ex. 11.)

Members of the Commission met with plaintiff on April 24, 27, and 30, 2007, to discuss his possible reappointment.  (Amd. Compl. ¶¶ 160-170.)  At the April 27 meeting, plaintiff stated that he would apologize to the ALJs for sending the March 9, 2007 e-mail, which he said "lapsed back into 'unnecessary and derogatory references to the Chief Judge'" and evidenced "poor judgment and a lack of civility."  (*Id.* at ¶ 168.)  At the April 30 meeting, plaintiff acknowledged that he "could have made . . . other choices in his communications with his colleagues and in his letter to the Mayor about CJ Butler."  (*Id.* at ¶ 167.)[8]  Plaintiff agreed to extend a public apology to Chief ALJ "for the tone of certain communications in 2005 and an email [he] sent in 2007." (Defs.' Ex. at 14 at 3.)

On May 2, 2007, plaintiff's initial two-year term expired.  On that day, he was notified that the Commission had not yet reached its decision, and that pursuant to 6 D.C. CODE MUN. REGS. § 3705.26, he would remain at OAH at his same salary grade and step but would receive non-judicial assignments as determined by the Chief Judge's office.  (Amd. Compl. ¶¶ 173-74.)

On May 22, 2007, Chief ALJ Butler made an additional submission to the Commission and recommended that plaintiff *not* be reappointed.  (*Id.* at ¶¶ 178-180; Defs.' Ex. 12.).

Commissioner Lavine's term then expired, and the Mayor requested that the Commission not act on plaintiff's reappointment application until a new Commissioner was selected to fill the vacancy.  (Amd. Compl. ¶ 190.)  On June 27, 2007, a superior court judge, Anita Josey-Herring, was appointed to fill the vacancy.  (*Id.* at ¶ 191.)

---

[8] Plaintiff now maintains that these communications were not improper.  (Amd. Compl. ¶ 167.)

On August 7, 2007, the Commission provided written notice to plaintiff, pursuant to D.C. CODE § 2-1831.01 and 6 D.C. CODE MUN. REGS. § 3705.17, of the "grounds for possible denial of your reappointment." (Defs.' Ex. 13 at 1; Amd. Compl. ¶ 199-200.)  The letter provided plaintiff with specific concerns the Commission had regarding his performance during his initial two-year term as an ALJ.  (Defs.' Ex. 13 at 2-4.)  The notice also informed plaintiff of his right to appear before the Commission, to have individuals appear before the Commission on his behalf, and to submit documents in support of his reappointment.  (*Id.* at 4.)

On August 22, 2007, plaintiff responded to the Commission's notice with a twenty-two page written response and requested an opportunity to appear before the Commission.  (Defs.' Ex. 14.)  He was subsequently advised of the hearing and allotted three hours in which the Commission would hear from him and any individuals whom he wanted to present to the Commission.  (Defs.' Ex. 16 at 1.)  Plaintiff was also informed that he would not be allowed to be present while statements were being made to the Commission and that the meeting was not open to the public.  (*Id.* at 2.)  The Commission further informed plaintiff that the following individuals were expected to appear before the Commission: Christine Davis, General Counsel, Department of Public Works (DPW), Office of the Attorney General (OAG); Deputy Chief ALJ Mark Poindexter (OAH); Principal ALJ Janet Mahon (OAH); Principal Administrative Law Judge Ann Yahner (OAH); Principal ALJ Jennifer Long (OAH); Principal ALJ John Dean; and ALJ Savannah Little (OAH).  (*Id.*)

Starting October 4, 2007, the Commission held a series of meetings regarding plaintiff's reappointment, hearing from a number of persons.[9]  (Amd. Compl. ¶ 207; Defs.' Ex. 15 at 3.)  Plaintiff's written request to attend the October 4 meeting was denied.  (Amd. Compl. ¶ 207.)

---

[9] Those witnesses provided reasons for the Commission to deny plaintiff's reappointment application. (*See* Defs.' Ex. 15 at 3 (recounting statements by Davis that plaintiff had "poor interaction with staff"

Plaintiff submitted additional materials to the Commission on October 1, 11, and 15, 2007.  (*See* Defs.' Ex. 15 at 2; *see also* Defs.' Ex. 17.)

On October 11 and 15, 2007, plaintiff appeared again before the Commission.  (Amd. Compl. ¶ 210.)  Combined, those meetings lasted more than seven hours.  (*Id.* at ¶ 176.)  Plaintiff was offered the opportunity to present witnesses on his behalf but declined to do so.  (Defs.' Ex. 16.)

The Commission ultimately determined not to reappoint plaintiff, and, on October 30, 2007, "issued an eight page decision denying plaintiff's application for reappointment."  (Amd. Compl. ¶ 215; Defs.' Ex. 15 at 8.)  The Commission cited, *inter alia*, "a pattern of conduct on [his] part that indicates a lack of judicial temperament and judgment in the conduct of [his] judicial duties which are quintessential requirements of [plaintiff's] position."  (Defs.' Ex. 15 at 8 (citing D.C. CODE § 2-1831.08(d)(5); 6 D.C. CODE MUN. REGS. § 3703.5).)

On May 1, 2008, plaintiff filed suit, alleging that defendants, in declining to reappoint him to a ten-year term as an ALJ, violated his First Amendment rights by retaliating against him for testifying before the D.C. Council in February 2006 and making a private disclosure to the Council's staff in February 2007.  (Amd. Compl. ¶¶ 221-233 (Count I).)  Plaintiff also alleges that defendants violated his First Amendment and Equal Protection rights "to file and prosecute a lawsuit."  (*Id.* at ¶¶ 234-246 (Count II).)  Plaintiff further alleges that defendants violated his rights to Equal Protection and substantive and procedural due process.  (*Id.* at ¶¶ 247-256 (Count

---

which led to "complaints regarding [his] handling of DPW cases from about half of the DPW inspectors," and that he was "rude often dismissive of individuals, not interested in hearing both sides and not allowing individuals to present their cases"); *id.* (recounting statements by Judge Poindexter that plaintiff displayed "continued intemperate behavior"); *id.* at 3 n.5 (recounting Judge Little's statement that her request to be removed from plaintiff's email distribution list "because [his] emails were a distraction" was ignored by plaintiff); *id.* at 4 (recounting statements by other ALJs who commented on plaintiff's "refusal to be a team player" and use of "intense personalized attacks on the integrity and character of the Chief Judge in [his] emails").

III).)  Finally, plaintiff alleges that defendants violated the D.C. Whistleblower Protection Act

("WPA"), D.C. CODE §§ 1-615.51 *et seq.*, (Amd. Compl. ¶¶ 257-273  (Count IV)), and

committed the tort of intentional infliction of emotional distress and wrongful retaliation in

violation of public policy.  (*Id.* at ¶¶ 274-288 (Count V).)[10]

Plaintiff seeks to have this Court: (1) declare that defendants violated plaintiff's

constitutional rights; (2) enjoin defendants from retaliating against plaintiff for past and future

protected disclosures and activities; (3) reinstate plaintiff at OAH for a ten-year term as an

Administrative Law Judge, or, order defendants' to pay damages for a ten-year term and a

subsequent six-year term of office; (4) reinstate plaintiff's seniority rights; (5) order record

correction and expunction; (6) order retroactive payment of lost wages and benefits, including

back pay and interest on back pay; (7) award compensatory damages in excess of

$1,000,0000.00 for each defendant; (8) award pre-judgment and post-judgment interest; (9)

award punitive damages no less than ten times the amount of compensatory damages; (10) award

attorneys' fees and costs, and (11) take disciplinary action against defendants and order a civil

fine of up to $1,000 against each defendant that violated the D.C. Whistleblower Act.  (*Id.* at 58-

60.)  In his motion for preliminary injunction, plaintiff also seeks the Court order that OAH

adopt new regulations and rescind its existing regulations.  (Pl.'s Mot. at 43-44.)

---

[10] Plaintiff's prolix 60-page amended complaint with more than 300 numbered paragraphs represents a "throw it against the wall" with the hope that something will "stick" approach.  "Such advocacy is lamentable and serves only to delay the Court's consideration of claims that might have merit."  *Save Our Schools Southeast & Northeast v. District of Columbia Bd. of Ed.*, 2006 WL 1827654, *1 n.3 (D.D.C. 2006).

ANALYSIS[11]

## I.   IMMUNITY

When a plaintiff sues a government agent in his or her official capacity, and the defense

of qualified immunity is raised, that plaintiff must overcome that defense in order to survive a

Rule 12(b)(6) motion to dismiss.  *See Jackson v. Bush*, 448 F. Supp. 2d 198, 200 (D.D.C.

2006).[12]  In this case, the individual defendants argue that they are entitled to qualified immunity

because their actions did not violate clearly established law.  (Defs.' Renewed Mot. to Dismiss at

8-10 (citing *Pearson v. Callahan*, 129 S. Ct. 808, 822 (2009)).)[13]

Claims of qualified immunity are matters of law for the Court to decide "at the earliest

possible stage in litigation."  *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quotation marks and

citation omitted).  An official protected by qualified immunity enjoys "*immunity from* suit rather

than a mere defense to liability," which is "effectively lost if a case is erroneously permitted to

go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

---

[11] As a preliminary matter, the Court overrules plaintiff's meritless objection regarding the authentication of the District's exhibits.  (*See* Pl.'s Opp'n at 46.)  As previously noted (*see supra* note 1), these documents were referenced in plaintiff's complaint, were authored or received by plaintiff, or do not need to be authenticated.  For instance, defendants' exhibit 1 is a "public record under Fed. R. Evid. 803(8) and is therefore admissible.  Defendants' exhibit 6 is admissible as a party-opponent admission under Fed. R. Evid. 801(d)(2)(A).  Plaintiff himself submits and relies upon several of the documents to which he objects, including defendants' exhibits 6, 7, 9, 11, 12, 13, 14, 15, and 16.  Moreover, Chief ALJ Butler's sworn declaration is sufficient to authenticate defendants' exhibits 2-5 and 7-17.  *See Moncada v. Peters*, 579 F. Supp. 2d 46, 51 (D.D.C. 2008) (explaining that under Fed. R. Evid. 901, a proponent "need only offer proof sufficient for a reasonable fact finder to conclude that the evidence in question is what the proponent says it is").

[12] Plaintiff's assertion that certain defendants "admitted" that they lack immunity for their actions (*see* Amd. Compl. ¶¶ 23-24) is wholly irrelevant, as the determination of immunity is a legal question for the Court to determine.  *See Pitt v. Dist. of Columbia*, 491 F.3d 494, 509 (D.C. Cir. 2007) (explaining that the "ultimate legal question of whether a defendant is entitled to qualified immunity" properly belongs to the judge, not the jury).

[13] The Individual Defendants also argue that, as *quasi* judicial officers, they are entitled to absolute immunity.  (Defs.' Renewed Mot. to Dismiss 14-18.)  The Court need not decide this issue, however, because it finds that qualified immunity protects them from liability.

In selecting, reappointing, and disciplining ALJs, the Commission Members perform discretionary functions.  Under D.C. law, the Commission Members "shall have protection from liability as provided in § 2-415(b-1)."  D.C. CODE § 2-1831.06(d); *see also* D.C. CODE § 2-415(b-1) ("The District of Columbia shall defend and indemnify members of the [Commission], established by § 2-1831.06, from claims and suits in law or equity arising from acts or omissions in the course and scope of their official duties, other than willful or bad faith misconduct.").  The Commission Members receive no salary for their service, D.C. CODE § 2-1831.07(e), and the risk of personal liability would hinder the government's ability to fill positions like those on the Commission, as few qualified persons would be willing to assume this responsibility with the accompanying risk of personal liability.  *Simons v. Bellinger*, 643 F.2d 774, 782 (D.C. Cir. 1980) ("Perhaps, without this immunity, membership on the [Commission] would be transformed from a distinguished achievement in public service into an invitation to become a defendant in costly, time-consuming litigation."); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (discussing "the general costs of subjecting [government officials] to the risks of trial – distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service") (citing *Harlow v. Fitzgerald*, 457 U.S. 809, 816 (1982)).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006).  To determine whether qualified immunity applies, the Court looks to (1) whether plaintiff's allegations, if taken as true, show that the official's conduct violated a constitutional or statutory right, and (2) whether that right was "clearly established" at the time

of the defendant's alleged misconduct.[14]  *Saucier*, 533 U.S. at 201.  Qualified immunity applies unless the official's conduct violated such a right.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

If "no constitutional right would have been violated were the allegations established," the court must grant the motion to dismiss.  *Saucier*, 533 U.S. at 201.  However, if the alleged facts do state a violation, the court then examines whether that right was "clearly established" at the time of the violation.  *Id.*

For the reasons stated below, the Court finds that the facts alleged, taken in the light most favorable to plaintiff**,** fail to state a claim of constitutional wrongdoing by any of the defendants, including the District.  Having concluded that plaintiff's allegations do not show a violation of any constitutional right, the Court need not determine whether the right infringed was "clearly established" such that qualified immunity applies.  *Id.* ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

But even assuming that plaintiff had alleged a cognizable constitutional violation, the Court concludes that the individual defendants would nonetheless be shielded by qualified immunity because, based on the facts alleged in the complaint and for the reasons discussed more fully below, a reasonable official in defendants' situation could have believed that his or her conduct did not violate plaintiff's constitutional rights.  *See Johnson v. District of Columbia*, 445 F. Supp. 2d 1, 10 (D.D.C. 2006).

---

[14] The Court may exercise its discretion to address the two-prong inquiry in whatever sequence it deems appropriate. *See Pearson v. Callahan*, 129 S. Ct. 808, 817 (2009).

## II.      FIRST AMENDMENT CLAIM: COUNT I

The Court first addresses plaintiff's First Amendment claims, brought under 18 U.S.C.

§ 1983.  Count I alleges that defendants violated plaintiff's First Amendment right to free speech

by retaliating against him for disclosing to the D.C. Council and its staff the existence of "a

secret and misnamed 'peer review' system that delayed and coerced decisions at OAH."  (Amd.

Compl. ¶¶ 221-233.)  Count II alleges that defendants violated plaintiff's First Amendment right

to petition the government for regress of his grievances as a private citizen by failing to reappoint

him in retaliation for his prosecution of "a public interest lawsuit . . . for fraud and unfair trade

practices that an interstate, dry cleaning chain in plaintiff's neighborhood persisted in for seven

years."  (*Id.* at ¶¶ 234-246.)  The Court finds plaintiff's speech is not protected and will therefore

dismiss Counts I and II for failure to state a claim.

Government employees do not relinquish all of their First Amendment rights by reason of

their public employment.  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  However, the

government has legitimate interests in regulating its employees' speech, and its employees "by

necessity must accept certain limitations on [their] freedom."  *Garcetti v. Ceballos*, 547 U.S.

410, 418 (2006).  Without "a significant degree of control over their employees' words and

actions," government employers would have "little chance for the efficient provision of public

services."  *Id.*

To establish that his speech is protected under the First Amendment, plaintiff must prove:

(1) he spoke as citizen on a matter of public concern; (2) his interest in expressing himself on

that matter is outweighed by the injury that speech could cause to the employer's operations; (3)

his speech was a substantial or motivating factor in prompting the retaliatory or punitive act; and

(4) plaintiff must rebut the employer's showing, if made, that it would have reached the same

decision in the absence of the protected speech.  *Pickering*, 391 U.S. at 568; *Garcetti*, 547 U.S. at

418 .  The first two prongs of this test are matters of law for the court to resolve, and the latter

two are questions of fact ordinarily left to the jury.  *Hall v. Ford*, 856 F.2d 255, 258 (D.C. Cir.

1988).[15]

Count I is based on plaintiff's claim that he was not reappointed as an ALJ on account of

his February 2006 public testimony before the D.C. Council and his February 2007 private

disclosure to the D.C. Council staff.  (Amd. Compl. ¶ 222.)  The Court concludes that the

_____

[15]        Given the Court's resolution as to the first two factors, under *Pickering*, it need not decide if
plaintiff's communication with the D.C. Council (Count I) or his private lawsuit (Count II) were
substantial or motivating factors in the Commission's decision not to reappoint plaintiff to another term.
The Court nonetheless is persuaded that the decision not to reappoint plaintiff was a proper exercise of
supervisory authority over an employee for cumulative acts of poor judgment that reached the stage of
willful insubordination.
           The Commission's eight-page decision does not rely upon plaintiff's communications to the D.C.
Council or plaintiff's private lawsuit and cites a host of otherwise valid reasons for the Commission's
decision.  (*See* Defs.' Ex. 15 at 8 (concluding that "in the discharge of [his] judicial duties [plaintiff]
engaged in behavior that was unprofessional and inappropriate"); *id.* (finding plaintiff's work
communications that "accused the Chief Judge of having a 'low level of ethics" and of being
"incompetent and ethically challenged" were inappropriate); *id.* (citing "a pattern of conduct on
[plaintiff's] part that indicates a lack of judicial temperament and judgment in the conduct of [his] judicial
duties, which are quintessential requirements of [the] position").)
           Moreover, well-documented criticism of plaintiff's job performance predated his disclosures to
the D.C. Council.  *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005) ("Evidence
of an employer's concerns about an employee's performance before the employee's protected activity
undercuts a finding of causation.").  Plaintiff was "counseled on numerous occasions" regarding his work
performance, both formally and informally, starting on June 8, 2005 (about one month after he starting
working at OAH), again on August 3, 2005, and "a number of [other] times to discuss matters related to
[his] performance."  (Defs.' Ex. 15 at 3 n.5.)  His performance evaluation for the time period from May 2,
2005, to September 30, 2006, also states that plaintiff "needs improvement" in his judicial temperament
and teamwork.  (Defs.' Ex. 8A at 5-15.)  *See Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir.
2008) (rejecting retaliation claim and documenting, *inter alia*, plaintiff's "disregard of" orders, "emailing
of grievances about [his supervisor] to a colleague," and "failure to comply with instructions or respect
[his supervisor's] authority"); *Gonzalez v. Bolger*, 486 F. Supp. 595, 602 (D.D.C. 1980) (finding plaintiff
failed to establish that he was terminated in retaliation for his discrimination complaints, where the
termination "was the final step in a measured series of disciplinary responses that began prior to
plaintiffs' [protected activities]").
           Finally, plaintiff's D.C. Council testimony in February 2006 occurred more than twenty months
prior to the Commission's decision not to reappoint plaintiff, and his superior court lawsuit was filed
more than two years prior to the decision.  *See Farris v. Clinton*, 602 F. Supp. 2d 74 (D.D.C. 2009)
(temporal proximity must be "very close, *i.e.*, closer than three or four months" to give rise to a
reasonable inference of causality).

communications at issue, which focus on plaintiff's critique of the peer review system,[16] are not, as a matter of law, protected by the First Amendment, since plaintiff was not speaking as a private citizen on matters of public concern.  *See Pickering*, 391 U.S. 563.

The threshold question for a public employee's First Amendment claim is "whether the employee spoke as a citizen on a matter of public concern."  *Garcetti*, 547 U.S. at 418.  If so, the speech is protected unless the government can justify treating its employees differently from other citizens.  But if the employee spoke "pursuant to [his] official duties," he cannot claim constitutional protection.  *Id.* at 421 (finding that a district attorney did not speak as a private citizen when he wrote a memo that was "part of what he, as a calendar deputy, was employed to do").

"Whether employees spoke pursuant to their official duties, and thus receive no First Amendment protection, is a 'practical' inquiry – focusing not on formal job descriptions, but on the employees' actual responsibilities."  *Thompson v. Dist. of Columbia*, 530 F.3d 914, 916 (D.C. Cir. 2008) (quoting *Garcetti*, 547 U.S. at 424); *see also Garcetti*, 547 U.S. at 424-25 ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties."); *Williams v. Johnson*, 537 F. Supp. 2d 141, 151-52 (D.D.C. 2008) (finding that plaintiff "did not speak as a citizen" when she testified before the Council, even though her job description did not require her to report to or testify before the Council).

---

[16] In addition to the alleged deficiencies in OAH operations, plaintiff often complained to his supervisors, co-workers, the Commission, and the Mayor about a myriad of issues, including everything from "ongoing deceit" regarding his initial appointment date (Defs.' Ex. 4 at 2-3) to placement in an office on the floor of a building where "staff members have been suffering from mysterious illnesses [and] suspect mold." (Defs.' Ex. 2 at 17 n.3.)  Count I, however, relies solely on the February 2006 and February 2007 disclosures to the D.C. Council and its staff.

This case is a classic example of a plaintiff pleading himself out of court by alleging a host of facts that only serve to totally undercut his claims. *See Trudeau v. FTC*, 456 F.3d 178, 193 (D.C.Cir.2006) (noting that it "is possible for a plaintiff to plead too much: that is, to plead himself out of court by alleging facts that render success on the merits impossible") (quoting *Sparrow v. United Air Lines, Inc*., 216 F.3d 1111, 1116 (D.C.Cir.2000)).  Based on plaintiff's undisputed facts as pled in his papers, he has affirmatively shown that he was *not* speaking as a private citizen when he testified before the D.C. Council, but he was speaking pursuant to his job duties.

First, plaintiff repeatedly identified himself in his professional capacity rather than his personal capacity.  The cover sheet of plaintiff's written testimony explicitly identified him as "Roy L. Pearson, Jr., Administrative Law Judge, D.C. Office of Administrative Hearings." (Defs. Ex. 6 at 1.)  Plaintiff also identified himself in his written and oral testimony as "an Administrative Law Judge (or 'ALJ') with the D.C. Office of Administrative Hearings" (*id.* at 2), and his title on the televised program reads, "Administrative Law Judge, OAH." http://www.octt.dc.gov/services/on_demand_video/channel13/February2006/02_13_06)JUDICI_1.asx; *see also id.* ("My name is Roy Pearson.  I am an administrative law judge, or ALJ, with the D.C. office of Administrative Hearings.").

Second, plaintiff's testimony before the D.C. Council concerned only the subject matter of his employment.  During the testimony, plaintiff spoke about his personal experiences working inside OAH and expressed his subjective beliefs as to how OAH should be run.  As such, his testimony represented an employee's specific recommendations regarding internal office policy that directly related to his job.  *See Thompson*, 530 F.3d at 916 ("Ordinarily, employees who make recommendations to their supervisors on subjects directly related to their

jobs are carrying out their official duties and thus receive no First Amendment protection.");
*Davis v. McKinney*, 518 F.3d 304, 313 n.3 (5th Cir. 2008) ("[T]he caselaw is unanimous in
holding that employee's communications that relate to his own job function up the chain of
command, at least within his own department or division, fall within his official duties and are
not entitled to First Amendment protection.").

Most significantly, however, the pleadings show that plaintiff's testimony arose from his
job duties, as an ALJ, to comment upon and shape OAH policy.  *See* D.C. CODE § 2-1831.09(a)
(stating ALJ is required to "[f]ully participate in . . . management activities to set and steer
policies relating to Office operations").  By his own description, plaintiff's job responsibilities
included commenting upon policies related to OAH operations.  (*See, e.g.*, Amd. Compl. ¶ 106
("The OAH Code of Ethics requires that 'An Administrative Law Judge shall participate in
establishing, maintaining and enforcing high standards of conduct and shall personally observe
those standards of conduct . . .") (quoting Chpt. I(B)); *Id.* ¶ 107 ("[T]the OAH Code of Ethics
requires that ALJs 'take appropriate action or initiate appropriate disciplinary measures against
an Administrative Law Judge . . . for unprofessional conduct of which he may become
aware.'").)  Plaintiff thus concedes that his job "require[d]" him to speak out about what he
perceived was unprofessional or unethical conduct."  (*Id.* at ¶ 61.)

Plaintiff further alleges that he was acting in furtherance of those duties by exposing the
existence of the peer review system, critiquing the use of that system, and complaining about
other related issues.  (*See, e.g.,* Pl.'s Mot. for Expedited Ruling at 20 ("As a District of Columbia
employee plaintiff was *required* to make the Whistleblower disclosures he made.") (emphasis in
original)[17]; Amd. Compl. ¶ 95; Defs.' Ex. 2 (characterizing his research regarding the peer

---

[17] Because the Court addresses only plaintiff's constitutional claims, it need not address whether
plaintiff's disclosures are protected under local law.  Despite plaintiff's apparent confusion on this issue,

review system as "a valuable service" to OAH); Amd. Compl. ¶ 112 (asserting that "the OAH

Code of Ethics obligated plaintiff to report the Chief Judge's unprofessional conduct"); Defs.'

Ex. 4 at 1 (explaining that his letter to the Mayor was driven by his job responsibilities: "I am

required, by statute, to comply with the requirements of the Code of Ethics for OAH

Administrative Law Judges . . . <u>Our Code of Ethics requires that I 'take appropriate action or

initiate appropriate disciplinary measures against an Administrative Law Judge . . . for

unprofessional conduct of which [I] may become aware'</u> . . . .  I am obligated, therefore, to

advise you that I am aware that the Chief Judge has engaged in unprofessional conduct by

violating multiple provisions of the Code of Ethics.") (emphasis in original); *id.* ("The conduct

that *requires* that I prepare and send this letter . . .") (emphasis added).  *See Thompson*, 530 F.3d

at 917-18 (holding that Chief of Security for D.C. Lottery Board spoke pursuant to duty to

maintain Board's financial integrity when he reported Board members' financial misconduct);

*Wilburn v. Robinson*, 480 F.3d 1140, 1151 (D.C. Cir. 2007) (holding that an employee hired "to

root out discrimination in the District government" did not speak as citizen when reporting

discriminatory hiring practices).

       Plaintiff does not dispute that his initial complaints (*i.e.*, those made prior to his February

2006 testimony before the City Council) regarding the operating procedures at OAH were a

direct part of his job duties and thus unprotected by the First Amendment.  Plaintiff does not

claim that he acted as a private citizen when he went about "prepar[ing] and deliver[ing] an

---

state laws, such as the D.C. Whistleblower Protection Act, employ standards distinct from the *Pickering*
standard that applies to alleged constitutional violations. *See, e.g.,* D.C. CODE § 1-615.52(a)(6) (defining
"protected disclosure" as "any disclosure of information, not specifically prohibited by statute, by an
employee to a supervisor or a public body that the employee reasonably believes evidences: (a) Gross
mismanagement; (b) Gross misuse or waste of public resources or funds; (c) Abuse of authority in
connection with the administration of a public program or the execution of a public contract; (d) A
violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District
government and a District government contractor which is not of a merely technical or minimal nature; or
(e) A substantial and specific danger to the public health and safety.").

extensively researched 19 page memorandum to Chief Judge Butler on how the Peer Review

process required that [plaintiff] violate the [law]" (Defs.' Ex. 7 at 3), which he wrote on official

OAH letterhead, signed "Roy L. Pearson, Jr., Administrative Law 'Judge,'" and distributed in

the workplace to his superiors and co-workers.  (*See* Defs.' Ex. 2 (characterizing his legal

analysis in the June 2005 memorandum as "a valuable service" to OAH); *see also* Defs.' Ex. 3 at

2 (referring again to the June 2005 memorandum as "a valuable service").  In the same way,

plaintiff does not claim that he spoke as a citizen by writing a July 2005 letter to the Commission

to address the peer review system, which was also written on official OAH letterhead and signed

"Roy L. Pearson, Jr., Administrative Law Judge."  (*See* Defs.' Ex. 3; *see also* Defs.' Ex. 7 at 4

(listing the letter as part of a "major contribution [he] made to realizing OAH's legislative

goals"); Defs. Ex. 7 at 3 (detailing his "constructive efforts to change [the peer review] system,

and mindset" as a "contribution to judicial independence and integrity at OAH").)  When

plaintiff went to work and performed the tasks he was paid to perform, plaintiff acted as a

government employee.  Plaintiff does not, and cannot, dispute this.

After being unsuccessful in petitioning his supervisors, his co-workers, and the

Commission, plaintiff believed, apparently based on a misreading of the law, that he could

immunize his criticism of the peer review system by petitioning the D.C. Council.  Such an

analysis was not correct, for it is clear that his supervisors retained the ability to regulate his

official speech.  *Garcetti*, 547 U.S. at 422 (The First Amendment "does not invest [public

employees] with a right to perform their jobs however they see fit.").  "Restricting speech that

owes its existence to a public employee's professional responsibilities does not infringe any

liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of

employer control over what the employer itself has commissioned or created."  *Id.* at 421-22.

Indeed, the "'internal memorandum' prepared by [plaintiff] never lost its character as speech pursuant to his official duties simply by virtue of the wider dissemination he elected to give it after his recommendations were ignored by [his supervisors]." *Andrew v. Clark*, 472 F. Supp. 2d 659, 662 n.4 (D. Md. 2007).

As the D.C. Circuit has recognized, "it would be incongruous to interpret *Garcetti*, a case concerned with allowing the government to control its employees within their jobs, as giving broader protections to disobedient employees who decide they know better than their bosses how to perform their duties." *Thompson*, 530 F.3d at 918. This Court "fails to see how the broader dissemination of precisely the same speech alters the fundamental nature of the underlying communication, such that what was once a part of the employee's official duties becomes the speech of a private citizen." *Omokehinde v. Detroit Bd. of Educ.*, 563 F. Supp. 2d 717, 728 (E.D. Mich. 2008) (finding "[p]laintiff's complaints to her supervisor about questionable Title I expenditures flowed directly from her duties and responsibilities as an employee of the Defendant School District. When her protests through the chain of command proved unavailing, she repeated precisely the same complaints to an outside audience.").

Plaintiff maintains, however, that his subsequent communication with the D.C. Council was outside of his job duties, largely because he used his annual leave, went outside his chain of command, and was identified by the Council Chairman at the outset of his testimony as a "citizen." (Amd. Comp. ¶¶ 101-02; Pl.'s Opp'n at 55 n.29.) Yet, plaintiff admits that, throughout the entire period in question, including February 2006 and February 2007, his job required him to maintain the integrity of OAH's operations and to take action when he perceived misconduct within the OAH. Moreover, plaintiff's application for reappointment discusses his testimony before the D.C. Council as an activity that plaintiff believed would "be helpful to the

Commission in the evaluation of [his] candidacy for reappointment" as an ALJ.  (*See* Defs. Ex. 7

at 1.)  In his statement, plaintiff lists his testimony as part of a "long running struggle" and "a

major contribution [he] made to realizing OAH's legislative goals."  (*See* Defs. Ex. 7 at 4; *see*

*also id.* at 11 (citing his "campaign to secure greater judicial independence for ALJs at OAH"

through the "revamp[ing of] the Peer Review process" as his "proudest contribution to OAH").

The Court finds that, in light of plaintiff's own admissions regarding his job duties and

actual job performance, the speech at issue here "owe[d] its existence to [his] professional

responsibilities."  *Garcetti*, 547 U.S. at 421; *see also Meggison v. Charlevoix County*, __ F.

Supp. 2d __, 2008 WL 5411896, at *7 (W.D. Mich. Dec. 23, 2008) ("The entire subject matter of

[plaintiff's] speech owes its existence to her role as Jail Administrator.  Her knowledge of the

issue and her obligation to help remedy the problem arose solely as a consequence of her

employment.").

Although testimony before a legislative body might otherwise be just the sort of citizen

speech protected by the First Amendment, plaintiff's repeated identification of himself in his

professional capacity, his previous advocacy on the same issue while acting in his official

capacity, and his assertions that such activism was required by and in furtherance of his job

duties deprive plaintiff of any claim of protection under the First Amendment.  Plaintiff's

complaints were made pursuant to his official job duties and thus defendants did not violate

plaintiff's First Amendment rights.  *See Thompson*, 530 F.3d at 916 ("[T]he First Amendment

places no restrictions on the government's right to punish employees for speech made 'pursuant

to their official duties.'") (quoting *Garcetti*, 547 U.S. at 421).

Where an employee is simply performing his or her job duties, as the Court has

concluded is the case here, the Court need not – and should not – proceed to balance the

competing interests.  The *Pickering* balancing test applies only if the employee spoke as a citizen on a matter of public concern.  *See Garcetti*, 547 U.S. at 418.

The Court does, however, conclude that even if plaintiff had properly alleged that he was speaking as a citizen on a matter of public concern, he could not satisfy the second prong of the *Pickering* test, which requires that plaintiff's interest, "as a citizen, in commenting upon matters of public concern," outweighs the employer's interest, "as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering*, 391 U.S. at 568. In performing this balancing test, courts must take "the content, manner, time and place of the speech . . . into account in weighing the governmental interest in regulating the speech." *O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C. Cir. 1998).

Government employers are afforded sufficient discretion to manage their operations.  "A government entity has broader discretion to restrict speech when it acts in its role as employer" so long as the restrictions are "directed at speech that has some potential to affect the entity's operations."  *Garcetti*, 547 U.S. at 418.  "Employers have heightened interests in controlling speech made by an employee in his or her professional capacity.  Official communications have official consequences, creating a need for substantive consistency and clarity.  Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission."  *Id.* at 423.  To that end, government employers have a "strong state interest" in avoiding "interference with work, personnel relationships, or the speaker's job performance [which can] detract from the public employer's function" that may outweigh the speaker's desire to express himself.  *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

Courts look to whether the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* at 388 (citing *Pickering*, 391 U.S. at 570-73).

Plaintiff argues his disclosures to the D.C. Council "*furthered* the government's efficiency interests – by exposing the defendants' efforts to frustrate the mission of the D.C. Office of Administrative Hearings" and thus the balancing test is "inapplicable." (Pl.'s Opp'n at 5 n.1 (emphasis in original).) He contends that, regarding the government interests, "there is no trade off; no countervailing interests, that have to be weighed and balanced." (Pl.'s Opp'n at 13.) This is not, as plaintiff would like to believe, a fact, but rather is nothing more than a legal conclusion, and a faulty one at that.

Here, plaintiff's public testimony and private remarks to the D.C. Council "discredited the office by [being heard] . . . in public." *AFGE v. Loy*, 332 F. Supp. 2d 218, 222-29 (D.D.C. 2004) (quoting *Am. Postal Workers Union, AFL-CIO v. United States Postal Serv.*, 830 F.2d 294, 301 (D.C. Cir. 1987). There are stronger governmental interests in regulating the speech of certain public employees because of the degree of trust and discipline required for the job. "Public employees . . . often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Garcetti*, 547 U.S. at 419. As observed by the D.C. Circuit, "[h]igh-level officials must be permitted to accomplish their organizational objective through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims." *Hall*, 856 F.2d at 263 (upholding dismissal of athletic director after he repeatedly and publicly disagreed with superiors regarding proper

response to violations of university rules).  An employee may be dismissed who "express[es]

views on matters within the core of his responsibilities that reflect[] a policy disagreement with

his superiors such that they could not expect him to carry out their policy choices vigorously."

*Id.* at 265.

Moreover, because plaintiff's speech "emerged after a persistent dispute between [him

and his supervisors] over office . . . policy," *Connick*, 461 U.S. at 154, his speech had the

capacity to exacerbate prior conflict over the same issue and to threaten his supervisors'

authority.  Plaintiff's campaign against the peer review system "interfered with the efficient

functioning" of OAH by "disturb[ing] or interrupt[ing] other employees," at whom plaintiff

directed his complaints.[18]  *Rankin*, 483 U.S. at 389; *see also Connick*, 461 U.S. at 152, n.11

(plaintiff "disrupt[ed] the routine of the office" by preparing and distributing at her workplace a

questionnaire with critical questions regarding her supervisor).  Because the speech at issue

"concern[ed] office policy" and "ar[ose] from an employment dispute concerning the very

application of that policy to the speaker," the Court gives "additional weight" to the supervisor's

view that the speech threatened his authority.  *Connick*, 461 U.S. at 153.  As the Supreme Court

has recognized, "[p]rolonged retention of a disruptive or otherwise unsatisfactory employee can

adversely affect discipline and morale in the work place, foster disharmony, and ultimately

impair the efficiency of an office or agency."  *Arnett v. Kennedy*, 416 U.S. 134, 168 (1974); *see*

*also Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir. 2008).  Plaintiff's testimony to the

D.C. Council criticized Chief ALJ Butler and other ALJs with whom plaintiff would normally be

---

[18] *See, e.g.,* Defs. Ex. 12 at 30 ("I am sick of this.  I asked that Mr. Pearson not send me these nasty, derogatory, inflammatory statements.  This goes beyond unprofessional conduct.  This type of conduct is distracting and intolerable."); *id.* at 32 ("I have refrained and will continue to refrain from responding to your e-mails because I find your approach to raising issues (regardless of whether they merit our attention) to be quite confrontational, demeaning and not in the collegiate manner that we, in OAH, have worked to establish.").

in contact in the course of his daily work and thus jeopardized the harmony of the office. *Cf.*

*Pickering*, 391 U.S. at 569-70 (there, the speech was "in no way directed towards any person

with whom [plaintiff] would normally be in contact in the course of his daily work").

Defendants need not wait for "events to unfold to the extent that the disruption of the

office and the destruction of working relationships is manifest before taking action." *Connick*,

461 U.S. at 152. Instead, they were free to act in response to plaintiff's harmful speech,

particularly here where his speech is "most accurately characterized as an employee grievance

concerning internal office policy," and thus "touch[es] upon matters of public concern in only a

most limited sense," if at all. *Id.* at 152-54.

The Court therefore concludes that the governmental interests far outweighs any

conceivable countervailing interests, and for this reason as well, plaintiff's communications with

the D.C. Council were not protected speech.

## III.     FIRST AMENDMENT CLAIM: COUNT II

In Count II, plaintiff alleges that he was retaliated against because he filed and prosecuted

a public interest lawsuit. (Amd. Compl. ¶¶ 4, 19-39, 64-90, 127-31; Pl.'s Opp'n at 6.) Plaintiff

filed the lawsuit in the District of Columbia Superior Court, seeking approximately $65 million

dollars in damages relating to one pair of pants allegedly misplaced by a small dry cleaners

establishment in Washington, DC.

To constitute protected speech, plaintiff's lawsuit must address a matter of public

concern, *i.e.*, "of political, social, or other concern to the community." *Connick*, 461 U.S. at 146;

*see Pickering*, 391 U.S. 572; *see also Rendish v. City of Tacoma*, 123 F.3d 1216, 1221 (9th Cir.

1997) (holding that public employee's suit "must involve a matter of public concern" to be

protected under the First Amendment); *Zorzi v. County of Putnam*, 30 F.3d 885, 896 (7th Cir.

1994) ("If a public employee is retaliated against for filing a lawsuit, the public employee has no

First Amendment claim unless the lawsuit involves a matter of public concern."); *see also Berndt*

*v. Jacobi*, 978 F.2d 1261 (7th Cir. 1992) ("This court has considered the question, and

determined that not every lawsuit, just by virtue of its existence, presents a matter of public

concern.").

　　　"Whether an employee's speech addresses a matter of public concern must be determined

by the content, form, and context of a given statement, as revealed by the whole record."

*Connick*, 461 U.S. at 147-48.  The employee's "personal motivation" for his speech, although

not dispositive, is "certainly a factor in the public-concern analysis."  *O'Donnell*, 148 F.3d at

1134.

　　　A review of the nature of, and motivation behind, plaintiff's lawsuit demonstrates that

plaintiff was not on a mission to protect the public welfare.  "[A]ll the claims in [plaintiff's]

Amended Complaint relate[d] only to him" and he sought "relief solely on his own behalf."  *See*

*Pearson v. Chung et al.*, Dkt. No. 05 CA 4302 B, Findings of Fact and Conclusions of Law, 4

(June 25, 2007) (Bartnoff, J.).[19]  His lawsuit was, in the words of the superior court judge, "a

one-victim case involving a single pair of lost suit pants."  *See Pearson v. Chung et al.*, Dkt. No.

05 CA 4302, Order Denying Plaintiff's "Motion to Amend and Supplement Complaint," 3 (Nov.

20, 2006) (Kravitz, J.) (noting that "the first amended complaint contains no factual allegations

concerning any injuries suffered by other customers as a result of the defendants' alleged CPPA

violations and seeks no money damages, in its prayer for relief or elsewhere, for anything other

than the injuries allegedly suffered by the plaintiff").

---

[19] The Court may take judicial notice of public documents, such as court records, without converting the
motion to dismiss into a motion for summary judgment. *Munoz v. Bd. of Trustees*, 590 F. Supp. 2d 21, 25
n.3 (D.D.C. 2008).

The mere fact that plaintiff characterizes his status as that of a private attorney general does not alter the general nature of his lawsuit, which more properly should be characterized as a personal vendetta against a dry cleaners over a pair of pants. *See Pearson v. Chung et al.*, Dkt. No. 05 CA 4302, Order Granting in Part and Denying in Part (1) Plaintiff's Motion Addressing Trial-Related Issues and (2) Defendants' Motion in Limine (Mar. 23, 2007) (barring evidence relating to unclaimed or other clothing on defendants' premises because "the only claim in this case relates to one pair of pants belonging to the plaintiff"). In fact, plaintiff's request to "amend and supplement the Complaint to assert claims as a private attorney general on behalf of potentially thousands of other consumers" was denied. *Id.* (noting the "claims in this case involve [plaintiff] alone"); *see also Pearson v. Chung et al.*, Dkt. No. 05 CA 4302, Order Denying Plaintiff's "Motion to Amend and Supplement Complaint," 3 (Nov. 20, 2006) (Kravitz, J.) (noting that "plaintiff has not identified by name a single other victim of the defendants' alleged unfair trade practices or described, in an affidavit or otherwise, a single occurrence in which the defendants' unlawful conduct has injured another customer").

Because plaintiff's lawsuit did not involve a matter of public concern, his prosecution of the private lawsuit cannot constitute protected activity under the First Amendment as a matter of law.[20] Plaintiff has other avenues for relief, including the powerful network of legislative

---

[20]     Moreover, there is strong reason to doubt whether plaintiff can rebut the government's showing that its reasons for denying his request for reappointment were not based on the lawsuit he filed. The Commission's final decision explicitly declined to reach the issue of plaintiff's manner of prosecuting his lawsuit. (*See* Defs.' Ex. 15 at 2 n.2) ("Although the Commission questions the wisdom of the manner in which you prosecuted your lawsuit, the Commission does not reach this issue. Rather, the Commission has looked at your performance as an ALJ over the entire two year period of your initial appointment."). *See also supra* note 14.
        Likewise, there is a strong basis for a finding that the plaintiff's interest in pursuing his lawsuit was outweighed by his employer's interest in maintaining the integrity of OAH and its judiciary. *See* Code of Ethics, Chapter II, Section B (stating that ALJ shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the administrative judiciary); *id.* at Section D (stating that ALJ shall not lend the prestige of the office to advance private interests). Plaintiff's litigation tactics were criticized by the presiding judge who noted plaintiff's "misrepresentations" and expressed

enactments – such as whistleblower protection laws and labor codes – that are available to those who seek to expose wrongdoing.  The Court rejects, however, the notion that the First Amendment shields plaintiff from unfavorable employment action in this instance.

## IV.     FIFTH AMENDMENT DUE PROCESS CLAIM: COUNT III

Count III alleges that defendants violated plaintiff's Fifth Amendment rights by denying plaintiff procedural and substantive due process when deciding whether to reappoint him as an administrative law judge.[21]

The due process clause provides that "no person shall be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. v.  "The procedural due process guarantee imposes procedural requirements on the government before it deprives individuals of protected interests."  *Richard Milburn Pub. Charter Alternative High Sch. v. Cafritz*, 798 A.2d 531, 541 (D.C. 2002) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).  "When protected

---

"significant concerns that the plaintiff is acting in bad faith and with an intent to delay the proceedings." *Pearson v. Chung et al.*, Dkt. No. 05 CA 4302, Order Denying Plaintiff's "Motion to Amend and Supplement Complaint," 4-5 (Nov. 20, 2006) (Kravitz, J.).  The presiding judge described the lawsuit as "an unusual case, in which the plaintiff attempted to take what was at best a misunderstanding about one pair of pants and expand it to a claim of $67 million, based on legal theories that – once they clearly were articulated – were unsupported in fact or in law."  *Pearson v. Chung et al.*, Dkt. No. 05 CA 4302 B, Order Denying "Plaintiff's Motion in Opposition to Bill of Costs" and Plaintiff's Request for Attorney's Fees (Aug. 16, 2007) (Bartnoff, J.).  Additionally, because the lawsuit drew intense public criticism, OAH "had to divert its already over-taxed resources to answer scores of media inquiries from national and international news organizations, and private citizens from around the world."  (Defs.' Ex. 12 at 3.)  *See also Am. Postal Workers Union, AFL-CIO v. United States Postal Serv.*, 830 F.2d 294, 304 n.12 (D.C. Cir. 1987) (nothing "there are cases where the harmful nature of speech is so apparent that no evidentiary inquiry need be made into actual disruption of the employer's responsibilities to the public") (internal quotation marks omitted).

[21] Plaintiff fails to respond to defendants' argument in favor of dismissal of his Equal Protection Claim. The Court will therefore dismiss this claim as conceded.  *See Hopkins v. Women's Div., General Bd. of Global Ministries*, 284 F.Supp.2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 Fed.Appx. 8 (D.C.Cir. 2004); *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F.Supp.2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.").

interests are implicated, the Constitution requires notice and opportunity for hearing appropriate to the nature of the case." *Id.* (citation and internal quotation marks omitted).

Plaintiff's procedural due process claims must fail as a matter of law.  Generally, procedural due process requires only that the government provide "notice and opportunity for hearing." *See, e.g., Jones v. Flowers*, 547 U.S. 220, 223 (2006).

Plaintiff maintains that he had an expectation of continuation in office as an ALJ which amounted to a property interest entitling him to the full panoply of due process protections during the evaluation by the Commission of his candidacy for reappointment, and that he was denied those protections.  He argues that he was provided "virtually none" of the process due him (Pl.'s Opp'n at 22), and that the Commission Members failed "to provide even the bare minimum of due process."  (*Id.* at 44.)

Contrary to plaintiff's argument, this Court concludes that plaintiff did not have a property interest which entitled him to the full panoply of due process.  *See Halleck v. Berliner*, 427 F. Supp. 1225, 1235 (D.D.C. 1977) ("The process which must be afforded by the Commission in connection with the evaluation of a candidate for reappointment as a judge is less than the full panoply of protections accorded in a criminal trial.").  He did, however, have an interest in possible reappointment which entitled him to a thorough and fair evaluation of his candidacy by an impartial Commission, and plaintiff was entitled to such process as would insure that the Commission's evaluation of his candidacy for reappointment was thorough and fair.  *Id.*

In *Halleck*, the court found that the plaintiff, a superior court judge who was denied reappointment, had been accorded due process, because the Commission had notified him of the areas of its concern, advising him of the specific incidents that gave rise to such concern, and had

afforded him a day-long hearing and an opportunity to respond to the Commission's inquiries through documents and testimony.  *Id.* at 1236.

Similarly, plaintiff in this case was afforded adequate process.  The allegations, and the supporting documents, show that the Commission gave plaintiff advance notice of all the bases for the possible non-renewal of his appointment, advised him of the specific communications giving rise to such concern, referred plaintiff to the specific laws upon which it relied, and provided plaintiff with copies of every document upon which it relied.  (Amd. Compl. ¶ 165; Defs.' Ex. 13.)   Plaintiff was afforded multiple opportunities to submit evidence on his behalf, to call witnesses, to respond to the Commission's inquiries and concerns, to present argument supporting his candidacy for reappointment, and to meet with the Commission regarding his reappointment application.  (Amd. Compl. ¶¶ 159-60, 203, 206, 210, 212; Pl.'s Statement of Material Facts ¶¶ 13, 17-18, 21, 23.)[22]

Plaintiff asserts that due process required an opportunity to confront the witnesses against him and "prior disclosure of all witnesses."  (Pl.'s Opp'n at 21-22.)  Plaintiff does not have a right to confront witnesses against him, as the Confrontation Clause does not apply here.  *See Dutton v. Evans*, 400 U.S. 74, 97 n.4 (1970) (Harlan, J., concurring) (explaining that the Confrontation Clause applies only to criminal prosecutions); *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 574 n.22 (1996) ("The strict constitutional safeguards afforded to criminal defendants are not applicable to civil cases . . .").  Contrary to plaintiff's claim, "a candidate for reappointment need not be given the right to examine or cross-examine every person who gave any information, favorable or unfavorable, to the Commission or any of its members with respect

---

[22] Plaintiff submitted a fifteen-page written response to the Commission on April 19, 2007 (Defs.' Ex. 11) and another twenty-two page written response on August 22, 2007.  (Defs.' Ex. 14.)  He submitted additional materials to the Commission on October 1, 11, and 15, 2007.  (*See* Defs.' Ex. 15 at 2; *see also* Defs.' Ex. 17.)

to the candidate's performance in office or fitness for reappointment." *Halleck*, 427 F. Supp. at 1236. Accordingly, the Commission's decision not to allow plaintiff to confront witnesses cannot serve as the basis for plaintiff's due process claim.

Moreover, there is no statutory basis for plaintiff's claim that the OAH Act "prohibits the Chief ALJ from using subjective evaluation standards as measures of an ALJ's performance." (Pl.'s Mem. 8 n.2.)[23] Nor is there any support in the case law for this novel proposition. *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) ("[E]mployers may of course take subjective considerations into account in their employment decisions . . . ) (en banc); *Vasilevsky v. Reno*, 31 F. Supp. 2d 143, 151 (D.D.C. 1998) ("An employer is entitled to rely on his perception of an employee's work performance.").

Nor may plaintiff rest his due process claim on the Commission's failure to meet a statutory deadline for a vote on plaintiff's reappointment.[24] A "mere violation of law does not give rise to a due process claim." *AFGE, AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341, 353 (D.C. Cir. 2007); *see Duckett v. Quick*, 282 F.3d 844, 848 (D.C. Cir. 2002) (holding due process

---

[23] The statute cited by plaintiff, D.C. CODE § 2-1831.05(a)(10), states, in its entirety, that the Chief ALJ shall: "Develop and implement annual performance standards for the management and disposition of cases assigned to Administrative Law Judges, which shall take account of subject matter and case complexity." Nothing in that section prohibits the Chief ALJ from considering subjective factors. The other statute relied upon by plaintiff, D.C. CODE § 2-1831.10(b) states, in relevant part,

> [T]he Chief Administrative Law Judge shall prepare a record of the Administrative Law Judge's performance with regard to that judge's efficiency, efficacy, and quality of performance over the period of his or her appointment. . . . At a minimum, the record shall contain at least one year of decisions authored by the Administrative Law Judge, data on how the Administrative Law Judge has met applicable objective performance standards, the Chief Administrative Law Judge's recommendation as to whether the reappointment should be made, and any other information requested by one or more members of the Commission.

This provision, far from prohibiting subjective factors, directs the Commission to consider "all information received with regard to reappointment." *Id.*

[24] According to the Commission, it had "clearly determined that there was insufficient information on whether [plaintiff] should be reappointed" prior to the deadline. (Defs.' Ex. 15 at 2 n.1.)

was not violated by agency's failure to comply with D.C. regulations); *Brandon v. District of Columbia Bd. of Parole*, 823 F.2d 644, 648-49 (D.C. Cir. 1987) (holding that a state does not violate an individual's due process rights by deviating from its own procedures). The rules clearly contemplate that the timelines for review and reappointment may indeed go past an ALJ's initial period of appointment. *See* 6 D.C. CODE MUN. REGS. § 3705.23. Under those regulations, if a timely vote cannot occur, the ALJ applying for reappointment may "be retained as a non-judicial employee of the [OAH], without reduction in grade or step, until the Commission votes on his or her reappointment." 6 D.C. CODE MUN. REGS. § 3705.26. That is precisely what occurred here. Plaintiff "remained with OAH in the capacity of an Attorney-Advisor pending the Commission's decision with regard to his reappointment pursuant to the Commission's rules." (Defs.' Ex. 12 at 2 n.1; *see also* 6 D.C. CODE MUN. REGS. § 3705.26.) He received the same salary and was not substantially prejudiced by the delay.[25] *See Gallothom, Inc. v. D.C. Alcoholic Beverage Control Bd.*, 820 A.2d 530, 535 (D.C. 2003) ("Statutory provisions concerning the performance of duties by public officers generally are considered directory so that the interests of private parties and the public might not suffer due to the official's failure to act promptly.") (quoting *Vahn v. Dist. of Columbia Bd. of Funeral Directors & Embalmers*, 441 A.2d 246, 248 (D.C. Cir. 1982)).

Plaintiff also alleges that he was not afforded a hearing before an impartial tribunal (*see* Pl.'s Mot. at 35-37), but provides no evidence of bias. Nothing in the record indicates that plaintiff moved to have any member of the Commission recused. *Kowal*, 16 F.3d at 1276 ("[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.").

---

[25] Because plaintiff received the same salary and was not substantially prejudiced by the delay, the Court rejects plaintiff's artificial and factually incorrect attempt to claim that he lost his job as of May 2007 and was therefore due greater procedural rights prior to that date. (Pl.'s Mot. at 22-23.)

Here, as in *Halleck*, "the evaluation process adequately safeguarded plaintiff from arbitrary governmental action."  427 F. Supp. at 1237; *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) (finding that notice and "some form of hearing" are all that due process requires).   No further process was constitutionally required.

Likewise, plaintiff's substantive due process claim is meritless.  Even assuming plaintiff had a property or liberty interest, the threshold for a substantive due process violation has not been met.  The doctrine of substantive due process contains only egregious government misconduct.  The "threshold question is whether the behavior . . . [was] so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).  The conduct at issue here simply does not come anywhere near the extreme level necessary to violate substantive due process.

Count III must therefore be dismissed as a matter of law.[26]

## V.      STATE LAW CLAIMS: COUNTS IV AND V

When the federal-law claims on which a court's original jurisdiction is based have been dismissed, the court has discretion in deciding whether to exercise supplemental jurisdiction over the remaining state-law claims.  *See* 28 U.S.C. § 1367(c)(3); *Edmondson & Gallagher v. Alban Towers Tenant Ass'n*, 48 F.3d 1260, 1265-66 (D.C. Cir. 1995).

In making this determination, the court balances the traditional "values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  However, "in the usual case in which all federal-law claims are eliminated before

---

[26] Because the Court finds no basis for plaintiff's due process claims, plaintiff cannot establish a substantial likelihood of success on the merits.  The Court must therefore deny his motion for emergency injunctive relief on Count III.  *See American Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (Absent a "substantial likelihood" of success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.").

trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Id.* at 350 n.7; *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

In light of the dismissal of plaintiff's federal claims, the Court sees no reason to retain jurisdiction over the remaining claims under the D.C. Whistleblower Act and under the common law (Counts IV and V).

## CONCLUSION

For the foregoing reasons, the Court concludes that plaintiff's speech was not protected because he spoke pursuant to his official duties when he complained to the D.C. Council and because his private lawsuit was not a matter of public concern.  The Court therefore grants defendants' motion to dismiss Counts I and II.  The Court also concludes that plaintiff was afforded adequate process and therefore dismisses Count III.  For these same reasons, the Court concludes that Chief ALJ Butler and the Commission Members are shielded from liability by the doctrine of qualified immunity.  The Court declines to exercise supplemental jurisdiction and dismisses the Counts IV and V without prejudice.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   July 23, 2009